Michelle R Burrows 86160
michelle.r.burrows@gmail.com
420 SW Washington Ste. 300
Portland OR 97204
503-241-1955
503-241-3127

Jennifer L Coughlin 065781
jlc@brotherslaw.com
Brothers Hawn & Coughlin, LLP
974 NW Riverside Blvd.
Bend, OR 97703
541-382-5885
541-382-3328
            Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| RONDA MCGOWAN, Personal Representative for Estate of Brian Babb, LEE BABB, CONNOR BABB, by and through Guardian ad litem, STEPHANIE WOODCOOK, KAYLEE BABB. | Case No. |
| | COMPLAINT |
| Plaintiffs, | |
| | Civil Rights Violations; |
| v. | Unreasonable Use of Deadly Force; Battery; Wrongful Death |
| WILL STUTESMAN, OFFICER GROSE OFFICER PIESKE Sgt. MCALPINE, CITY OF EUGENE, a municipal subdivision of the State of Oregon, JANE DOE CALL TAKER, John and Jane Does 1-10 | 42 U.S.C. §1983 |
| | Demand for Jury Trial |
| Defendants | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, by and through his attorney, Michelle Burrows, Attorney at Law, bring their complaint herein and state and allege as follows:

## INTRODUCTORY STATEMENT

1.

This action is filed by Plaintiffs under 42 U.S.C. § 1983 and ORS 30.265, for events occurring on or about March 30, 2015, alleging unreasonable use of deadly force, in violation of the Fourth Amendment to the United States Constitution, along with state torts of battery and wrongful death, arising from the wrongful and unnecessary shooting of Brian Babb

2.

This court has jurisdiction over Plaintiffs' claims of violations of federal Constitutional Rights under 28 U.S.C. §§ 1331 and 1343.

3.

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants reside in the District of Oregon and Plaintiffs' claims for relief arose in this district.

4.

The court has supplemental jurisdiction over Plaintiffs' pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

5.

Plaintiff Estate of Brian Babb is represented by Ronda McGowan as the personal representative.

6.

Plaintiff Lee Babb is the father of Brian Babb and sues in his individual capacity.

7.

Plaintiff Kaylee Babb is the daughter of Brian Babb and sues in her individual capacity.

8.

Wanda Hollaway is the mother of Brian Babb.

9.

Plaintiff Connor Babb is the son of Brian Babb. Connor Babb is a minor and is represented for the sole purpose for this litigation by his mother Stephanie Woodcook as his guardian ad litem.

10.

Defendant Will Stutesman is a police officer with the City of Eugene Police Department and was acting under color of law at the time of the events alleged herein.

11.

Defendant Grose is a police officer with the City of Eugene Police Department at the time of the incident and at all times was acting under color of law.

12.

Defendant Pieske is a police officer with the City of Eugene Police Department at the time of this incident and at all times was acting under color of law.

13.

Defendant McAlpine was a supervisor law enforcement officer employed by the Eugene Police Department at the time of this incident and was at all times acting under color of law.

14.

Defendant Jane Doe Call Taker was a call taker at the Eugene 911 Dispatch Center.

15.

Defendant City of Eugene was at all times a municipal subdivision of the State of Oregon. John and Jane Does 1-5 are defendants whose identities who are not fully known at this time and are employed by The City of Eugene or Lane County by and through the dispatch center or the police department who may have engaged in some conduct which was relevant to the facts alleged in this complaint. As soon as their identities are more fully known they will be substituted for the John and Jane Does.

16.

Plaintiffs are entitled to a reasonable attorney fee under 42 U.S.C. §1988.

**GENERAL FACTS**

17.

Brian Babb served in the United States Army and the Oregon National Guard in three separate tours: 2/88 to 4/90, 5/90-8/94, 7/05 to 1/07. He was an Afghanistan war veteran who served as a Captain in 2005-2007 with the 10th Mountain Division. He also served in Louisiana in the aftermath of Hurricane Katrina with rescue and security efforts with the Oregon National Guard.  As a result of his service for his country Captain Babb received numerous citations and commendations.

18.

While serving as the Commander of an embedded training team with an Afghan Infantry Company in northeastern Afghanistan, Captain Babb was wounded by enemy fire.  A 107mm rocket impacted close behind him into a wall throwing Captain Babb into nearby rocks. He received numerous physical injuries including a closed head Traumatic Brain Injury (TBI), a percussion brain injury and a tear to his pericardium.  At the time of his discharge from the

military he had a 130% disability rating due to combat services by the United States Department of Veterans' Affairs. His neurological damages arising from the TBI accounts for 70% of his ratings, with a post-traumatic stress disorder accounting (PTSD) for 30%.

19.

Prior to his service in Afghanistan Captain Babb ran his own construction business after graduating from Oregon State University. He was the owner and chief estimator for Pacific Rim Contracting. He was a successful and able businessman and provided a good living for his family.

20.

After over six months of hospitalization and rehabilitation Captain Babb returned home with serious and significant deficits. His cognitive abilities were significantly reduced and he suffered from short term memory loss, struggled with logical reasoning skills, suffered from rapid and extreme mood swings. He also suffered from migraine headaches, tinnitus and PTSD. The PTSD could be extreme as he suffered flashbacks, nightmares and severe anxiety. He was also usually in a great deal of pain.

21.

Captain Babb came from a very prominent local Eugene family. His father Lee Babb co-owned Delta Sand and Gravel. The family has resided in and done business in Eugene for over 70 years on acreage where the Delta Sand and Gravel was located.

22.

The combination of disabilities suffered by Captain Babb resulted in his inability to calculate estimates on construction jobs or assess the needs for each job. He did not have consistent or functional conversations in a timely manner as his ability to process complex

thinking was severely limited. As a result of these medical and neurological problems his

formerly successful business suffered significant financial losses because he could no longer

manage it.

23.

Recent studies reveal that blast waves from exploding ordnance cause tissue damage to

the brain separate from concussive or other impact injuries. Blast related brain damage can not

only result in long term neurological losses but can contribute to Post Traumatic Stress Disorder.

(Perl, Daniel, The Lancet, June 2016). The blast waves from exploding ordnance, including

roadside bombs, grenades generate hurricane force wind which can blow soldiers off their feet

and into stationary objects causing fatal head injuries.

24.

The blast TBI occurs when a wave of compressed air, traveling faster than the speed of

sound and arrives before the wind—propagates intense pressure affecting brain tissue after

crashing through the helmet and skull. Blasts are also believed to compress the sternum and send

waves through the blood vessels and up into the brain thus causing fissures and tears in the brain

tissue itself.

25.

In the Lancet study, researchers found that soldiers who were the victims of ordnance

blasts had astroglial scarring in the subpial glial plate penetrating cortical blood vessels, grey

white matter junctions and structures lining the ventricles. Injury to the cerebral cortex, which

regulates emotional and cognitive functioning, was found only in the blast injury cases. Blast

damage occurs when the invisible waves caused by the blast enter the delicate brain tissue in a

"spider leg" pattern in different regions of the brain: the frontal lobe, which controls attention

span and emotional control; the hypothalamus, which regulates sleep; the hippocampus responsible or the formation of memories The symptoms resulting from blast wave damage are exactly the same type of symptoms often attributed to PTSD.

26.

Blast injuries also reportedly contribute to the exacerbation of PTSD symptoms. Blast injuries do not show up on any MRI or CT brain scans. Victims of blast impact have headaches, sleep disturbance, and memory problems.  Blast TBI (Traumatic Brain injury) is believed to produce different damage to the brain than impact TBI. It appears Captain Babb suffered both impact and blast impact damage to his brain.

27.

Captain Babb received extensive evaluation and testing by the VA, entered into several reentry and rehabilitation programs. Over time Mr. Babb developed a significant alcohol problem and was eventually prescribed over 36 different medications for his various emotional, psychological, physical and neurological issues. He checked himself into a VA run rehabilitation center and was removed from most of his medications. At the time of his death the Medical Examination revealed he had a .22 ETOH level, small levels of citalopram/escitalopram, aminoclonazapam, and clonazepam.

28.

During the time of his rehabilitation including up to the time of the shooting, Captain Babb continued with VA outpatient services, group therapy and one-on-one counseling with therapist Becky Higgins who was on contract with the VA.

//

//

29.

Brian Babb was divorced from the mother of his children, Stephanie Woodcook. She worked with Chrystal Stutesman, the sister in law of Will Stutesman, the man who shot Brian Babb. The relationship between Brian Babb and Ms. Woodcook was contentious and acrimonious however Mr. Babb maintained a good and positive role in his children's lives.

**EVENTS OF March 30, 2015**

30.

On the afternoon of March 30, 2015 Brian Babb called his therapist, Becky Higgins, and informed her that he had fired his 9mm handgun into the floor of his bedroom to "see how it sounded".  It appears he may have fired that weapon a day or so earlier as the 9 mm was found locked in Mr. Babb's pickup by the police. Ms. Higgins suggests she advised Mr. Babb unload and store the weapon in his truck, but it is unknown when Mr. Babb placed his sidearm in his truck.  Ms. Higgins, who knew Brian Babb well, noting that he was able to provide support and counseling for other vets, believed Mr. Babb was in a crisis. She called 9-1-1.

31.

Ms. Higgins has worked as a licensed clinical social worker in Eugene for over two decades. She specializes in working with trauma survivors including numerous veterans suffering from combat and sexual trauma. She provided consultation to the Eugene Vet Center for eight years and worked six years as a trauma therapist there. She received more than 100 hours of training in trauma work and provided training in the same. At the time of the Babb shooting 50% of Ms. Higgins clients were veterans.

//

//

32.

Ms. Higgins called 9-1-1 at approximately 5 p.m. on March 30, 2015. She told the operator that Mr. Babb has fired a shot into the floor before he called. She reported to dispatch that Brian was alone at the house. The dispatcher however radioed to the officers that Mr. Babb had fired his handgun into the window.  Ms. Higgins advised dispatch that Mr. Babb was 'having a hard time", had been drinking and was a disable veteran suffering from a traumatic brain injury and PTSD.

33.

Even though Ms. Higgins said that Mr. Babb was alone, she did advise dispatch that Mr. Babb had a roommate. The roommate came home during the twenty minute call between Ms. Higgins and Mr. Babb. The dispatch operator asked whether the shot fired by Mr. Babb had caused any injuries or "did he shoot through the window". Ms. Higgins once again clarified that she had not heard any shot and believe Brian had told her he shot "into the ceiling or the wall"

34.

The actual dispatch records demonstrate that the officers could hear Ms. Higgins on the phone with Mr. Babb, and, that they knew her name and phone number. The recordings show a mix of poor communications, sloppy and inaccurate recording of information. There was a mixture of information that Mr. Babb had shot into the ceiling, was taking out the clip from his weapon, that he was shooting out of the window, that he had the gun to his head, that he was an Afghan veteran. The dispatch records show that the officers could tell Mr. Babb was intoxicated and on pain meds and was continuously on the line with his therapist. Since the officers could hear Ms. Higgins on the phone with Mr. Babb they are imputed with the information she was providing to dispatch.

35.

Ms. Higgins told dispatch that Mr. Babb had mental disorders and wanted the police to go easy and only do a "welfare check". During one of the calls Mr. Babb's roommate left the house and was secured with the police.

36.

Ms. Higgins remained on the cell phone with Mr. Babb while she had an open line with the dispatch. At one point the dispatch operator advised Higgins to place the land line near the cell phone so that all the officers in the field could hear the ongoing discussion between Babb and Higgins. Dispatch records show that officers were receiving the information in the call between Babb and Higgins.

37.

The officers on the scene, led by Sgt. Malcolm McAlpine, were not sure whether Mr. Babb had fired out of the house or even when the shot had occurred. They never called Ms. Higgins or asked dispatch to confirm the facts. Sgt. McAlpine believed that Mr. Babb was "suicidal" and that he "if he had shot a round and at that point I wasn't sure if he had shot it out the window if he shot it at a door so then he's gone above and beyond just hurting himself where he's putting kind of the community as a whole in danger". But McAlpine had different versions of the shot and never checked with Higgins or dispatch to confirm the actual truth.

38.

McAlpine noted that his supervisor "wanted me to really find out if the shot inside was credible because that to us is a game changer. If he's shooting outside we obviously want to keep the public safe".  Both the dispatch records and Ms. Higgins' recorded statements show that officers were aware the shot was inside the house.

39.

Ms. Higgins' first call with Brian Babb lasted approximately 20 minutes when her call was dropped. She called him right back and spoke with him another 25 minutes. In her interview with the IDFIT detective doing the shooting investigation Ms. Higgins was told that her calls with Brian Babb were being "real time" transmitted to the "front" and that officers on the scene were getting up to date information as she was speaking with Mr. Babb. The calls were audible and all the officers on the scene could hear it. This is verified by interviews given by Officers Stutsman and Grose.

40.

Both of Ms. Higgins' calls were recorded. She worked with Brian Babb to get him to remove the magazine from his weapon and then the chambered round. He appeared to agree to do so while on the phone while both Ms. Higgins and the operator listened.  Though it is unknown when he placed the sidearm in the truck, Ms. Higgins told the operator that Mr. Babb had unloaded his gun and that he was cooperating. All officers involved were being transmitted this information.

41.

Ms. Higgins managed to engage Mr. Babb in a cooperative back and forth conversation in which it was clear he was following the conversation, de-escalating and calming down. There was no indication that he was going to hurt himself or others. He agreed to come in the next day to meet with her in a regular appointment. She even wrote down his appointment in her calendar. It was clear that the 45 minutes on the phone with Ms. Higgins had calmed him down and was productive.

//

42.

The police heard this calm conversation. Officer Grose was the department hostage
negotiation expert and was sitting in the front seat of the light armored vehicle (Bearcat) which
had arrived at the scene with the numerous officers including Stutesman.   Stutesman was
assigned to the SWAT team and is a trained certified sharpshooter. Officer Grose is trained in
de-escalation of tense situations and was aware of the conversation between Ms. Higgins and Mr.
Babb.

43.

Instead of addressing the calming atmosphere, the officers lead by Sgt. McAlpine decided
to escalate and began using the bullhorn ordering Mr. Babb to leave the house with his hands up.
At no point up to that moment had the police tried to call, or communicate directly with Mr.
Babb inside the house, nor did they request dispatch or Ms. Higgins to advise Mr. Babb come out
of the house.

44.

The 9-1-1 operator instructed Ms. Higgins to hang up the phone so that the police could
speak with Mr. Babb.  Ms. Higgins told them that he would likely talk to her but not the police.
She begged the operator to let her remain on the phone talking with Mr. Babb. They refused and
within 12 minutes Brian Babb was dead.

45.

While Ms. Higgins was speaking with Mr. Babb, the Eugene police responded at
approximately 5:13 p.m. They all acknowledge they were monitoring the dispatch enroute.
Officers Stutesman and Kidd arrived first. Mr. Babb's house is at the end of an L shape
landlocked parcel. It is completely surrounded by an 8 foot fence. Two pickup trucks were

parked in Mr. Babb's driveway. No one could see any portion of the first floor of the Babb

home, but there were several windows on the second floor. Officer Kidd climbed up on the roof

of a neighboring house to the south to get a better view.

46.

Kidd and Stutesman were worried that any approach to the house was dangerous they

requested the Bearcat which was enroute by 5:20 p.m. Ms. Higgins was still on the phone with

Mr. Babb.

47.

No responding officer had any training in operating the Bearcat. None of the responding

officers had been trained in the capabilities of the Bearcat and none of the officers understood the

armor on the Bearcat was designed to withstand penetration by bullets into the windshield or the

armor. An officer volunteered to drive the Bearcat that day without any instruction or education.

It is unknown why a Bearcat armored vehicle was needed to respond to a welfare check.

48.

When Ms. Higgins lost her transmission in the first call she called dispatch and told them

she needed to talk with Mr. Babb and they should get someone to check on him quickly. The

dispatcher told her that they had a lot of people going out there now. Ms. Higgins told her "he's

not saying I'm going to shoot now, but he's refusing to come out".  McAlpine learned that

Higgins was on the phone with Babb and asked Higgins to have Babb come out.  McAlpine at

that time asked for Higgins' number and requested that Babb come out the front door.  Higgins

has told dispatch that there is single round chambered in Babb's weapon which was then locked

in Babb's truck.

//

49.

The dispatcher provided both Higgins' and Babb's numbers to McAlpine.  McAlpine

gave Ms. Higgins approximately 10 minutes to convince Babb to come out of the house and

when he was told that she was still talking with him, McAlpine said he would start making his

own calls. McAlpine never confirmed that Higgins had yet asked Babb to come outside or take

any specific action. McAlpine appeared to be in some hurry to take action even after the

roommate safely walked out of the Babb house, leaving the door open.

50.

Ms. Higgins stated that the requests made by Sgt. McAlpine were not forwarded to her by

dispatch or the call center and no one from the Eugene PD ever called her directly to talk about

her progress with Mr. Babb. Ms. Higgins states emphatically no one ever requested she ask Brian

Babb to come out of the house. Because of this failure of critical communication Brian Babb was

unaware of police presence and was unarmed when the police showed up in a tank and with

snipers positioned on adjoining rooftops.

51.

While the call takers at the Eugene dispatch are separate from the dispatchers they

nevertheless share a single room. The call takers input their data from conversations into the

database which feeds into the mobile computers in each patrol vehicle, but if the officers are

away from the computer they only have access to the radio dispatch. There is only a single

notation in the call taker's log that McAlpine asked Babb to come to the front door with his

hands empty at 5:25.  McAlpine never checked to confirm this request was actually made to

Higgins.

//

52.

Nothing in the records indicates how much, if any, of the information being gathered by Higgins was being conveyed to Officer Grose. But he notes he could hear the dispatch conversations. He does not indicate whether he was aware of Sgt. McAlpine's request for Babb to surrender.

53.

The Bearcat arrived at 5:34 pm and within 3 minutes was parked in the neighbor's driveway approximately 100 feet from Babb' front door. The driver, Officer Pieske and the negotiator, Officer Matthew Grose, were seated in the two front seats. Officer Pieske says he could see the doorway of the Babb house "through cracks in the fence", however, even standing up in the turret of the tank, Officer Stutesman said he could only see the top of the doorway. Officer Grose said that in the seated position in the tank he could not see any part of the lower floor of the house including the doorway. There were two officers positioned on the roofs of two adjoining houses. None of them admitted to being able to see the front door or Brian Babb when he stepped into it.

//

//

//

//

//

//

//

//



JESSEN DR.

**Detail** RANDY PAPÉ BELTLINE

DEVOS ST.

BARGER DR.

Eugene

N

*Brian Babb shot in doorway*

**Babb's home**

Porch

Fence

Trailer

**Babb's truck**

❸

❷

**Neighbor's house**

Trees

N

0    20

*feet*

**Roommate's truck**

DEVOS ST.

BearCat route

❶

BearCat

**1.** 5:52 p.m.: Stutesman fatally shoots Babb after he reports Babb points a high-powered hunting rifle at him.
**2.** 5:57 p.m.: Officers, fearing a possible ambush from a wounded Babb, drive the armored vehicle through two fences to the front porch.
**3.** 6:02 p.m.: Medics declare Babb dead at the scene.

*Source: Lane County Interagency Deadly Force Investigation Team*

**Neighbor's house**

*Officer Joe Kidd*

*Officer Matthew Grose* **crisis negotiator**

*Officer Will Stutesman* **standing in roof hatch**

*Officer Nate Pieske* **BearCat driver**

*Sgt. Scott Vinje*

*Sgt. Malcolm McAlpine* **on-scene commander**

54.

Directly in front of the front door to the house is a large blooming fruit tree which in March 2015 would have obstructed a clear view from the top of the Bearcat.

55.

Officers McAlpine and Vinje were positioned behind the Bearcat once it was parked in the neighbor's driveway. Officer Stutesman who is reportedly 6'4" stood in the open hatch of the Bearcat and rotated the hatch door so to provide him the maximum ballistic coverage. He was also turned out in his armored uniform and was assigned the role of sharpshooter for that day. He

took his position within the Bearcat and could hear the conversation from the officers inside the Bearcat and that on the radio and from dispatch

56.

Officer Stutesman's weapon that day was an assault rifle Heckler and Koch 416D with a mounted scope with red dot optical sight. In the top of the Bearcat Officer Stutesman reported he had a view of the "top half" of the door through the branches of the tree.

57.

Approximately one to two minutes before Officer Grose yelled through the megaphone to Babb, the call taker noted that Higgins was asking to confirm with Babb that he had removed the clip and round from his weapon. Higgins notes that she repeated the information directly to the call taker who only typed on her computer that she could not hear the answer.

58.

Officers reported that the fact that Babb was de-escalating was not relayed to the officers. However, the officers had all the relevant phone numbers and were listening to the conversation. Their duty was to proceed in an objectively reasonable manner and not to escalate a situation.

59.

At 5:40 p.m. Officer Grose began hailing Babb via a loudspeaker telling him they were the police, they did not want him to get injured and wanted him to come out unarmed and with his hands in the air.  Officer Grose hailed Babb seven times. Brian Babb went from calm and neutral to angry as the loudspeaker continued despite Higgins' warnings.

//

//

//

60.

Higgins heard Babb say, "no, this is not happening to me". Higgins told the call taker that she only wanted a welfare check. An officer witnessed Babb open the door, unarmed and yelled at the officers "not to fuck with him" and slammed the door shut.

61.

At this point a well-trained police force would know that it is critical to calm a veteran and ascertain what is triggering the response. Properly trained law enforcement personnel would know that war veterans have vital and unseen triggers which can propel them back to the battlefield and that to insure a peaceful resolution it is imperative not to escalate, to keep the veteran oriented, communicative, not to surprise them, and do not make them feel threatened. The police who are trained properly know that escalation and forceful demands which make the veteran threatened can trigger an undesired response.

62.

No one knows if Babb had a flashback or that some battlefield memory was triggered but the police response to use heavily armored officers with assault rifles and armored vehicles was not the de-escalation necessary to produce a calm and positive result.

63.

Mr. Babb's roommate, Jim Antonini, had come home while Babb was on the phone with Higgins and noted nothing different and that Babb was unarmed. The hailing from the police awoke him from a nap. Antonini woke to loud speaker aggressive instructions from the police and Babb who was acting agitated and yelling obscenities

//

//

64.

Antonini came downstairs to find Mr. Babb trying to open his gun safe. He told Antonini

to leave as Antonini was trying to calm Babb down.  Babb instructed Antonini to tell the police

to leave his property. Antonini opened the door once and asked the police to back off as he was

trying to get Mr. Babb to calm down.  Antonini closed the door after yelling "give me a

moment".  The police then hailed Antonini and forced him to leave the house.  He left through

the front door and left it open while Babb continued to try to open the gun safe.

65.

At approximately this point in time, Ms. Higgins returned to her cell phone to ask what

was happening. The call taker told Ms. Higgins that the officers were at the scene and wanted to

know what room Babb was in. This information had been sought by McAlpine but the call taker

neglected to ask Ms. Higgins whether she could ask Babb to come out.  Ms. Higgins could hear

the activity in the room with Babb and listened as he became more and more agitated. She could

also hear the officers on the bullhorn and determined that the continual yelling by the police was

the worst possible thing to do to Mr. Babb.

66.

Officer Kidd could see Mr. Babb running to the various upstairs windows, unarmed. Mr.

Babb would yell to the police that he was not a criminal and not coming out. He also yelled he

had done nothing wrong and the Constitutional right to be here (in his own home). Antonini who

was at the back of the Bearcat offered to call Mr. Babb to calm him down and get him to come

outside.  Antonini told the police that Mr. Babb had hunting rifles and Officer Stutesman told

investigators this made him worried as hunting rifles are powerful.

//

67.

With Antonini out of the house and safe, Sgt. McAlpine and Officer Vinje discussed

leaving the scene.  McAlpine was updating the SWAT commander Lt. Eric Klinko to see if he

wanted to come out and to activate the unit "because Babb had shot out". However, this was not

the correct information. Antonini confirmed that he had not heard any shots. No one called Ms.

Higgins to confirm.

68.

Neighbors to the rear of the Babb house saw and photographed a uniformed Eugene

police officer walk through his yard, climb the fence into Babb's yard and enter the front of

Babb's property. The timing of this entry is roughly around the time Stutesman shot Brian Babb.

There is no report or information from the Eugene police department who this officer was and

why he was entering the house.

69.

Lt. Klinko requested the officers confirm whether Babb had shot out of the house. No one

did until after Babb was dead.

70.

At 5:47 Officer Vinje requested Higgins get off the line so that Officer Grose could call

Babb. It is unknown why Grose did not call Higgins earlier or tried to call Babb before yelling

on the bullhorn, or even before pulling the Bearcat up to the house.

71.

Grose reached Babb on his cellphone. Babb told Grose that he had a gun pointed at him.

Grose did not know if he meant pointed at himself or the officers. Babb ordered the officers "not

to come onto his property or go onto his property, to just leave". At this point in the timeline

there is little evidence that Mr. Babb has committed any clear crime and asked law enforcement to leave. His therapist only asked for a welfare check, not an armored response. There is no evidence that Babb was suicidal or intended to hurt anyone else.

72.

Babb was told the police were not going to leave and they wanted a peaceful ending to the situation. One minute later Mr. Babb opened his front door. Stutesman was the only officer who saw Brian Babb and the only one who said that he saw Babb lift a rifle to his shoulder and aim it at Stutesman who was standing behind the turret lid with his own rifle pointed at Babb.

73.

Stutesman determined that Babb was going to shoot but it did not appear Stutesman was worried for his own safety believing that the turret protected him, but was worried for Officer Kidd on the rooftop to the south. He noted that no other officer could see Babb at that point. At 5:52 Stutesman aimed his laser light at Babb's head and fired. The round entered Mr. Babb's left cheek and exited from the right rear just behind the right ear. The round exited from the back of Mr. Babb's head and lodged in a wall behind Babb at the far end of the living room. The trajectory suggests that Mr. Babb was facing away from Officer Stutesman and not looking at him when the round entered his face.

74.

Officer Stutesman claims he yelled "drop it" twice, but no one else heard this. Stutesman and all the other officers indicate there was a long moment of dead radio silence as the officers present tried to determine who fired. No one else saw the shot and no one else saw the rifle claimed by Stutesman.

//

75.

During that lull Sgt. McAlpine who was supposedly standing five feet behind Stutesman at the back of the Bearcat thought that Babb had fired and called out the SWAT team. Then he ordered roll call of all the officers on scene to see whether anyone had fired. For about 45 seconds to one minute one officer hailed the others asking what Babb had in his hands. Stutesman replied that "it was a long gun. Pointed at me."

76.

It took three minutes for McAlpine to confirm that Stutesman had fired a round.

77.

Stutesman claimed that the officers in the Bearcat did not know he had fired his weapon despite standing right between them inside the Bearcat. He admitted he had to lean into the tank and tell the other trained police officers that it was his firearm which had just fired just above their heads.

78.

Pieske apparently was able to see through the fence, which covered up the entire doorway, to the doorway over 100 feet away in a view obstructed by a column and a large well leafed out tree, that he had seen Babb "was armed with a rifle with a bipod and had raised the firearm *as he exited*." Officers later found an empty long rifle on the porch outside the house. It did not have a "bipod" on it. Brian Babb's body was found well inside the house with the bottom of his sneakers just on the threshold. The rifle was located outside the house, several feet away around a corner and to the right of the door jam. Blood pool was found underneath Babb's head and splatter was low on the wall near Babb's body indicating that he was shot while standing a foot or more inside the door of the house. There was no forensic examination of the bullet path,

the blood splatter or any explanation as to how the gun was apparently tossed around the doorjam to the porch outside.

79.

Pieske also apparently was able to see what Babb was wearing, what he was carrying and what actions he took. Grose in contrast could only see the top of Babb's head over the top of the fence and could not see any weapons. Grose was sitting next to Pieske and both men are roughly the same height. Brian Babb was 5'9" and could not have been seen at all if he was standing on the porch which is forensically where he would have been standing to explain how the rifle ended up on the porch and the blood pool and splatter would have been on the porch or the wall behind him. If he was standing on the porch no one inside the Bearcat could have seen him at all. Plaintiff contends Pieske is making up his statements.

80.

The Bearcat had a video record of this event. The recording shows that the fence obscured all but the uppermost portion of the front door. The video shows the door opening, but neither Babb nor the weapon can be seen. The video contains no audio. The District Attorney announced that Pieske and Stutesman's statements corroborate each other but ignores the forensic evidence and the contradictory statement by Grose.

81.

After the shooting the officers thought Babb was "playing dead" and Pieske rammed the Bearcat through the fence to the front porch. The reports by all the officers are vague and unclear on the location of the gun with respect to the body. The weapon located on the porch was unloaded and was mounted with a scope. The reports consistently noted the weapon was on the

porch "near the body".   The body itself was inside the house several feet away from the location

the officers say the weapon was located.

## BACKGROUND OF WOUNDED WARRIORS IN AMERICA

82.

Since the United States entered the Iraq and Afghan wars the FBI Hostage and

Barricaded Database System (HOBAS) has compiled statistics on crisis incidents submitted by

law enforcement. In approximately 6% of all "crisis incidents' between police and a suspect have

involved a veteran or active duty member of the military.  Nearly all of the military involved

personnel in these crisis incidents have involved veterans with traumatic brain injury. The FBI

estimates that the prevalence of major depression, generalized anxiety disorder and PTSD for

veterans returning from Iraq to be from 15.6 to 17.1% and may be 11.2% for those returning

from Afghanistan.  The FBI reports that the percentage of veterans suffering from PTSD

increased over time.

83.

PTSD, depression and other disorders produce a major impact on returning veterans

adjustment and potential for a police related encounter. Only approximately 50% of returning

veterans seek professional assistance with their disorders. Stigma and concerns about the effect

of a psychiatric diagnosis and treatment on their careers inhibits the veterans desire to seek

therapy. The FBI statistical studies also show that returning veterans are two to three times more

likely to commit intimate partner violence and veterans with PTSD are more likely to abuse

alcohol.

//

//

84.

The FBI has studied the increasing number of confrontations between veterans and police. The federal agency has issued reports with numerous recommendations to law enforcement on making changes in the manner and method in which they respond to specifically veterans. These publications and studies have been public since at least July 2011. The military itself has issued reports, support programs and information through the Center for Deployment Psychology at the Uniformed Services University of the Health Sciences and the Battlemind Program.

85.

The law enforcement agency first tasked with responding to an incident involving a veteran is to become familiar with the traits and trends experienced in past cases. No longer can law enforcement treat a veteran involved crisis situation like any other crisis situation. Of particular note, law enforcement must be aware of, and educated in, the skill sets of military personnel taught to survive combat and accomplish their mission. Combat requires constant vigilance, expected immediate response to orders, erratic driving to avoid roadside bombing, operation security, carrying a weapon and it behooves law enforcement to understand the emotional drivers of a veteran in crisis. He may default to a survival mode rather than logic.

86.

Returning veterans do not easily transition from the hypervigilant state required for war, have difficulty giving up weapons which provided security in war zones, are used to sleep deprivation and chronic fatigue. Letting go of habits essential for survival is a slow and difficult process for returning veterans.

//

87.

The FBI advises law enforcement to make attempts to understand that many combat veterans suffer from invisible wounds including feelings of alienation and isolation, guilt, fear and shame along with an undefined sense of anger. Veterans also experience strong sense of cynicism, distrust of government, a tendency to react to stressful situations with survival tactics and difficulty with authority figures. The FBI notes that the best friend and best hope the combat veteran may have in a situation escalating out of control is the informed police officer or negotiator.

88.

The FBI recommends law enforcement maintain an open line of communication with the veteran in crisis and express a willingness to listen to their stories and employ active listening skills to demonstrate to the soldier in crisis that officers demonstrate an understanding of the emotional experiences of the veterans.

89.

Police officers must always keep in mind that most of today's soldiers are volunteers and want to maintain the military values of duty, honor and country along with commitments to friends and units. Police must accept and always perceive that the returned soldier in crisis must be perceived and given respect as strong and brave. One of the returned soldier's biggest fears is to be perceived as weak or cowardly. Warriors must not be put into situations where they will be forced to act in a way that proves their personal courage. They want to be treated with respect and they have little tolerance for half-truths or disingenuous talk. By relating to the soldiers as equals and as servants of a greater good who may not always be appreciated or understood,

police officers and negotiators have a better chance to earn the veterans' trust and de-escalate situations that potentially may become dangerous.

90.

The FBI recommends that officers call upon their commonality with soldiers when negotiating: both share life threatening experiences, both feel the need to serve and feel they are contributing and worthy. Officers understand the concept of honor, bravery and duty. Both have witnessed humankind's capacity for evil and cruelty. At the end of each day both go home and attempt to separate the job from their family life.  In order to build this rapport police officers should begin questions of the veteran related to his military service and listen to allow the veteran to tell his story to a willing audience.

**FIRST CLAIM FOR RELIEF: Unreasonable Use of Deadly Force**
All individual Eugene defendants
42 U.S. C. 1983 4th Amendment

91.

Plaintiff realleges all previous paragraphs as if more fully set forth.

92.

Plaintiff Brian Babb is entitled to be free from unlawful seizure of his person pursuant to the parameters of the 4th and 14th Amendments to the United States Constitution.  Plaintiff Babb is also entitled to be safe and secure from undue and unreasonable force including deadly force.

93.

The acts and omissions of Defendants in shooting Plaintiff Babb without a reasonable belief that Plaintiff Babb presented an imminent and serious danger to themselves or others is a violation of the 4th Amendment restriction on deadly force. The officers failed to ascertain all

reasonable and objective facts and used inaccurate information to justify approaching the Babb home, failed to de-escalate, failed to confirm information, ignored radioed information that confirmed the situation was de-escalating, did not confirm information being conveyed to Ms. Higgins, and at least two officers provided false information. It is believed that Officer Stutesman did not see Mr. Babb raise his rifle and point it, and it is believed that the officers did everything wrong in approaching this situation creating their own exigency when none existed and that the forensic evidence shows a scenario entirely different from the one being reported.

94.

Defendants' conduct was well defined by law and each Defendant knew or should have known that their conduct was not only well below the standard prescribed by law, but illegal per se.

95.

As a result of these Constitutional violations, Plaintiff Babb died.  The extent of damages will be more fully proven at trial.

**SECOND CLAIM FOR RELIEF: Substantive Due Process/Parental Loss Claim**
**42 U.S.C. § 1983 Violation of the 14th Amendment**
**(Individual defendants)**

96.

Plaintiffs reallege all previous allegations as if more fully set forth.

97.

Brian Babb's parents have the right not to have their liberty taken by government action with due process of law under the 14th Amendment to the United States Constitution.

//

//

98.

The rights protected under the 14th Amendment due process clause bar certain government actions regardless of the fairness of the procedures used to implement them.  In this situation the 14th Amendment is intended to prevent government officials from acting in ways that employ their powers as an instrument of oppression or menace or which shocks the conscience.

99.

The substantive due process rights of the 14th Amendment protect against the arbitrary governmental actions which infringe upon the bodily integrity of any citizen.  When governmental employees act in such a way they are interfering with fundamental rights implicit in the concept of an ordered liberty.  The Supreme Court recognized that when the government kills a citizen the parents, children and spouse have the right to bring an action for their own individual loss arising from the unlawful killing.

100.

The actions and inactions of Defendants jointly and severally resulting in Brian Babb's death were intentional and without justification or right.  The killing of Brian Babb deprived his parents of his companionship and love, and support. The killing of Brian Babb was unjustified and unreasonable and shocks the conscience.

101.

Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law, but illegal per se.

102.

As a result of these Constitutional violations, Brian Babb's parents have lost the companionship, society and love of their son.  The extent of Plaintiffs' damages will be more fully proven at trial.

//

//

**THIRD CLAIM FOR RELIEF: Substantive Due Process Violations/Loss of a Parent**
**42 U.S.C. § 1983 Violation of the 14th Amendment**

103.

Plaintiffs reallege all previous matters as if more fully set forth herein.

104.

The rights protected under the 14th Amendment due process clause bar certain government actions regardless of fairness of the procedures used to implement them and the amendment is intended to prevent government officials from abusing their power or employing it as an instrument of oppression.

105.

The substantive due process rights of the 14th Amendment protects against governmental arbitrary takings, and those actions which shock the conscience or are so brutal and offensive that they do not comport with traditional ideas of fair play and decency or interfere with rights implicit in the concept of an ordered liberty.  It is said to protect against violations by government officials, which rise to deliberate decisions to deprive a person of life, liberty or property.

106.

The Supreme Court recognized that when the government kills a citizen, the parents, children and spouse have the right to bring an action for their own individual loss arising from the unlawful killing. A child has a constitutionally protected liberty interest in the companionship and society of his or her parent. This right is found under the substantive due process clause of the 14th Amendment, and sons and daughters may maintain an action under that provision for unlawful deprivation of the right to a parent's companionship.

107.

The actions of Defendants that resulted in the death of Brian Babb were intentional and without justification or right.  The actions of Defendants in their treatment of Brian Babb violates the very concept of decency, shocks the conscience and were deliberate actions in violation of

the 14th Amendment.  The killing of Brian Babb deprived his children, Connor and Kaylee Babb, of his companionship and love, and support. The killing of Brian Babb was unjustified and unreasonable and shocks the conscience.

108.

Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard of law described herein, but was illegal per se.

109.

As a result of these Constitutional violations, Brian Babb died, and Plaintiffs Connor and Kaylee Babb lost the companionship, society and love of their father.  The extent of Plaintiffs' damages will be more fully proven at trial.

**FIFTH CLAIM FOR RELIEF:** *Monell*
**Unconstitutional/Illegal Custom, Policy or Procedure**

110.

Plaintiffs reallege all previous matters as if more fully set forth.

111.

The City of Eugene has a policy, custom or procedure which allows officers to shoot suspects when there is no threat of deadly force, open fire without warning and without an awareness of the totality of circumstances which would not justify such use of force.

113

The City of Eugene has a policy of failing to train officers in several particulars relating to a response to a crisis situation, to wit:

1. Failing to train to de-escalate when the circumstances warrant it;

2. Failing to train officers to address the specific needs of the situation including
   modification of tactical response when dealing with mentally or emotionally impaired

individuals; failing to train to deal with combat veterans, failing to train to obtain all

critical information before use of extreme force;

3.  Failing to train officers to recognize the difference between a welfare check and a

dangerous barricaded individual;

4.  Failing to train proper crisis situation tactics which allows officers to use deadly force

without any supervision, direction or tactical plan.

5.  This policy also includes approval of officers testifying falsely about the circumstances

and facts leading up to a shooting so as to create or fabricate justification for the

shooting.

6.  Allowing the interruption of a interaction between patient and therapist which resulted in

a reduction of the crisis and consequently caused a serious escalation of the situation

without probable cause;

7.  Responding to a welfare check with a high level of force and without probable cause;

8.  Allowing untrained and uncertified personnel to operate the armored vehicle;

9.  Bringing an armored vehicle to a welfare check;

10. Using highly aggressive tactics and extreme show of force in a mental health crisis when

there was no evidence of any threat to others, the officers or Brian Babb.

11. Conducting a sloppy and poor forensic investigation of the shooting of Brian Babb to

justify the high level of force.

12. Not de-escalating the situation when it was obvious de-escalation was more appropriate.


114.

As a result of the unofficial policies, customs or procedures described above, Plaintiffs

were subjected to unreasonable seizure, excessive force, substantive due process violations,

battery, and financial, mental and emotional injury. Brian Babb died because of these policies,

customs or procedures.  The extent of Plaintiffs' damages will be more fully established at trial.

**SIXTH CLAIM FOR RELIEF: Failure to Supervise**
Sgt. McAlpine

114.

Plaintiff realleges all previous paragraphs as if more fully set forth.

115.

Plaintiff Brian Babb is entitled to be free from unlawful seizure of his person pursuant to the parameters of the 4th and 14th Amendments to the United States Constitution.  Plaintiff Babb is also entitled to be safe and secure from undue and unreasonable force including deadly force.

116.

The acts and omissions of Defendants in shooting Plaintiff Babb without a reasonable belief that Plaintiff Babb presented an imminent and serious danger to themselves or others is a violation of the 4th Amendment restriction on deadly force. The officers failed to ascertain all reasonable and objective facts and used inaccurate information to justify approaching the Babb home, failed to de-escalate, failed to confirm information, ignored radioed information that confirmed the situation was de-escalating, did not confirm information being conveyed to Ms. Higgins, and at least two officers provided false information. It is believed that Officer Stutesman did not see Mr. Babb raise his rifle and point it, and it is believed that the officers did everything wrong in approaching this situation creating their own exigency when none existed and that the forensic evidence shows a scenario entirely different from the one being reported.

117.

Sgt. McAlpine was the supervising officer on the scene and was responsible for the placement of the officers, the escalation of force, the interruption of the calls with Ms. Higgins,

poor communication with dispatch and Ms. Higgins, failure to establish a good communication

with Babb, failure to ascertain the facts before escalating the force, failure to confirm what, if

any crimes had been committed by Babb, what, if any, use of force had been displayed by Babb,

encouraged and ordered the escalation in the show of force which caused the resulting shooting.

Defendant McAlpine's conduct was well defined by law and he knew or should have known that

his conduct in failing to control and supervise the situation was not only well below the standard

prescribed by law, but illegal per se.

118.

As a result of these Constitutional violations, Plaintiff Babb died.  The extent of damages

will be more fully proven at trial.

## SUPPLEMENTAL STATE CLAIMS

### SEVENTH CLAIM FOR RELIEF:  Wrongful Death
**Defendants Stutesman and City of Eugene**

119.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

120.

The actions taken by defendants Stutesman and the City in shooting and killing Plaintiff

Babb were unjustified and are not supported by the law. The detention and use of force were not

in the furtherance of official duties and there was no crime to justify the actions by the officers.

121.

Each of the actions described herein were performed by Defendants while they were on

duty, carrying a badge and weapon, and working as a law enforcement officer. The act of

shooting Mr. Babb was reasonably foreseeable to cause his death and was not justified by the facts and circumstances then present.

122.

The death of Plaintiff Babb was wrongful and caused the Estate damages in lost income potential, funeral expenses, lost support for his children all to be fully explored at trial but no less than 7.5 million dollars.

**EIGHTH CLAIM FOR RELIEF: Jane Doe Call Taker**

**Negligence**

123.

Plaintiff realleges all matters previously raised as if more fully set forth.

124.

The Jane Doe Call Taker was speaking with both Ms. Higgins and law enforcement. She was tasked with accurate taking information from both parties and insuring the information was accurately and deliberately provided to each party, particularly the police.

125.

The Jane Doe Call Taker took in information inaccurately and transmitted that inaccurate information to the police.  The Call Taker failed to accurately transmit information to the police and to Ms. Higgins which lead to the significant escalation of force and ultimately the death of Mr. Babb. Specifically the call taker took the following steps or made the following mistakes which created a more volatile situation.

1. She failed to accurately transmit information about the status of when Mr. Babb fired his weapon to the police. She also failed to accurately inform the police of when and where the weapon had been discharged and the present location of the weapon;

2. She failed to accurately inform the police of information she was hearing from Ms. Higgins as she convinced Brian Babb to unload and secure his weapons;

3. She failed to accurately inform the police that Brian Babb was calming down and had de-escalated;

4. She failed to accurately inform the police of information she was obtaining from both Ms. Higgins and Brian Babb on the monitored phone call;

5. She failed to relay requests from Sgt. McAlpine namely that Brian Babb be made aware the police were on scene, that they wanted him to come out and that they wanted him to put his weapons down;

6. She failed to advise Ms. Higgins that the police wanted Brian Babb to leave the house;

7. She failed to advise the police that Ms. Higgins did not want any show of force and that such a show of force would trigger Babb's PTSD and cause an escalation;

8. She failed to inform the police of Brian Babb's mental, emotional and physical disabilities;

9. She failed to inform Becky Higgins the police were arriving with a tank and an extreme show of force.

126.

As a result of the numerous failures by the Call Taker it was reasonably foreseeable that the police would have poor information, react accordingly and escalate the situation which would then result in the shooting of Brian Babb.

//

//

//

127.

As a result of the substantial failures by the Call Taker Brian Babb was killed and his estate suffered losses to be proven at trial but no less than 7.5 million in economic and non-economic losses.

WHEREFORE Plaintiffs request that this Court grant judgment as follows:

1.    Judgment against Defendants for economic damages in an amount to be proven at trial but no less than $150,000;

2.    Judgment against Defendants for non-economic damages in an amount to be proven at trial but no less than $7.5 million;

3.    Judgment against Defendants for punitive damages in a fair and reasonable amount to be proven at trial;

4.    Judgment against Defendants for deterrence damages in a fair and reasonable amount to be proven at trial; and

5.    Judgment for costs, interest, attorney fees and such other and further relief as the Court deems just and equitable.

DATED this March 15, 2017

Respectfully submitted,

/s/Michelle R. Burrows
Attorney for Lee Babb and Estate