**Robert E. Franz, Jr.**              **OSB #730915**
E-Mail:  rfranz@franzlaw.comcastbiz.net
LAW OFFICE OF ROBERT E. FRANZ, JR.
P.O. Box 62
Springfield, OR  97477
Telephone:  (541) 741-8220
Facsimile:  (541) 741-8234
  Of Attorneys for Defendants Will Stutesman,
Officer Grose, Officer Pieske, Sgt. McAlpine,
and the City of Eugene.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  |  |
|---|---|
| **RONDA MCGOWAN**, Personal Representative for the Estate of Brian Babb, **LEE BABB**, **CONNOR BABB**, by and through his Guardian Ad Litem, **STEPHANIE WOODCOCK**, and **KAYLEE BABB**,<br><br>         Plaintiffs,<br><br>    vs.<br><br>**WILL STUTESMAN**, **OFFICER GROSE**, **OFFICER PIESKE**, **SGT. MCALPINE**, **CITY OF EUGENE,** a municipal subdivision of the State of Oregon, **JANE DOE CALL TAKER**, and John and Jane Does 1-10.<br><br>         Defendants. | Case No.  6:17-cv-00424-TC<br><br><br>**Declaration of**<br>Matthew Grose |

{2. Decl Grose;1 }    Page 1 – Declaration of Matthew Grose.

I, Matthew Grose, under penalty of perjury do hereby declare as follows:

I am over the age of 18 years, and I make this declaration based on my personal knowledge of the facts contained herein.

I am one of the individually named defendants in the above-captioned case. I am in the patrol division of the Eugene Police Department, having been hired by the City of Eugene in 2008. My law enforcement career began with the City of Eugene.

After I was hired by the City of Eugene, I attended the Oregon Public Safety Academy and obtained a Basic Certificate as a Certified Police Officer. I then obtained an Intermediate as a Certified Police Officer on September 5, 2013, from the Department of Public Safety Standards and Training of the State of Oregon.

I was also on the Crisis Negotiation Team for about seven years, and was on the team on March 30, 2015. The CNT generally has 20 hours of training per month. I have attended the 40-hour basic crisis and hostage negotiation training, and another 40-hour intermediate crisis and hostage negotiation training. I was also a member of the Western States Hostage Negotiation Association.

I have also been a field training officer. See Exhibits 102 and 116 which are true and correct copies of some of the training records showing the training I have received from the City of Eugene and the Department of Public Safety Standards and Training of the State of Oregon.

During my career with the City of Eugene, I have been very well trained as a police officers in all areas of law enforcement, including the areas of the use of force, defensive tactics, firearms, and crisis and hostage negotiations.

The Eugene Police Department has promulgated various written policies and procedures. These procedures include the use of force. Prior to March of 2015, I had read those polices and understood them. During my time as a Police Officer and prior to March of 2015, I have received excellent training and supervision by

the Eugene Police Department and the DPSST, and none of this training and supervision has been inadequate.

I have personal knowledge of the acceptable standards and practices applicable to police officers acting as a crisis negotiator in Lane County and the State of Oregon and acceptable to the Department of Public Safety Standards and Training of the State of Oregon. Based upon the knowledge and experience I had as of March 30, 2015, and based upon the knowledge and experience I have of today, all of the decisions I made as the crisis negotiator on March 30, 2015, met or exceeded the acceptable standards and practices in Lane County and the State of Oregon and were acceptable standards and practices as taught by the Department of Public Safety Standards and Training of the State of Oregon.

Attached to this motion for summary judgment is Exhibit 103.  This is a true and correct copy of the recording of the information that was supplied to me and the other officers in this incident from dispatch and other radio traffic.  I was able to hear the information set forth in Exhibit 103, whether it was dispatch talking to me or another officer talking on the radio.  I relied upon the information provided to me in Exhibit 103.

On March 30, 2015, me and the other responding officers were advised that Mr. Babb had "a 9-millimeter gun to his head;" he had "already shot one bullet into a window or somewhere in the house;" and that this information had been provided directly from Mr. Babb himself to his therapist.  (Exhibit 103-Live Radio Dispatch)  So at that point, I knew Mr. Babb was armed with a firearm, and that he was not afraid of using it

We then were advised that a roommate may also be in the Babb residence, and that the second pickup truck in the driveway to the Babb residence belonged to James Antonini (Exhibit 103-Live Radio Dispatch)  We were further advised by

dispatch that: "She is just advising that he says he has a round loaded in the chamber and that it is ready to go." (Exhibit 103)

Once we got the Bearcat in position, I was instructed to start addressing Mr. Babb over a loudspeaker. Prior to doing this, I had attempted to make contact with Mr. Babb over a cell phone, but my call was either not answered or it went to voice mail. Thus, the decision to start addressing Mr. Babb over a load speaker was one that was correct and acceptable under the circumstances. We had reason to believe that there was a roommate in the house and we could not make contact with Mr. Babb so as to give him instructions as to what we wanted him to do.

I called out to Mr. Babb for several minutes. Portions of the statements I made to Mr. Babb can be heard on Exhibit 108. One can hear that I gave very clear and straight forward instructions to Mr. Babb to come out with empty hands in the air, and that we just wanted to help him.

As a result of my calling out and giving these instructions, the roommate came out of the residence with his hands empty and in the air, without anyone getting hurt.

By using this technique of calling out with a loud speaker to address Mr. Babb, we were able to get the roommate out of the house, safely, without anyone getting hurt. This technique also showed Brian Babb that all he had to do was come out of the house just like his roommate did; and if he did, everyone would be safe and secure, and that Mr. Babb would be safe and secure, and that no one would get injured.

Prior to the roommate coming out of the house, Mr. Babb opened the front door to his house, yelled at us, and then went back inside. Also, after the roommate came out of the house, Mr. Babb came to the open door, shouted at us, and closed the door. Thus, I knew that Mr. Babb could hear me, and that he had

heard my  instructions on how to safely come out of the house.  I also knew that he was not complying with our requests and directions.

Once we got the roommate back to the Bearcat, I started calling out to Mr. Babb again.  This can be heard on Exhibit 108.  Again, I gave very clear instructions to Mr. Babb that we wanted to help him and that we wanted him to come outside with his hands empty and in the air.  I did this for a couple of seconds.  I was hoping that this technique that worked on getting the roommate out safely would also work to get Mr. Babb out of the house safely.

I then tried to call Mr. Babb on his cell phone.  On one attempt he answered the phone.  It was a very short phone conversation.  I introduced myself as Matt and told him I was with the Police Department.  I asked him something along the lines of what is going on today.  Mr. Babb responded: "Well, Matt," and then he told me he was looking at me through the scope of a rifle and pointing a gun at me.  As I described in my deposition:

> He was angry and hostile. He was telling me that I couldn't come into his home, don't come into his house or don't come any closer, that he was looking at me through the scope of a rifle and pointing a gun at me. I believe he told me to fuck off or don't fucking come in my house, something along those lines. It was a very brief less-than-20-second conversation, if you want to call it a conversation, and then he hung up on me.
> ****
> I remember while I was talking to him, I was telling him that we are not -- I remember very clearly telling him we are not coming into your house, we are not going on your property.

/ / /

/ / /

/ / /

After Mr. Babb hung up, and as I was trying to call Mr. Babb back, I heard the shot.

PURSUANT TO 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

_____
Matthew Grose

_____
Date

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing DECLARATION OF
MATTHEW GROSE IN SUPPORT OF FRCP 56 MOTION FOR SUMMARY
JUDGMENT BY DEFENDANTS STUTESMAN, GROSE, PIESKE, McALPINE,
AND CITY OF EUGENE on Plaintiffs on Friday, September 28, 2018, by notice
of electronic filing using the CM/ECF System:

Mr. Timothy R. Volpert
Email:  tim@timvolperlaw.com
Tim Volpert PC
610 SW Alder Street, Suite 415
Portland, OR  97205

Mr. Andrew M. Stroth
Email:  astroth@actioninjurylawgroup.com
Action Injury Law Group, LLC
191 N. Wacker Drive, Suite 2300
Chicago, IL  60606

  Attorneys for Plaintiffs

Dated:  Friday, September 28, 2018.

/s/ Robert E. Franz, Jr.
LAW OFFICE OF ROBERT E. FRANZ, JR.
Robert E. Franz, Jr.        OSB #730915
P.O. Box 62
Springfield, Oregon 97477
E-Mail:  rfranz@franzlaw.comcastbiz.net
Telephone:  (541) 741-8220
Facsimile:  (541) 741-8234
  Attorneys for Defendants
  Will Stutesman, Matthew Grose,
  Nathan Pieske, Malcolm McAlpine,
  and the City of Eugene