*Malcolm McAlpine*

*McGowan v Stutesman, et al.*

*October 18th, 2017*



**CC REPORTING AND VIDEOCONFERENCING**
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 3
Page 1 of 130

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

RONDA MCGOWAN, Personal         )
Representative for Estate of    )
Brian Babb, LEE BABB, CONNOR    )
BABB, by and through Guardian   )
ad litem, STEPHANIE WOODCOOK,   )
KAYLEE BABB,                    )
                                )
          Plaintiffs,           )
     v.                         ) No. 6:17-cv-00424-TC
                                )
WILL STUTESMAN, OFFICER GROSE,  )
OFFICER PIESKE, Sgt. MCALPINE,  )
CITY OF EUGENE, a municipal     )
subdivision of the State of     )
Oregon, JANE DOE CALL TAKER,    )
John and Jane Does 1-10,        )
                                )
          Defendants.           )

DEPOSITION OF MALCOLM McALPINE

October 18, 2017

Wednesday

2:14 P.M.

THE VIDEOTAPED DEPOSITION OF MALCOLM

McALPINE was taken at Harrang Long Gary Rudnick, 360

East 10th Avenue, Suite 300, Eugene, Oregon, before

Christine Oljace, CSR, RPR, CRC, Certified Shorthand

Reporter in and for the State of Oregon.

```
 1

 2                      APPEARANCES

 3  For the Plaintiffs:

 4      MS. MICHELLE R. BURROWS
        420 SW Washington, Suite 300
 5      Portland, Oregon  97204
        503/241-1955
 6      michelle.r.burrows@gmail.com

 7  For the Defendants:

 8      HARRANG LONG GARY RUDNICK, PC
        360 East 10th Avenue, Suite 300
 9      Eugene, Oregon  97401
        541/485-0220
10      BY:  MR. JENS SCHMIDT
        jens.schmidt@harrang.com

11

12  Also Present:

13      LEE BABB

14      MS. JAMIE IBOA

15      NATHAN PIESKE

16      WILL STUTESMAN

17      MATTHEW GROSE

18

19  Videotaped by:  ROBERT CARRICK

20  Reported by:  CHRISTINE OLJACE, CSR-RPR

21      CC REPORTING & VIDEOCONFERENCING

22      EUGENE        541/485-0111

23

24

25
```

1

2                        INDEX

3

4   WITNESS.......................................PAGE

5   MALCOLM McALPINE

6        BY MS. BURROWS                            5

7        BY MR. SCHMIDT                          124

8

9   EXHIBITS....................................MARKED

10  Exhibit 43    Supplemental Report Lane County    24

11                Sheriff's Office; Bates

12                Nos. COE 000721 - COE 000723

13  Exhibit 44    McAlpine Interview; Bates          25

14                Nos. COE 000513 - COE 000514

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We are on record.

2    This is the video deposition of Malcolm McAlpine.

3    Today's date is October 18, 2017.  The time is

4    2:14 p.m.

5               This is the case of Ronda McGowan, et

6    al., Plaintiffs, versus Will Stutesman, et al.,

7    Defendants, Case No. 617-cv-00424-TC.  This case is

8    pending in the United States District Court for the

9    District of Oregon, Eugene Division.

10              Would all present please identify

11   yourselves, beginning with you, Mr. McAlpine.

12          THE WITNESS:  Malcolm McAlpine.

13          MS. BURROWS:  I'm Michelle Burrows,

14   Plaintiffs' attorney.

15          MR. SCHMIDT:  Jens Schmidt for the

16   defendants.

17          THE VIDEOGRAPHER:  Okay.  The court

18   reporter will now swear in the witness.

19

20              MALCOLM McALPINE,

21   having been first duly sworn to testify the truth,

22   the whole truth, and nothing but the truth, was

23   examined and testified as follows:

24   ///

25   ///

Malcolm McAlpine

5

| | |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MS. BURROWS: |
| 3 | Q.    Sergeant McAlpine, could you state your |
| 4 | name for the record, please. |
| 5 | A.    Malcolm McAlpine. |
| 6 | Q.    Sergeant McAlpine, this is -- is it |
| 7 | McAlpine? |
| 8 | A.    McAlpine, yeah. |
| 9 | Q.    All right.  You will find that I can |
| 10 | strangle nouns better than anybody else -- |
| 11 | A.    Okay. |
| 12 | Q.    -- so feel free to correct my |
| 13 | pronunciation at any time. |
| 14 | A.    Okay. |
| 15 | Q.    This is the time set for your deposition |
| 16 | in a federal civil rights lawsuit brought by the |
| 17 | Estate of Brian Babb.  And have you ever had your |
| 18 | deposition taken before? |
| 19 | A.    Never. |
| 20 | Q.    Well, you are in for a treat.  So this is |
| 21 | like court testimony except that it is somewhat more |
| 22 | informal, as you can see from the room here. |
| 23 | A.    Sure. |
| 24 | Q.    This is my client, Lee Babb.  He is the |
| 25 | father of Brian Babb. |

Exhibit 3
Page 6 of 130

1          MR. BABB:  Hi.

2  BY MS. BURROWS:

3      Q.    He will be sitting in here today and

4  tomorrow.

5      A.    Okay.

6      Q.    A deposition is your testimony under oath

7  being recorded by a court reporter, and at the end

8  of the proceeding, there will be a transcript

9  created.  And you do have the right to read and

10  review that transcript if you so choose.  Most of

11  the officers have availed themselves of the right to

12  read and review, so I am assuming that your lawyer

13  will do the same today.

14          If at any point in time you don't

15  understand my question, if it is inarticulate or you

16  just don't understand what I am trying to get at,

17  please ask me to clarify.

18      A.    Okay.

19      Q.    It is really important to the best of our

20  ability, you and I today, that we understand each

21  other so that we can have a fair and accurate

22  transcript of today's proceedings.  Like I said,

23  this is like court testimony.

24          So in your years of service to the City,

25  have you testified in court before?

1       A.      Yes.

2       Q.      So the same general parameters apply

3   except that there is no judge present here, so if

4   there are evidentiary problems in the future,

5   Mr. Schmidt and I will take care of that with the

6   transcript with the federal judge later.  But

7   otherwise, generally speaking, even if there are

8   objections, you probably are expected to answer the

9   question unless your attorney tells you otherwise.

10          There are opportunities here for you to

11  take a break should you need it.  The only thing

12  that I ask is that if you want to take a break, that

13  you wait and answer the question, if there is one

14  pending, and then we can take a break.  And

15  Mr. Schmidt has been really good about waiting for

16  your answer and then asking for a break, but if you

17  need a personal break, you don't have to tell me

18  why.  Just ask for a break and we will do that.

19      A.      Okay.

20      Q.      All righty.

21          One other thing -- a couple of the other

22  officers I have deposed -- and you are the third to

23  the last in about two and a half weeks of

24  depositions here.  A couple of the other officers,

25  who are very good witnesses, anticipate my question

1  before it is asked and will talk over the top of the

2  question, and while I appreciate the intuitive

3  nature of the witness, it makes it difficult for the

4  court reporter.  So we need to speak one at a time.

5  I don't know if you have that inclination, but if

6  you do, she or I will probably jog you about slowing

7  down and waiting for the question.

8          Vice versa.  If I interrupt your answer --

9  I try not to, but I will try and be patient and let

10  you finish your answer before we move forward to the

11  next question.

12          Any concerns about what I have told you?

13      A.    No.

14      Q.    So I see that you are in uniform.  Are you

15  on duty today?

16      A.    I am in training today.

17      Q.    What does that mean?

18      A.    It means I am part of the SWAT team, so it

19  is one of our assigned training days.

20      Q.    And are you in a hurry to get back to

21  that?

22      A.    No.

23      Q.    So you have no other concerns that would

24  otherwise occupy your mind today as we talk?

25      A.    No.

Malcolm McAlpine

9

1      Q.    Have you reviewed any documents in

2  preparation -- and I -- let me strike that.

3            Have you reviewed anything in preparation

4  for today's deposition?

5      A.    Yes.

6      Q.    What have you reviewed?

7      A.    The reports related to the case.

8      Q.    Have you reviewed your statement that you

9  gave to Officer -- Detective Crolly?

10     A.    I believe I gave it to the LCS Chad

11  Rogers.

12     Q.    Well, we will get to that in a second.

13     A.    Okay.

14     Q.    So you did give at least one statement.

15  Is that correct?

16     A.    Yes.

17     Q.    Do you recall giving any others besides

18  the one that you reviewed?

19     A.    The internal affairs interview.

20     Q.    Okay.  Who was the subject of the internal

21  affairs?

22     A.    Officer Stutesman.

23     Q.    Is that separate from the shooting review

24  board review?

25     A.    No.

Malcolm McAlpine

10

1    Q.    Okay.  Anything else you have reviewed?

2    A.    I listened to the audio tapes.

3    Q.    And which audio tapes have you listened

4  to?

5    A.    The radio transcripts or the radio

6  dispatch.

7    Q.    And what period of time did you listen to?

8    A.    Over the last couple weeks I listened to

9  it.

10    Q.    Okay.  Let me -- that was one of those

11  examples of a really poorly asked attorney question.

12          The dispatch records that you reviewed,

13  what dates did they cover?

14    A.    They covered this incident.

15    Q.    Okay.  On March --

16    A.    The date of this incident.

17    Q.    Okay.  March 30th, 2015.

18    A.    Uh-huh.

19    Q.    Was there a particular time period that

20  you listened to of those tapes?

21    A.    From dispatch until -- I don't remember

22  how far after the shooting.  It was a -- minutes

23  after the shooting, and then that was it.

24    Q.    Okay.  Approximately a little over an

25  hour, hour and a half maybe?

Exhibit 3
Page 11 of 130

1    A.    I couldn't say for sure, but from the

2    dispatch until a few minutes after the house was

3    finished being cleared.

4    Q.    Oh, is that different than after the

5    shooting when the house was cleared?

6    A.    It was shortly thereafter.

7    Q.    What do you mean by the term "when the

8    house was cleared"?

9    A.    After officers had made sure nobody else

10    was in the house injured.

11    Q.    So -- and after the house was cleared,

12    were there detectives then investigating?

13    A.    I left the scene then.  There were lots of

14    detectives on scene, so I don't know what that time

15    frame was.

16    Q.    Okay.  So the period of time and the

17    dispatch calls you listened to started from about

18    the time that you were dispatched to the call --

19    A.    No.

20    Q.    -- until --

21    A.    I dispatched myself to the call.

22    Q.    Okay.  Well, we will look at the dispatch

23    records in a second and maybe we can narrow down the

24    time frame a little bit.

25    A.    Okay.

1      Q.    So my -- you are the latest in a long line

2   of officers who were at the scene that I have talked

3   to, so I may not have as many questions for you or I

4   may not want to go into a lot of the other areas

5   that I went into with other officers, so I don't

6   plan on keeping you an inordinate amount of time

7   today.  Do you have to go back to duty after this?

8      A.    No.

9      Q.    Okay.

10                MR. SCHMIDT:  Can we take a break?

11                MS. BURROWS:  Yes.  Did I ask a

12   controversial question?

13                MR. SCHMIDT:  Oh, yeah.

14                THE VIDEOGRAPHER:  Let me go off.  The

15   time is 2:22.  We are off record.

16                (Recess:  2:22 to 2:23 p.m.)

17                THE VIDEOGRAPHER:  Okay.  We are on

18   record.  Time is 2:23.

19   BY MS. BURROWS:

20      Q.    Mr. Schmidt said you had something you

21   wanted to add.

22      A.    Yeah.  As well as reviewing my report, I

23   reviewed the other reports as well as the aerial

24   photographs and the use of force review board's

25   summary.

Malcolm McAlpine

13

1    Q.    What other reports did you review besides

2  yours?

3    A.    It was a packet from the whole case.  I

4  don't know specifically each one.

5    Q.    Did you read Officer Stutesman's

6  statement?

7    A.    Yes.

8    Q.    Did you read Officer Pieske's statement?

9    A.    Yes.

10   Q.    Did you read Officer Kidd's statement?

11   A.    Yes.

12   Q.    Any -- do you recall any other names of

13  officers?

14   A.    Officer Barnes.  Officer Grose.

15   Q.    Warden?

16   A.    Warden.

17   Q.    Clark?

18   A.    Farley and Clark.

19   Q.    And DeWitt?

20   A.    Yes, DeWitt.

21   Q.    When was -- when did you do this review?

22   A.    Over the last couple weeks.

23   Q.    Okay.  And prior to your review for

24  today's deposition, had you reviewed any of those

25  reports?

Malcolm McAlpine

14

```
 1      A.    Not for a long time.

 2      Q.    When was the first time you remember

 3  reviewing all those reports?

 4      A.    When we prepared for our debrief of this.

 5      Q.    About what time was that?

 6      A.    Six months after the incident or so.

 7      Q.    Okay.

 8      A.    I don't remember the exact date.

 9      Q.    And you remember the incident we are

10  talking about was on March 30th of 2015?

11      A.    Uh-huh.

12      Q.    Okay.  You have to answer out loud as

13  well.

14      A.    Okay.

15      Q.    That is one thing I didn't tell you

16  before.

17      A.    Okay.

18      Q.    Nodding and shaking doesn't always make it

19  accurately into the transcript.

20      A.    Okay.

21      Q.    Okay.  Appreciate it.

22            You also said that you read -- that you

23  gave a statement -- used to use the term "internal

24  affairs."

25      A.    Uh-huh.
```

Malcolm McAlpine

15

1    Q.    And I think you told me that that was the

2    same as the shooting review board?

3    A.    I gave one to the internal investigation

4    of -- at the department --

5    Q.    Okay.

6    A.    -- of what exactly I had done and why, and

7    how they used that and what -- I don't know

8    positively what -- who had access to that for which

9    part of the review.

10    Q.    And because I want to make sure I

11    understand, is that separate than the statement you

12    gave to Detective Rogers?

13    A.    Yes.

14    Q.    And have you seen a written version of the

15    statement you gave to the shooting review board?

16    A.    I didn't see a written one, no.  I have

17    heard an audio portion of it.

18    Q.    When was the last time you heard the audio

19    portion of your statement to the shooting review

20    board?

21    A.    When it came out in the Register-Guard.

22    Q.    And when you say it came out in the

23    Register-Guard, was there a newspaper article on --

24    A.    Yeah, and a link on the website.

25    Q.    And was the recording on that link?

Exhibit 3
Page 16 of 130

Malcolm McAlpine

16

1      A.    Yes.

2      Q.    Were you surprised that your statement

3 made it to the media?

4      A.    No.

5      Q.    Okay.  You knew that that was going to

6 happen?

7      A.    Yes.

8      Q.    Now, I have not seen that audio link.

9 Were there other officers' statements on that link?

10      A.    I don't remember.

11      Q.    Was yours the only recorded statement that

12 made it to the Register-Guard?

13      A.    I only remember mine.

14      Q.    Okay.  Did you read -- there were a number

15 of reports about this shooting shortly after the

16 shooting in the Register-Guard and I think other

17 places.  Do you remember reading those media

18 reports?

19      A.    I read a smattering of them, a few of them

20 here and there, yeah.

21      Q.    Okay.  And did you feel that the reports

22 were accurate with what you remember happening?

23      A.    I don't remember which was in each

24 article.  I really don't.  I just was curious at the

25 time.

Exhibit 3
Page 17 of 130

Malcolm McAlpine

17

1    Q.    Okay.  Do you remember feeling any of them

2 were not accurate?

3    A.    I don't remember --

4    Q.    Okay.

5    A.    -- exactly how I felt with each one.  I --

6 I don't know.

7    Q.    Was it interesting to be in the media?

8    A.    In our profession, especially in Eugene,

9 we get pretty used to it.

10    Q.    Oh, is it?  They do a lot of reporting on

11 police activity?

12    A.    They sure do.

13    Q.    Okay.  How long have you worked for the

14 Eugene Police Department?

15    A.    Since 2004.

16    Q.    And did you work at another department

17 prior to that?

18    A.    I did.  I worked at the Sweet Home Police

19 Department and the Lane County Jail.

20    Q.    When did you work for Sweet Home?

21    A.    Between 2001 and 2004.

22    Q.    And what position did you hold at Sweet

23 Home?

24    A.    Police officer.

25    Q.    Patrol?

Exhibit 3
Page 18 of 130

1    A.    Yes.

2    Q.    And you said you worked for the Lane

3  County Jail?

4    A.    Uh-huh.

5    Q.    When was that?

6    A.    That was from early in '01 to late in '01,

7  so I worked there like eight months, I think.

8    Q.    Were you at that time a certified

9  corrections officer?

10    A.    I don't know, because I went to the -- to

11  the corrections academy, and I had been there for

12  about eight months.  And I had finished the

13  training, and I was a solo deputy, but I don't know

14  whether or not, through DPSST, they ended up sending

15  my paperwork to become a certified corrections

16  deputy.  I don't remember.

17            MR. SCHMIDT:  Does he need to slow

18  down a little bit?

19            THE COURT REPORTER:  So far so good,

20  but that's always nice.

21            THE WITNESS:  Okay.  I'll work on it.

22  BY MS. BURROWS:

23    Q.    So Officer, were you a certified police

24  officer when you worked at Sweet Home?

25    A.    Yes.

Malcolm McAlpine

1    Q.    Did you go from the jail to Sweet Home?

2    A.    Yes.

3    Q.    And prior to the Lane County Jail, did you

4  work as a corrections off- -- or a Lane County

5  officer in any capacity anywhere else?

6    A.    No.

7    Q.    You weren't a reserve officer anywhere?

8    A.    No.

9    Q.    Where did you graduate from high school?

10   A.    Northgate High School in Walnut Creek,

11 California.

12   Q.    Warner Creek?

13   A.    Walnut creek.

14   Q.    Oh, Walnut Creek.  Little house on the

15 Prairie?

16   A.    Not quite.

17   Q.    What year did you graduate in?

18   A.    '96.

19   Q.    And what did you do between '96 and 2001?

20   A.    I went to school for a while.  I had jobs.

21 I had a child.

22   Q.    Did you ever serve in the military?

23   A.    No.

24   Q.    Did you get a college degree?

25   A.    No.

Exhibit 3
Page 20 of 130

Malcolm McAlpine

20

```
1        Q.     What positions have you held at EPD since

2   you have been working in 2004?

3        A.     I have been -- I was a police officer to

4   start.   Then I got promoted to police sergeant in

5   2011.

6        Q.     So between 2004 and 2011, were you always

7   a patrol officer?

8        A.     There were a couple assignments that I

9   had.   I was a detective for a short period of time.

10  I worked downtown patrol for a while.   I had been on

11  the SWAT team since 2006.   I was a defensive tactics

12  instructor.

13       Q.     Have you ever been an FTO?

14       A.     Yes.

15       Q.     Ever on any specialty investigative team?

16       A.     When I was on -- in detectives, I was up

17  in property crimes for 90 days.   It was a rotational

18  spot.   That is it.

19       Q.     Okay.   And what is your highest level of

20  certification with DPSST?

21       A.     Advanced police officer certification and

22  supervisory.

23       Q.     Okay.

24              MR. SCHMIDT:   Would you read back the

25  last answer?
```

Exhibit 3
Page 21 of 130

```
 1                    (Record read as follows:)

 2        ANSWER:  Advanced police officer

 3      certification and supervisory.

 4                    MR. SCHMIDT:  Okay.  Thank you.

 5    BY MS. BURROWS:

 6        Q.    I understand -- strike that.

 7              When did you go -- did you go to the DPSST

 8    academy?

 9        A.    I did.

10        Q.    Do you remember what year you went in?

11        A.    2002.

12        Q.    After the jail?

13        A.    Yes.

14        Q.    All right.  Did you already have a job

15    with Sweet Home when you went to the academy?

16        A.    I did.

17        Q.    All right.  What made you leave Sweet

18    Home?

19        A.    I wanted to work for a bigger agency.

20        Q.    And why the jail?

21        A.    I was very young and wanted to get into

22    law enforcement.

23        Q.    That was an opening that you took?

24        A.    Uh-huh.  Yes.

25        Q.    Yes?
```

1          Why did you leave Lane County?

2     A.    I wanted to be on street patrol, and when

3  you went to Lane County Jail, you had to go through

4  the jail first.  At that particular time, it was

5  like eight to ten years before you could transfer to

6  the street, and I wanted to continue my career to be

7  a -- become a police officer, so that is what I did.

8     Q.    Okay.  Have you ever done any instruction

9  work at DPSST?

10    A.    No.

11    Q.    All right.  Let me give you a little

12  background on what is going on here.  This notebook

13  is full of exhibits --

14    A.    Okay.

15    Q.    -- that we have used consecutively, with

16  one exception I will explain to you in a second,

17  with all of the different witnesses.

18          At the back of this notebook you will see

19  it starts over at 1.  Those are exhibits that were

20  used for dispatch and call taker depositions we did

21  in the middle of all of the police officer

22  depositions.  The dispatch record I am going to have

23  you look at throughout this deposition is attached

24  as Exhibit 7 at the back.

25    A.    Okay.

Malcolm McAlpine

23

1      Q.    It is not this 7.

2      A.    Okay.

3      Q.    There is also some aerial photographs that

4  we may rely on that were introduced during

5  witness -- neighbor witness testimony, and I may ask

6  you to identify whether those are similar to the

7  ones you looked at in preparation for today's

8  deposition.  Is that okay?

9      A.    Yes.

10      Q.    All righty.  I am going to show you a copy

11  of the statement that you gave after the shooting on

12  March 30th.  And what I have heard from other

13  officers is that there is not a report that you

14  wrote but rather a statement given to a detective.

15  Is that correct?

16      A.    Correct.

17      Q.    And when you reviewed the statement that

18  you gave to Officer -- or Detective Rogers, did it

19  appear to be a fair and accurate version of what you

20  told that officer?

21      A.    Yes.

22      Q.    Was your statement recorded?

23      A.    Yes, I believe so.

24      Q.    And have you listened to that recording in

25  preparation for today's deposition?

Exhibit 3
Page 24 of 130

1      A.    I have not.

2      Q.    All right.  Let's mark this the next in

3  order.

4                 (Deposition Exhibit No. 43 marked

5                  for identification.)

6  BY MS. BURROWS:

7      Q.    Would you take a look at Exhibit 43 and

8  tell me if that looks to be a fair copy of your

9  statement to Detective Rogers, the first three pages

10  at least.

11     A.    Okay.

12           It appears to be, yes.

13     Q.    And if you will look on the fourth page,

14  and if you look way down at the bottom in the

15  right-hand corner, there is a Bates stamp number of

16  513 on the -- yes.

17     A.    Yeah.

18     Q.    -- what is -- it says McAlpine Interview,

19  March 30th, 2015, 2101 hours.  Is this a different

20  interview than that which is depicted in the first

21  three pages?

22     A.    I don't know what this is.

23     Q.    Can you look at it and tell me if you

24  recognize it?

25     A.    I don't.

Malcolm McAlpine

1    Q.    Have you ever seen this before?

2    A.    No.

3    Q.    Who were the officers who were

4    interviewing you for the use of force review, if you

5    recall?

6    A.    I don't remember for sure.

7    Q.    But were they EPD officers?

8    A.    I don't remember who did the interview.  I

9    don't remember for sure.

10    Q.    Okay.  So let's take a look at -- here is

11    what I think I want to do.  Those last pages

12    starting with 513, let's separately mark that as a

13    different exhibit.

14              (Deposition Exhibit No. 44 marked

15               for identification.)

16    BY MS. BURROWS:

17    Q.    Okay.  Let's look at 43.

18    A.    Okay.

19    Q.    And if you need to refer to Exhibit 7 --

20    which maybe I should start there first.  Exhibit 7

21    is the dispatch record, and I would like you to look

22    at it for me and tell me when you first dispatched

23    yourself to this call, what time.  Maybe I should

24    give you a little explanation, too.

25              As was explained to us in the dispatchers'

1   depositions, this particular format was created when

2   Mr. Schmidt got a prior version that was very, very

3   difficult to read.

4       A.    Okay.

5       Q.    So they reformatted it, and the first four

6   pages, as I understand it, are really from the call

7   taker and the dispatchers' CAD notations.

8       A.    Okay.

9       Q.    And then starting at page 4 of 11, where

10  it says Radio Log at the bottom --

11      A.    Uh-huh.

12      Q.    -- are, generally speaking, the

13  information relating to the location of the

14  different Eugene police officers.

15      A.    Okay.

16      Q.    So wherever you need to look on any of

17  this, if you could locate where it was that you

18  first dispatched yourself to the Devos Street

19  address on March 30th.

20      A.    I -- even with looking at this, I

21  didn't -- I said it on the radio, so whatever time

22  stamp it has on the radio, but I didn't look at the

23  clock, so I don't know exactly what time.

24              MR. SCHMIDT:   What is your designator?

25              THE WITNESS:   3 X-ray 31.

1    BY MS. BURROWS:

2        Q.    So look for 3 X-ray 31 and where these

3    records say you were first dispatched to the Devos

4    Street address.

5              Maybe I can help you, Officer.

6        A.    That would be helpful.  I don't see it.

7        Q.    If you could take a look at -- it looks

8    like page 5.  It looks like 3 X-ray 31 is the third

9    notation down, 5:08:03 p.m.

10       A.    Okay.

11       Q.    So what does that information tell us

12   besides -- in that entry?

13       A.    That if the dispatcher put that I was

14   going en route to that call at that moment, that is

15   when she put it in.

16       Q.    Okay.  Now, at that point -- and I know it

17   is an approximation.

18       A.    Uh-huh.

19       Q.    I know that is just when the dispatcher

20   got to notating this information and that, in fact,

21   you may have headed out earlier.  What do you recall

22   knowing about the call at Devos Street before you

23   headed out to that address?

24       A.    Oh, that there had -- there was a suicidal

25   male in a house.  He had a gun to his head, I

Malcolm McAlpine

28

1  believe, and he had possibly shot out a window.

2      Q.    And where did that information come from?

3      A.    Dispatch.

4      Q.    Was that something you remember being

5  radioed, or did you read it?

6      A.    It was over the air.

7      Q.    Over the air.

8            Did you -- and the notations, the CAD

9  notations are the first couple three pages.  Let's

10  scan down through page 1.  There is a lot of

11  information that is being noted here.

12            If you could read down, from the beginning

13  down, and tell me of those notations which of that

14  information you knew before you went to the Devos

15  Street address.  Does that make any sense, what I

16  just asked you?

17      A.    It does.  It just seems like it would be

18  easier to listen to the tape, because that is what I

19  heard.

20      Q.    Well, I am trying to figure out what you

21  remember before --

22      A.    Okay.

23      Q.    -- you went out.

24      A.    Okay.  I remember the dispatcher saying

25  that there was a gentleman in the house.  He had a

Exhibit 3
Page 29 of 130

1  gun to his head.  Here it says 9-millimeter.  I

2  don't recall if that was -- it was that specific.

3  She did say she [sic] has already shot one bullet

4  into a window or somewhere into the house and that

5  the therapist was online with him and was the

6  caller.  That is what I remember when I went

7  en route.

8      Q.   Okay.  If you read further on down, at

9  5:10, it looks like that the suspect is an

10 Afghanistan vet.

11     A.   Uh-huh.

12     Q.   Do you remember that?

13     A.   I don't remember when that came out, no.

14     Q.   Do you remember the notation at 5:11:11

15 that the caller didn't hear the shot and told her he

16 shot into the ceiling one time?  Do you remember

17 that information?

18     A.   They never told us that.

19     Q.   They never told you that?

20     A.   No.

21     Q.   So if it is written here like on page 1,

22 is that -- how is that information, if at all, being

23 translated to you?

24     A.   I don't -- I mean, it is put into CAD --

25     Q.   Yeah.

Malcolm McAlpine

30

1      A.     -- but if they don't say it on the radio,

2   I don't know it.

3      Q.     Is CAD showing up on your computer in your

4   vehicle?

5      A.     Yeah.  Some of it is.  Some of it is not.

6   I don't know what -- I am not savvy enough to know

7   what CAD details show up and what don't, but I did

8   not know that.

9      Q.     Could you explain that answer to me?  Not

10  everything on here shows up on your computer?

11     A.     I don't know is what I am saying.

12     Q.     All right.

13     A.     I am not sure what shows up.  Looking at

14  this, I could tell you if I had the computer of what

15  was in front of me and that is what showed up, that

16  is what showed up, but just by looking at this, I

17  don't know for sure, because I know that many times

18  in the past information that dispatch has had has

19  not shown up on our computer.

20     Q.     So if you are out of your vehicle,

21  obviously you can't see what is on the computer

22  anyway?

23     A.     Correct.

24     Q.     So you would depend upon that information

25  being relayed over the radio to you?

Exhibit 3
Page 31 of 130

Malcolm McAlpine

31

1      A.      Yes.

2      Q.      Okay.  Now, besides the things that you

3  already told me, is there anything else you recall

4  learning about this call prior to going to the Devos

5  Street address?

6      A.      Not that I can remember.

7      Q.      All right.  Were you a sergeant on that

8  day?

9      A.      Yes.

10     Q.      And I talked to Sergeant Vinje just a tad

11 bit about this, but can you tell me, when you

12 respond to a scene, as a sergeant are you the

13 commander of that scene?

14     A.      Yes.

15     Q.      All right.  And I know Sergeant Vinje was

16 a sergeant at that time as well.

17     A.      Yes.

18     Q.      Were you the -- and if I am not using the

19 right term, please provide the correct one for me.

20     A.      Uh-huh.

21     Q.      Were you the incident commander of the

22 Devos Street incident?

23     A.      I was.  I was.  When he arrived, we made

24 decisions in conjunction with each other.  We were

25 in close proximity.

1    Q.    Is that a procedure with Eugene Police

2  Department if there is more than one -- and I will

3  just use sergeant --

4    A.    Uh-huh.

5    Q.    -- and we can talk about other ranks in a

6  second.  But if there is two sergeants at a critical

7  incident or complicated incident, who -- would you

8  typically share command positions?

9    A.    Sometimes.  It kind of depends on the

10  tenure of the sergeant.  Sergeant Vinje and I were

11  actually promoted during the same sergeant process.

12  We also were sergeants on the SWAT team together, so

13  working together with me and him was very normal for

14  us.

15    Q.    Okay.  And you were comfortable, then,

16  sharing command with Vinje?

17    A.    Absolutely.

18    Q.    Now, Sergeant Vinje explained briefly --

19  and he didn't go into a lot of detail -- how you

20  divided up those command duties.  Do you remember if

21  there were particular areas of command that you were

22  responsible for?

23    A.    I remember that I was responsible for -- I

24  specifically asked him to call our lieutenant when

25  he was on his way to deal with the BearCat -- the

1   armored vehicle coming out, to make that

2   notification, because I was trying to listen to the

3   radio and allocate resources.

4            I don't remember which one of us -- I

5   think we had a brief conversation about who was

6   going to be in charge of the hasty team, which would

7   be a team that would maybe have to deal with

8   something immediate, and then how we were dealing

9   with the surrounding area.  If I remember right, I

10  was going to deal with kind of the hasty team, and

11  he was going to deal with the surrounding area.  But

12  he was very close and we were talking to each other,

13  so I am -- we just kind of -- we kind of both did it

14  together, all of it, it seemed like.

15      Q.    Your answer sort of comports a lot with

16  what Vinje told me as well.

17      A.    Uh-huh.

18      Q.    What I would like to do is maybe go

19  through some questions with you about how you

20  approached command of this particular incident.

21      A.    Okay.

22      Q.    And I have never been a police officer,

23  and I have never been in charge of a complex

24  incident like this, so I may ask you questions that

25  might seem a little odd, but I am trying to figure

1    out your thought processes as you approached this

2    situation.

3        A.    Okay.

4        Q.    So first I need a little bit of background

5    explanation about what the hasty team is.

6        A.    A team that would have to deal with

7    something immediate, if something was like

8    immediately they had to move to somebody being

9    injured or immediately going towards wherever the

10   problem was rather than more of the perimeter

11   positions that would be kind of surrounding the

12   house and getting observation of the house.

13       Q.    So those perimeter positions are more of a

14   cover officer role?

15       A.    They can be.  They can also -- things can

16   transition very quickly, but in general, yes.

17       Q.    Okay.  So how do you pick -- let's just

18   talk about March 30th.

19       A.    Okay.

20       Q.    And let's not make it too general.

21             On March 30th, when you were thinking that

22   you needed to have a hasty team --

23       A.    Uh-huh.

24       Q.    -- how do you go about deciding who is

25   going to be on that team and what they are going to

1  do?

2       A.    Whoever arrives there.

3       Q.    So any officer can be on the hasty team?

4       A.    Yes.

5       Q.    I understand that on the date of this

6  incident, there were a number of members of the SWAT

7  team who just coincidentally showed up at the scene.

8       A.    Yeah.

9       Q.    Would you pick SWAT officers primarily to

10 be on your hasty team?

11      A.    I would use them certainly if they were at

12 hand, but I wouldn't take somebody -- a SWAT officer

13 who was maybe in the back of the house and take the

14 time to bring them to the front because -- not until

15 it became a SWAT incident, which this never -- well,

16 it didn't turn into.

17      Q.    A SWAT incident?

18      A.    Uh-huh.

19      Q.    Yes?

20      A.    Yes.

21      Q.    Sorry.

22      A.    Yes.  Sorry.

23      Q.    What -- so in your experience both on the

24 SWAT team and as an incident commander, what factors

25 go into creating a SWAT response?

Exhibit 3
Page 36 of 130

1    A.    It has to do with the severity of the

2  crime.

3    Q.    All right.

4    A.    And the details at whole.  A lot of what

5  our policy will say is armed barricaded subjects,

6  active shooters, high-risk search warrants, those

7  kind of things are what our SWAT team responds to.

8    Q.    And that is in a policy dealing with the

9  deployment of the SWAT team?

10    A.    Yes.

11    Q.    All right.  In this incident at the Devos

12  Street -- on Devos Street on March 30th --

13    A.    Uh-huh.

14    Q.    -- did you at any point in time think that

15  this was an incident that would call for the SWAT

16  deployment?

17    A.    I briefly did towards the end of it, when

18  I -- I didn't have the whole picture of what was

19  going on.  I briefly did, but up until that point,

20  no, or we would have deployed the team.

21    Q.    At what point in this timeline -- I am

22  going to go through the timeline with you in a

23  minute, but at what point in the timeline did you

24  briefly consider deployment of the SWAT team?

25    A.    When I believed that there was a shot

1  fired at us.

2      Q.    When -- was that when Officer Stutesman

3  fired?

4      A.    Yes.

5      Q.    And you didn't know who had fired the

6  shot?

7      A.    Correct.

8      Q.    Okay.  And if you had believed it was

9  Mr. Babb or the suspect in the house, would that

10 have triggered the SWAT deployment?

11     A.    Yes.

12     Q.    All right.  So up to that point, what sort

13 of situation did you think you had?

14     A.    Well, we were still trying to figure it

15 out.  I wasn't quite sure.  It changed dynamically

16 from the beginning until -- until the end a couple

17 different times.

18     Q.    And let's go through that.

19     A.    Okay.

20     Q.    And I know that we are re-creating

21 something that happened two years ago.

22     A.    Uh-huh.

23     Q.    And you are free to use any of the

24 paperwork or documents to jog your memory, including

25 your report or anyone else's report.

Exhibit 3
Page 38 of 130

1          When you first arrived at the Devos Street

2    address, were there other officers already present?

3        A.    Yes.

4        Q.    Do you recall who was present at that

5    time?

6        A.    I don't remember exactly who, no.

7        Q.    And prior to this call, were you familiar

8    with that Devos neighborhood?

9        A.    I know of the neighborhood.  I wasn't

10   familiar with the house or the layout of the area

11   around it.

12       Q.    Okay.  I have -- I am looking for some

13   pictures and some maps, so I apologize.  I might

14   have to use stuff that is in your notebook real

15   quick.  I think we were using Exhibit 16

16   consistently with the other officers' testimony, so

17   that might be fair to just use the same one with

18   you.

19          This is a Google Maps overview of the area

20   that officers were deployed to on March 30th.

21   Several officers have testified with this picture in

22   mind, and this picture was originally used with the

23   neighbor at 2244.

24          So does this look familiar to you, this

25   particular picture?

1    A.    The overview.  Not what is written on it.

2    Q.    Oh, yes.  Witnesses have written on it, so

3 don't -- just ignore that.

4    A.    Okay.

5    Q.    Just don't focus on the writing.

6          So where did you enter Devos Street?

7    A.    Where did I --

8    Q.    When you first arrived, what was your

9 approach?

10    A.    I walked on foot from the south.

11    Q.    And where did you park your vehicle, if

12 you recall?

13    A.    Somewhere down here.

14    Q.    Okay.  Somewhere off --

15    A.    Somewhere off the map, yes.

16    Q.    Why did you park at the location you

17 chose?

18    A.    I wanted to be out of sight and out of any

19 firing line from the involved residence.

20    Q.    And did you think that you had an active

21 shooter in the vehicle when you first -- or in the

22 house when you first approached?

23    A.    An active shooter, no.

24    Q.    Now, I know that you have told me that you

25 believed that the person in the house had fired a

1    shot.  Did you know where that shot had been fired

2    towards, where he had fired, if at all?

3        A.    Dispatcher said out the window or

4    somewhere in the house is -- I think was similar to

5    what she said.  Out the window or somewhere in the

6    house.

7        Q.    Were you able to confirm that, in fact, a

8    shot had been fired that day?

9        A.    Later in the investigation?

10       Q.    Yes.

11       A.    Yes.

12       Q.    That day that shot had been fired?

13       A.    Well, I don't know for sure.  They found,

14   I believe, a bullet hole in the house.

15       Q.    Was there any question as to the

16   truthfulness of the information about -- let me

17   strike that.

18            Did you ever confirm the accuracy of the

19   report that a shot had been fired that day?

20       A.    I just saw it in police reports.

21       Q.    That the shot had been fired that day?

22       A.    That they had found a bullet hole, I

23   believe.  I don't remember the specifics.

24       Q.    Okay.  The original information, as I

25   understand it, came from the therapist to dispatch

1  about the shot being fired.  Is that correct?

2      A.    I believe so.

3      Q.    All right.  Do you -- at any point in time

4  in this March 30th incident, did you ever speak to

5  the therapist yourself directly?

6      A.    No.

7      Q.    Did you ever try to make attempts to speak

8  to the therapist?

9      A.    No.  We did have her number.

10     Q.    All right.

11     A.    But I don't remember ever calling.

12     Q.    Is there any reason why you did not call

13  her?

14     A.    She was on the line with Mr. Babb at the

15  time for most of this incident.

16     Q.    Were you able to -- was anyone on your --

17  were any of the responding officers able to call

18  Mr. Babb on the line in the house?

19     A.    I believe Officer Grose attempted to and

20  may have gotten him on the line at least on one

21  occasion.

22     Q.    Did you -- did you think -- did you ask

23  any officer maybe to go retrieve the therapist from

24  her office to bring her to the scene?

25     A.    No.

Malcolm McAlpine

1    Q.    And is there some reason why not?

2    A.    Well, that -- the incident was happening

3  pretty dynamic, pretty quick.  I didn't think at

4  that point it was practical.

5    Q.    And why not?

6    A.    I didn't know where she was.  She had been

7  on the line with Mr. Babb for -- she had been

8  speaking with Mr. Babb, and she thought it so --

9  such a dire situation that she needed to call the

10  police to help.  I assumed that she had done

11  everything that she could to help him and was now

12  trying to go through another avenue to get the

13  situation resolved.

14    Q.    Well, was this a welfare check response by

15  police?

16    A.    It was a response to somebody who may have

17  shot out of the house.

18    Q.    So it was a criminal investigation

19  response?

20    A.    To start.  That was part of it for sure.

21    Q.    So was there anything -- any plan in your

22  mind to maybe arrest Mr. Babb for firing a round?

23    A.    If we had determined that he was -- that

24  he had fired it outside of the house, that would

25  have eventually been our thought process, yes.  I

1    don't know when or how that would have occurred.

2        Q.    Okay.  So I am going to go through with

3    you the best that we can together --

4        A.    Okay.

5        Q.    -- the timeline upon your response,

6    responding to the -- Mr. Babb's location.

7              You said you walked from the south north

8    on Devos Street.  Is that correct?

9        A.    Yes.

10       Q.    And where did you walk to originally?

11       A.    Right here.

12       Q.    The driveway of 2244?

13       A.    Yes.

14       Q.    And I know the picture is a more recent

15   picture than March 30th.  What could you -- where

16   did you go to on that particular property?

17       A.    At the -- I guess it would be the

18   northeast corner of the structure.

19       Q.    Could you see the Babb house from there?

20       A.    The second story.

21       Q.    Could you see -- you couldn't see the

22   front door at all?

23       A.    No, not well enough to be able to contain

24   anything that was -- may or may not have happened at

25   that front door.  I don't remember if I could see

Malcolm McAlpine

44

```
1    the top, but certainly not enough to be able to --

2    to have a good observation of if anything came or

3    went from that door.

4         Q.    When you arrived at the driveway of 2244,

5    were there other officers already present?

6         A.    Yes.

7         Q.    Who was present?

8         A.    I don't remember.  I think -- I couldn't

9    say for sure.  I don't remember.

10        Q.    Were there -- was Officer Kidd on the roof

11   of 2244 at that time?

12        A.    No.

13        Q.    Were there officers at the rear of the

14   Babb property?  And I mean by rear, behind this

15   vacant space here on the map.

16        A.    Uh-huh.  I don't believe that --

17   Officer Clark was one of the officers that was back

18   here, and I don't believe he approached until he had

19   a second officer, which was Officer Warden, so there

20   was a -- a little bit amount of time before we had

21   any view or information of the back side or the west

22   side of the house.

23        Q.    When you first arrived at 2244, do you

24   know where any of your officers were posted up?

25        A.    We had a couple officers here, and Barnes
```

1    and Farley were trying to -- were out to the north.

2        Q.    And you said you had a couple of officers,

3    and you pointed to 2244 driveway.  Do you remember

4    who those officers were?

5        A.    I don't.

6        Q.    And the BearCat was not yet located there.

7    Is that correct?

8        A.    No.

9        Q.    And I understand that you may have called

10   Lieutenant Klinko to get permission to get the

11   BearCat.  Is that correct?

12       A.    No.  Just to make the notification.

13       Q.    All right.  And then at some point Officer

14   Pieske arrived with the BearCat.  Is that correct?

15       A.    Correct.

16       Q.    How long had you been at the 2244 location

17   when the BearCat arrived?

18       A.    I don't recall.  I guess that would be on

19   dispatch records again.

20       Q.    And I am just trying to get a ballpark

21   from you what you recall.

22       A.    Sure.  I don't remember.

23       Q.    All right.

24             How long -- so you knew there were other

25   officers at the location when you first arrived.  Is

1    that fair?

2        A.    Absolutely.  Yes.

3        Q.    Okay.  Why did you not go up to the Babb

4    house?

5        A.    Because we had information that he had

6    shot out of the house, and we would never walk --

7    just walk up to a house where somebody had possibly

8    fired out of a window for fear of our safety.

9        Q.    So let's stop right there for a second.

10       A.    Okay.

11       Q.    To the best of your ability -- and I

12   understand that this is just -- we are talking two

13   years later.

14       A.    Sure.

15       Q.    To the best of your ability, at that point

16   in time upon your arrival at the 2244 residence,

17   what was your plan to figure out what was going on?

18   What were you going to do?

19       A.    We were going to try to get into contact

20   with Mr. Babb or have his therapist ask him to come

21   out unarmed so that we could talk to him and figure

22   out what was going on.

23             My other -- the other plan was we needed

24   better eyes on the house, be able to see the house

25   from every point of view that we could in the safest

Malcolm McAlpine

47

1    manner that I could make that for everybody

2    involved.

3        Q.    Okay.  How were you going to contact the

4    therapist?  I am just talking -- we are right --

5        A.    I did it through dispatch.

6        Q.    Okay.  What did you say to dispatch?

7        A.    I said ask -- I don't know what my exact

8    words were.

9        Q.    Okay.

10       A.    But I said something to the effect of can

11   you ask the therapist to have Mr. Babb come out of

12   the house unarmed.

13       Q.    And did that happen as far as you know?

14       A.    No.

15       Q.    You don't know whether -- do you know

16   whether dispatch asked the therapist to speak to

17   Mr. Babb?

18       A.    No.

19       Q.    Did you follow up to find out if the

20   therapist had, in fact, spoken with Mr. Babb?

21       A.    I asked a second time, yes.

22       Q.    Did you get any response from dispatch?

23       A.    I don't believe so.

24       Q.    You said that you had the therapist's

25   phone number?

Exhibit 3
Page 48 of 130

1     A.    Yes.

2     Q.    And was -- and I know you have answered

3  this already, but let me -- let me try down another

4  line to see if we can jog your memory.

5         Do you know whether you or any other

6  officer called the therapist when you got no

7  response back from dispatch?

8     A.    I did not.

9     Q.    Do you know if any other officer tried to

10  contact the therapist?

11     A.    I don't know.

12     Q.    Did you think -- did you ask -- strike

13  that.

14         Do you know whether the therapist tried to

15  call any officer at the scene at that time?

16     A.    I don't believe so.

17     Q.    Okay.  Now, I have spoken -- we have

18  spoken to several neighbors, and we have got a few

19  more to go through.  I understand that there were

20  officers clearing or advising the neighborhood to

21  stay inside or -- I don't remember what the term is,

22  but stay in their house.

23     A.    Uh-huh.

24     Q.    Was that something that you directed

25  officers to do?

1    A.    No.

2    Q.    Who did that?

3    A.    Which officers did that?

4    Q.    Yes.

5    A.    I think -- I believe it was Barnes and

6  Farley, because they were trying to find a place

7  where they could see from this northeast area.  And

8  I think, during the process of doing that, they were

9  letting people know that they were either in their

10  backyard or if they could walk through their house.

11  So they had notified a couple people, but we weren't

12  specifically doing any citizen notifications at that

13  moment.  We were still very early on in the incident

14  and trying to figure out exactly what we had.

15    Q.    So you knew that you had the potential for

16  a person who had fired a round possibly outside

17  through -- outside into the community?

18    A.    Possibly.

19    Q.    Possibly.  There are neighbors who say

20  that a plainclothes police officer came to their

21  door and told them to shelter inside.

22    A.    Uh-huh.

23    Q.    Do you know who that person might be, if

24  in fact there was a plainclothes policeman that day?

25    A.    I don't know.

Malcolm McAlpine

50

1    Q.    And Sergeant, since you were the incident

2    commander, at least until Sergeant Vinje arrives,

3    did you order or ask any officer to go notify

4    neighbors to shelter inside?

5    A.    I don't believe so.

6    Q.    Okay.  Sitting here today, and now you

7    have the benefit of all this hindsight and all this

8    review and all this evaluation, do you know who

9    might have been the officers who were notifying

10   particularly the neighbors here?

11   A.    I have -- I have no idea.

12   Q.    Okay.  Prior to -- so we are still in the

13   driveway.  That is where we are timeline in this.

14   Do you recall at any time from that point forward

15   you spoke -- you personally spoke to any neighbors

16   about Mr. Babb or the situation?

17   A.    You know, I vaguely remember somebody

18   poking out here and yelling out to get back in the

19   house, but I didn't have a conversation with any of

20   the surrounding neighbors, I don't believe, no.

21   Q.    So you pointed to the house which is to

22   the immediate north of 2244.  Is that correct?

23   A.    Yes.

24   Q.    And did you speak to any resident of 2244?

25   A.    I don't remember.

Exhibit 3
Page 51 of 130

1    Q.   They remember speaking to somebody.  Did

2  you see any officers speak to the residents of 2244?

3    A.   I never saw anybody, but there was, by the

4  end, four or five of us in and around here, and

5  Officer Kidd had made his way to the roof, so any

6  one of those officers could have.  I don't -- I

7  don't remember doing it specifically.

8    Q.   Okay.  And that -- all you can do is tell

9  me what you remember.

10    A.   True.

11    Q.   Were there any -- did you assign an

12  officer to get on the rooftop of any other house

13  besides 2244?

14    A.   No.  And, in fact, I told Officer Kidd to

15  see if he could also get a better view of the front

16  part of the residence.

17    Q.   From the top of 2244?

18    A.   I didn't tell him to go there, but that is

19  where he chose.

20    Q.   Okay.  All right.  Other neighbors, a

21  couple of them, remember seeing officers on two

22  rooftops.

23    A.   Okay.  By the end, there was an officer

24  with a ladder on this -- on the house directly to

25  the north.  Maybe that is what they saw, but I don't

1   think he had ever made it to the top where he could

2   crest the view of the house.

3       Q.    Okay.  Do you remember which -- who that

4   was?

5       A.    Farley.

6       Q.    Farley?

7       A.    I believe so.

8       Q.    Now, Kidd told us that he had some

9   communication with Farley about maybe getting

10  another angle on the front of the house.  Do you

11  remember --

12      A.    Correct.

13      Q.    -- any of those conversations?

14      A.    Yes.

15      Q.    Can you tell me what you recall of those

16  conversations?

17      A.    I believe it was over the radio, and Joe

18  asked him if he could get a better view of the front

19  from anywhere.  We -- this is a -- you know,

20  obviously, a residential area, and typically we

21  don't direct people to exact locations.  We just

22  tell them, "Can you see the front side of the house?

23  Get to a place where you can see the front side of

24  the house," and officers will work from there.

25      Q.    So as a layperson, it occurs to me that it

Malcolm McAlpine

53

1   would be a good idea to know where all your officers

2   are physically located --

3       A.    Absolutely.

4       Q.    -- if you ever got a potential shooting.

5       A.    100 percent.  In fact, I asked for that

6   several times, but when you are dealing with a

7   dynamic situation and about probably by the ten --

8   end of it, eight to ten officers, it is really hard,

9   especially when people are moving.  You have a

10  general idea of where they are.  And what I had

11  tried to do is keep a notebook with me and try to

12  figure out where stuff was.

13      Q.    Okay.

14      A.    But it is real -- in fact, on the radio, I

15  asked several times for people to give me their

16  exact locations, but that changes.

17          So again, really we have in these dynamic

18  situations that are happening very quickly, we do

19  the best that we can to know where they are at, but

20  we don't always know absolutely for sure where they

21  are.

22      Q.    So when you say you had a notebook and you

23  were trying to keep track of everybody, were you

24  tracking them by their call sign or by their name?

25      A.    I don't remember.

1      Q.     Okay.  Did you have a -- did you do a

2   rough handwritten map of the location?

3      A.     No.

4      Q.     Did you pull up a map like this one or

5   another one of the neighborhood?

6      A.     No.  I was standing at the back of a car

7   so --

8      Q.     Okay.  On the onboard computers in your

9   various patrol vehicles, can you pull up a map --

10     A.     Uh-huh.

11     Q.     -- of an area?  Yes?

12     A.     Yes.

13     Q.     Did you ask anyone to do that for you?

14     A.     We did not have the resources for that and

15   we could see where we were at.

16     Q.     And that is fair.  Thank you.

17           What I am trying to figure out is if you

18   have got at least one officer on a roof at some

19   point, another one maybe going on a second roof, you

20   have got two officers back here, and you think you

21   have an active -- you may have an active shooter in

22   here, do you want to avoid crossfire situations?  So

23   you don't want these guys back here shooting if you

24   have got officers in front, do you?

25     A.     Well, unfortunately, that is kind of the

Malcolm McAlpine

55

1   nature of our business.

2       Q.    And so tell me how you try to protect

3   against that happening, an officer getting

4   accidentally shot by friendly fire?

5       A.    By knowing where they are at.

6       Q.    Okay.

7       A.    And officers putting themselves in places

8   behind cover.

9       Q.    Okay.

10      A.    And this position on this rooftop didn't

11  happen for a while.

12      Q.    I get that.  I am moving that way, but I

13  am of kind of asking some background, because you

14  are my -- you are my incident commander sitting

15  here --

16      A.    Okay.

17      Q.    -- answering your thought processes about

18  the incident.  And I do appreciate it.

19          So were you able to -- it sounds like it

20  was very difficult for you to kind of know where

21  your officers were during this situation.

22      A.    I had a general idea of where they were.

23      Q.    So --

24      A.    I was also standing in the front, so there

25  were some people that I could see.

Exhibit 3
Page 56 of 130

1    Q.    Well, and Officer Kidd did say that at

2    points in time he was actually talking to you

3    directly from his location.

4    A.    Correct.

5    Q.    Now -- but the officers down here, Barnes

6    and Farley, at least where they initially were

7    posted up, could they talk to you directly?

8    A.    Occasionally they were back here, so I

9    could, yes.

10   Q.    So they would move from this northernmost

11   post here down to the --

12   A.    They were trying to get a better spot up

13   front, so they were around here.

14   Q.    All right.  At what point in this

15   situation did Farley move over here to the -- I wish

16   I knew the address of this; I am sorry -- but the

17   house north of 2244?

18   A.    I don't recall.

19   Q.    What about Barnes?

20   A.    Probably the same time, but I don't know.

21   Again, they had mentioned it on the radio.  I am

22   sure that is time stamped.  I don't know what that

23   time was.

24   Q.    And some of this becomes a little bit

25   important to me because Officer Barnes said that she

1    really never left this position throughout most of

2    the time period.

3        A.     Uh-huh.

4        Q.     Do you recall her moving up to this

5    northern tax lot over --

6        A.     They were together.  Officer Barnes and

7    Officer Farley, they said that they were together.

8    I assumed that they moved together.  If they didn't,

9    that is -- we typically work in two-person teams.

10       Q.     Uh-huh.

11       A.     And we bound and overwatch, which

12   essentially means that one officer will go ahead of

13   us, and the other one will kind of watch from

14   behind.  So if Farley tells me he is going here, I

15   assume that she is with him.  That doesn't

16   necessarily mean she is right next to him.  She

17   knows where he is at.

18       Q.     Okay.  So when Farley -- I think you have

19   told me that at one point Farley was trying to get

20   on the rooftop of that house north of 2244.  Do you

21   remember seeing him put the ladder there and make --

22       A.     No.

23       Q.     Okay.  How do you know that he was -- had

24   a ladder there?

25       A.     I remember seeing a ladder there, and I

Malcolm McAlpine

58

1   knew that is where he was going to be.

2       Q.    Okay.  With respect to Warden and Clark --

3       A.    Uh-huh.

4       Q.    -- on the -- is that the east side of

5   this?

6       A.    Yes.

7       Q.    East side.  Could you see where they were

8   located from your position at 2244?

9       A.    No.

10      Q.    And the information that they are relaying

11  to you on the radio, where did you understand them

12  to be?

13      A.    Somewhere along what would be the west

14  side of the house -- somewhere not along the west

15  side, but with a view of the west side of the house.

16      Q.    Do you know which lot they were in?

17      A.    I don't.

18      Q.    Do you believe that they were together?

19      A.    I don't know.

20      Q.    Okay.  All right.  So do you know where

21  the notes are that you kept trying to locate, keep

22  track of your officers?

23      A.    I don't know.

24      Q.    Would you have given that to any

25  investigator?

1      A.    I don't believe so.

2      Q.    All right.  When I -- I have sued a few

3  SWAT officers in my career, and typically the SWAT

4  team has the benefit -- a little bit advance notice

5  and a little bit of advanced planning.  Is that

6  typical with your SWAT team?

7      A.    It is probably a 50/50 split.

8      Q.    Okay.  That is fair.

9            In those instances where you have time to

10  do a plan, do you have a map and then you do

11  different -- where you want officers to go?

12     A.    Yes.

13     Q.    Did you have time to do anything like this

14  at the Babb house?

15     A.    Not -- nothing any more than scratched

16  notes on a scratch piece of paper, my notebook.

17     Q.    Now, at some point Officer -- or

18  Sergeant Vinje arrived, and I think you have already

19  told me that you divided duties up at that point.

20     A.    Correct.

21     Q.    And I think you told me -- and he said

22  something like this as well, that his -- he believed

23  his assignment were to take care of these perimeter

24  officers on the perimeter of the house.  Is that

25  fair?

1    A.    Yes.

2    Q.    What did you expect him to be doing when

3    he is taking care of the perimeter?  And I don't

4    mean like you are in charge -- just in your mind, as

5    you are thinking through the dynamics of the

6    situation, what did you believe Sergeant Vinje was

7    taking care of?

8    A.    Dealing with the officers that were

9    getting into place.  The problem was we didn't have

10   very many.

11   Q.    Very many what?

12   A.    Officers.

13   Q.    Could you have brought more in if you

14   needed them?

15   A.    No.

16   Q.    Oh, okay.  You were maxed out?

17   A.    At that point, everybody that could go was

18   going.

19   Q.    Okay.  So there were, what, eight or nine

20   officers there at the maximum capacity when --

21   A.    Somewhere around there.

22   Q.    Okay.  And did -- did each of those

23   officers check in with you upon their arrival at the

24   scene?

25   A.    They just checked out with dispatch.

1    Q.    So the only way you knew who was

2  responding and roughly where they were going is what

3  was being told to you on the dispatch?

4    A.    Yes.

5    Q.    Okay.

6    A.    Other than the people in the front that I

7  could see.

8    Q.    Okay.  So let's -- let's move forward.

9  And again, if you need to look at your report, that

10  is very fine with me.

11         So from the driveway at 2244, we were --

12  where you originally posted up, tell me the next few

13  things that happened in the order that you remember

14  them happening.

15    A.    From what point?

16    Q.    When you are standing here in the driveway

17  at 2244, when you first get there.  So what is the

18  next thing that you remember happening?

19    A.    Well, I talked to the officers, and I

20  believe I wanted to make sure that we had less

21  lethal options with us, like a 40-millimeter, and

22  officers trying their best to keep an eye on it to

23  see if anybody was going to leave the residence or

24  if there were any shots out of the residence.  So I

25  was trying to coordinate with the people that were

1   there on scene for that.

2           And then I was, again, continuing to try

3   to figure out where exactly people were so I had a

4   better understanding of who was where.  Not

5   necessarily for a crossfire issue.  That is kind of

6   lower on our threat assessment.  More we wanted eyes

7   on every side of this -- of the involved residence

8   so we could see if something -- if there was a shot

9   out of a window, if there was damage to the house,

10  to make sure nobody got out of the house, or if they

11  did, we were able to intercept them.

12      Q.   So was this -- I want to ask my questions

13  in order, but I feel like I want to skip ahead a

14  little bit here.

15          When you -- you advised me earlier that

16  you thought that this was as likely to be a criminal

17  investigation -- that is a shot fired out -- as well

18  as a welfare check.  Was there any point in time

19  when you determined that you were going to leave the

20  scene?

21      A.   We were going to -- that was certainly an

22  option at one point.

23      Q.   What was going on at the point where you

24  were talking about leaving the scene?

25      A.   We had gotten the roommate out, so the

1    concern of anybody else being in the house was

2    mostly gone.  And we were talking to him.  He didn't

3    believe that there was anybody else in the house, so

4    at that point, when Mr. Babb is in the house by

5    himself, we needed just to make sure that a shot

6    hadn't been fired out.

7              So I had spoken to Lieutenant Klinko, and

8    we both concurred that leaving was going to be an

9    option very soon after we could get direct eyes on

10   each side to make sure that we didn't see a window

11   with a bullet hole in it, and then we were going to

12   pull back from the situation.

13        Q.    So that house has two floors.  Correct?

14        A.    Correct.

15        Q.    So you had windows on the top floor?

16        A.    Yes.

17        Q.    Front and back?

18        A.    Yes.

19        Q.    And you had windows on the bottom floor,

20   front and back?

21        A.    Yes.

22        Q.    Who was checking the back to see if the

23   windows had been broken out?

24        A.    We -- I didn't ask for that yet but --

25        Q.    Okay.

1      A.     -- I assume if they had told -- if they

2    had seen it, my assumption would be that they would

3    probably tell me.  I don't know if they were looking

4    specifically for that.  But as I was about to give

5    that command, to start asking people if they see any

6    holes in any of the windows, Mr. Babb came out.

7      Q.     Okay.  When did -- so at some point the

8    BearCat did arrive.  Did that change what you were

9    doing at the scene?

10     A.     It gave us a platform where we could move

11   a little closer to see the front door.

12     Q.     Okay.  Between the time you arrive and the

13   time the BearCat arrives, could you hear Mr. Babb

14   yelling or saying anything?

15     A.     I don't remember if it was before --

16   certainly during this incident we heard lots of

17   yelling.

18     Q.     Sure.

19     A.     I don't remember if he was yelling before

20   we had gotten the BearCat there.

21     Q.     And how did you know there was a roommate

22   in the house?

23     A.     Well, we were told -- I think it was the

24   therapist that maybe told dispatch.  Also, there was

25   two trucks in the driveway.  We were able to

1  determine from the license plate that Mr. Babb's

2  truck was in front, and there was a -- Antonini, I

3  believe is his last name, his truck was behind him.

4  So I am -- we thought maybe that there was somebody

5  else in the house.

6      Q.    And how did you get Mr. Antonini to come

7  out of the house?

8      A.    We were hailing with the BearCat.

9      Q.    So the hailing from the BearCat came after

10  the BearCat was moved up the driveway at 2244?

11      A.    Yes.

12      Q.    Okay.  Was the BearCat staged down here on

13  Devos Street at all for a period of time?

14      A.    Momentarily.

15      Q.    Okay.  There is one witness who saw what

16  she called a van.  Was there ever a command vehicle

17  or a van located on the street?

18      A.    Eventually.

19      Q.    After the shot's fired?

20      A.    Much after.

21      Q.    Okay.  Now, can you explain to me why you

22  asked for the BearCat to be deployed to this scene?

23      A.    Because we knew that somebody could

24  possibly be shooting out of a house.  The first

25  officers on scene had said that it was a panhandle

1    lot and very difficult to get eyes on the front

2    door, which is the common ingress and egress point

3    for somebody where we really want to get eyes on.

4    So I felt like we needed to get a piece of armor,

5    also with an elevated platform that we could

6    position somewhere to be able to keep eyes on that

7    front door and to use it as a PA if we needed to.

8        Q.    Okay.  And you had Officer Pieske drive

9    the BearCat to the location?

10        A.    He just happened to be on duty, and I

11    don't remember if he was asked or volunteered, but

12    he is the one that went.  I didn't specifically ask

13    for anybody.

14        Q.    Okay.  So I want to ask you about where

15    that BearCat eventually parked --

16        A.    Okay.

17        Q.    -- in the driveway.  And there may be some

18    pictures, what, about Exhibit 38 through 40,

19    something like that.  There are some pictures that

20    are longer.  There you go.  And I didn't number

21    mine, but let me see which ones would be best.

22            Take a look at Exhibit 37, and this is an

23    exhibit I used with Officer Pieske.  The writing on

24    here is his.

25        A.    Okay.

1    Q.    And I am trying to locate the best

2  recollection that officers have of where that

3  BearCat was situated when you started hailing the

4  house.

5    A.    Well, we were -- we were kind of angled

6  towards the front door.  I believe we were behind a

7  drift boat in the RV parking of the house directly

8  to the south.

9    Q.    Okay.  At some point were you inside the

10 BearCat?

11   A.    Kind of.  If the back -- the back has two

12 doors that open, and it is kind of a big opening, so

13 if I needed to talk to somebody that was inside, I

14 would kind of step into it.  Mr. Antonini and -- at

15 some point ended up in the back of the BearCat.  I

16 remember talking to him.  So kind of back and forth.

17   Q.    Now, I -- I think I have enough of a

18 description from Officer Pieske about the vehicles

19 that were between he and the house --

20   A.    Uh-huh.

21   Q.    -- and the fence and all of that.  Was

22 there some decision to have Officer Stutesman stand

23 in the turret?

24   A.    Yes.

25   Q.    Who made that decision?

1      A.    I did.

2      Q.    And why did you choose Officer Stutesman?

3      A.    He -- initially, I believe I was going to

4  put Officer Kidd in there, but he didn't have his

5  long rifle, so I put Officer Stutesman up there, who

6  did.

7      Q.    And Officer Kidd told me at some point he

8  did ask for a rifle.

9      A.    Yes.

10     Q.    And that you handed him one.

11     A.    Yes.

12     Q.    Do you remember that happening?

13     A.    Yes, I did.

14     Q.    Okay.  When Officer Kidd was on the

15  rooftop of 2244, did you ask him what he could see,

16  what his vantage point was?

17     A.    I believe I did.

18     Q.    Can you remember what he told you?

19     A.    I don't.

20     Q.    Do you remember if he could see the front

21  door?

22     A.    Can I look at the radio traffic?

23     Q.    Yes.

24     A.    I don't remember if --

25     Q.    Yes.

Malcolm McAlpine

69

1      A.    Because I believe he told me something.  I

2   don't remember what it was.

3           There is not a comment in here, I don't

4   believe.  I believe he could see a portion of the

5   door.  I don't remember which portion that was

6   exactly.

7      Q.    Okay.  So -- I am sorry.

8      A.    That is okay.

9      Q.    I don't mean to get in your way here.

10          So Exhibit 40, these -- in fairness, we

11   did a shooting reconstruction, and we used the dash

12   cam video from the BearCat and we did a 3D rendering

13   with a particular topography machine.  And then the

14   neighbors north of 2244 were videotaping and

15   photographing you guys while you were there.  So we

16   put all of those things together to do our best

17   estimate of the location of the BearCat.

18          So if you could take a look at these

19   pictures, and these again are from the camera in the

20   BearCat, which is slightly elevated and to the right

21   of the driver's seat.  Do you remember that?

22     A.    Where our camera is on --

23     Q.    In the BearCat, yes.

24     A.    The ICV?

25     Q.    Yes.

1      A.     Yeah.   It is in the windshield inside.

2      Q.     Let's make sure we are talking about the

3   same thing so -- I never assume anything.

4           Take a look at 41.  There is a picture of

5   the BearCat, and we have drawn a line to the camera.

6   Is that fair about where the camera is located?

7      A.     Where the dash cam is?

8      Q.     Yeah.

9      A.     That is the picture of the BearCat, so

10   yeah, that is fair.

11      Q.     Is there a different camera or that's the

12   only one in the BearCat?

13      A.     That is the only one that was on the

14   BearCat.

15      Q.     Okay.  So if you can look at this angle,

16   and this is, again, a screenshot we have captured

17   from the video of the BearCat.  Does this look like

18   the angle that the BearCat was pointed at the time

19   of the shooting?

20      A.     I don't know.

21      Q.     Well, let's back up a second.

22           So the BearCat gets into the driveway.

23      A.     Of next door.

24      Q.     Of 2244.

25      A.     Okay.

1      Q.     And there were vehicles that were in the

2    driveway leading up to the Babb house.  Is that

3    correct?

4      A.     Correct.

5      Q.     And did you move the BearCat at any time

6    once it was in the driveway other than the advance

7    on the house at the end?

8      A.     I don't remember.  I know that it was --

9    we had pulled it in to face -- because the house is

10   kind of canted.

11     Q.     Uh-huh.

12     A.     And we were trying to position the BearCat

13   in such a way that the person in the -- that was out

14   of the hatch could see the front door, so I don't

15   remember if there was any jockeying around with

16   that.  I don't -- I don't recall.  I was standing

17   behind it.  They may have made minor adjustments.  I

18   just don't know.

19     Q.     Okay.  If you look in the picture there

20   from the BearCat, there is not only the two

21   vehicles, but there are these posts in the ground.

22   Was there some discussion about how the BearCat was

23   going to get up to the house if you had to get up to

24   the house?

25     A.     No.

Malcolm McAlpine

72

1    Q.    All right.  And I have heard testimony

2  that Mr. Babb actually came out the door twice that

3  officers saw.  Do you remember any of that?

4    A.    I remember them saying the door is open

5  and he was yelling out.  I don't know whether -- I

6  was standing behind.  I couldn't see anything that

7  was happening, so I don't know if he came out of the

8  house, went back in.  I know that he was yelling and

9  the door opened I think it was a couple times at

10  some point during this.

11    Q.    Okay.  Did Officer Kidd say anything to

12  you after the first time Mr. Babb came to the door

13  about what he saw or what was going on?

14    A.    I think so, because I saw a dispatch

15  comment in here about it.

16    Q.    Okay.

17    A.    At 5:43 he said that the subject is at the

18  door.

19    Q.    Now, that was on the radio.  Correct?

20    A.    Yeah.  I don't know what his exact

21  verbiage was.  Typically they summarize what they

22  say.

23    Q.    Did Officer Kidd turn around and yell down

24  at you that the subject was at the door or what he

25  was doing, what he was wearing, anything like that?

Exhibit 3
Page 73 of 130

1      A.    I don't remember.  We were in some

2  conversations occasionally.  I don't remember

3  exactly what that -- those conversations entailed.

4  And if it was on the air, I was listening to it, and

5  I was catching as much as I could.

6      Q.    Do you remember the essence of information

7  you were getting from Officer Kidd even if you don't

8  remember the exact language?

9      A.    I don't know.  I don't remember.

10     Q.    Okay.  Now, when Officer -- when Mr. Babb

11  came to the door the first time -- and I have heard

12  from a number of witnesses that he came at least

13  twice that your officers saw.  The first time

14  Mr. Babb came to the door, did anyone else tell you

15  they saw him besides Officer Kidd?

16     A.    I don't remember.

17     Q.    In relationship to the first appearance --

18  you just told me Officer Kidd radioed 5:43 Mr. Babb

19  was at the door.  Had Mr. Antonini already left the

20  house at that point?

21     A.    No.

22     Q.    And how long after that -- and I know

23  there is some dispatch notations on that.  How long

24  after that did Mr. Antonini leave the house?

25     A.    According to dispatch, nine seconds.

1    Q.    Nine seconds after Kidd saw Mr. Babb at

2    the door?

3    A.    Uh-huh.

4    Q.    And did you watch Mr. Antonini come down

5    from the house?

6    A.    No.  I could just hear the officers giving

7    him commands.

8    Q.    Who was telling you that Antonini was -- I

9    know they didn't know his name, but who was telling

10   you that someone was coming out of the house?

11   A.    All of the officers that were around.  I

12   think Vinje was on one side.  DeWitt was on another

13   side.  When we are back there, everybody is just

14   kind of talking, like "We have one person coming out

15   of the house."  I don't remember what the exact

16   verbiage was, but it's something similar to that.

17   Pretty normal.  So I knew that there was somebody

18   coming out.

19   Q.    So I know Officer Kidd noted when

20   Mr. Antonini left the house.  How did Vinje and

21   DeWitt learn that someone was coming out of the

22   house?

23           MR. SCHMIDT:  Objection.  Calls for

24   speculation.

25   BY MS. BURROWS:

1    Q.    You just told me that Vinje and DeWitt

2  were talking about someone coming out of the house.

3  Do you know how they learned that information?

4    A.    I don't.

5    Q.    Could you see Mr. Antonini as he is coming

6  down the driveway?

7    A.    I don't remember if I peeked my head out.

8  I don't believe so.

9    Q.    When was the -- where were you when you

10  first saw Mr. Antonini?

11    A.    I don't recall.

12    Q.    Did you interview Mr. Antonini once he got

13  down behind the BearCat?

14    A.    When he was inside of it, yeah.

15    Q.    Why did you put him inside the BearCat?

16    A.    Because I was worried for his safety.

17    Q.    And tell me that conversation you had with

18  Mr. Antonini.  What did he tell you?

19    A.    We asked him if there was anybody else in

20  the house.  We asked him what he saw as he was

21  coming out.  And that was kind of the -- asked him

22  if he had heard a shot while he was in there.  When

23  he had got home.  Just trying to get some more

24  information about what was going on that afternoon.

25    Q.    When did Mr. Antonini get home that day?

Exhibit 3
Page 76 of 130

1   Do you recall?

2       A.    I think it is in my report, I believe, or

3   in my statement.

4       Q.    Tell me where you are reading from when

5   you get there.

6       A.    Okay.  He said he had arrived home about

7   four, and that is on page 3 of 4.

8       Q.    And you are reading from where, please?

9       A.    One, two, three -- the fourth paragraph

10  down, second line.

11      Q.    Okay.  And he also told you he had not

12  heard a gunshot?

13      A.    Correct.

14      Q.    And he had gotten home about 4 p.m.?

15      A.    Correct.

16      Q.    And the original call that came in from

17  the therapist was about five o'clock or so?

18      A.    Yes.

19      Q.    Okay.  What other -- what other things did

20  you and Mr. Antonini speak about?

21      A.    He told me that he was going towards the

22  gun safe when he left, when Mr. Antonini came out

23  towards the front door.

24      Q.    Mr. Babb was going to the safe?

25      A.    Correct.  And that he acts crazy when he

1   is not on his medication.

2       Q.    Mr. Babb is crazy?

3       A.    Mr. Babb.

4             And that he had severe PTSD to -- and had

5   a bunch of firearms.

6       Q.    Okay.  Did you ask Mr. Antonini whether he

7   was in fear for his own safety?

8       A.    No, not right then.  We had a different

9   conversation a few moments later.

10      Q.    Okay.  Did Mr. Antonini appear that he was

11  afraid?

12      A.    He was -- the way he was describing

13  Mr. Babb's actions, he was very concerned.

14      Q.    Okay.  Did Mr. Antonini tell you -- so

15  strike that.  Let me back up a few steps.

16            Mr. Antonini gets home at four o'clock.

17  This is about 5:43 or so when you are having this

18  conversation with Mr. Antonini.  Did Mr. Antonini

19  tell you what had gone on between four o'clock and

20  the time that he came out of the house?

21      A.    I believe he said he went to -- he was

22  sleeping.

23      Q.    He was sleeping.

24      A.    Yeah.

25      Q.    Did he tell you when he became aware that

1  police were outside yelling at the house?

2      A.    When the BearCat started hailing.

3      Q.    Can you look at dispatch and tell me if

4  there is any indication about when that was, when

5  y'all started hailing the house?

6      A.    I believe it is at 5:37.

7      Q.    And did you hail -- and I don't mean

8  constantly but continuously from three -- from 5:37

9  until 5:44, when Mr. Antonini came out?

10     A.    Not continuously, no.

11     Q.    How many times do you suppose you hailed

12  the house during that ten-minute period?

13     A.    I don't know.

14     Q.    And who was doing the hailing?

15     A.    Officer Grose.

16     Q.    And do you remember the things that

17  Officer Grose was saying?

18     A.    I believe for anybody inside the house to

19  come out with their hands empty to the police and

20  that we were the Eugene Police Department.

21     Q.    Okay.  Do you know whether -- you said

22  earlier, I think, that Officer Grose also called in

23  to Mr. Babb's house?

24     A.    (Nods head.)

25     Q.    Yes?

1      A.    Yes.

2      Q.    Was that before or after this ten minutes

3  or so of hailing?

4      A.    I don't remember.

5      Q.    And Officer Grose is -- I don't know if I

6  will use the right word here, but please correct

7  me -- a hostage negotiator or is trained in

8  negotiation tactics?

9      A.    He is a negotiator, yes.

10     Q.    Have you been on scenes with Officer Grose

11  prior where he has negotiated with suspects?

12     A.    I have.

13     Q.    And how would you say Mr. -- Officer

14  Grose's ability as a negotiator is?

15     A.    He is very capable.

16     Q.    Okay.  And has he been successful in

17  talking suspects into surrendering or coming safely

18  out?

19     A.    I don't know what his success rate is.

20     Q.    Well, what have you seen?

21     A.    I don't remember exactly.  I couldn't say.

22  He has dealt with people, and it has been effective.

23  I don't know how many times that has been.  I don't

24  really document that so -- but I have seen him talk

25  to many people, and he seems to be able to gain a

1   rapport.

2       Q.    Okay.  In this particular instance, you

3   knew that Mr. Babb was in -- a wounded veteran.  He

4   had PTSD.  Did you know that he had any neurologic

5   or brain injuries?

6       A.    No.

7       Q.    Okay.  Have you been trained in how to

8   approach wounded veterans who may have either

9   psychological or physical injuries?

10      A.    Some.  We have CIT training that is put on

11  through the department.

12      Q.    What does CIT stand for, if you know?

13      A.    Critical incident training --

14      Q.    Okay.

15      A.    -- I believe.  It has to do with speaking

16  to folks that are both mentally ill and have had

17  some sort of trauma in their lives, including

18  veterans.

19      Q.    Okay.  And of the CIT training, how often

20  is that offered?

21      A.    We had a 40-hour class.

22      Q.    A 40-hour class?

23      A.    Yeah.  And then we talk about it pretty

24  regularly in in-service, whether that is with

25  command staff talking to us about it -- I have also

1  had the luxury of being involved in the SWAT team

2  and have gone to team commander schools where we

3  talk about this sort of thing very regularly.

4      Q.   Okay.  So you would say that you have a

5  fairly deep knowledge of how to deal with mentally

6  or physically impaired suspects?

7      A.   I don't know that anybody has a fairly

8  deep knowledge.  I have a very basic understanding

9  of how to try to deal with it in a police setting.

10     Q.   Can you explain to me how you have been

11 trained to deal with -- and let's focus on a

12 veteran, because that is what we have here --

13     A.   Sure.

14     Q.   -- who may or may not be suffering from

15 PTSD.  And tell me, do you understand what PTSD is?

16     A.   Yes.

17     Q.   Could you explain to me what you -- your

18 understanding of PTSD is?

19     A.   Trauma suffered from a very traumatic

20 incident or a series of incidents that have occurred

21 in somebody's life.  Specifically for a veteran,

22 maybe having been involved overseas in some sort of

23 warfare, some sort of seeing things that a layperson

24 wouldn't normally see in a war-type setting.

25     Q.   And is it your understanding that these

Malcolm McAlpine

82

1   experiences can psychologically traumatize someone?

2       A.      Absolutely.

3       Q.      And what is your understanding of what

4   happens with a person suffering from PTSD?  What

5   symptomatology, what experiences are they going

6   through?

7       A.      I guess I don't understand your question.

8       Q.      Well, do you understand that they may

9   suffer from flashbacks?

10      A.      Yes.

11      Q.      Are there any other experiences that you

12  understand a victim of PTSD would be suffering from?

13      A.      Voices in somebody's head, panic.

14      Q.      Okay.

15      A.      Those are the two that come to the top of

16  my head.

17      Q.      In your CIT training or any other training

18  you have received, have you -- have you given

19  training or been given training or education on the

20  combat experiences that veterans may have

21  experienced that could be triggered by a police

22  presence?

23      A.      Yes.

24      Q.      Okay.  Can you explain to me what sorts of

25  training and education you have received?

Exhibit 3
Page 83 of 130

Malcolm McAlpine

83

```
 1      A.    Just that in -- as a veteran, certain

 2   military kind of things could trigger a violent

 3   response.

 4      Q.    And by violent, what do you mean?

 5      A.    A shooting encounter.

 6      Q.    Okay.  So let's go into that just a tad

 7   bit deeper for me, if you don't mind.

 8      A.    Sure.

 9      Q.    Have you been trained that a veteran -- a

10   combat veteran who may come across a police officer

11   or SWAT team in an aggressive fashion, that SWAT

12   teams do do, that they may have a flashback or

13   believe that they are back in combat?

14      A.    Sure.

15      Q.    Okay.

16      A.    But we also have to weigh that against the

17   safety of the community.

18      Q.    I am not asking -- I am not making a

19   judgment.  I am just asking what your training is.

20      A.    Sure.  But the training also has to deal

21   with -- we also have a duty to do our particular

22   job, which is, say, to protect the community at

23   large as well as the people that are involved, so it

24   could be a measured response depending on what we

25   are dealing with.
```

1          So just because somebody may be in that

2     sort of crisis, we also have to balance that with

3     the protection of the community around, so those are

4     the things that we are thinking about.  So we are

5     taking those into account, but also our job as

6     police officer is to keep other people in the

7     neighborhood safe.

8          Q.    And I get that.

9          A.    Okay.

10         Q.    I personally appreciate that that is what

11    you do.

12         A.    Sure.

13         Q.    So in this situation --

14         A.    Uh-huh.

15         Q.    -- you have a combat veteran who one

16    witness is telling you -- the roommate is telling

17    you that he is having some kind of an emotional

18    response to whatever situation he is finding himself

19    in at that moment.  Have you been trained on how to

20    diffuse that heightened state of reaction in

21    veterans?

22         A.    I have been given a number -- several

23    different ways to deal with it, correct.

24         Q.    Can you explain to me how you have been

25    trained to --

Malcolm McAlpine

85

1    A.    There are lots of different ways.  You can

2  sometimes -- sometimes getting them to talk to a

3  veteran.  Sometimes seeing -- I mean, it could be

4  varied.  Everybody has a different reaction.

5    Q.    Sure.

6    A.    It could be completely retreating.  It

7  could be not.  It could be showing like, hey, we are

8  here.  We are here to help.  So it kind of depends

9  on each situation, and we are trying to, again,

10 balance the community safety with the safety of the

11 people involved and the safety of the officers

12 there.  So we have about a hundred tools in our

13 toolbox, and we are just trying to use each one

14 appropriately for each particular situation.

15   Q.    And I am trying to explore what tools you

16 did use.  That is what I am getting at with these

17 lines of questioning with you.

18   A.    Okay.

19   Q.    Have you been trained that as -- a police

20 presence can escalate a veteran who may already be

21 experiencing difficulties?

22   A.    Yeah.  It could also deescalate it.

23   Q.    Sure.

24   A.    Yeah.

25   Q.    Sure.

1          So what training have you received to be

2     able to distinguish in all of these different

3     variables how to figure out what is going on with

4     that veteran and how to respond appropriately?

5          A.    Well, we have had veterans come in and

6     talk to us specifically during that CIT training

7     but --

8          Q.    Was that before the Babb incident?

9          A.    Yeah.

10         Q.    Okay.  And tell me what they told you?

11         A.    I don't remember exactly.  I know it had a

12    lot to do with veterans having vast reactions to

13    different kind of responses all the way from us

14    pushing that is not good and us leaving, which is

15    not good either.  So certainly a police presence

16    could worsen a person in crisis, but there is a lot

17    of other factors involved.

18         Q.    Okay.  So what I would do in trial with

19    you is try and walk through the details of how the

20    situation was evolving in order to understand what

21    decisions you made considering all these variables

22    you have just explained to me, and you have told me

23    at some point you were considering withdrawing from

24    the scene.  And that -- I think you have already

25    told me that you were going to see if there had been

1  a shot fired out of the windows.  Was that going to

2  be the decision -- the factor that would decide

3  whether you withdrew?

4       A.    Along with all of the other things we had

5  learned earlier, yeah.

6       Q.    Tell me what you mean by that.

7       A.    So initially, we didn't know whether there

8  was somebody else in the house.  If somebody had

9  fired a round in the house, that is very important

10  to us.  Once we got Mr. Antonini out of the house,

11  that was a big -- a big part of our decision-making

12  process.  When he told us that he was the only one

13  in there and he didn't hear the shot -- very

14  regularly people don't hear that.  It is -- I don't

15  know why.  He was sleeping.  He heard us.  I don't

16  know whether or not he heard the shot.  That is --

17  but again, that is another little piece, so we are

18  putting those pieces together.

19       Q.    Uh-huh.

20       A.    I asked him specifically, "What do you

21  think of us leaving?"  And he was shocked, dismayed,

22  and, quite frankly, he was using some very colorful

23  language of why we should not.

24            And even with all that, we would not have

25  just completely left the area.  We would have still

1    tried to talk to maybe the therapist, get on the

2    line with Mr. Babb.  But we certainly would have

3    moved police officers into a safer location.

4              So those were the -- with all those pieces

5    of information and the fact that, once we get eyes

6    on every side of the house and see that there is no

7    bullet hole coming out of a window, with those

8    particular factors in that incident, yes, absolutely

9    we would have backed away.

10             MR. SCHMIDT:  Can we take a break when

11   you are --

12             MS. BURROWS:  Yeah.

13             MR. SCHMIDT:  Well, when you are done

14   with this line of questioning.  You can --

15             THE VIDEOGRAPHER:  Well, I have about

16   five minutes.

17             MS. BURROWS:  Well, let's take a break

18   now then.

19             MR. SCHMIDT:  Okay.

20             THE VIDEOGRAPHER:  Time is 3:40.  We

21   are off record.

22             (Recess:  3:40 to 3:57 p.m.)

23             THE VIDEOGRAPHER:  We are on record.

24   Time is 3:57.

25   BY MS. BURROWS:

Malcolm McAlpine

89

```
 1      Q.    Okay.  Let's pick it up where we left off.

 2      A.    Okay.

 3      Q.    Which I don't remember where exactly we

 4  were.

 5            But you indicated that your next step to

 6  make the decision to retreat or not -- and I

 7  understand you weren't going to completely leave the

 8  scene, but you were going to retreat.

 9      A.    Uh-huh.

10      Q.    What was your goal in retreating?

11      A.    Just to put our officers in a better

12  position where they weren't exposed.  At that point,

13  we would have known that there wasn't a huge risk to

14  the community if we didn't think that he had shot

15  out and that he was just going through a mental

16  crisis, that that sort of -- that very extreme

17  criminal act of shooting outside of the house to

18  where somebody could have gotten hurt, that -- when

19  we would have realized that didn't happen, we would

20  have backed out and seen if we could have gotten him

21  the resources that he needed as far as a mental

22  health evaluation or -- and then who knows?  If

23  there is a chance we couldn't have seen a shot and

24  then at some point we got information that there

25  was -- somebody did see it or something could have
```

Malcolm McAlpine

90

1  changed where we could have went back, so -- but

2  just the information we had at that moment, if we

3  had seen the windows, we would have backed out.

4      Q.    And you hadn't gotten to the point to have

5  officers check for the windows?

6      A.    Not on all sides.

7      Q.    What windows did you checked, if any?

8      A.    I don't remember exactly which ones they

9  had seen.  We had seen movement in lots and lots of

10 windows.

11     Q.    Okay.

12     A.    And I wanted -- I had to be able to

13 specifically ask officers that were out there, "Do

14 you see a gunshot hole, damage to a window on any of

15 the scenes?"

16         We were also going to look at neighboring

17 houses, because who knows if there was a window open

18 and now it is closed.  So we would have looked at

19 the houses around as well to see if there was any

20 damage.

21     Q.    Did you assign any officers to interview

22 neighbors to see if they heard a gunshot?

23     A.    I don't -- we hadn't gotten that far, no.

24     Q.    Was that on your list of things to do, to

25 ask neighbors?

Malcolm McAlpine

91

1      A.    It could have been.  I think that we would

2  probably have done that after we had moved, if we

3  didn't see anything right away, because we knew

4  there was nobody else in there with him.

5      Q.    Okay.  So do you recall if -- if, in fact,

6  you had asked officers if they saw broken out

7  windows?  Do you recall doing that?

8      A.    I didn't.

9      Q.    You didn't do that yet?

10      A.    No.  Not specifically, no.

11      Q.    Did any officer tell you whether or not

12  they had seen damaged windows?

13      A.    No.

14      Q.    Were you aware whether or not all your

15  officers knew that there was a suspected gunshot

16  from the house?

17      A.    From -- if they had seen or heard the

18  original dispatch, I would have made that

19  assumption.

20      Q.    When officers started arriving, did you

21  give them any additional briefing or information on

22  the call?

23      A.    No.

24      Q.    Were you then expecting that they got

25  their information from dispatch?

1    A.    Yeah, or the computer on their call -- in

2    their car as they are responding or just before --

3    just when they get there, to like go through the

4    rest of the details before they get out.

5    Q.    Did anyone ask you to get -- fill them in

6    on details upon their arrival at the scene?

7    A.    I don't -- I don't remember.  I don't

8    think so.

9    Q.    All right.  Now, I know from various

10   witnesses that Mr. Babb, as you have noted, was seen

11   in windows.  Do you remember which window he was

12   seen in?

13   A.    I think Vinje saw him in a downstairs

14   window, and then he was seen in upstairs windows by

15   various officers.  I don't remember which.

16   Q.    Where was Vinje to be able to see the

17   downstairs windows?

18   A.    He was standing on the side of the

19   BearCat.

20   Q.    And he could see the downstairs windows

21   from standing on the ground?

22   A.    Yeah.  I -- I assume so.  I remember

23   hearing that on the radio traffic.

24         Sometimes officers will maybe expose

25   themselves a little bit more than necessary, so I

1    don't know if he was -- if he was looking -- how far

2    he was looking or where exactly he was standing.  I

3    just remember hearing that in the dispatch tapes

4    when I had reviewed those.

5        Q.    I don't remember him telling me that he

6    ever moved up to have a good view of the front of

7    the house.

8        A.    He wouldn't have moved up.  He would have

9    maybe moved laterally.

10       Q.    Did you move around in front of that

11   driveway to see if you could see better?

12       A.    No.  I was standing in the back of the

13   BearCat for most of the time.

14       Q.    Okay.  Where are we here?  So this angle

15   in this picture on Exhibit 41, again, is taken with

16   the BearCat camera that we talked about earlier.

17       A.    Uh-huh.

18       Q.    And I know that this is a slightly

19   elevated position.

20       A.    Uh-huh.

21       Q.    Of this -- what this picture is depicting,

22   is this what you could see from inside the BearCat?

23       A.    I don't know.  I was never inside looking

24   out the front window.  But if it is a picture of the

25   camera that is coming out the front, I would assume

1  so, but I couldn't -- I wasn't -- I wasn't there.  I

2  wasn't in the front seat looking at this vantage

3  point.

4      Q.    No.  You did look at the front of the

5  house, at least from some vantage point.  Correct?

6      A.    As I am kind of walking around, I may have

7  peeked around at some point, yeah.

8      Q.    Okay.  Could you point and show me what

9  you could see when you were walking around and

10 peeking at the house?

11     A.    I don't remember.  That is really

12 difficult to say.  I mean, we are -- we are in a --

13 in a situation where we are trying to stay behind a

14 big piece of armor so as not to get shot.  What --

15 when we are looking around, we are just trying to

16 kind of get our bearings of where exactly -- what

17 something could be.

18          So as I am standing kind of in the back, I

19 might peek around and look.  I could see kind of the

20 outline of the house, the cars, the fences, but

21 specifically recalling what exactly I was -- it was

22 just trying to get some situational awareness.

23     Q.    Well, when we started this discussion, you

24 said you couldn't see anything of the downstairs.

25     A.    Not inside of the house --

Malcolm McAlpine

95

1      Q.    Well --

2      A.    -- certainly.

3      Q.    -- in this picture, which is from the

4  BearCat, you can see the fence line here.

5      A.    Uh-huh.

6      Q.    Is that correct?

7      A.    Yeah.

8      Q.    And you can see the doorway here?

9      A.    Yeah.

10     Q.    Could you see that much of the downstairs

11  from standing outside on the ground?

12     A.    Without standing back there, I couldn't

13  say for sure.

14     Q.    Well, earlier you could remember that you

15  couldn't see the downstairs windows.

16     A.    Well, I couldn't see inside of them.

17     Q.    Well, could you see them at all?

18     A.    I am sure I could see the outline of part

19  of it.

20     Q.    Okay.  Exhibit 40 is pointing to the door.

21  Could you see that much of the door opening from

22  standing outside?

23     A.    This vantage point --

24     Q.    Uh-huh.

25     A.    -- is from the front of the BearCat.

Exhibit 3
Page 96 of 130

1      Q.     How do you know that?

2      A.     Well, you told me.

3      Q.     It is from the -- this is a still shot

4  from the BearCat video.

5      A.     Correct.  And the BearCat video camera is

6  in the front windshield.

7      Q.     Yes.

8      A.     Okay.  So I am assuming that is the front

9  of the BearCat.

10     Q.     Okay.

11     A.     So what I'm saying is is being behind it

12  in a complete different angle, I can't exactly

13  remember exactly what I saw.  So being behind it,

14  you are at a different angle from all these

15  positions, so it is kind of -- it is really

16  difficult to say.  This is not the view I was

17  looking at.

18     Q.     When Mr. Babb came to the door the second

19  time, could you see him?

20     A.     No.  I was standing behind the BearCat.

21     Q.     What were you doing behind the BearCat?

22     A.     Trying to figure out where people were,

23  gather information, trying to call command staff,

24  trying to formulate a plan on how exactly we were

25  going to deal with this, doing all those sorts of

1   things.  There is a lot of stuff going on.

2       Q.    And at that point when you are behind the

3   BearCat, Kidd is on the roof, Stutesman is in the

4   turret.  Where did you understand the rest of your

5   officers were located?

6       A.    Barnes and Farley were somewhere to our

7   north, and the team that was at the BearCat was with

8   me at the BearCat.  And Clark was on the back side

9   of the house or the west -- it would be the west

10  side, and eventually Warden showed up.

11      Q.    Now, this exhibit -- your report is

12  Exhibit forty what?

13      A.    3.

14      Q.    43?

15      A.    Uh-huh.

16      Q.    Is this a fair and accurate statement of

17  what you told the investigator?

18      A.    Yes.

19      Q.    Is there anything in here that you felt

20  was not completely accurate or that you would want

21  to modify now?

22      A.    I don't believe so.

23      Q.    Okay.  You arrived -- you have testified

24  you arrived before the BearCat did.  And I am sorry

25  if I have already asked you this question.  I

Malcolm McAlpine

1    sometimes forget what I ask.

2       A.    Uh-huh.

3       Q.    From the time you first arrived until the

4    BearCat arrived, did you hear Mr. Babb yell or

5    scream anything outside of the -- from inside

6    outside?

7       A.    I don't remember.

8       Q.    Do you remember him yelling or screaming

9    inside the house?  Any banging, any noises like

10   that?

11      A.    There were certainly yells and -- while we

12   were there.  Whether that happened before the

13   BearCat got there or not, I don't recall.

14      Q.    You know -- you know what my ultimate

15   question is.  Do you think the BearCat may have

16   exacerbated the situation?

17      A.    I don't know.

18      Q.    And you didn't begin hailing from the

19   BearCat right away.  Is that fair?

20      A.    Pretty quickly after it got there, I think

21   so.

22      Q.    Okay.  Did Mr. Babb appear to respond to

23   that loud speaker system, angrily or otherwise?

24      A.    I don't know what he was responding to.

25      Q.    Well, did his behavior appear to change

Malcolm McAlpine

1    after you began hailing him?

2        A.    I don't know exactly what his behavior was

3    before we got there.  We couldn't see in the house.

4        Q.    Well, when you got there --

5        A.    Uh-huh.

6        Q.    -- until the BearCat and then when you

7    started hailing, did his behavior change or modify

8    at all?

9        A.    I don't know.  I don't know what he was

10   doing in the house.

11       Q.    I mean, what you could tell.  Was there

12   increased yelling?  Was there --

13       A.    We were in a position to better see the

14   house, to better keep that incident contained, so

15   once we got closer, certainly we were able to

16   perceive more.

17       Q.    Well, forgive me.  Let me try this one

18   more time.

19             From the time you arrived, you had a

20   continuous observation post of what was going on

21   there.  And you may not have been staring at the

22   house continuously, but -- you were not only

23   managing the scene, but you were trying to keep

24   awareness of where everybody was and what Mr. Babb

25   was doing.  Is that fair?

Exhibit 3
Page 100 of 130

Malcolm McAlpine

100

1      A.    Absolutely.

2      Q.    So at some point, did you notice an

3  escalation in Mr. Babb's behavior?

4      A.    His behavior escalated probably at the

5  point when the therapist was saying that it did and

6  called the police.

7      Q.    Well --

8      A.    I don't know what was going on inside of

9  the house.  I really don't.  When we were able to

10  move up and he was yelling and screaming -- I don't

11  know whether or not that was before we moved the

12  BearCat up or not.  It certainly was while the

13  BearCat was up there.  I don't remember -- I

14  wouldn't say that that is what pushed it, because I

15  don't know -- I am not -- I don't know what the

16  thought process was there.

17      Q.    That is why I didn't ask you that question

18  that way.  I am asking what you observed, including

19  hearing --

20      A.    Sure.

21      Q.    -- seeing.  So did you observe through any

22  of your senses a change in Mr. Babb's behavior once

23  the BearCat got there?

24      A.    I don't know.

25      Q.    Okay.  Would that have been something that

101

```
1   would have been important to you at the time,

2   Mr. Babb's change in manner or demeanor?

3       A.    Not particularly.

4       Q.    Well, aren't you looking at someone who

5   may be in crises?

6       A.    Yeah.  I am also trying to determine

7   whether or not a shot was fired outside of the house

8   to keep the community as a whole safe.  So certainly

9   his demeanor is going to be part of the decision

10  process, but we are also there to serve a purpose in

11  that that is our job function.

12      Q.    So you are worried about whether a shot

13  had been fired outside the house.

14      A.    Correct.

15      Q.    That is what you just told me.  What did

16  you determine to determine if that had happened?

17  What did you do?

18      A.    We were trying to look around the house.

19      Q.    You said you didn't start doing that.

20      A.    I didn't give the specific order.

21      Q.    Okay.  And that came -- that hadn't come

22  by the time the shot had fired.  Correct?

23      A.    No.

24      Q.    So prior to the shot being fired, what

25  steps did you take to decide -- to determine whether
```

Exhibit 3
Page 102 of 130

Malcolm McAlpine

102

1    a shot had been fired?

2        A.    We were -- I was looking around the house,

3    and I assume the other officers were too.

4        Q.    But you said you couldn't see very much of

5    the house.  What could you see?

6        A.    I could see the other places around it.  I

7    could see the other houses.

8        Q.    Okay.  So you were looking at --

9        A.    I was just trying to do -- I was trying to

10   do about 50 different things.

11       Q.    I get that.

12       A.    Officers act kind of autonomously

13   sometimes -- most of the time, because I don't give

14   specific orders.  What we give is police officers

15   training to be able to do the job that we need them

16   to do.  The reason I would have specifically asked

17   that was just to clarify it to make sure that --

18   again, we are trying to keep everybody safe,

19   including the incident at the house, to try to

20   figure out what was going on.

21       Q.    So if you don't specifically ask officers

22   to do a specific task, how do you get things done?

23       A.    Well, we train officers.

24       Q.    So they are supposed to automatically know

25   to look at these windows to see if they have been

Malcolm McAlpine

103

1   shot through?

2       A.      Absolutely.

3       Q.      Okay.  Did any of them call in and tell

4   you that they saw shots fired?

5       A.      No.

6       Q.      Did you try and verify with any officer

7   from their vantage point that they could see a

8   broken window?

9       A.      I hadn't gotten to that point yet.

10      Q.      Okay.  So when you say that you were

11  worried about whether a shot had been fired outside

12  the house --

13      A.      Uh-huh.

14      Q.      -- what actively had you done as the

15  incident commander to determine whether that had

16  happened?

17      A.      I guess I didn't -- I never asked

18  specifically.  We were there.

19      Q.      I get that.

20      A.      We were trying to get into contact with

21  him.

22      Q.      I get that.

23      A.      We were trying to be able to talk to the

24  therapist.  So those are the steps that we were

25  taking.

Exhibit 3
Page 104 of 130

Malcolm McAlpine

104

1     Q.     What did you do to try and talk to the

2  therapist?

3     A.     I asked dispatch to -- I could try to

4  communicate to the therapist through dispatch.

5     Q.     And you said --

6     A.     Because he was already on the line with

7  them, and if they already had some rapport, I

8  assumed that maybe she could do it better than

9  anyone that we had on scene.

10    Q.     And those were unsuccessful attempts to

11 have dispatch get ahold of the therapist at your

12 request?

13    A.     I asked for it.

14    Q.     I know.  I get that.

15           So Officer Grose gets on the phone with

16 Mr. Babb at one point at least.  Did you ask him to

17 ask Mr. Babb if he had fired out of the house?

18    A.     I don't remember -- Officer Grose is a

19 negotiator.  I don't tell him how to do his

20 negotiations.

21    Q.     But if your job is security --

22    A.     Sure.

23    Q.     -- safety and security of the officers and

24 citizens present, and your --

25    A.     Yeah.

Exhibit 3
Page 105 of 130

Malcolm McAlpine

105

1       Q.      -- concern --

2       A.      Yeah.

3       Q.      -- is to find out if a shot has been fired

4   and one of the things you want to do is get contact

5   with Mr. Babb, and Mr. -- Officer Grose did that,

6   did you slip a note, "Can you ask him if he fired a

7   shot?"

8       A.      No.

9       Q.      "Can you figure this out?"

10          You didn't do that?

11      A.      No.

12      Q.      Do you remember if Officer Grose asked

13  those questions of Mr. Babb?

14      A.      I don't.  I wasn't in the front seat.

15      Q.      Is that where the call was taking place

16  was the front seat?

17      A.      Yeah.  This was also before Mr. Antonini

18  had come out, and that was another big factor in

19  this is if there is somebody else in the house.

20      Q.      Okay.  So besides worrying about whether a

21  shot is fired, are you worried about the safety of

22  the people inside the house?

23      A.      Absolutely.

24      Q.      So Antonini leaves, and does that concern

25  go away?

1    A.    It goes away until we get the information

2  from him that there is nobody else in the house,

3  yeah.

4    Q.    Okay.  What were your other concerns with

5  what you were doing at the scene that day?

6    A.    Mr. Babb's welfare.

7    Q.    Mr. Babb's welfare?

8    A.    Uh-huh.

9    Q.    What were you worried about what Mr. Babb

10  would do?

11    A.    Shoot out at officers or other people in

12  the public.

13    Q.    Well, how is that Mr. Babb's welfare?

14  That seems to be your concern for neighbors --

15    A.    Okay.

16    Q.    -- about something Mr. Babb might do.

17    A.    Sure.

18    Q.    Is that unfair or is it a different --

19    A.    No.  I -- I guess the question that you

20  asked to start, I think, was going there, and I

21  guess I misunderstood it.

22    Q.    Okay.  So were you concerned about

23  Mr. Babb's welfare?

24    A.    Yes.

25    Q.    And what were you worried Mr. Babb would

Exhibit 3
Page 107 of 130

Malcolm McAlpine

107

1   do to jeopardize his own welfare?

2       A.    Harm himself.

3       Q.    Okay.  Now, earlier you had learned that

4   Mr. Babb may have pointed a 9-millimeter at his own

5   head and was threatening suicide.  That was the

6   information dispatch gave you.  Is that correct?

7       A.    As well as he may have shot out the window

8   or in the house.

9       Q.    Yeah.  And I want to talk about the

10  9-millimeter and the gun to the head for a moment.

11  But you at least had that information from dispatch

12  when you arrived at the scene.  Is that correct?

13      A.    That was part of it, yes.

14      Q.    Did you ever learn from dispatch --

15  because there is some information from the call

16  taker that Mr. Babb had put his 9-millimeter in his

17  truck.

18      A.    I don't remember that.

19      Q.    Okay.  And there were neighbors that saw

20  Mr. Babb actually outside his house after police

21  arrived, and do you remember the front door or a

22  door to his truck being open when you arrived?

23      A.    I don't remember.

24      Q.    Okay.

25                MR. SCHMIDT:  Objection.  Assumes

Malcolm McAlpine

108

1  facts not in evidence.

2  BY MS. BURROWS:

3     Q.    So I have listed three things, and you are

4  watching me write them down here.  So you are

5  worried about whether a shot has been fired outside;

6  Mr. Antonini's welfare; Mr. Babb's welfare.  What

7  other things were you worried about as an incident

8  commander that day?

9     A.    The officers on scene's welfare.

10     Q.    Okay.  And this may seem obvious, but what

11  concerns did you have for their welfare?

12     A.    That they could be shot.

13     Q.    By Mr. Babb?

14     A.    Correct.

15     Q.    Okay.  And your concern that they would be

16  shot by Mr. Babb is based upon what information?

17     A.    That he may have shot outside of the

18  house.

19     Q.    Okay.  And as part of your anticipated

20  efforts to determine whether a shot had been fired

21  outside the house, was part of your to-do list to

22  speak to the neighbors then?

23     A.    Eventually.

24     Q.    Okay.  Did you know Mr. Babb before this

25  incident?

Malcolm McAlpine

1    A.    No.

2    Q.    Did you know his family?

3    A.    No.

4    Q.    Now, I need to talk to you a little bit

5  about something that you mentioned earlier, that you

6  were expecting the officers to know what to do in

7  this scene to address your various goals you have

8  outlined for me, and you said that you were relying

9  on their training to know what to do.  Is that a

10  fair characterization?

11    A.    Sure.

12    Q.    Okay.  Tell me what you mean by that.

13  What about their -- and again, you are speaking to a

14  noncop who has never done this before.  You knew

15  what your officers had been trained to do, so tell

16  me what you were expecting, as the incident

17  commander, for them to know what to do?

18    A.    To make observations of what they were

19  seeing.

20    Q.    Okay.  And did you expect them to make

21  observations of a potential bullet hole or shattered

22  glass?

23    A.    That could be one of about a thousand

24  things that they are looking for.

25    Q.    And I get that there are a lot, but tell

Exhibit 3
Page 110 of 130

Malcolm McAlpine

110

1   me what comes to your mind as you are thinking about

2   this question.   What were you expecting them to

3   observe and pass on?

4       A.   Okay.   So when they get there, I am

5   expecting them to find a position where they can

6   get -- observe the house.   Along with that, they are

7   trying to make sure that nobody else is walking

8   around, that they are not in a position where they

9   can get shot and killed, where nobody else can get

10  shot and killed, where they are looking for

11  evidence, where they are trying to make sure that

12  the house involved that they are looking at is the

13  right house.   That is just a start of about a

14  thousand things that they are trying to do, so there

15  is many things that they are trying to look for.

16      Q.   And you expected that they were all

17  automatically doing this, because they are trained

18  officers and they are at a complex scene?

19      A.   That is part of -- you know, I understand

20  that there is limitations.

21      Q.   Uh-huh.

22      A.   It is very difficult to do all these

23  things, especially in a compressed timeline.

24      Q.   Okay.   During -- until Mr. Babb came out

25  of the house that last time --

Malcolm McAlpine

1      A.     Uh-huh.

2      Q.     -- did any officer report that Mr. Babb

3  had waved a gun or threatened anybody with a gun?

4      A.     I don't believe so.

5      Q.     Did -- and there was lots of -- several

6  officers have told me they saw Babb in different

7  windows.

8      A.     Yeah.

9      Q.     Do you remember any officer telling you

10 that Mr. Babb was in the window with a weapon in his

11 hand or on his person?

12     A.     If he had a weapon in his hand, I would

13 assume he may have been shot if it was pointing at

14 us.

15     Q.     Well, or he just had a weapon and he

16 wasn't pointing it.  Did anybody report that they

17 saw a weapon?

18     A.     No.

19     Q.     At some point, various officers say they

20 heard Mr. Babb yell things out the window or out the

21 door.  Do you remember him yelling anything?

22     A.     He yelled some things.  I don't remember.

23 I think there was a part of that that I mentioned in

24 here.

25     Q.     Yeah.  You have "Get out of here" and

Malcolm McAlpine

112

1    "Fuck you" or "Fuck off."

2       A.    Yes.

3       Q.    Did you hear those things?  Because they

4    are in quotes in this interview.

5       A.    Yes, something similar to.

6       Q.    Okay.  At some point, though, you did hear

7    a shot?

8       A.    Yes.

9       Q.    What was the first -- well, let's see, how

10   do I ask this line of questions?  Did you see

11   Mr. Babb come to the door?

12      A.    No.

13      Q.    Did you hear any warnings to Mr. Babb?

14      A.    No.

15      Q.    And did -- the first notice you had that

16   Mr. Babb came to the door was the shot?

17      A.    Yes.

18      Q.    Where were you physically located when the

19   shot was fired?

20      A.    Standing behind the BearCat.

21      Q.    Could you tell where the shot came from?

22      A.    No.

23      Q.    What went through your mind when you heard

24   that shot?

25      A.    I think we are getting shot at.

Malcolm McAlpine

113

1      Q.     Okay.  Did you communicate that on the

2   radio?

3      A.     I believe so.

4      Q.     And how would you have communicated that

5   in the moment?

6      A.     Can I go back and look?

7      Q.     Yeah.

8      A.     Okay.  So at 5:52 there was -- said that

9   there were shots fired, and then we talked about

10  somebody being down at the front door.

11     Q.     And did you call out "Shots fired" on the

12  radio?

13     A.     I don't think so.

14     Q.     Okay.  Again, do you remember if you

15  communicated to your officers that you felt you all

16  were being fired upon?

17     A.     Yeah.  I asked -- I think I asked if

18  anybody had shot.

19     Q.     Okay.

20     A.     And I didn't get a response.  I asked then

21  to do a roll call, I believe, of the officers to see

22  if anybody around had been shot or if we weren't

23  hearing from somebody, and that didn't really

24  happen.  And then eventually, from standing back

25  there -- I don't remember who yelled out the back,

1   but it was that Officer Stutesman was the one that

2   took the shot.

3       Q.    And you can look at the dispatch records.

4   From the point in time you heard the shot until the

5   completion of that roll call you have just described

6   to me, about how much period -- how long a period of

7   time had elapsed?

8       A.    Until the end of the roll call was three

9   minutes.

10      Q.    Three minutes?

11      A.    Uh-huh.

12      Q.    And who is watching the house, if you

13  know?

14      A.    Well, people who originally were, so I

15  believe Officer Kidd, Officer Stutesman, people in

16  the front of the BearCat.

17      Q.    Who do you think -- which of your officers

18  do you think had the best vantage point of that

19  front door?

20      A.    Officer Stutesman.

21      Q.    And did Stutesman tell you what he saw at

22  the front door after the shot's fired?

23      A.    Not right then, not that I perceived.  Not

24  on the radio that I heard.

25      Q.    Okay.  Did Officer Kidd holler down what

Exhibit 3
Page 115 of 130

1   he could see?

2       A.    Yes.

3       Q.    What could he see?

4       A.    Somebody down in the doorway.

5       Q.    Okay.  Could he tell you what physically

6   he could see of the individual in the doorway?

7       A.    I don't remember exactly what he said.  I

8   was trying to determine whether or not he was -- had

9   been down from a shot, a self-inflicted gunshot

10  wound, or he was down in a position to attempt to

11  ambush us as we came back out, as we move up.

12      Q.    You didn't know if he was on his belly

13  or --

14      A.    I didn't.  I was trying to figure that

15  out.

16      Q.    And was Kidd helping you figure out --

17      A.    We were trying to.  It was difficult.

18      Q.    Okay.  Okay.  That makes Kidd's testimony

19  a little clearer.

20            So about three minutes until the end of

21  the roll call, did you then direct Officer Pieske to

22  drive up to the front door?

23      A.    Not until we found out that it was our

24  shot.

25      Q.    Okay.  Was that a little additional time

Malcolm McAlpine

116

1   after the roll call?

2       A.     Yes.

3       Q.     So what is going on in that three minutes

4   that you are doing the roll call?

5       A.     Trying to figure out whether or not he is

6   down in a position of trying to ambush us, if he is

7   down from a self-inflicted gunshot wound, or if he

8   is down from the wound that came from us.

9       Q.     Was the radio silent?  Was everybody kind

10  of --

11      A.     No.

12      Q.     Okay.  Everybody is chattering?

13      A.     Yes.

14      Q.     Now, I have heard from different witnesses

15  that there was a moment of like a pause.

16      A.     Yeah.  Sure.

17      Q.     People are confused what is going on?

18      A.     Yeah.

19      Q.     Do you know about how long that took

20  place?

21      A.     I don't remember.  Again, it would be very

22  clear on the radio traffic.

23      Q.     Were you guys using a different channel

24  than the main dispatch channel?

25      A.     No.

Malcolm McAlpine

117

1     Q.    Was that channel 1 that you were using?

2     A.    Yes.

3     Q.    Okay.  Nobody ever switched over to a

4   different channel?

5     A.    No.

6     Q.    Okay.  Were there any combat veteran

7   officers present at the scene that day, if you know?

8     A.    I don't.

9     Q.    Okay.

10     A.    I don't think -- I don't know.  I don't

11   think so.

12     Q.    I think I am just about done.

13     A.    Okay.

14     Q.    Have you -- did you -- oh, I do know.  I

15   have to do all of the standard questions about who

16   you talked to and when you talked to them and

17   whether you guys exchanged information.

18          Did you speak to any of the officers who

19   were at the scene after the incident?

20     A.    At the debrief.

21     Q.    When was the debrief?  I think you said it

22   was --

23     A.    Six months or so after.

24     Q.    Okay.  What was the point of the debrief

25   six months after the incident?

Malcolm McAlpine

118

1     A.     To talk about police tactics.

2     Q.     And were there tactical decisions that you

3  made that were discussed at this debrief?

4     A.     Absolutely.

5     Q.     And were there some suggestions made that

6  maybe different tactics could have or should have

7  been used?

8     A.     With what we had available at the time,

9  no.

10    Q.     None of your people evaluating it said

11  that you could have done anything differently?

12    A.     No.

13    Q.     Okay.  Were there any changes made to how

14  critical incidents are handled as a result of this

15  incident?

16    A.     It started a conversation internally that

17  has actually been going on externally in the police

18  world for a long time.

19    Q.     What conversation is that?

20    A.     About how to deal with armed, barricaded

21  subjects.

22    Q.     Any changes in how you deal with veterans?

23    A.     We have -- other than some people wear

24  veterans tags, no.

25    Q.     No other changes in dealing with --

Malcolm McAlpine

119

1    A.    I don't believe so.

2    Q.    -- combat veterans?

3    A.    No.

4    Q.    When you say there were some discussions

5    about dealing with armed, barricaded suspects, what

6    changes or what discussions were going on that you

7    can recall?

8    A.    Well, there hasn't been any changes that

9    have been made.  It is a discussion that starts at

10   the top, including our chief, and moves down

11   policy-wise.

12   Q.    Well, has there been any discussions about

13   making changes or adjustments to tactics?

14   A.    No.

15   Q.    Your department is determined that you

16   handle barricaded suspects completely well now?

17   A.    That on the day of that incident, the use

18   of force board review said that we handled it as we

19   could have with everything that we had available to

20   us at the time properly.

21   Q.    Well, my question was following up to your

22   question -- your answer about discussions --

23   A.    Yeah.

24   Q.    -- about how to handle barricaded

25   suspects.

Exhibit 3
Page 120 of 130

1      A.    Sure.

2      Q.    I am not talking about the Brian Babb

3   incident per se.

4      A.    Okay.

5      Q.    Do you know whether there have been

6   discussions about making adjustments or changes to

7   how your department responds to barricaded suspects?

8      A.    Absolutely there has been discussions, but

9   nothing -- I have been part of those where there is

10  committees and whatnot, and there has -- we are

11  talking to get other stakeholders involved, but

12  nothing of real significance from what we have done

13  in the past has come about.

14     Q.    I don't understand that answer.  You

15  haven't made any changes or --

16     A.    No significant changes in our policy have

17  been made.

18     Q.    And is that because you believe the

19  department feels their policies are perfectly fine

20  as is?

21     A.    I can't speak for the department.

22     Q.    What about you?

23     A.    At the time, I think our policies were --

24  followed standard police practice.

25     Q.    Around where?  The country or --

Malcolm McAlpine

121

1      A.     Absolutely.

2      Q.     Okay.  So I read in the police review

3   report by the chief that some officers went to

4   different cities to learn about how they deal with

5   veterans in crisis.  Do you know anything about

6   that?

7      A.     I don't.

8      Q.     Do you know any training that has occurred

9   since this incident about dealing with veterans in

10  crisis?

11     A.     I don't.

12     Q.     You said that you reviewed the police

13  chief's use of force review -- or not the chief's.

14  Excuse me.  The use of force review.

15     A.     Prepared by Lieutenant Bills, I believe.

16     Q.     And you have read that?

17     A.     Uh-huh.

18     Q.     And you believe that it is accurate?

19     A.     Absolutely.

20     Q.     And you believe it is based on accurate

21  information?

22     A.     I do.

23     Q.     Okay.  Since the incident, this lawsuit

24  was filed, have you spoken with any of the officers

25  who were present on Devos -- Devos Street on

Malcolm McAlpine

122

1  March 30th about this lawsuit?

2      A.    No.

3      Q.    Have you talked to any of the officers I

4  have already deposed before today about their

5  deposition testimony?

6      A.    No.

7      Q.    You haven't attended any of the prior

8  depositions.

9      A.    I have not.

10     Q.    May I ask way?

11     A.    Well, on Monday my kid was sick, throwing

12  up all over the house, so I felt like that was bit

13  more important at the time, and last week we were in

14  a SWAT training out of town, and the week before

15  that I was dealing with a hasty SWAT event or a

16  preplanned SWAT event --

17     Q.    Okay.

18     A.    -- so I was unavailable.

19     Q.    All right.  I -- hang on a second.  Sorry

20  about that.

21          MS. BURROWS:  You have already taken

22  your microphone off.  That is passive-aggressive for

23  telling me I am done.

24  BY MS. BURROWS:

25     Q.    Hang on just a second.  I want to look at

Exhibit 3
Page 123 of 130

Malcolm McAlpine

123

```
1    one thing, and then I think I am done with you.
2              Exhibit 9 is Lieutenant Bills' Deadly
3    Force Review Board report.  Is that the document you
4    reviewed and we talked about?
5        A.    Yeah.
6        Q.    All right.
7        A.    Yes.
8        Q.    Did you review any policies or procedures
9    prior to your deposition today?
10       A.    I read it.  I read this a couple days ago.
11       Q.    The -- you are putting your hands on the
12   whole notebook.  Just Exhibit 9?
13       A.    I read this use of force document.
14       Q.    What about use of force policies?
15       A.    Did I read those?  I didn't go through
16   those.
17       Q.    Okay.  That is what I am asking.
18       A.    Okay.
19       Q.    Any general orders or policies, protocols,
20   anything --
21       A.    No.
22       Q.    Okay.  I have no more questions.  Thank
23   you so much.
24              MR. SCHMIDT:  Let's take a break.  I
25   think I have got a couple questions.
```

Exhibit 3
Page 124 of 130

Malcolm McAlpine

124

```
 1                 THE VIDEOGRAPHER:  Time is 4:31.  We

 2   are off record.

 3                 (Recess:  4:31 to 4:36 p.m.)

 4                 THE VIDEOGRAPHER:  Okay.  We are on

 5   record.  Time is 4:36.

 6

 7                     EXAMINATION

 8   BY MR. SCHMIDT:

 9     Q.    All right.  Sergeant McAlpine, I want to

10   ask you a question about Exhibit 43, which is your

11   report, or a report of your interview.  I want to

12   ask you just about one part of it.

13             On page 2 -- or page 3, I am sorry, in the

14   middle of the page -- actually, it is page -- yeah.

15   It is the second page.  It is numbered 3.

16                 MS. BURROWS:  What is the Bates stamp

17   page?

18                 MR. SCHMIDT:  722.

19                 MS. BURROWS:  Okay.

20   BY MR. SCHMIDT:

21     Q.    It says, quote (reading):  Once

22     the roommate was removed from within the

23     house, Sergeant McAlpine, Sergeant Vinje,

24     and others higher up the chain of command

25     were trying to determine if they were going
```

Malcolm McAlpine

125

1    to simply leave.  The idea of leaving Babb

2    in the home alone was weighed against the

3    possibility of further -- of forcing the

4    confrontation.  Sergeant McAlpine's goal was

5    to resolve the situation without further

6    conflict or confrontation.

7    When Sergeant McAlpine mentioned to Antonini

8    that they might simply leave in the

9    residence, Antonini replied, quote:  Are you

10   kidding me?  This guy is crazy.  He has got

11   weapons.  He is out of it.  I don't feel

12   safe going back inside, unquote.

13        Now, you were asked whether this report is

14   accurate.  You said it was.  I want to ask you about

15   one thing.

16        You said earlier in the deposition that

17   when Mr. Antonini was responding to whether you

18   should simply leave, he used profanity.  Is that

19   right?

20      A.    Correct.

21      Q.    Okay.  Do you remember what he said, what

22   the profanity was?

23      A.    He said something to the effect of, "You

24   have got to be fucking kidding me."

25      Q.    Okay.  And then at the end of the

Malcolm McAlpine

126

1    deposition, Ms. Burrows asked you whether you had

2    talked to any of the other officers about the

3    lawsuit or the depositions, and you said no.  Right?

4        A.    (Shakes head.)

5        Q.    You need to --

6        A.    Yes.  I said no.

7        Q.    Do you want to clarify that answer?

8        A.    I have spoken to the case in front of you

9    with the other three.

10                 MR. SCHMIDT:  Okay.  All right.  That

11   is all I have.

12                 MS. BURROWS:  I have nothing further.

13   Thank you so much.

14                 THE WITNESS:  Thank you.

15                 THE VIDEOGRAPHER:  Okay.  This ends

16   the video deposition of Malcolm McAlpine on

17   October 18, 2017.  Time is --

18                 MR. SCHMIDT:  Oh.

19                 THE VIDEOGRAPHER:  We are still on the

20   record.

21                 MS. BURROWS:  You're done.

22                 MR. SCHMIDT:  I forgot one thing.

23                 THE VIDEOGRAPHER:  Still on record.

24                 MR. SCHMIDT:  All right.  We will

25   reserve his right to read and sign his deposition.

Exhibit 3
Page 127 of 130

Malcolm McAlpine

127

1                    THE VIDEOGRAPHER:   Okay.   Now we are

2     ready?

3                    MR. SCHMIDT:   Yes.

4                    THE VIDEOGRAPHER:   Okay.   Okay.   The

5     time is 4:39.   We are off record.

6                    (The deposition was concluded at

7                     4:39 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  State of Oregon    )
                       )        ss.
 2  County of Lane     )

 3      I, Christine Oljace, CSR-RPR, a Certified

 4  Shorthand Reporter for the State of Oregon, certify

 5  that the witness was sworn and the transcript is a

 6  true record of the testimony given by the witness;

 7  that at said time and place I reported by stenotype

 8  all testimony and other oral proceedings had in the

 9  foregoing matter; that the foregoing transcript

10  consisting of 127 pages contains a full, true and

11  correct transcript of said proceedings reported by

12  me to the best of my ability on said date.

13      If any of the parties or the witness requested

14  review of the transcript at the time of the

15  proceedings, correction pages are attached.

16      IN WITNESS WHEREOF, I have set my hand this 6th

17  day of November 2017, in the City of Eugene, County

18  of Lane, State of Oregon.

19

20

21

22  Christine Oljace, CSR-RPR

23  CSR No. 05-0397

24  Expiration Date:  September 30, 2018

25
```

1   Malcolm McAlpine

2   McGowan, et al., vs. Stutesman, et al.

3   October 18, 2017

4

5   PAGE/LINE....................................CHANGE

6   |_____

7   |_____

8   |_____

9   |_____

10  |_____

11  |_____

12  |_____

13  |_____

14  |_____

15  |_____

16  |_____

17

18      I declare under penalty of perjury that the 127

19  pages referenced above are true and correct except

20  for such corrections as noted.  Executed this ......

21  day of ................ 2017.

22          |...........................|

23            Malcolm McAlpine

24

25