*Matthew Grose*

*McGowan v Stutesman, et al.*

*October 19th, 2017*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 4
Page 1 of 25

Matthew Grose

---

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

RONDA MCGOWAN, Personal          )
Representative for Estate of     )
Brian Babb, LEE BABB, CONNOR     )
BABB, by and through Guardian    )
ad litem, STEPHANIE WOODCOOK,    )
KAYLEE BABB,                     )
                                 )
         Plaintiffs,             )
     v.                          ) No. 6:17-cv-00424-TC
                                 )
WILL STUTESMAN, OFFICER GROSE,   )
OFFICER PIESKE, Sgt. MCALPINE,   )
CITY OF EUGENE, a municipal      )
subdivision of the State of      )
Oregon, JANE DOE CALL TAKER,     )
John and Jane Does 1-10,         )
                                 )
         Defendants.             )

DEPOSITION OF MATTHEW GROSE

October 19, 2017

Wednesday

9:31 A.M.

        THE DEPOSITION OF MATTHEW GROSE was taken

at Harrang Long Gary Rudnick, 360 East 10th Avenue,

Suite 300, Eugene, Oregon, before Christine Oljace,

CSR, RPR, CRC, Certified Shorthand Reporter in and

for the State of Oregon.

---

2

1

2                     APPEARANCES

3    For the Plaintiffs:

4       MS. MICHELLE R. BURROWS
        420 SW Washington, Suite 300
5       Portland, Oregon  97204
        503/241-1955
6       michelle.r.burrows@gmail.com

7    For the Defendants:

8       HARRANG LONG GARY RUDNICK, PC
        360 East 10th Avenue, Suite 300
9       Eugene, Oregon  97401
        541/485-0220
10      BY:  MR. JENS SCHMIDT
        jens.schmidt@harrang.com
11

12   Also Present:

13      LEE BABB

14      MS. JAMIE IBOA

15      NATHAN PIESKE

16      WILL STUTESMAN

17

18   Reported by:

19      CHRISTINE OLJACE, CSR-RPR

20      CC REPORTING & VIDEOCONFERENCING

21      EUGENE       541/485-0111

22

23

24

25

---

3

1

2                       INDEX

3

4    WITNESS........................................PAGE

5    MATTHEW GROSE

6       BY MS. BURROWS                             4

7       BY MR. SCHMIDT                            90

8

9    EXHIBITS..................................MARKED

10   Exhibit 45    Continuation Report Lane County   49

11               Sheriff's Office; Bates

12               Nos. COE 000691 - COE 000693

13

14

15

16

17

18

19

20

21

22

23

24

25

---

4

1                      MATTHEW GROSE,

2    having been first duly sworn to testify the truth,

3    the whole truth, and nothing but the truth, was

4    examined and testified as follows:

5

6                      EXAMINATION

7    BY MS. BURROWS:

8        Q.   Good morning, Officer Grose.

9        A.   Good morning.

10       Q.   Am I saying that correctly?

11       A.   Yes, ma'am.

12       Q.   This is the time set for your deposition.

13   You have sat through almost all of the depositions,

14   have you not?

15       A.   I have.

16       Q.   So is there anything you can tell me about

17   how I am doing?

18       A.   Doing wonderfully.

19       Q.   So I don't -- I am not going to go through

20   all of the usual admonitions unless you have a

21   question or a concern.  And you do have the right to

22   read and review the transcript today if you so

23   choose.

24            I do want to go through a little bit of

25   your background.  Because you are second to the last

Exhibit 4
Page 2 of 25

5

1  in this round of depositions, I probably don't have
2  as much to ask you as I have the other officers.
3        You are in plainclothes today.  Are you
4  working today?
5     A.    No.  Today is my day off.
6     Q.    Okay.  And you have been in here
7  consistently for about two or three weeks now.  Have
8  you been on duty any of the times you have been in
9  here?
10    A.    No.  Most of those occurred before my
11  regular duty shift.
12    Q.    Okay.  When does your shift start?
13    A.    It begins at 5 p.m. and I work until
14 3 a.m.  Sunday through Wednesday are my normal
15 workdays.
16    Q.    Then you come in here at nine o'clock for
17 these depositions?
18    A.    For a little bit, yes, if I can.
19    Q.    How long have you worked for the Eugene
20 Police Department?
21    A.    About nine and a half years right now.
22    Q.    Did you work for any other department
23 before Eugene?
24    A.    No, ma'am.
25    Q.    And are you -- what is your highest level

6

1  of certification with the DPSST?
2     A.    I have an intermediate police
3  certification.
4     Q.    Okay.  What year did you graduate from
5  high school?
6     A.    1999.
7     Q.    Did you get a college degree?
8     A.    No.
9     Q.    What high school did you go?
10    A.    South Eugene High School.
11    Q.    Is that here?
12    A.    Yes, it is.
13    Q.    Okay.  I am sorry.
14        Did you -- when -- what year did you start
15 with the department?
16    A.    In May of 2008.
17    Q.    What did you do between graduating from
18 high school and 2008?
19    A.    I went to school, worked a variety of
20 jobs, spent a few years out of the country, got
21 married, had a child.
22    Q.    Okay.
23    A.    A lot of life stuff.
24    Q.    Have you ever been in the military?
25    A.    No, ma'am.

7

1     Q.    Okay.  Have you -- since you have been
2  with EPD, have you served on any specialty teams?
3     A.    Yes, ma'am.
4     Q.    Could you tell me?
5     A.    I have been assigned mostly to patrol.  I
6  spent about six months on a downtown bicycle team.
7  I was on the Crisis Negotiation Team, CNT, for a
8  little less than seven years, from August of 2010
9  until May of this year.  I am a field training
10 officer, and the last two years I have been assigned
11 to DUII enforcement on my patrol team.
12    Q.    Okay.  The Crisis Negotiation Team, did
13 that require any specialty training?
14    A.    Yes, ma'am.
15    Q.    And can you tell me about the training you
16 got to be on that team?
17    A.    The CNT team generally has 20 hours of
18 training per month in combination with a 40-hour
19 basic crisis and hostage negotiation training, as
20 well as another 40-hour intermediate crisis and
21 hostage negotiation training, both of which I took
22 in, I think, 2010 and 2012 for the basic and
23 intermediate trainings, as well as another 24-hour
24 training each year.  It is the Western States
25 Hostage Negotiation Association conference and

8

1  training.
2     Q.    Where is that?
3     A.    It is held somewhere in the Northwest,
4  anywhere from Alaska to Reno to Washington.  It
5  varies year by year depending on who hosts that
6  training.
7        And generally another 30- to 40-hour
8  training in combination with the SWAT team with Camp
9  Rilea, which is over on the Oregon coast.
10    Q.    Okay.  Are you on the SWAT team?
11    A.    No, ma'am.
12    Q.    Do you sometimes call out with the SWAT
13 team when there is a particular situation calling
14 for your skill set?
15    A.    Yes.  Generally, every single SWAT team
16 call-out requires some or all of the Crisis
17 Negotiation Team to go with them.
18    Q.    Who is on the Crisis Negotiation Team
19 right now?
20    A.    The sergeant is Shawn Marsh.  The officers
21 on that team are Michelle Jones; Brandon Rathje,
22 R-a-t-h-j-e; Bo Rankin; Lori Barnes; Matt Backer,
23 B-a-c-k-e-r; Rochelle Given (phonetic); John Jensen;
24 and there is one more whose name I cannot remember
25 right now.

Exhibit 4
Page 3 of 25

Matthew Grose

9

```
1      Q.    Are those all Eugene police officers?
2      A.    Yeah.  They are all either police officers
3  or Rochelle is a call taker and dispatcher at the
4  9-1-1 center.
5      Q.    Okay.  Do you have any civilians that are
6  assigned to that team --
7      A.    No, ma'am.
8      Q.    -- other than the call taker?
9      A.    No.
10     Q.    Are any members of this team trained in
11 psychology or therapeutic methods of dealing with
12 folks?
13     A.    Not that I am aware of.
14     Q.    Okay.
15     A.    I know that -- sorry.  The last member is
16 Jose Alvarez, and he, for a few years before working
17 patrol, worked with -- as a crisis counselor.
18     Q.    Okay.
19     A.    Other than that, I don't believe so, but I
20 am not certain.
21     Q.    Prior to working for Eugene Police
22 Department, did you do any work at any jobs that
23 allowed you to deal with folks in crisis, either as
24 a counselor or suicide hotline operator, anything
25 like that?
```

10

```
1      A.    No, ma'am.
2      Q.    Do you ever work -- does the Crisis
3  Negotiation Team ever work with Cahoots?
4      A.    Very frequently, yes.
5      Q.    Do you do training with Cahoots?
6      A.    No, ma'am.
7      Q.    And in what capacity do you work with
8  Cahoots?
9      A.    Most of the folks on the CNT team are
10 assigned to patrol, and so we work in conjunction
11 with Cahoots on patrol.
12     Q.    Now, all of this training that you have
13 outlined for me, the original classes that you took,
14 training classes, the basic and then the 2012
15 intermediate classes, are those put on by Eugene
16 Police Department?
17     A.    No.  The basic CNT course was hosted by --
18 I know the FBI participates in that training or puts
19 on that training, and it was somewhere near Salem.
20 I don't recall the exact area.  The intermediate
21 course was hosted by the Eugene Police Department,
22 but we didn't put on that training.  We contacted an
23 outside agency for that training.
24     Q.    Do you remember which agency you contacted
25 for that?
```

11

```
1      A.    I don't.  Not off the top of my head.  I
2  am sorry.
3      Q.    And you think that the FBI hostage
4  training folks participated in the basic training
5  you went to?
6      A.    Yes.  They issue part of that
7  certification in that training, yes.  They are --
8  and organize those trainings for that basic
9  training.
10     Q.    And you received your basic certificate in
11 2010?
12     A.    I believe it was in the fall and winter of
13 2010, yes.
14     Q.    And then you got your intermediate
15 certificate in 2012?
16     A.    I believe so.  I could be wrong on those
17 dates.
18     Q.    I will give you the dates.
19           Do you have to -- I know you have
20 mentioned a number of other hours of training.  In
21 order to maintain your certification with the Crisis
22 Negotiation Team, do you have to conduct or
23 participate in any particular number of hours of
24 training?
25     A.    I don't believe so, no.
```

12

```
1      Q.    Now, I know you have to maintain a certain
2  minimum level of training to maintain your DPSST
3  certification.  Do you have to do any updates or
4  refreshers on your certification with the CNT team?
5      A.    No, I don't believe so.
6      Q.    So once you get that -- do you have to be
7  an intermediary -- let's strike that.
8           Is there a requirement that you obtain
9  your intermediate certification to be on the team?
10     A.    No.
11     Q.    Do you have to have at least a basic
12 certification to be on the team?
13     A.    Yes.  Generally, as soon as someone gets
14 on the team, they are sent to the first basic
15 training that they can go to.
16     Q.    Okay.  Beyond the basic and the
17 intermediate, are there other additional
18 certification programs?
19     A.    Yes, there are.  There is an advanced
20 crisis negotiation course that was offered to me,
21 but it is -- generally focuses on team leader
22 skills, policy writing, grant writing, how to select
23 negotiators for your team, that kind of stuff.  More
24 administrative training than anything else, and I
25 have not participated in that.
```

Exhibit 4
Page 4 of 25

Matthew Grose

13

1    Q.    Okay.  Now, forgive the awkwardness of
2    some of these questions now.  Is there a manual or a
3    protocol or someplace that I can look for what is
4    required to be on the hostage negotiation team?
5    A.    The Eugene Police Department has a policy
6    surrounding the CNT team.  It wouldn't be as thick
7    as that book, but there is a policy.
8    Q.    When you became a member of the team, were
9    you explained about all these different trainings
10   and certification process?
11   A.    Yes, ma'am.
12   Q.    So is there a criteria?  Is there a
13   checklist?  For example, when you go to law school,
14   you have to have passed one exam to get in, and you
15   have to have a college degree, and you probably have
16   to have a certain GPA.  Are there -- is there a
17   location where all of the data on how you qualify
18   for the CNT team is located?  Where would I find
19   that information?
20   A.    Most of our special teams at the police
21   department have a list of criteria that everyone has
22   to meet, and I believe they are all fairly similar.
23   Q.    Okay.
24   A.    So -- but there is no specific list that
25   is just for the Crisis Negotiation Team that I am

14

1    aware of.
2    Q.    Are there any national standards that
3    apply to the Crisis Negotiation Team that you know
4    of?
5    A.    Not that I am aware of, but I could be
6    wrong.
7    Q.    Okay.  These criteria that we are talking
8    about, do you know where these criteria are derived
9    from?
10   A.    No, I do not.
11   Q.    The FBI?  The International Chief of
12   Police Association?  Anything like that?
13   A.    I am not certain.
14   Q.    Okay.  Who in your department would know
15   about all of that?
16   A.    I would speak to our sergeant of the
17   Crisis Negotiation Team, Shawn Marsh.
18   Q.    Why do you recommend Sergeant Marsh to
19   teach me about the Eugene Crisis Negotiation Team?
20   A.    As the supervisor of that team, I would
21   expect that he would know the policies and the
22   criterias and the standards set forth.
23   Q.    Okay.  Is there a lieutenant that also is
24   in the chain of command over the Crisis Negotiation
25   Team?

15

1    A.    Yes, ma'am.
2    Q.    Who is that lieutenant?
3    A.    Currently it is Lieutenant Jen Bills.
4    Q.    Okay.  And if you could pick the person
5    you feel is the single most knowledgeable person in
6    the Eugene Police Department about crisis
7    negotiation, who would you pick?
8    A.    I would default to Sergeant Shawn Marsh as
9    the team leader right now.
10   Q.    Is that your safe answer or is that --
11   A.    I would say him or Lieutenant Jen Bills.
12   Either one would be appropriate.  She was also a
13   member of the Crisis Negotiation Team a long time
14   ago, and she promoted to sergeant and lieutenant and
15   she oversees the SWAT and CNT teams.  So either one
16   of those would be excellent resources.
17   Q.    Okay.  Appreciate that.  Thank you so
18   much.
19        Beyond these certification classes you
20   have mentioned to me, you listed a number of hours
21   that you have taken in hostage negotiation, and I,
22   unfortunately, did not bring your DPSST records.
23   These additional hours that you -- have been taken,
24   are you submitting those to DPSST to get credit for
25   them?

16

1    A.    Some of them, but not all.
2    Q.    Okay.  So is there a location where all of
3    your training would be kept for me if I wanted to
4    look at all of the actual classes and training you
5    took?
6    A.    Our training department keeps records of
7    all of our training hours that are logged with the
8    DPSST.
9    Q.    Okay.
10   A.    Some of those training days were spent
11   doing equipment maintenance, and so those were not
12   logged with DPSST as official trainings.  So to find
13   out exactly how many hours I have attended team days
14   with the Crisis Negotiation Team, I don't believe
15   that is on record anywhere, no.
16   Q.    Do you get paid to do it?
17   A.    Yes, ma'am.
18   Q.    So you would have to submit some kind of
19   documentation to get paid?
20   A.    Yes.  So via my record, my time sheets,
21   you could probably find out which days I was at
22   trainings, yes.
23   Q.    And some departments have different rules
24   about getting paid for training and getting
25   permission before you go.  When you submit a

Exhibit 4
Page 5 of 25

17

1    documentation to get paid for training, do you have
2    to say what the name of the training is that you are
3    doing or do you just write "Training"?
4        A.    Are you referring to my time sheet that I
5    submit electronically or when I am going out of town
6    for training?
7        Q.    What I am trying to figure out is how do I
8    get a uniform record of all of the crisis
9    negotiation training you have taken?  How would I go
10   about doing that?
11       A.    I would first go to our training
12   department and get all of the records through DPSST
13   that they have, as well as any certifications or --
14   and then, second, via my time sheet records.
15       Q.    DPSST training records are online, so I
16   can get those pretty easy.  I am trying to fill in
17   the gaps with the training you said that didn't go
18   to DPSST.  That -- I should also ask the training
19   department for any of that information?
20       A.    Yes, ma'am.
21       Q.    Okay.
22       A.    They would have some that are not DPSST --
23   that are not logged with DPSST.  For example, the
24   western states conferences that I referred to, some
25   of them have been out of the state, and I don't

18

1    believe those were ever filed with DPSST.
2        Q.    How many of those western states hostage
3    training conferences have you attended?
4        A.    Five or six.
5        Q.    Did you happen to maintain or keep any
6    materials you received at these conferences?
7        A.    Yes, I have.
8        Q.    Are they at the department now or did you
9    take them home?
10       A.    Most of them are at home.
11       Q.    So if I ask your lawyer for copies of the
12   training material you received at the conferences,
13   would be able to get them to Mr. Schmidt?
14       A.    All of the ones that I have I would give
15   to him, yes.
16       Q.    And that is fair.  So the other training
17   that you received that did not involve these
18   conferences, do you also have paperwork or
19   documentation from that training?
20       A.    Not all of them, no.
21       Q.    All right.  And the materials for the
22   basic and intermediate certification programs, do
23   you have any of that material left?
24       A.    I believe I have both of those.
25       Q.    And again, if I asked Mr. Schmidt for

19

1    copies of that, can you make it available to him?
2        A.    Happily.
3        Q.    Have you been a part of developing or
4    writing any policies or procedures on crisis
5    negotiation?
6        A.    No, ma'am.
7        Q.    Okay.  Have you reviewed any records in
8    preparation for today's deposition?
9        A.    Yes, I have.
10       Q.    And I am just going to -- what materials,
11   written or otherwise, have you reviewed in
12   preparation for today?
13       A.    A handful of reports that were written by
14   the Interagency Deadly Force Investigations Team,
15   including interviews of myself and the other
16   officers you have deposed; some aerial photographs;
17   some photographs of Mr. Babb's residence; and the
18   in-car video from the BearCat.
19       Q.    Did you listen to any dispatch recordings?
20       A.    Not recently, no.
21       Q.    Have you ever -- let me strike that
22   question.
23            Since March 30th of 2015 until today's
24   date, have you listened to any recordings of
25   dispatch traffic on and of March 30th?

20

1        A.    Yes, ma'am.
2        Q.    And about when did you review those calls?
3        A.    I would estimate about six months after
4    the incident, so in the fall of 2015 at the tactical
5    debrief we had for the call.
6        Q.    Okay.  And I guess that begs the question,
7    did you review those dispatch calls for the debrief?
8        A.    It was during the debrief.  I don't
9    believe I listened to them on my own.  It was part
10   of the group.
11       Q.    When was this debriefing, best estimate?
12       A.    I am going to estimate in the fall of
13   2015, September, October.
14       Q.    Were there any handouts or
15   documentation -- I started that question before I
16   thought it through.  Were there any materials
17   created and handed out for that debriefing?
18       A.    I don't believe so.
19       Q.    And can you tell me who ran the
20   debriefing?
21       A.    I believe it was Lieutenant Klinko.
22       Q.    Can you tell me the format, how that
23   debriefing went?
24       A.    It was mostly a critical debriefing of the
25   incident itself, what we did in the roles that we

Exhibit 4
Page 6 of 25

Matthew Grose

21

1   participated in on the call for service.
2      Q.   Do you know if the debriefing was held
3   before or after the deadly force review report was
4   issued?
5      A.   I believe it was -- I believe the debrief
6   was long after the report was completed.
7      Q.   Okay.  It looks like the report -- and
8   this is just a slide show.  It looks like the report
9   was finished about April of 2015 and the debrief was
10  within the fall of 2015?
11     A.   Correct, so several months after.
12     Q.   Do you remember if any of the materials
13  that were used or created as part of the deadly
14  force review were used in your debriefing?
15     A.   I don't recall there being any handouts at
16  all, any paperwork or slide show or anything of that
17  matter.
18     Q.   But they played the tapes of the dispatch
19  calls?
20     A.   I think so, yes.  I think -- I remember
21  hearing the audio of the dispatch, yes.
22     Q.   Do you remember who all was present at
23  that debriefing?
24     A.   Not each -- not each individual, no.
25     Q.   Do you remember anybody?

22

1      A.   I believe most of the people you have
2   deposed this week were there in attendance.
3      Q.   Anybody besides the folks I have deposed?
4   Because there were some officers I haven't yet
5   deposed.
6      A.   Not that I can think of.  I am sorry.
7      Q.   Okay.  Both sergeants were there, Vinje
8   and McAlpine, at the debrief?
9      A.   I believe so.
10     Q.   Now, I have never been to a police
11  debriefing.  I have always wanted to.  But can you
12  tell me exactly how this one was run?
13     A.   Yes.  Generally in a debriefing -- I don't
14  remember the specifics of this one, but in a
15  debriefing, generally we talk about an outline of
16  the call and what happened, and then people can
17  participate and we critique what we did and how the
18  event ended.
19     Q.   Okay.  Were you ordered to go to the
20  debriefing?
21     A.   I don't believe I was ordered to go, no.
22     Q.   So it was a voluntary --
23     A.   I believe so.
24     Q.   All right.  And do you remember any
25  specific officer who spoke at the debriefing?

23

1      A.   I don't.
2      Q.   You know, in any group there is always
3   someone who doesn't say anything.  Was everyone
4   active in this debriefing?
5      A.   I don't recall.  I may have been the one
6   that didn't speak much, but I don't recall exactly.
7      Q.   Now, you said earlier that you worked
8   patrol for most of your tenure with the Eugene
9   Police Department.  Is that correct?
10     A.   Yes, ma'am.
11     Q.   You said that you are now working on a DUI
12  investigative -- is that a team?
13     A.   No.  I am assigned to patrol, but my
14  specific focus on patrol is DUII and traffic
15  enforcement.
16     Q.   Are there other emphasis for patrol
17  officers?
18     A.   Yes.  There is special teams that you are
19  aware of.  For example, the traffic enforcement
20  unit, the downtown bicycle team.  There are two of
21  us assigned to DUI enforcement so we -- so that all
22  seven days of the week are covered on patrol.  There
23  is airport officers.  Is that what you are asking?
24  Does that answer your question?
25     Q.   Well, I wasn't exactly sure what I was

24

1   asking when I asked the question, but now you have
2   helped me clarify.  My -- I guess I always believed
3   that any patrol officer could make a DUI stop and
4   investigate it.  Is that fair?
5      A.   Yes, that is fair and accurate, but my --
6   I am specifically assigned to do that.  So I don't
7   go to regular calls for service, so instead of being
8   tied down on a cold burglary that might take three
9   or four hours, I am essentially left free to do
10  traffic enforcement and actively search for DUII,
11  intoxicated drivers.
12     Q.   Okay.
13     A.   Does that make sense?
14     Q.   Yeah.
15     A.   Okay.
16     Q.   Do you ever get called by other patrol
17  officers if they see someone they suspect of driving
18  under the influence?
19     A.   All of the time.
20     Q.   Okay.  And are you the go-to guy, and your
21  other officer, to investigate DUIs so the other
22  patrol officers can do all these other things like
23  burglaries and --
24     A.   Correct.
25     Q.   Okay.  I think I got it now.

Exhibit 4
Page 7 of 25

25

1       On March 30th of 2015 -- and you know we
2   have been talking for three weeks about the call for
3   service to the Devos Street address.  Do you
4   remember how you were called out to that address or
5   how you got yourself out there?
6       A.   I do.  The call for service came in just
7   around 5 p.m., which is my start time, so I remember
8   that I was loading up my patrol vehicle in the first
9   ten minutes of my shift when the call for service
10  came out, and I went in service and dispatched
11  myself to the address.
12      Q.   And you have heard my different lines of
13  questioning with all of the different officers.
14  What information -- well, let me start that over.
15      By now you have heard every other
16  officer's testimony about what they heard, what they
17  knew, when they went to the location, and I ask that
18  question specifically because the courts have
19  indicated it is what the officer knew at the moment
20  they took a particular course of action.
21      A.   Uh-huh.
22      Q.   Are you able to remember now what you knew
23  distinguished from what all of the other officers
24  have testified to?
25      A.   Yes, ma'am.

26

1       Q.   Can you tell me what you knew about the
2   call for service prior to arriving at the address?
3       A.   That it was an armed, suicidal subject.
4   The call was generated via his therapist.  I
5   remember details -- and I don't recall if this is
6   prior to arriving at the home or in the first short
7   bit, but it was a combat veteran.  And there was
8   mention of a pistol round that had been fired
9   through a window, out a window.  I am not exactly
10  sure exactly what the verbiage was.
11      Q.   And you were a patrol officer on that
12  date?
13      A.   Yes, ma'am.
14      Q.   And you -- oh, I forgot to ask you one
15  follow-up question.
16      I think you said that you were on the
17  Crisis Negotiation Team until May of this year.
18      A.   Correct.
19      Q.   Are you no longer on the CNT?
20      A.   That's correct.
21      Q.   And why did you leave the CNT?
22      A.   I left voluntarily for -- it was due to
23  the scheduling conflicts with that team.
24      Q.   What was the scheduling conflict, if I
25  might ask?

27

1       A.   Those training days are generally on
2   Wednesdays at eight o'clock in the morning after I
3   have been asleep for about two hours, and I have
4   been doing that for seven years of two days a month
5   either 20-hour workdays or little sleep between.
6   The call-out schedule is conflicting -- the
7   call-outs with the SWAT team are conflicting with
8   child care and family life so --
9       Q.   Okay.  I get it.
10      But at the time, in March of 2015, you
11  were still on CNT?
12      A.   Yes, ma'am.
13      Q.   At that time -- and let's focus these
14  questions on 2015 -- how many times were you getting
15  called out in your capacity as a hostage negotiator
16  or crisis negotiator?
17      A.   It is a two -- I guess it is a twofold
18  question.  The first part of it is an official
19  call-out where an entire team or portions of the
20  team are called out, that would range anywhere from
21  six to 15 times a year, but I would utilize the CNT
22  skills and training that I developed -- I would try
23  and use them all of the time on patrol.  I would
24  volunteer for suicidal subject calls.  I would
25  volunteer for subjects-in-crisis calls.

28

1       Q.   Is there something in particular about
2   crisis -- I am using your term.  Every call for
3   service is a bit of a crisis.  I get that.  But is
4   there something about these types of calls, the
5   crisis calls, that appeal to you, that you like?
6       A.   Yes.
7       Q.   Could you tell me what that is?
8       A.   I like working with people.  I really
9   enjoy the deescalation portions of police work.  I
10  like interacting with people.  I don't enjoy
11  investigating property crimes and drug crimes.
12  Those things don't really appeal to me, but I do
13  enjoy working with people that are in crisis.
14      Q.   So over the course of your time with
15  Eugene Police Department and the increased training
16  and the on-the-job experience that you gathered, did
17  you find that you became more skilled at negotiating
18  with people in conflict?
19      A.   Yes, ma'am.
20      Q.   And was there any particular turning point
21  in your career that you noticed that you were
22  getting good at what you were doing?
23      A.   Getting good?  I am always trying to get
24  better.  I don't think that I am an expert by any
25  means or anything like that, but I try.  I just

Exhibit 4
Page 8 of 25

Matthew Grose

---

29

1  enjoy working with people.
2      Q.    Is there a degree of personal satisfaction
3  if you can talk someone out of committing suicide?
4      A.    Very much so.
5      Q.    What about other -- you may run into folks
6  who may not necessarily be suicidal but may be
7  having significant emotional problems at that point.
8  Do you have any particular way you approach a
9  specific situation to figure out what you need to
10 do?
11     A.    With people that are in crisis, I
12 generally try and approach them all with empathy.
13 Empathy, rapport building generally seems to be the
14 best way to resolve all of those, the overall
15 majority at least.
16     Q.    So in order to build empathy, don't you
17 have to get to know the person?
18     A.    Yes.
19     Q.    And have you adopted or used specific
20 techniques to get to know the person you are gaining
21 empathy with?
22     A.    Yes.  Generally through conversation.
23     Q.    And I -- there are a number of different
24 tactics or techniques that are taught.  Is there any
25 particular one that you go to the most often?

---

30

1      A.    No, not that I can think of.
2      Q.    Okay.  And do you find that these skills
3  that you have developed as a hostage crisis
4  negotiator have worked just generally in all of the
5  patrol work that you do?
6      A.    Yes.
7      Q.    Could you tell me how you have seen that
8  evolve and work for you?
9      A.    Yes.  Very low use-of-force rates at work.
10 It is very rare that I have to use force with people
11 or on people.  Contacting people that are very
12 hostile and aggressive, their attitudes can change
13 over time working with me.  I have found that that
14 is something that I am pretty good at.
15     Q.    So your approach is interesting to me,
16 because of all of the hundreds and hundreds of
17 police officers I have deposed, there was a theme
18 for a long time that officers are taught to control
19 the situation -- voice, manner, demeanor, whatever
20 techniques.  Do you find that to be counterintuitive
21 to your work as a patrol officer?
22     A.    Each and every call is different, as is
23 each and every person, so sometimes it works.
24 Sometimes talking to people can deescalate things
25 and get people to calm down to work well with us.

---

31

1  Not always.
2      Q.    But it works for you?
3      A.    Not always.
4      Q.    Do you think it is part of your
5  personality that you can diffuse an otherwise
6  volatile situation?
7      A.    I like to think so, yes.
8      Q.    Okay.  You seem like a very nice young man
9  to me.
10     A.    Thank you.
11     Q.    Okay.  Let's get back to March 30th, 2015.
12 You were in uniform that day and you were driving a
13 patrol car?
14     A.    Yes, ma'am.
15     Q.    And you were responding to what sounded
16 like a very difficult situation?
17     A.    Yes.
18     Q.    Okay.  Did you -- when you arrived, were
19 there other officers present?
20     A.    Yes.
21     Q.    Do you remember who was present when you
22 first arrived?
23     A.    Not every person, no.  I specifically
24 remember Officer DeWitt already being there on
25 scene.  Perhaps Officer Stutesman as well, but I

---

32

1  don't remember everyone that was on location.
2      Q.    When you did the debrief in the fall of
3  2015, did you go through those sets of questions --
4  who was there, who arrived, where do you go, that
5  sort of thing?
6      A.    Not in great detail that I remember.
7      Q.    Okay.  Now, this is Exhibit 16, and you
8  have sat here as I have gone through this exhibit
9  with a number of witnesses.  I like to use it
10 because -- well, it has got one of the more
11 important locations in this situation on it.  This
12 is the address at 2244 Devos Street.  Do you
13 remember where you approached Devos Street when you
14 first arrived?
15     A.    Yes.  I arrived from Barger, which would
16 be somewhere down here, and I parked my patrol car
17 somewhere off the paper down to the side.
18     Q.    And then you approached on foot?
19     A.    Yes, ma'am.
20     Q.    Could you tell me your route?
21     A.    It was north on Devos Street.
22     Q.    And what we have heard from other officers
23 is that this driveway at 2244 appeared to be a
24 meeting point for a number of officers.  Were there
25 officers in this driveway at 2244 when you first

---

33

1    arrived?
2        A.    I believe so, yes.
3        Q.    Okay.  And was the BearCat there when you
4    first arrived?
5        A.    No.
6        Q.    How long were you there before the BearCat
7    arrived?
8        A.    This is an estimation only, 15 minutes.
9        Q.    Okay.  Now, I am going to have you look at
10   the dispatch record, which is Exhibit 7 here at the
11   back, and let's get the timeline about your
12   activities that day to the best of your ability.
13   And I do understand from other officers that this
14   may not be precise to the minute of things, but it
15   is a good guideline.  If -- and again, as you
16   remember I have told a couple of officers, the
17   dispatchers tell us that these first four pages are
18   basically their CAD records of what they were
19   conveying to folks, and then the radio traffic
20   starts on page 4 of 11.
21            What was your call sign that day?
22       A.    My call sign was 4E31.
23       Q.    It might be easier for you to start on
24   page 4 and tell me -- let's go through the timeline
25   of what this record shows about what you did that

34

1    day.
2            So when does it show on Exhibit 7 your
3    first call for service, whether -- and you said you
4    self-dispatched, so where is that entry?  What is
5    the time?
6        A.    I see my designator as 4E31 first at
7    5:14:47 p.m. on March 30th.
8        Q.    And then if you could follow down and find
9    every time your designator is listed and tell me
10   what you were doing and at what time, according to
11   Exhibit 7.
12       A.    The next time I see 4E31 is at 5:26:59.
13       Q.    What does it say you were doing?
14       A.    That I arrived at the location.
15       Q.    That took you 12 -- approximately 12
16   minutes to get there?
17       A.    Yes.
18       Q.    Okay.  And in that 12 minutes that you
19   were driving, was there more radio traffic about
20   what was happening at the Devos Street address?
21       A.    Yes, ma'am.
22       Q.    Can you tell me, if you can, what
23   additional information you were acquiring in those
24   approximate 12 minutes?
25       A.    Information about Mr. Babb being on the

35

1    phone with his therapist.  A lot of the radio
2    traffic was officers that were arriving at the scene
3    and where they were going, where they were staging,
4    for example, their positions on the perimeter of the
5    home.  I believe that is all I recall.
6        Q.    Okay.  You heard yesterday Sergeant
7    McAlpine, who testified that he was expecting
8    officers to take positions on the perimeter or
9    wherever based upon their training and experience.
10   Is it common on these types of calls, the March 30th
11   type of call, for that to happen?  The incident
12   commander will expect the officers to know where to
13   go?
14       A.    It is not uncommon for them to expect us
15   to know where to go.  It depends on the sergeant.
16   Some supervisors will tell specific people to go to
17   specific locations.  Others will just hear where
18   they are going and realize and know that those
19   positions are covered.
20       Q.    Sure.
21            So since you have a great deal of
22   experience in going through crisis situations, is it
23   helpful to know where every officer is located
24   during the situation?
25       A.    The more information the merrier, yes.

36

1        Q.    Okay.  All right.  And during this
2    situation -- I don't have another word for it, but
3    let's just call it the March 30th incident.
4            During the March 30th incident, do you
5    recall at any point in time either sergeant who was
6    present, McAlpine or Vinje, assigning officers to
7    specific locations?
8        A.    I don't.
9        Q.    Did you have an understanding, at least by
10   the time you arrived at 5:26 -- and that is an
11   approximate.  These are all approximate times for
12   purposes of my questions.
13            Did you have an understanding as of
14   approximately 5:26 where various officers were
15   located?
16       A.    I had an approximate estimate, yes.
17       Q.    Okay.  Now, you have heard --
18       A.    I would like to step back one question --
19       Q.    Go ahead.
20       A.    -- about being assigned.  Yes, I was
21   assigned to sit in the passenger seat of the
22   BearCat.
23       Q.    Okay.
24       A.    I remember myself being specifically
25   assigned to that location.

Matthew Grose

37

1      Q.      Who assigned you to that location?
2      A.      I believe it was Sergeant McAlpine.
3      Q.      Do you know why you were assigned to that
4   location?
5      A.      For the negotiation role of being in the
6   BearCat.
7      Q.      Were you the only -- I know that Officer
8   Barnes was there on the March 30th incident.  Do you
9   know why Sergeant McAlpine picked you to be the --
10  to play that role of hostage negotiator?
11     A.      Yeah.  Officer Barnes was not on the CNT
12  at the time.  She has been on the team for probably
13  18 months now.
14     Q.      Okay.  I did not know that.  Thank you for
15  clarifying.
16             Were there any other members of the CNT
17  other than yourself at the March 30th incident?
18     A.      I don't believe so.
19     Q.      Have you worked with Sergeant McAlpine in
20  the past?
21     A.      I have.
22     Q.      At different -- at different crises
23  situations like this?
24     A.      Yes.  And he was my patrol sergeant for a
25  period of time in the past.

38

1      Q.      And have you worked with him on SWAT
2   calls?
3      A.      I have.
4      Q.      And tell me how this works.  If you are
5   going out to a crisis call and CNT is specifically
6   asked to go on this call, does the whole team show
7   up?
8      A.      It depends on the call.
9      Q.      Tell me what you mean by that.
10     A.      So if there is a SWAT call-out and a CNT
11  call-out, generally the whole team does not respond,
12  because a lot of us are off duty, on vacation, have
13  other obligations, so a hundred percent response
14  from the CNT team is very rare, but sometimes they
15  just need two or three, depending on the call.
16             For example, if it is a search warrant, a
17  planned search warrant with a relatively lower
18  likelihood of needing us, they will just take
19  perhaps two negotiators and the sergeant.  So other
20  call-outs will require everybody to attend that can.
21     Q.      And does dispatch say all members of CNT
22  available go to the call?
23     A.      No.  If it is a call-out where we are
24  paged out from home, the SWAT and CNT team, all of
25  us will receive either a text message or a page

39

1   from a pager.  We may have had pagers at the time.
2      Q.      So you will get some direction to go to a
3   particular address?
4      A.      Correct.
5      Q.      Okay.  I didn't know if you just listened
6   to the radio all day long and --
7      A.      No.
8      Q.      -- showed up.
9      A.      No.
10     Q.      Okay.  So on this call, do you know
11  whether or not members of CNT were actually paged or
12  called out to the March 30th incident?
13     A.      I don't recall.  If they were, they would
14  have been paged out simultaneously with the SWAT
15  team.
16     Q.      Are they ever called separate from SWAT?
17     A.      Very rarely.
18     Q.      Why is that?  Do you know?
19     A.      I believe that the EPD policy dictates
20  that the CNT team is paged out with the SWAT team.
21     Q.      And if both teams are present at a
22  particular call, is the SWAT sergeant your sergeant
23  directing your duties that day?
24     A.      The sergeant of the CNT team generally
25  runs the CNT portion of that call.

40

1      Q.      So let's create -- think of -- think of a
2   very significant call-out that you have been on with
3   the SWAT team and the CNT team.  Can you go through
4   sort of the mechanics of what happens when two teams
5   are on a crisis call like that?
6      A.      Yes.  We are all on the same radio
7   channel.  We are generally all working together for
8   the same goal, but there is a lot of moving parts,
9   so there are frequently two SWAT sergeants,
10  potentially a lieutenant at the scene and a CNT
11  sergeant and a large number of officers.
12     Q.      Now, I have a very rudimentary concept of
13  what SWAT does, and I have used SWAT officers in the
14  past.  So is the purpose of SWAT at those calls to
15  provide security and perhaps lethal cover for an
16  entry into a house?
17     A.      That is a portion of what they do, I
18  believe, but I am also not a SWAT team member, so my
19  knowledge of what they do is also rudimentary.
20     Q.      How do you see your role when the SWAT
21  team and the CNT team are called out jointly?  What
22  are you supposed to do?
23     A.      Work for a peaceful resolution without
24  having -- to basically avoid them having to use any
25  force at all.

Exhibit 4
Page 11 of 25

41

1    Q.    You mean SWAT?
2    A.    Correct.
3    Q.    And how does that happen?  When you have
4   got these two teams and multiple sergeants present,
5   who makes the decision about what to do in what
6   order?
7    A.    Generally, the on-scene commander, who is
8   usually a lieutenant if they are there, or whatever
9   sergeant is the on-scene commander.  And the SWAT
10  team is aware of what we do and how we do what we
11  do.  They generally give us adequate time to try and
12  deescalate and avoid confrontation.  They use force
13  as the last resort routinely.
14   Q.    Okay.  Why are multiple members of CNT
15  called to a particular crisis?
16   A.    There is a lot of moving parts and a lot
17  of assignments.  There is generally a primary
18  negotiator, a coach.  There is a lot of equipment to
19  deploy.  There is intel to gather, witnesses to
20  interview.
21   Q.    What does the coach do?
22   A.    The coach sits with the primary
23  negotiator, listens to the conversation, and is
24  basically a listening ear to provide support and
25  encouragement and ideas.

42

1    Q.    Who picks the primary negotiator in a
2   joint call like that?
3    A.    Ideally, it would be the sergeant if the
4   sergeant is there, and they can assign parts.
5    Q.    Okay.  Have you ever taken the role of
6   primary negotiator in a crisis call?
7    A.    Yes, ma'am.
8    Q.    How many times do you think you have done
9   that?
10   A.    I would estimate a guess of 10 to 15.
11   Q.    Over seven, eight years?
12   A.    Correct.
13   Q.    And how many times have you played the
14  role of coach?
15   A.    An equal amount of times.  It is also a
16  guess, though.
17   Q.    Okay.  And that is fine.  I respect your
18  answer.
19       When you say that there is a lot of intel
20  gathering and witnesses to interview, in your role
21  on CNT what are you trying to find out with -- with
22  intel gathering, witness interviews?
23   A.    Trying to gather information that is
24  important to anyone, so information about weapons,
25  prior arrests of the people we are trying to speak

43

1   to.  Some of that stuff is more tactical-based
2   information.  But also for the CNT team, we are
3   trying to learn about family members, medical
4   history, mental health history, medications,
5   important things to the person we are trying to talk
6   to, things that we can use and topics of
7   conversations we can help to deescalate situations.
8    Q.    Okay.  And in this call on March 30th, did
9   you have those resources available to you -- the
10  intel gathering, the witness interviews -- to
11  negotiate with Mr. Babb?
12   A.    No.
13   Q.    Okay.  And is there some reason why that
14  wasn't done, why that part of hostage negotiation
15  wasn't done?
16   A.    I was the only CNT team member at the
17  call, and the rest of the team hadn't been called
18  out yet.
19   Q.    Do you know why the rest of the team had
20  not been called yet?
21   A.    Yes.  It was a pretty dynamic call for
22  service, and it was very quick and very fast.  And
23  oftentimes we will get to -- we will get to a call
24  for service comparable to this one, and then the
25  entire thing will just dissolve and go away and

44

1   there is no need to call out as many resources as we
2   would if it were a prolonged call.
3        So those resources would have been
4   available if we had needed them and called for them,
5   but we were still at the very beginning of our
6   investigation to find out what was going on, what we
7   had.
8    Q.    Okay.  So let's go back to the dispatch
9   record.  And it says -- your last entry that you
10  have testified to was 5:26:59, when you arrived at
11  the Devos Street address.  What is the next entry,
12  what time and what were you doing?
13   A.    The next time I see my designator is
14  7:55 p.m. and at 450 Country Club.
15   Q.    Is that -- that is a long time without --
16   A.    Yes.
17   Q.    -- seeing you on the dispatch call.
18   A.    Yes, it is.
19   Q.    You were there and doing things.  Correct?
20   A.    I was.
21   Q.    Were you on the radio during that time
22  period?
23   A.    I believe so.
24   Q.    I know during that time period, what we
25  have just identified, the hour and a half, you were

Exhibit 4
Page 12 of 25

Matthew Grose

45

1  trying to call Mr. Babb inside his house.  Were you
2  using a personal cell phone?
3      A.    No, ma'am.
4      Q.    A department-issued cell phone?
5      A.    Correct.
6      Q.    Is it one that you always carry with you?
7      A.    Yes.
8      Q.    Do you still have that same cell phone?
9      A.    No, I do not.
10     Q.    Do you remember the phone number for that
11 cell phone?
12     A.    Yes.
13     Q.    Can you tell me?
14     A.    It is (541)359-6838.
15     Q.    6838?
16     A.    Correct.
17     Q.    How many times do you remember you tried
18 to call Mr. Babb?
19     A.    This is an estimation only, 15 to 20
20 times.
21     Q.    And I know you got through at least once.
22 Is that correct?
23     A.    Correct.
24     Q.    And the other times were you getting a
25 busy signal?  Were you getting voicemail?  What was

46

1  happening on the phone when you were trying to make
2  these calls?
3      A.    At first it would go straight to
4  voicemail, which generally indicates to me that he
5  is on the phone with someone else or the phone is
6  turned off.  I believe at the time he was on the
7  phone with his therapist, Ms. Higgins.
8          Then later the phone would ring and after
9  several rings would go to voicemail, so someone just
10 wasn't answering.  And then finally, near the very
11 end, Mr. Babb did answer the phone.
12     Q.    So the phone that you were using that day,
13 when -- do you have a blocking function so no one
14 knows what the number is if they are receiving your
15 call?
16     A.    I don't think there is a blocking
17 function.  I know you can press star 67, I think, to
18 block phone numbers.  It is a regular old flip
19 phone.  There is no special functions to it.  It is
20 just a --
21     Q.    Okay.
22     A.    I don't know if there is a blocking
23 function.
24     Q.    So if somebody received a call from that
25 phone, would they know it was from the Eugene Police

47

1  Department?
2      A.    I don't think so.  I think it would just
3  show up with that phone number that I gave you.
4      Q.    A phone number?  Okay.
5          Do you know at any point in time whether
6  Ms. Higgins was asked to get off the phone so you
7  could call through?
8      A.    Yes.  I recall one of the sergeants -- I
9  believe it was Sergeant McAlpine -- requesting via
10 the Station 1 dispatcher to tell the call taker to
11 have Ms. Higgins hang up the phone.
12     Q.    Okay.  Was -- and that -- did that happen,
13 then, after you tried to make those calls to
14 Mr. Babb?
15     A.    That happened after I had been trying to
16 make phone calls to Mr. Babb that were unsuccessful
17 and after the information was relayed to us that
18 Ms. Higgins was no longer able to communicate with
19 Mr. Babb.
20     Q.    Okay.  These 15 or so attempts to call
21 Mr. Babb, were those all made from inside the
22 BearCat?
23     A.    I don't believe so.  I believe I started
24 trying to make phone calls with him relatively
25 quickly after I arrived on the scene, but I could be

48

1  wrong.
2      Q.    Okay.
3      A.    May I look through these transcripts here?
4  There might be a time where it was dictated for me
5  to start calling him but --
6      Q.    Yeah.  Try the first four pages.  It might
7  be in there.
8          The construction noise is loud out there.
9      A.    So no, I don't see any details where it
10 indicated me to start making phone calls to
11 Mr. Babb.  I honestly can't remember if I started
12 making phone calls to him before or after I was in
13 the BearCat.
14     Q.    Okay.  What happened to that phone?  Did
15 you just turn it in to the department?
16     A.    Yes.
17     Q.    Do you know when you did that?
18     A.    It was earlier this year.  Oh, let's see.
19 Strike that.  It was -- I would say the late summer,
20 early fall of 2016 I was given an upgraded phone to
21 a smart phone, and I swapped out that old one for
22 the new one.
23     Q.    And a new phone number?
24     A.    Same phone number.
25     Q.    Same phone number.  Okay.  And again, it

Exhibit 4
Page 13 of 25

Matthew Grose

---

49

1   would be on whatever account the department uses for
2   cell service?
3       A.    Yes.
4       Q.    Okay.
5       A.    They use Verizon.  And my assumption is
6   they would keep records of all those incoming and
7   outgoing phone calls.
8       Q.    Is there an audit of your cell phone usage
9   within the department?
10      A.    Not that I am aware of.
11      Q.    I ask, because sometimes there is
12  controversies in public entities over the misuse of
13  cell phones.
14          Okay.  Let's -- let me show you or give
15  you your statement.
16          (Deposition Exhibit No. 45 marked
17              for identification.)
18  BY MS. BURROWS:
19      Q.    Could you take a look at 45, and is this a
20  narrative of the statement you gave to Investigator
21  Jones as part of your role in the Babb incident?
22      A.    Yes, ma'am.
23      Q.    And again, you told me that this is one of
24  the documents you reviewed for today's deposition.
25  When was the last time you reviewed this statement?

---

51

1       Q.    So this statement and this deposition that
2   we are doing right now are the only two times you
3   have given a formal statement about what happened on
4   March 30th?
5       A.    I believe so, yes.
6       Q.    Okay.  Did anybody call you and ask you
7   for any follow-up information about things you may
8   have noted?
9       A.    I don't think so.
10      Q.    Okay.  Let's go back to Exhibit 16 for a
11  second.
12          Before the BearCat arrived, what -- where
13  were you located?  And you said it was approximately
14  15 minutes before the BearCat arrived.
15      A.    I believe I stayed here in the front of
16  the residence.  I am not sure if I stayed here at
17  2244 Devos Street or one house to the north.  I
18  believe at some point in time I was over here in
19  that yard.
20      Q.    So in those 15 minutes when you were out
21  front, did you hear Mr. Babb yelling or saying
22  anything from inside the house?
23      A.    No, ma'am.
24      Q.    Did you see him come out of the house in
25  those 15 minutes?

---

50

1       A.    Last night.
2       Q.    Last night?
3           Was this statement recorded?  Do you know?
4       A.    I don't know if it was.  I don't recall
5   there being a recorder in the room.
6       Q.    Okay.  Some of these reports do note that
7   there was a recording going on, but you don't
8   remember being told or shown that you were being
9   recorded?
10      A.    I don't recall.
11      Q.    When you reviewed this statement the last
12  time, do you -- you agree that this is in substance
13  an accurate rendition of what you told the
14  investigator?
15      A.    I do.
16      Q.    Were there any even minor misstatements or
17  changes or adjustments that you would make to this?
18      A.    Not that I can think of.
19      Q.    Okay.  Other than this interview by
20  Detective Jones, were you interviewed by anyone else
21  as part of an investigation of this incident?
22      A.    No, ma'am.
23      Q.    Were you interviewed by anyone that is
24  part of the use of force review matter?
25      A.    I don't think so.

---

52

1       A.    No.  Prior to the arrival of the BearCat,
2   I did not see him come out of the house.
3       Q.    Did you see him in the windows at any
4   point in time in those 15 minutes?
5       A.    I don't remember if I saw him in the
6   windows, no.
7       Q.    In those 15 minutes, did you hear radio
8   traffic from other officers who may have gotten eyes
9   on Mr. Babb?
10      A.    Yes.
11      Q.    And what were they telling you?
12      A.    That he was coming to the windows and
13  opening and closing blinds in the upstairs windows.
14      Q.    In front or in back?
15      A.    I can't remember.
16      Q.    Okay.  Do you remember which officers were
17  giving you that information?
18      A.    I remember Officer Kidd relaying
19  information about seeing windows open or Mr. Babb at
20  windows.
21      Q.    Okay.  And in -- before the BearCat
22  arrived, where was Officer Kidd located, if you
23  recall?
24      A.    I don't know exactly.  I believe he was in
25  one of the neighboring houses, but I wouldn't be

---

Exhibit 4
Page 14 of 25

Matthew Grose

53

1    able to remember his location.
2        Q.    Officer Kidd did get
3    on the roof of 2244.  Had the BearCat already
4    arrived when he took that position?
5        A.    I don't know.
6        Q.    Did you see him get on the roof?
7        A.    I don't think so, no.
8        Q.    Was there any officer on any other roof
9    shown in this picture?
10       A.    I know that at some point in time Officer
11   Farley was on a ladder and on a roof, but I don't
12   recall when or where that occurred.
13       Q.    Officer McAlpine thinks it was this
14   residence just to the north of 2244.  Does that
15   sound right to you?
16       A.    It does.  As I am looking at the map, in
17   recollection, that would be -- if I had to guess
18   based on recollection only, I would guess that
19   Officer Farley climbed up onto that roof.
20       Q.    Now, I know that you sat through Officer
21   Barnes' and McAlpine's testimony.
22       A.    Yes.
23       Q.    Sergeant McAlpine believed that Barnes and
24   Farley were a team.  They were together?
25       A.    Uh-huh.

54

1        Q.    Did you see Officer Barnes up here in this
2    tax lot just north of 2244 at any point?
3        A.    I don't recall seeing Officer Barnes
4    anywhere.
5        Q.    Okay.  At any point after your arrival,
6    did you receive any information from Kidd or Farley
7    verbally and not over the radio?  That was a stupid
8    way of saying that.
9              Other than radio traffic, did you hear
10   Kidd or Farley give you any information by yelling
11   down at you or telling you what was going on?
12       A.    No.  I don't think so.
13       Q.    Did Officer Farley tell you what he could
14   see of the Babb house?
15       A.    No.  Any radio -- or any information I
16   would have received from him would have been via the
17   radio.
18       Q.    And I think Sergeant McAlpine said
19   yesterday that you were all communicating on channel
20   1.
21       A.    Correct.
22       Q.    Do you remember anybody going to a
23   different channel or asking to go to a different
24   channel?
25       A.    I don't.  I don't recall that at all.  We

55

1    had what is called a Code 9 for that call for
2    service, which means that any radio traffic
3    pertaining to that call should remain on that
4    station so anybody leaving and taking additional
5    information on a different channel would be very --
6    it would be inappropriate and really odd.
7        Q.    Okay.  Why would any officer do that if it
8    did happen?  I am not saying it did, but if somebody
9    did go off channel, what --
10       A.    I don't know why.
11       Q.    Okay.  Now, at any point after your
12   arrival at the scene, do you know where the officers
13   who were posted back here were located?
14       A.    Specifically, no.  I knew that there were
15   officers posted behind the residence, but I don't
16   know their specific location.
17       Q.    Okay.  So I know you have had the benefit
18   of listening to everybody we have deposed so far,
19   and my memory is that Officer Barnes and Farley were
20   on the north edge of this picture somewhere in these
21   properties for a period of time.  You recall Farley
22   perhaps going to this rooftop.  We know that Officer
23   Kidd was on 2244.  And we know that Warden and
24   Clark --
25       A.    Uh-huh.

56

1        Q.    -- were somewhere back here, and you were
2    up here in front.  And we know that Vinje and
3    Stutesman were up here in front of 2244.  Do you
4    remember any other officer being there and where
5    they may have been located?
6        A.    Sergeant McAlpine was back there with us,
7    too, at 2244.
8        Q.    That's true.  That's right.
9        A.    I believe at some point in time Officer
10   Keyser was back there as well.
11       Q.    You mentioned him in your statement.  Do
12   you know where Keyser was?
13       A.    I know that at some point he was with us
14   at the BearCat, but I don't recall the timeline that
15   he was there.  I think he was mobile and moving
16   around from position to position.
17       Q.    Because it is interesting you're the -- of
18   all of the folks I have talked to, you are the only
19   one who remembers Keyser and you mention him in your
20   statement.  Did he have a particular position he was
21   to assume, or do you know what he was doing?
22       A.    He was there as part of the perimeter in
23   the front of the house.
24       Q.    Okay.
25       A.    I don't recall exactly what he was doing

Exhibit 4
Page 15 of 25

57

1  though, no.
2      Q.   Was he in uniform?
3      A.   Yes, I believe so.
4      Q.   You heard me ask the questions of Sergeant
5  McAlpine about whether or not there were officers
6  going door to door advising residents to stay
7  inside.  Did you see any officer doing that?
8      A.   No.
9      Q.   Were there any plainclothes officers there
10 before the shot was fired?
11     A.   I don't think so, no.
12     Q.   Okay.  I don't remember if you were
13 present during the neighbor depositions, but some of
14 the neighbors said that there was an officer in
15 plainclothes telling them to shelter inside.  Do you
16 have any idea who that might be?
17     A.   I don't.  I don't recall the presence of
18 any plainclothes officer or plainclothes detective
19 at the scene until after the shooting occurred.
20     Q.   Okay.  At any point in time while you were
21 on scene, do you remember seeing or hearing about
22 any officers coming over this back fence line?
23     A.   No, not until we approached in the
24 BearCat.
25     Q.   Okay.  And after the approach with the

58

1  BearCat, do you remember hearing or seeing any
2  officers coming up over the fence into the Babb
3  backyard?
4      A.   No.  I don't recall any officers going in
5  the backyard.
6      Q.   I think Officer Warden said he did at some
7  point.  Do you remember seeing him back here?
8      A.   No.  The first I recall seeing Officer
9  Warden was after the shooting had occurred, and he
10 came -- I believe he came around the side of the
11 yard.
12     Q.   2244?
13     A.   I was up here in the -- when Officer
14 Warden arrived, I was up here at the front of the
15 residence.  And I remember Officer Warden coming
16 somewhere from back there, but I don't know his --
17 he moves a lot.
18     Q.   Okay.  All right.  Now, how -- I am sorry.
19 I just kind of lost track of where I was going for a
20 minute.
21          I want to ask you about the position of
22 the BearCat.  And you heard Officer Pieske's
23 testimony and Sergeant McAlpine yesterday, and
24 sitting here today -- I will show you these pictures
25 if I can find them -- do you remember the angle --

59

1  strike that.  Let me back up.
2          After the BearCat was pulled into the
3  driveway here at 2244, do you recall it being moved
4  or adjusted in any way?
5      A.   So when it pulled into 2244 Devos, if it
6  was moved or adjusted, it would have been what I
7  would refer to as like micro adjustments just for
8  angle, but there wasn't any big large movements out
9  to the street or all over in the driveway.  If there
10 were adjustments, it would have been primarily just
11 to the angle to see the home.
12     Q.   At what point in this situation did you
13 climb inside the BearCat in the passenger seat?
14     A.   I believe I climbed in the BearCat when it
15 arrived on Devos Street before it went to the 2244.
16     Q.   So down on Devos Street somewhere?
17     A.   I believe so, but I -- that portion of
18 when I got in the BearCat is quite hazy.  I don't
19 remember exactly when.
20     Q.   Okay.  Let's see if we can figure out what
21 you do remember.  If, in fact, you got into the
22 BearCat somewhere on Devos, who was inside the
23 vehicle, if anyone, other than the driver?
24     A.   Officer Pieske would be the only person
25 that I would be able to testify with any certainty.

60

1  He was the driver.  Everybody else behind me in the
2  back I am unsure.
3      Q.   Why did you get inside the BearCat?
4      A.   That is one of the roles I generally or
5  frequently participate in is -- on the CNT is using
6  hailing from the BearCat and making phone calls and
7  negotiating from the BearCat.
8      Q.   So if in fact you got in the BearCat, it
9  would have been down here on the road?
10     A.   That is my guess, yes.
11     Q.   Okay.  And who gave the order, if anyone,
12 to move the BearCat up into the driveway at 2244?
13     A.   It would have been one of the two
14 sergeants on the scene.  There was Sergeant McAlpine
15 or Sergeant Vinje, but I don't recall which one.
16     Q.   And Officer Pieske was driving the BearCat
17 the entire time you were present?
18     A.   Yes, ma'am.
19     Q.   Okay.  Did he ever leave the BearCat prior
20 to the shot being fired?
21     A.   I don't think so.
22     Q.   And I know that you have testified that if
23 there were any changes in the direction of the
24 BearCat, they would have been minor micro changes?
25     A.   Correct.

Matthew Grose

61

1    Q.    Do you remember any of that sort of
2  jockeying for position going on?
3    A.    I don't remember.  I have sat in the
4  BearCat a number of times, and it is frequently
5  moved and jostled, so this particular event I don't
6  remember if it was adjusted or not.
7    Q.    Was the engine to the BearCat turned off
8  at any time while it was sitting in the driveway of
9  2244?
10   A.    I don't recall that either.
11   Q.    Would that be a procedure to turn it off,
12  or do you leave it running in case you need to move
13  quickly?
14   A.    Generally it is left running in case we
15  need to move quickly, and everything attached to it
16  runs on a battery.
17   Q.    That was my next question.
18   A.    So if you turn -- yeah.  Just like our
19  patrol cars, if you turn the motors off, then you
20  run the liability of everything dying and never
21  starting it again.
22   Q.    Does the camera run off the battery in the
23  BearCat?
24   A.    It does.
25   Q.    And does the hailing system and the loud

62

1  speaker system run off the battery?
2    A.    It does.  So if I were to take an educated
3  guess --
4    Q.    That is the best kind.
5    A.    -- my guess is that -- and this is based
6  on my experience of being in the BearCat -- that it
7  was turned on when we arrived and remained on the
8  entire time.
9    Q.    They didn't let us turn it on when we went
10  to inspect it.  Is it a loud-sounding vehicle?
11   A.    In comparison to --
12   Q.    A well-made Ford.  I don't know.
13   A.    It is --
14       MR. SCHMIDT:  A Prius.
15   A.    It is louder than a Prius, but, you know,
16  it has the same engine as a stock F350 diesel pickup
17  truck.
18  BY MS. BURROWS:
19   Q.    Those are kind of loud.
20   A.    Some are louder than others, so some
21  people will change the exhaust to make them louder.
22  There is nothing done to that like that.  It is a
23  run-of-the-mill diesel pickup truck.
24   Q.    With a really cool body on it.  Right?
25   A.    Yes.

63

1    Q.    Okay.  Now, you heard me go through the
2  explanation about how some of these slides were
3  created as part of our forensic reconstruction with
4  Officer Pieske, and I won't repeat it with you, but
5  I do want to show you --
6    A.    May I interrupt you?  Some of that may
7  need repeating.  I was only here for a portion of
8  his deposition.
9    Q.    Oh, okay.  There are some exhibits here
10  that I started with Officer Pieske because I want
11  to -- I need to try and figure out as accurately as
12  possible and as scientifically sound as possible the
13  location of different things such as the BearCat and
14  such as the officers.
15       So the neighbor here north of 2244 was
16  taking pictures and videotapes of the conduct and
17  actions of the officers.  And while we were doing
18  the reconstruction, they shared some of those with
19  our expert.  So you see here this is one of the
20  pictures from the neighbors, and I -- there are a
21  lot of slides I didn't show and I am probably not
22  going to show you, but there is a scientific
23  comparison made with this picture and then the
24  actual picture of the house so that we could get an
25  alignment.  And I had a machine out there to do

64

1  trajectory and all of that information.  But from
2  the pictures from this machine that does this 3D
3  rendering, we were able to, as close as possible,
4  locate the BearCat in the driveway.  And we also
5  relied on still shots from the camera inside the
6  BearCat.  We even got the height of the officers and
7  all that good stuff.
8        So these are some pictures that are still
9  shots from the CVT inside the -- did I say that
10  right? -- inside the BearCat that we have pulled up
11  and then compared to and used with our 3D rendering
12  measurement of the situation.  So I am trying to
13  figure out the best we can -- because this is one
14  position at 5:56, according to the clock on the
15  BearCat.  We are trying to figure out the best we
16  can where the BearCat was located and how it was
17  positioned at the time of the shooting.  So all of
18  that was a long explanation for what these pictures
19  show.
20       And then I think Officer Pieske confirmed
21  for me that that is where the camera is located, and
22  we measured that.  We measured the distance from the
23  floor up to the turret.  We did all of the
24  measurements inside.  And you know what I am -- you
25  can tell what I am doing here with this.

Exhibit 4
Page 17 of 25

Matthew Grose

---

65

1        These pictures are taken from our -- I
2 don't remember what it is called, but it is this 3D
3 rendering machine, and there was a particular
4 picture I wanted to show you to see -- so this shows
5 at least the angle of the camera towards the Babb
6 house.  And when you were in the passenger seat --
7 and I realize that your vantage point was different,
8 maybe to the right and slightly lower than the
9 camera, but does this look like the angle of the
10 BearCat at the point in time the shot was fired in
11 Exhibit 41, the picture on the right?
12     A.    I believe that was the angle of the
13 BearCat, yes.  That camera can swivel and can move,
14 so, you know, it is not going to be -- there is no
15 way it is going to be a hundred percent perfectly in
16 line with the BearCat, because it can move various
17 and slight angles.
18     Q.    Sure.
19     A.    Based on my recollection, I believe it was
20 pointed relatively straight ahead, so that would
21 indicate a relatively clear and accurate
22 representation of the angle of the BearCat.
23     Q.    Okay.  Thank you.
24           And this picture -- this truck, I
25 believe -- I can't tell from this angle.  This is

---

66

1 Mr. Antonini's truck?
2     A.    His Tacoma, yes.
3     Q.    Was that standing -- was the Tacoma there
4 while you were sitting in the BearCat?
5     A.    Yes, ma'am.
6     Q.    And this is the Ford F250 up here?
7     A.    Yes, ma'am.
8     Q.    And Officer Pieske drove the BearCat
9 between these two vehicles?
10    A.    Technically, yes, between them.  There was
11 contact between the BearCat and the Ford.
12    Q.    He made a path, in other words?
13    A.    Yes.
14    Q.    Okay.  All right.  Let's go back to 16.
15 So all of that questioning about the angle of the
16 BearCat -- so at some point we have the BearCat up
17 here at the northwest corner of 2244?
18    A.    South corner.
19    Q.    I am sorry.
20    A.    Oh, sorry.  I'm sorry.  Yes.  Northeast
21 corner.
22    Q.    Northeast?
23    A.    Southwest of Mr. Babb's home.
24    Q.    And let me think about how to ask this
25 question.

---

67

1        Once the BearCat got in this angle that we
2 saw in the previous picture pointed towards the Babb
3 house, were you consistently in that passenger seat?
4     A.    Yes.
5     Q.    Did you ever leave the BearCat prior to
6 the shot being fired?
7     A.    No, ma'am.
8     Q.    And approximately how long do you recall
9 sitting in the BearCat before the shot was fired in
10 the driveway?
11    A.    Without -- without looking at the time
12 stamp and based on estimate only and recollection,
13 20 minutes so --
14    Q.    What could you look at to maybe give your
15 estimation a little more --
16    A.    If I could look at the CAD details of when
17 the BearCat arrived --
18    Q.    Yeah.
19    A.    -- and when the shot was fired, that might
20 give a more accurate representation of how long I
21 was sitting there.
22    Q.    Take a look and --
23    A.    So at 5:37 the BearCat was positioned,
24 starting hails, so my assumption would be that 5:37
25 is an accurate timestamp of when the BearCat was

---

68

1 positioned on Devos.
2     Q.    On Devos or in the driveway?
3     A.    In the driveway.
4     Q.    Okay.
5     A.    Then at 5:52 it is indicated there is a
6 subject on the ground.
7     Q.    And at 5:37 did you say the CAD records
8 said the starting of the hail at that time as well?
9     A.    Correct.
10    Q.    Before 5:37, had you made all of the
11 calls, telephone calls that we have been talking
12 about?
13    A.    I believe I started making phone calls
14 prior to making hails, yes.
15    Q.    Was there -- the time that you started
16 hailing the house, what made you change from phone
17 calls to hailing?  Was there some -- something
18 happened?
19    A.    Yeah.  There was no success with the phone
20 calls.
21    Q.    Okay.  Did someone advise you you should
22 start hailing the house?
23    A.    Yes.
24    Q.    Who did that?
25    A.    Sergeant McAlpine.

---

69

1    Q.    Did you notice -- so before you started
2 hailing -- and I know I am being very tedious in
3 breaking down this timeline, but before you started
4 hailing and after the BearCat was positioned in the
5 driveway, did you notice any activity from Mr. Babb?
6    A.    No.
7    Q.    Was anybody reporting any activity from
8 Mr. Babb?
9    A.    Not that I recall.
10    Q.    And Mr. Antonini had not yet left the
11 house.  Is that correct?
12    A.    That's correct.
13    Q.    Did anybody report Mr. Babb was yelling or
14 screaming out of the windows?
15    A.    Not that I recall, no.
16    Q.    Okay.  And then you were hailing on the
17 loud speaker in the SWAT.  Is there a particular
18 dialogue or script that you follow, or do you just
19 say, "Hey, dude, come out"?
20    A.    No, there is not a particular written
21 script that I use.
22    Q.    Do you remember what you said in those
23 hails to the house?
24    A.    Not verbatim, no.
25    Q.    Do you remember the gist of what it was?

70

1    A.    Yes.  I remember the first hail or two
2 would have been hailing to any occupants inside of
3 the home specifically, because I knew that
4 Mr. Antonini -- we believed Mr. Antonini was still
5 inside the house.
6    Q.    Okay.
7    A.    And we were unsure whether or not he was
8 free to leave or was safe and okay, so the first two
9 or three hails would have been something along the
10 lines of -- along the lines of "Occupants of 2248
11 Devos, this is the Eugene Police Department.  We
12 need you to come outside with your hands empty and
13 in the air."  Something along those lines.
14    Q.    Okay.  And you got to do that because you
15 are the hostage negotiator or just because you were
16 in the front seat?
17    A.    Just because I was in the front seat.
18 Other people hail as well, but I was the crisis
19 negotiator on the scene sitting in the BearCat.
20    Q.    Okay.  Any response to those initial
21 hails?
22    A.    Yes.  Relatively shortly Mr. Antonini came
23 out.
24    Q.    And could you see him come out of the
25 house?

71

1    A.    No.  I could not see him come out.
2    Q.    Did someone report that he was coming or
3 someone was coming out of the house?
4    A.    Yes.  Someone reported that there was a
5 male coming out of the house.
6    Q.    Do you remember if that was Officer Kidd?
7    A.    I see here the designator 2E13, which I
8 believe was Officer Kidd, but I could be wrong.
9    Q.    Okay.  And then were you able to watch
10 Mr. Antonini come down the driveway towards the
11 BearCat?
12    A.    I don't recall that.  I don't recall
13 seeing him, no.
14    Q.    Did any officer go up to meet Mr. Antonini
15 or did you all just wait for him to get down?
16    A.    I think we -- I think that he was just
17 given direction to come down the driveway.  I don't
18 believe anybody went up to meet him.
19    Q.    What kind of -- over the loud speaker he
20 was given direction or somebody was yelling at him?
21    A.    No.  Someone else was speaking to him.
22    Q.    Okay.  And I know from your report and
23 other officers that Antonini did, in fact, come down
24 to the BearCat, in the back of the BearCat.
25    A.    Correct.

72

1    Q.    And I think in your report or the -- your
2 statement, you note that you could overhear some of
3 the conversation going on between Antonini and some
4 officers.
5    A.    Yes, ma'am.
6    Q.    And was it at about that time that you got
7 Mr. Babb on the phone?
8    A.    It was while Mr. Antonini was in the back
9 of the BearCat, yes.
10    Q.    Tell me about the call, however limited it
11 was, with Mr. Babb.
12    A.    It was a very short phone call.  I had --
13 I had called several times.  It had rang and then
14 gone to voicemail.  And one of the times it didn't.
15 It rang two or three times, and then it answered and
16 it was silent on the line.  There was no answer.
17 And I had a very brief conversation with Mr. Babb.
18    Q.    Tell me what was said, if you remember.
19    A.    I introduced myself.  Generally when I am
20 on the phone with somebody in a CNT capacity, I
21 introduce myself by my first name, not "Officer
22 Grose, I am a police officer in your yard."  It's,
23 "It is Matt with the police department.  What is
24 going on today?"  Some sort of introduction of what
25 is going on, what is going on with you type of

Matthew Grose

73

1  thing.
2          Mr. Babb called me by name.  He said,
3  "Well, Matt," and then he told me he was looking at
4  me through that scope of a rifle and pointing a gun
5  at me.
6      Q.    Could you see anybody in the window doing
7  that?
8      A.    No.
9      Q.    Okay.  Did you call him Brian or did you
10 just not use any names?
11     A.    I believe I called him Brian.
12     Q.    Okay.  And what was his tone and manner
13 like on the phone?
14     A.    He was angry and hostile.  He was telling
15 me that I couldn't come into his home, don't come
16 into his house or don't come any closer, that he was
17 looking at me through the scope of a rifle and
18 pointing a gun at me.  I believe he told me to fuck
19 off or don't fucking come in my house, something
20 along those lines.  It was a very brief
21 less-than-20-second conversation, if you want to
22 call it a conversation, and then he hung up on me.
23     Q.    Okay.  Did you try and call him back?
24     A.    I believe so, yes.
25     Q.    And he didn't answer, I take it?

74

1      A.    Correct.
2      Q.    Okay.  And approximately that same period
3  of time Mr. Antonini is in the back speaking with
4  officers.  Is that correct?
5      A.    Yes.
6      Q.    Can you tell me what you remember
7  overhearing that conversation -- in that
8  conversation?
9      A.    Well, I would like to step back a little
10 bit to the phone conversation.
11     Q.    Go ahead.
12     A.    I remember while I was talking to him, I
13 was telling him that we are not -- I remember very
14 clearly telling him we are not coming into your
15 house, we are not going on your property.
16         At that point we already had Mr. Antonini
17 out of the house.  We were getting information --
18 further information saying that there was nobody
19 else in the home.  I remember hearing Mr. Antonini
20 clarifying that he didn't recall ever hearing a shot
21 fired in the house in the time that he had been
22 there.
23         At that point, my phone conversation was
24 more focused, less of intel gathering and more of
25 pure deescalation.  We had a suicidal subject who

75

1  reportedly shot off a round somewhere was the
2  information that we had, and so it was very -- very
3  casual like, "Hey, we are here to help.  What can we
4  do to help you now?  We are not coming into your
5  house.  We are not going to drive into your yard."
6  But that is all of the information I could get out
7  over that very short period of time.
8          Sorry.  Then your second question was what
9  did Mr. Antonini say and what did I recall hearing?
10 Is that --
11     Q.    Well, I -- for some reason, I didn't
12 remember that part of your statement, that you had
13 told Mr. Babb that you weren't going to come into
14 the house and you weren't going to drive up, and I
15 think you also -- do you remember anything else you
16 told Mr. Babb?
17     A.    I don't think so, no.
18     Q.    I know it was a really short call.
19     A.    Right.
20     Q.    And I am looking at your statement really
21 quickly.  Your statement -- and this just may be a
22 memory issue or -- on page -- the second page of
23 your statement, which says 5 of 9 at top and, let me
24 see, one, two -- the third full paragraph:  "Officer
25 Grose then attempted to make contact with Babb by

76

1  cell phone."
2          In this statement, it has that call after
3  Antonini came out of the house.
4      A.    Correct.
5      Q.    Is that probably when the call happened?
6      A.    Yes.  Where I was able to speak to
7  Mr. Babb, Mr. Antonini was already out of the home.
8      Q.    And that is -- I don't see anywhere in
9  this statement that you told Babb you weren't coming
10 into the house and you weren't going to drive up on
11 the -- I mean, I believe that is what you said, but
12 I don't see it in the statement.  Do you remember
13 telling the investigator that?
14     A.    I remember telling the investigator that,
15 and I remember -- and it looks like he summarized it
16 by saying we're not going anywhere --
17     Q.    Okay.
18     A.    -- and that we were seeking a peaceful
19 resolution.  So he summarized my words into that
20 sentence.
21     Q.    But you actually said more specific?
22     A.    Yes.
23     Q.    So as we go through your report -- and I
24 am not going to go through it in a lot of detail
25 with you, because you have a really good memory and

Exhibit 4
Page 20 of 25

Matthew Grose

77

1    you are very clear -- if we come across other things
2    that appear to be shorthand by the investigator,
3    will you please point those out to me?
4        A.    I will do my best.
5        Q.    Okay.  And then you were able to overhear
6    the conversation between Antonini and the officers
7    in the back of the vehicle.
8              After your call with Mr. Babb terminated,
9    did you turn around to see who was talking to
10   Mr. Antonini?
11       A.    Yes.  I remember turning around once and
12   seeing somebody speaking to him, but I don't recall
13   who it was.
14       Q.    Okay.  Was it more than one officer
15   speaking to Mr. Antonini?
16       A.    I remember there were -- Mr. Antonini was
17   back there along with -- I remember seeing Officer
18   Stutesman standing.  I remember seeing Sergeant
19   McAlpine, but I don't recall if they were the people
20   talking to him.
21       Q.    Okay.
22       A.    For some reason, Officer DeWitt is coming
23   to mind.  He may have been back there, but I could
24   be mistaken.
25       Q.    He told me he was at the back of the

78

1    BearCat.
2        A.    Sounds familiar.
3        Q.    Okay.  Looking at the last paragraph and
4    then -- this, again, is the investigator noting your
5    conversation with him, and I am still on page 5 of
6    9, last paragraph.
7        A.    Uh-huh.
8        Q.    "He heard the roommate say" -- see where I
9    am reading?
10       A.    I do.
11       Q.    "He heard the roommate say he was
12   concerned about the armored capabilities of their
13   vehicle."
14             So Mr. Antonini was questioning the
15   BearCat's capabilities to withstand rounds?
16       A.    Yes, ma'am.
17       Q.    Okay.  "Due to the types of rifles that he
18   knows Babb possesses."
19             Did Mr. Antonini share what additional --
20   what rifles or weapons Mr. Babb possessed?
21       A.    I don't remember him saying anything
22   specific to calibers of weapons, but saying that he
23   hunted and that he hunted -- frequently had a
24   variety of hunting rifles, large game rifles.
25       Q.    "And that Babb has many weapons."

79

1        A.    Correct.
2        Q.    Did Mr. Antonini share with you
3    approximately how many weapons Mr. Babb may have
4    had?
5        A.    I don't recall him giving a number, but
6    saying he had a lot of hunting rifles.
7        Q.    Okay.
8        A.    And I remember that conversation
9    distinctly, because Mr. Antonini was sitting behind
10   us, so he could see the home through the front
11   windshield, and he expressed a concern of being shot
12   while inside the BearCat through the window
13   behind me.  He was worried about, you know, how
14   much -- what size rounds can this glass take and can
15   this BearCat withstand.  He was worried about being
16   shot in the middle of an armored vehicle.
17       Q.    Okay.  Did anybody tell him what the
18   capability of the BearCat was?
19       A.    I don't recall if somebody advised him of
20   what the capabilities were, no.
21       Q.    Okay.  And then what was Mr. Antonini's
22   manner and demeanor in this conversation?
23       A.    At first he was confused.  He wasn't aware
24   of what was going on and why we were there.  He was
25   fearful.  I remember him expressing -- he told us

80

1    about Mr. Babb being really, really angry inside and
2    frantic inside the home.
3        Q.    So I see also that you -- it is noted in
4    this statement you gave to the investigator that
5    Mr. Antonini claims he got home about 1600 hours,
6    and so he had been home an hour and a half, hour and
7    45 minutes by the time this conversation is taking
8    place.  Is that correct?
9        A.    Correct.
10       Q.    And I know you mentioned earlier that
11   Mr. Antonini said he didn't remember hearing any
12   gunshot in the house.
13       A.    Correct.
14       Q.    Is that correct?
15       A.    Yes, ma'am.
16       Q.    Did Mr. Antonini talk about Mr. Babb's
17   conversation with his therapist?  Did he overhear
18   that?
19       A.    I don't recall any mention of that from
20   Mr. Antonini, no.
21       Q.    Did Mr. Antonini tell anyone in that hour
22   and a half, hour 45 minutes, whatever timeline had
23   elapsed that Mr. Antonini had been home, when
24   Mr. Babb started to get agitated?
25       A.    No, he didn't.  He only made mention of

Exhibit 4
Page 21 of 25

---

81

1   seeing Mr. Babb agitated as he was walking out to us
2   or as he was leaving the home.
3       Q.   Did anyone ask Mr. Antonini what had
4   precipitated this event?  Because obviously the
5   therapist called.  Did Mr. Antonini see or hear
6   anything that was going on in the house?
7       A.   No.  He seemed very unaware of what was
8   going on.
9       Q.   Did he -- were you able to conclude why he
10  was unaware?
11      A.   Based on my recollection, the first -- the
12  first -- Mr. Antonini first became aware of what was
13  going on at the hails of the BearCat.
14      Q.   Okay.
15      A.   Prior to that, he was -- I believe he was
16  in his room or somewhere secluded in the house and
17  unaware of any event going on.
18      Q.   I find that interesting, because officers
19  outside heard Mr. Babb yelling.  Even officers
20  inside the BearCat heard Mr. Babb yelling.  Did
21  anyone ask Mr. Antonini about that yelling, about
22  that agitation inside the house?
23      A.   I don't recall if anybody asked him, no.
24      Q.   Okay.  How long do you suppose the officer
25  spoke with Mr. Antonini at that point?

82

1       A.   It was from the time that he arrived in
2   the BearCat until the shot was fired.
3       Q.   Was he still in the BearCat when the shot
4   was fired?
5       A.   I believe so, yes.
6       Q.   What were you doing when Officer Stutesman
7   fired that shot?
8       A.   I was sitting in the passenger -- front
9   passenger of the BearCat.  I was attempting to call
10  Mr. Babb back.
11      Q.   Were you looking towards the house?
12      A.   Yes.
13      Q.   Could you see Mr. Babb come to the door?
14  It has been reported he came at least twice.
15      A.   Yes, I saw him -- I saw the door open and
16  I saw the top of his head, yes.
17      Q.   Okay.  Both times or just once?
18      A.   I definitely remember the second time.  I
19  don't recall if I saw him the first time coming out.
20      Q.   The first time Mr. Babb came to the door,
21  I think Officer Kidd said that he called on the
22  radio that he could see a male in the doorway.
23      A.   Uh-huh.
24      Q.   Do you remember that call?
25      A.   I remember somebody saying that he saw

83

1   someone in the doorway.  It very well could have
2   been Officer Kidd.
3       Q.   Okay.  Were you actively on the phone when
4   the shot went off?
5       A.   I wasn't speaking to anyone, but I was --
6   I was either dialing or holding it to my ear, I
7   believe, yes.
8       Q.   Did the shot surprise you?
9       A.   It did.
10      Q.   And could you tell where it was coming
11  from?
12      A.   I felt and thought that it came from right
13  behind me.
14      Q.   Okay.  Did you hear anything being said
15  prior to the shot being fired?
16      A.   Yes.
17      Q.   What did you hear?
18      A.   I heard Officer Stutesman saying something
19  along the lines of "Pointing a gun" or "He has a
20  gun."  Something like that.
21      Q.   Okay.  Did Officer Pieske say anything?
22      A.   Not that I recall, no.
23      Q.   Okay.  So when you heard he has a gun or
24  there is a gun, did you make any attempt to go for
25  cover or figure out where the gun was?

84

1       A.   No.
2       Q.   Did anybody else in the BearCat do that,
3   go for cover or figure out where the gun is?
4       A.   I don't think so.  I may be overly
5   confident in the capabilities of the BearCat.  I
6   feel fairly secure in there.
7       Q.   So if you had been out in the open, you
8   might have ducked for cover?
9       A.   Yes.
10      Q.   Okay.  All right.  That makes sense.
11      A.   So when Mr. Babb told me that he was
12  pointing a rifle right at me and looking at me
13  through the scope of a rifle, I was less concerned
14  about my own welfare and considerably concerned
15  about the welfare of the officers that were out on
16  the scene.  I was more likely than not sitting in
17  the most secure location to be at the time.
18          But I knew that there were officers in the
19  backyard, officers on the rooftops, officers -- and
20  I am having a phone conversation with him.  He
21  doesn't know who I am.  So when he's saying, "I am
22  looking at you through the scope of a rifle, I was
23  instantly concerned for Officer Kidd, who was on the
24  rooftop, and I was very concerned for officers.
25          I remember thinking of Officer Keyser and

Exhibit 4
Page 22 of 25

85

1   DeWitt, who were in a neighbor's yard, for example,
2   standing behind -- I remember when I first started
3   being behind just a thin sheet of roofing material
4   that you could see my silhouette through, for
5   example, but it wouldn't stop a bullet at all.
6           And I remember instantly thinking he is
7   pointing a gun at one of my coworkers, one of my
8   peers, and not very concerned about me or concerned
9   about Will, who is in the roof hatch behind me.  So
10  if he is pointing a rifle at me, that didn't really
11  startle me, but I was very concerned for my
12  coworkers.
13      Q.    Those outside of the BearCat?
14      A.    Exactly.  Those that were not behind a
15  vehicle designed to withstand fire.
16      Q.    Do you know what the capabilities of the
17  BearCat are with respect to the ballistics
18  resistance?
19      A.    I have heard, but I haven't looked at the
20  technical specs, no.
21      Q.    What had you heard?
22      A.    What I have heard is that the metal can
23  take glancing -- up to glancing blows or a glancing
24  blow from a 50-caliber rifle.
25      Q.    Okay.

86

1       A.    The windshield I have heard a variety of
2   reports.  I don't know what the windshield can
3   withstand.
4       Q.    Okay.  Now, when Mr. Babb told you on the
5   phone that "I can see you and I have" -- "I can see
6   you in my scope and I have a rifle pointed at you,"
7   did you hear anybody who had eyes on the house say,
8   "I see him in the window" or "He has got a rifle,"
9   anything like that?
10      A.    No.
11      Q.    And presumably Officer Kidd had eyes on at
12  least the windows in the front of the house.  Is
13  that correct?
14      A.    I think so, yes.
15      Q.    And do you know whether Officer Farley was
16  on the rooftop of the house to the north of 2244 at
17  that point?
18      A.    I don't think he was on the roof yet.
19      Q.    Okay.  Was he on the way up?
20      A.    I remember hearing radio traffic from
21  Officer Farley and Officer Kidd about maneuvering on
22  roofs.  Where they were exactly at the time, I don't
23  know, if they were going from rooftop to rooftop or
24  climbing up or down.
25      Q.    So did you tell anyone that Babb said, "I

87

1   can see you with my scope and I have got a rifle
2   pointed at you?"  Did you relay that to anyone?
3       A.    I attempted to.  I was attempting to get
4   on the radio traffic -- on the radio to air that
5   information specifically to other officers like he
6   is pointing a rifle at someone is what I wanted to
7   say.  He told me he is pointing a rifle at someone,
8   but I was unable to because of the communication of
9   people going on rooftops.
10      Q.    Okay.  Did any other officers report via
11  the radio that they saw Mr. Babb in a window with a
12  rifle?
13      A.    I don't think so, no.
14      Q.    Okay.  Could you see Mr. Babb in the
15  window?
16      A.    No.  That was part of my concern.  Had he
17  said "I am pointing a rifle at you" and I could see
18  him and a rifle, then I would be concerned for that.
19  I was concerned that he was pointing a rifle at
20  someone in the backyard, for example, or to the
21  north, for example --
22      Q.    Okay.
23      A.    -- and believing it might be me talking to
24  him and just saying "I am pointing my rifle at you."
25  That was what I wanted to get on the radio and say,

88

1   "He is pointing a rifle at somebody.  If you are not
2   behind a tree or something very large, get behind
3   appropriate cover."  But I was unable to because it
4   was shortly after he hung up on me that he came out
5   with a rifle that he pointed at Will, Officer
6   Stutesman.
7       Q.    Okay.  I want to ask you about sort of
8   the -- it wasn't yet a conversation, but Sergeant
9   McAlpine and a couple other officers indicated that
10  they were considering withdrawal --
11      A.    Uh-huh.
12      Q.    -- from the scene.  Do you remember that,
13  those discussions?
14      A.    I do.
15      Q.    Can you tell me what you recall about
16  those discussions?
17      A.    Yes.  So that was after Mr. Antonini came
18  out of the house, after he was giving the
19  information that he had been at the home since about
20  4 p.m., had not heard a shot fired, and didn't
21  believe anybody else was in the house.  Essentially,
22  Mr. Antonini was -- yeah, I would use the word
23  either eroding or dissolving our reason to be there
24  at that time.
25          There was only one person reporting a shot

89

1    being fired, a therapist who is not at the scene, so
2    he was basically saying I don't know what we are
3    there for.  And so we stopped with hails.  We were
4    starting the discussion of, well, then why are we
5    here?  I remember that being part of it.  And that
6    being what I was gathering as well from the
7    conversation is that we are going to be out of here
8    in ten minutes.
9        Q.    Okay.  Were you going -- was the
10   discussion to completely leave the scene or just
11   withdraw the BearCat?
12       A.    What would have happened at that time was
13   we would have definitely withdrawn the BearCat
14   within a few minutes, and I would have attempted to
15   continue to talk to him on the phone, but from down
16   the block, just to offer resources.
17            He is obviously someone in crisis.  He is
18   a combat veteran.  He could use assistance and
19   support and support, which is why I wanted to be
20   there.  And I would have maintained phone calls had
21   he allowed me to and said:  "Hey, here is the
22   resources I have.  What can I do to help?  Do you
23   want me to go away?  Do you want Cahoots?  Do you
24   want Ms. Higgins?  What can I do to help you tonight
25   to calm down from what is going on?"  But that never

90

1    came to be.
2        Q.    Now, can I ask how tall you are?
3        A.    I am five eight.
4        Q.    Okay.  Okay.  I have got your statement
5    in.  I think I am done with you.
6            MS. BURROWS:  Let's take a break and
7    let me double-check.
8            MR. SCHMIDT:  Okay.
9            (Recess:  11:08 to 11:17 a.m.)
10
11            EXAMINATION
12   BY MR. SCHMIDT:
13       Q.    All right.  Officer Grose, did you want to
14   clarify or correct an answer that you gave regarding
15   the engine in the BearCat?
16       A.    Yes.  I stated earlier the engine in the
17   BearCat is a diesel.  It, in fact, is a V10
18   gas-powered engine, so it is probably quieter than
19   the diesel.
20            MS. BURROWS:  Okay.
21   BY MR. SCHMIDT:
22       Q.    And then you testified that at the
23   incident regarding the radio traffic, that the radio
24   traffic on the channel you were using was Code 9?
25       A.    Correct.

91

1        Q.    Right?  And Code 9 means that only
2    officers who are involved in that particular
3    incident should be using the channel you are on.
4    Correct?
5        A.    Correct.
6        Q.    That was channel 1.  Right?
7        A.    Correct.
8        Q.    And that officers who aren't at the call
9    should use a different channel?
10       A.    Correct.
11       Q.    And how many channels are there?
12       A.    Hundreds.  There are hundreds of channels
13   accessible to either our portable hand-held radios
14   or our car radios.
15       Q.    How many are typically used?
16       A.    I would say that 95 percent of the radio
17   traffic occurs on Stations 1, 2, and 3.  Maybe a
18   little bit more on channel 4.  The overwhelming
19   majority is on Stations 1, 2 and 3.
20       Q.    So if an officer on the scene on channel 1
21   wanted to talk to another officer on a different
22   channel, would the Code 1 radio traffic pick that
23   up, that an officer was asking another officer to go
24   to a different channel?
25       A.    Yes.  You would have to request that the

92

1    other officer change channels as well.  So typical
2    radio traffic, if I wanted to speak to, let's say,
3    Officer Stutesman, I would say something along the
4    lines of, "Stutesman, go to 3," and he would know
5    what that means.  And we would both change to
6    channel 3, have our own private conversation, and
7    then switch back to 1.
8            But with a Code 9 on channel 1, that
9    generally indicates that everything having to do
10   with that call should remain on that channel so that
11   everyone on that call is aware of all of the
12   information.  So taking side bar conversations and
13   side information is -- shouldn't happen at all.
14            MR. SCHMIDT:  Okay.  That is all of
15   the questions I have.
16            MS. BURROWS:  I have no more
17   questions.  Thank you so much.
18            MR. SCHMIDT:  We will reserve the
19   right to read and sign his deposition.
20            (The deposition was concluded at
21            11:19 a.m.)
22
23
24
25

Matthew Grose

93

```
1   State of Oregon   )
                      )       ss.
2   County of Lane    )

3       I, Christine Oljace, CSR-RPR, a Certified

4   Shorthand Reporter for the State of Oregon, certify

5   that the witness was sworn and the transcript is a

6   true record of the testimony given by the witness;

7   that at said time and place I reported by stenotype

8   all testimony and other oral proceedings had in the

9   foregoing matter; that the foregoing transcript

10  consisting of 92 pages contains a full, true and

11  correct transcript of said proceedings reported by

12  me to the best of my ability on said date.

13      If any of the parties or the witness requested

14  review of the transcript at the time of the

15  proceedings, correction pages are attached.

16      IN WITNESS WHEREOF, I have set my hand this 2nd

17  day of November 2017, in the City of Eugene, County

18  of Lane, State of Oregon.

19

20

21      Christine L Oljace

22  Christine Oljace, CSR-RPR

23  CSR No. 05-0397

24  Expiration Date:  September 30, 2018

25
```

```
1   Matthew Grose

2   McGowan, et al., vs. Stutesman, et al.

3   October 19, 2017

4

5   PAGE/LINE....................................CHANGE

6   |_____

7   |_____

8   |_____

9   |_____

10  |_____

11  |_____

12  |_____

13  |_____

14  |_____

15  |_____

16  |_____

17

18      I declare under penalty of perjury that the 92

19  pages referenced above are true and correct except

20  for such corrections as noted.  Executed this ......

21  day of ................. 2017.

22          |............................|

23              Matthew Grose

24

25
```

Exhibit 4
Page 25 of 25