*Joseph Anthony Kidd*

*McGowan v Stutesman, et al.*

*October 13th, 2017*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 6
Page 1 of 26

1

```
         IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF OREGON

                 Eugene Division


RONDA MCGOWAN, Personal      )
Representative for Estate of )
Brian Babb, LEE BABB, CONNOR )
BABB, by and through Guardian )
ad litem, STEPHANIE WOODCOOK, )
KAYLEE BABB,                 )
                             )
            Plaintiffs,      )
     v.                      ) No. 6:17-cv-00424-TC
                             )
WILL STUTESMAN, OFFICER GROSE,)
OFFICER PIESKE, Sgt. MCALPINE,)
CITY OF EUGENE, a municipal  )
subdivision of the State of  )
Oregon, JANE DOE CALL TAKER, )
John and Jane Does 1-10,     )
                             )
            Defendants.      )


          DEPOSITION OF JOSEPH ANTHONY KIDD

                 October 13, 2017

                     Friday

                    8:54 A.M.


       THE DEPOSITION OF JOSEPH ANTHONY KIDD was

taken at Harrang Long Gary Rudnick, 360 East 10th

Avenue, Suite 300, Eugene, Oregon, before Christine

Oljace, CSR, RPR, CRC, Certified Shorthand Reporter

in and for the State of Oregon.
```

2

```
1              APPEARANCES

2    For the Plaintiffs:

3       MS. MICHELLE R. BURROWS
        420 SW Washington, Suite 300
4       Portland, Oregon  97204
        503/241-1955
5       michelle.r.burrows@gmail.com

6    For the Defendants:

7       HARRANG LONG GARY RUDNICK, PC
        360 East 10th Avenue, Suite 300
8       Eugene, Oregon  97401
        541/485-0220
9       BY: MR. JEFFERY MATTHEWS
        jeff.matthews@harrang.com
10

11   Also Present:

12      LEE BABB

13      MATTHEW GROSE

14      NATHAN PIESKE

15      WILL STUTESMAN

16      JAMIE IBOA

17

18   Reported by:

19      CHRISTINE OLJACE, CSR-RPR

20      CC REPORTING & VIDEOCONFERENCING

21      EUGENE        541/485-0111

22

23

24

25
```

3

```
1

2                      INDEX

3

4    WITNESS.......................................PAGE

5    JOSEPH ANTHONY KIDD

6        BY MS. BURROWS                          4

7

8    EXHIBITS...................................MARKED

9    Exhibit 29   Case Supplemental Report; Bates    14

10               Nos. COE 000739 - COE 000740

11   Exhibit 30   Crime Scene Log; Bates            24

12               Nos. COE 00039 - COE 000640

13   Exhibit 31   Photograph                        72

14   Exhibit 32   Photograph                        77

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1                JOSEPH ANTHONY KIDD,

2    having been first duly sworn to testify the truth,

3    the whole truth, and nothing but the truth, was

4    examined and testified as follows:

5

6                   EXAMINATION

7    BY MS. BURROWS:

8        Q.   Officer Kidd, could you state your name

9    for the record?

10       A.   Yes.  It is Joseph Anthony Kidd.  K-i-d-d.

11       Q.   Thank you.

12            Officer Kidd, have you ever had your

13   deposition taken before?

14       A.   I have.

15       Q.   How many times?

16       A.   I think just once.

17       Q.   Do you remember the nature of the lawsuit?

18       A.   It was a lawsuit regarding a search

19   warrant that I had written and a SWAT service

20   related to the search warrant.

21       Q.   Do you remember the name of the case, by

22   any chance?

23       A.   JoAnn Ernst was one of the primary

24   plaintiffs in the case.

25       Q.   How long ago was that matter?
```

Exhibit 6
Page 2 of 26

Joseph Anthony Kidd

5

1     A.     Probably about six, seven years ago.
2     Q.     Do you remember the name of the
3 plaintiff's attorney who took your deposition?
4     A.     Brian Michaels.
5     Q.     Okay.
6     A.     And Marianne Dugan.
7     Q.     Okay.  I think I know what case it is.
8            And that case was in federal court as
9 well?
10    A.     Yes.
11    Q.     I represent the Estate of Brian Babb and
12 his father, Lee Babb, in a federal civil rights
13 lawsuit against four officers and the City of
14 Eugene, and this is your time for a deposition in
15 your memory of events on March 30th of 2015.
16           The rules of this particular proceeding
17 have not really changed much since your last
18 deposition, but sometimes it bears repeating some of
19 the parameters and rules of the road that we will be
20 adhering to today.
21           Your testimony -- and that is what it is.
22 It is testimony under oath, which is being
23 transcribed by the court reporter here.  I am not
24 videotaping your deposition, though I will be
25 videotaping some other officers in this matter.

6

1            The transcript is -- will be finalized at
2 some point.  I am sure someone will order it at some
3 point, and you have the right to read and review it
4 for accuracy to make sure there aren't any mistakes
5 and that you recollect your testimony as the record
6 reflects if you reserve the right to do so.
7 Mr. Matthews has been reserving that right for all
8 previous officer witnesses.
9            One thing that sometimes happens in
10 depositions when we get going on our discussions
11 here is that my questions may not always make sense
12 or they may be confusing or I may be thinking way
13 ahead of what we are talking about, and you might
14 not understand.  If that happens, if you do not
15 understand my question, would you please ask me to
16 clarify?  Let me know what is confusing.  Because I
17 don't get to sit down with you over a cup of coffee
18 and talk about this matter, this is my only chance
19 to get your memory and your facts from you.
20           And vice versa, if I don't understand your
21 answer, I am probably going to ask you to explain it
22 to me, clarify it to me so that I understand fully
23 what is going on.
24           If at any point in time you want to take a
25 break, we can do that.  You don't have to tell me

7

1 why.  The only rule is that if there is a question
2 pending, that you answer that question, and then we
3 can take a break.  Is that fair?
4     A.     I understand.
5     Q.     Thank you.
6            Have you testified in court before?
7     A.     Yes.
8     Q.     This is basically like testifying in
9 court, and that is why the transcript is being
10 created, so that in some future proceedings I can
11 actually use your testimony in my case or to impeach
12 your testimony or to show conflict between others'
13 testimony.  So that is why it is pretty important
14 that we are very clear with each other today,
15 because this is part of a formal official record in
16 this litigation.
17           That said, I have just recently been
18 subpoenaed to testify about a matter in which a
19 police officer has been decertified for not telling
20 the truth in a deposition, so it is very important
21 for us to make sure that this -- we understand each
22 other, that there is no confusion.  And so because
23 you are the witness, I always want you to have the
24 opportunity to understand the question and your
25 answer.  And at any point in time you want to adjust

8

1 or you remember something differently, it is
2 perfectly fine to add to your testimony that you
3 have already given or to clarify it, because
4 sometimes, particularly with the events that take
5 place many years previous to the deposition, memory
6 is a slow process that may come out over time as we
7 talk about it.  And I am probably going to ask you
8 questions differently than what the original
9 investigator asked you in this matter.
10           All that okay?
11    A.     Yes.
12    Q.     Clear?  Good.
13           Please tell me where you are now employed.
14    A.     At the Eugene Police Department.
15    Q.     And how long have you been employed at
16 EPD?
17    A.     13 years.
18    Q.     What year did you start?
19    A.     2004.
20    Q.     And did you work in any agency prior to
21 Eugene?
22    A.     No, not in law enforcement.
23    Q.     Can you tell me all of the different
24 positions you have held within the police
25 department?

Joseph Anthony Kidd

9

1      A.    I am going to mute my phone.  I am sorry
2   about that.  I forgot to do that.
3      Q.    Are you getting buzzed?
4      A.    Yeah.
5            All right.  I have been a patrol officer
6   the whole time I have been there.  I think the only
7   other major ad hoc assignment is SWAT.  I am a
8   member of the SWAT team.  I have been on the team
9   for about 11 years.
10      Q.    And you have already anticipated my next
11   few questions.  Besides SWAT, have you been any
12   other special position?
13      A.    Honor guard, I guess.
14      Q.    Okay.  Well, that's good.
15      A.    I consider that important.
16      Q.    Have you been -- it says here it looks
17   like you have been on a bike patrol.
18      A.    I was on the downtown bike team for about
19   three years.  I did park patrol on a bike for about
20   eight months one year with a coworker.  That is
21   really about it.
22      Q.    Ever been an FTO?
23      A.    No.
24      Q.    Okay.  A long time ago that was --
25            MR. MATTHEWS:  Joe, you want to keep

10

1   your voice up.  The HVAC in here is fairly loud.  We
2   want to make sure the court reporter --
3            THE WITNESS:  Okay.  I will do that.
4            MR. MATTHEWS:  -- gets everything.
5            MS. BURROWS:  And are you hearing him
6   okay?
7            THE COURT REPORTER:  Yes, but louder
8   is always better.
9            THE WITNESS:  I will do that.
10   BY MS. BURROWS:
11      Q.    Sometimes if you look at her, that will
12   help.  What she is doing is really important today
13   so --
14            A long time ago or a few years ago there
15   was a rapid response team.  Were you ever on that?
16      A.    I was, yes.  CCT.  We had a Crowd Control
17   Team that was bike based, and I was on that.
18      Q.    All right.  Prior to becoming a police
19   officer, what was -- how were you employed?
20      A.    I have done a few things.  I was in the
21   Marine Corps for four years.  I was a newspaper
22   reporter at the Register-Guard for about seven or
23   eight years.  I was a journeyman plumber for a
24   certain number of years, about six or seven, I
25   think, and then police work after that.

11

1      Q.    When did you serve in the military?
2      A.    1983 to '87.
3      Q.    What was your rank at discharge?
4      A.    Corporal, E4.
5      Q.    And you were a reporter with the
6   Register-Guard?
7      A.    Yes.
8      Q.    How did you go from being a reporter to a
9   police officer?
10      A.    It was a weird path.
11      Q.    It is a zigzaggy little career you have
12   got here.  So how did that happen?
13      A.    I was a good reporter.  I enjoyed it.  It
14   was a little bit too monotonous for me.
15      Q.    Okay.
16      A.    I wanted more variety.
17      Q.    When did you go to the academy?
18      A.    Back then we had the police academy here
19   in town.  Eugene Police ran our own academy, and
20   that was starting in February of 2004.
21      Q.    So you never went to DPSST?
22      A.    It was -- at that time, the State allowed
23   two agencies to have their own academies.  That was
24   Portland and Eugene.
25      Q.    Okay.

12

1      A.    And everybody else went to Monmouth at
2   that time for the DPSST academy.
3      Q.    How many -- what is your highest level of
4   certification within DPSST?
5      A.    I have an advanced certificate.
6      Q.    Okay.  Are you -- have you ever been a use
7   of force instructor?
8      A.    No.
9      Q.    Okay.  Now, on March 30th, 2015, were you
10   on duty?
11      A.    Yes.
12      Q.    And what shift were you working at that
13   time?
14      A.    It was the day shift.  I think it was T21,
15   because when this call began to unfold, I was
16   heading to headquarters to secure.  I was at the end
17   of my shift.
18      Q.    All right.  And I understand that there
19   are districts within the city that an officer may be
20   assigned to?
21      A.    Yes.
22      Q.    Which district were you assigned to at
23   that time?
24      A.    I am not certain.
25      Q.    Okay.

Exhibit 6
Page 4 of 26

13

1    A.    I know I have worked in the southeast
2  portion of town for me a couple years.  I don't
3  remember if I was working that specific area then or
4  not.  That is currently -- my current beat is
5  southeast Eugene, and I have been doing that for a
6  couple years.
7    Q.    Did you review any records for today's
8  deposition?
9    A.    I looked at the statement that Detective
10  Crolly took from me on the day of this incident, and
11  I looked at the shooting review board review, the
12  final statement from the shooting review board.
13    Q.    Have you spoken to any of the officers in
14  the room today about --
15    A.    No.
16    Q.    -- your testimony?
17          What about the officers who have already
18  given their depositions, have you spoken with any of
19  them?
20    A.    No.
21    Q.    When was the last time you reviewed your
22  statement?
23    A.    This morning.
24    Q.    And have you only reviewed it the once
25  since the incident?

14

1    A.    No.  I looked at it briefly last night,
2  and then I looked at it briefly this morning.
3    Q.    Okay.
4          MS. BURROWS:  I will mark the next in
5  order.  And I don't have copies.  I live in Boise.
6          (Deposition Exhibit No. 29 marked
7           for identification.)
8          MR. MATTHEWS:  I think I have a copy
9  of what you are looking at.  Is it the one that is
10  marked 739, 740?
11          MS. BURROWS:  Yes.
12  BY MS. BURROWS:
13    Q.    Can you take a look at Exhibit 29 and tell
14  me if that is a copy of the statement you gave as
15  part of this investigation?
16    A.    Yes.
17    Q.    And is that the document then you did
18  review prior to your deposition?
19    A.    Yes.
20    Q.    All right.  And then in here we have had a
21  number of depositions, and we are, as you can see,
22  almost up to 30 exhibits, and so we are just
23  numbering them consecutively as we go through
24  everybody's deposition.
25          Could you look at Exhibit 9 in this

15

1  notebook and tell me if that is the use of force
2  review that you read in preparation for today's
3  deposition?
4    A.    Yes.  I didn't read all of it.  I read the
5  first couple pages of it.
6    Q.    Have you ever at any time read the
7  entirety of the exhibit?
8    A.    No, I have not.
9    Q.    Have you read statements given by any
10  other witness to this incident?
11    A.    No.
12    Q.    Now, your lawyers over the last couple of
13  days have brought in some really good pictures of
14  the neighborhood, much better than my pictures, so I
15  think I might just have you refer to -- I think 16
16  is one of the better ones.
17          Do you recognize the situation depicted in
18  Exhibit 16?
19    A.    I do.
20    Q.    Have you looked at any maps or schematics
21  or pictures of that neighborhood prior to today?
22    A.    Last night I looked at a picture -- maybe
23  this one actually, a black and white version of it,
24  and just this aerial view.  And there were a couple
25  other photographs of I think a street view.

16

1    Q.    Exhibit 2 was the poor quality picture I
2  had Officer Warden testify to.
3    A.    Uh-huh.
4    Q.    Did you look at anything that looks like
5  this?
6    A.    It could be this one.  It was black and
7  white and it was an aerial view.
8    Q.    Okay.
9    A.    I can't say if it was exactly this
10  picture, but it is either that or similar.
11    Q.    All right.  Now, besides your report, the
12  use of force review, and this picture, have you
13  reviewed anything else?
14    A.    Like I said, there were a couple black and
15  white photographs I looked at of just the street
16  view --
17    Q.    Okay.
18    A.    -- of the houses, two or three of them,
19  and that is it.
20    Q.    Have you listened to any tapes?
21    A.    No, I have not.
22    Q.    What was your call sign that day, if you
23  recall?
24    A.    My current -- it has been 2 Edward 35 for
25  two years, but I don't know if that was then or not.

17

1   This was in 2015, so I am not sure.
2       Q.   All right.  Some of the interviewers put
3   down the different officers' call sign, and it
4   doesn't look like this investigator did for you.
5   Who was the -- was it Officer Crolly who did the
6   interview with you?
7       A.   George Crolly, yes, ma'am.
8       Q.   Did you know him prior to this
9   investigation?
10      A.   I have heard his name.  I don't know that
11  I had ever met him before that.
12      Q.   Was he alone in his interview with you?
13      A.   No.  Jed McGuire -- I think Jed McGuire
14  was there as well.  He was a union representative.
15      Q.   Do you recall if your statement was
16  recorded?
17      A.   I don't remember.
18      Q.   Many of these reports indicate that the
19  investigator did record the statement.  Some of them
20  do not have that, and I don't know if that just
21  means it wasn't recorded if it is not noted.  That
22  is why I asked you.
23      A.   Okay.
24      Q.   If they had recorded it, would you have
25  had to give your consent or acknowledgment?

18

1       A.   I don't know.
2       Q.   Okay.  You were present with the
3   association vice president, Officer McGuire.  Is
4   there some reason you took an association
5   representative with you to this interview?
6       A.   No.  There is -- I can't think of any
7   particular reason.
8       Q.   I mean, did you --
9       A.   I think it is just common practice.
10      Q.   Okay.  Did they give you any Garrity
11  warnings prior to this interview?
12      A.   Not that I remember.
13      Q.   Okay.
14      A.   They may have, but I -- I don't recall
15  that.
16      Q.   And normally, if they were to give you
17  Garrity warnings, that would have been noted in the
18  documentation?
19      A.   I don't know.  I have never been on IDFIT,
20  and I have never been a detective.
21      Q.   All right.  Have you been interviewed as
22  part of an internal affairs investigation?
23      A.   Yes.
24      Q.   And have you been given Garrity warnings
25  in those previous interviews?

19

1       A.   Sometimes, yes.
2       Q.   Are you required to sign an acknowledgment
3   if you are given Garrity warnings?
4       A.   There is a form that I sign for that, yes.
5       Q.   Do you recall signing such a form prior to
6   your interview with Officer Crolly?
7       A.   I don't remember.  I don't have any
8   recollection of doing that, so I don't know.
9       Q.   This interview appears to have been
10  conducted about April 1st at, what, three in the
11  afternoon, four in the afternoon?
12      A.   That is what is indicated here.
13      Q.   And the incident occurred on March 30th of
14  2015.  Do you know why you were not interviewed on
15  the day of the incident?
16      A.   I don't know.
17      Q.   When were you asked to give this
18  interview?
19      A.   I don't know.  I am sorry.
20      Q.   All right.  Was it before April 1st at
21  1400 hours?
22      A.   Yes.  I mean, they scheduled us for
23  interviews.  I just don't know what the time
24  proximity was for scheduling that appointment for
25  that interview and when it actually occurred.

20

1       Q.   How did you receive information that you
2   needed to give an interview?
3       A.   I don't know.  I can't remember if it was
4   a phone call or an email.
5       Q.   At the time of the incident on March 30th,
6   do you recall giving any kind of initial statement
7   to detectives who were on the scene?
8       A.   I don't think so.  I don't think so,
9   because I ended up being back here for crime scene
10  security on the back side of this fence, and then I
11  secured after that.
12      Q.   Okay.
13      A.   So I parked out here, my patrol car, so I
14  ended up walking essentially from this spot to
15  maintain crime scene security to my car and then
16  securing it, so I don't recall giving a statement to
17  anybody at that time.
18      Q.   All right.  Have you seen any of the crime
19  scene photos that were taken after the shooting?
20      A.   The only one that I -- that I have seen
21  was -- I think it was when the DA announced their
22  findings, and there was a large map that they used
23  during their briefing for the media.  I remember it
24  being sort of like a three-dimensional image or map,
25  and that was put out by the media and the TV news

21

1 reporter and a picture of that briefing in the
2 newspaper. So that map I am talking about is really
3 the only other -- the only thing that comes to mind
4 right now.
5     Q.   When you were a reporter, did you cover
6 crime?
7     A.   Not -- I was never truly the police
8 reporter, but I was the city hall reporter for the
9 last three years or so at the paper, so I covered
10 the city council, mayor, city government. And as a
11 part of that, I did write quite a bit about police
12 activities and changes of leadership and issues like
13 that, but I was not really the actual police
14 reporter.
15     Q.   What years did you work for the
16 Register-Guard?
17     A.   As a reporter, it would have been 1990 to
18 '98, I think. I am guessing here a little bit on
19 the transitions. I started as a part-time reporter
20 there when I was going to school at the U of O, and
21 then I went full time, became a full-time reporter
22 when I finished school, which is around '91. And
23 then I think I quit in '98.
24     Q.   Do you have a degree?
25     A.   I do.

22

1     Q.   What is your degree in?
2     A.   Journalism and Russian and Eastern
3 European studies at the university.
4           MR. MATTHEWS: Keep your voice up.
5           THE WITNESS: Okay.
6           MR. MATTHEWS: It is the noise up here
7 that kind of interferes with the court reporter's
8 ability to hear you.
9 BY MS. BURROWS:
10     Q.   Have you reviewed any of the CAD reports
11 or dispatch records?
12     A.   No.
13     Q.   So let me explain the situation here.
14 We -- this is -- it looks like it is Exhibit 7 from
15 the dispatcher's deposition right here.
16     A.   Okay.
17     Q.   And this is a -- I don't want to use the
18 wrong word, but the original version of the dispatch
19 record is extremely difficult to read, and so your
20 lawyers asked the folks to do a cleaned-up version.
21 So look at Exhibit 13, and you will see what I mean.
22 That is -- this is the same thing as 7 --
23     A.   Okay.
24     Q.   -- but it is backwards.
25     A.   Uh-huh.

23

1     Q.   So if you flip the page to the next page,
2 it actually starts at the bottom and you have to
3 read up.
4     A.   Okay.
5     Q.   So we had this cleaned-up version created
6 for the deposition --
7     A.   Okay.
8     Q.   -- and I am going to be asking you some
9 questions from this version.
10     A.   Okay.
11     Q.   But we have already had dispatchers
12 indicate that this is exactly the same as 13.
13     A.   Okay.
14     Q.   Okay?
15     A.   Uh-huh.
16     Q.   At the time of this incident, once
17 Mr. Babb was killed, there was a crime scene
18 perimeter set up. Is that correct?
19     A.   Yes.
20     Q.   And in order to access the perimeter of
21 the crime scene, you had to sign in. Is that
22 correct?
23     A.   Yeah. There is typically a crime scene
24 log that is created.
25     Q.   And I have that crime scene log here.

24

1 Let's mark this the next in order as well. It would
2 be 30.
3           (Deposition Exhibit No. 30 marked
4            for identification.)
5 BY MS. BURROWS:
6     Q.   Do you recognize at least the format of
7 this document?
8     A.   I do.
9     Q.   And your name is on this page?
10     A.   Correct.
11     Q.   And tell me what the information that is
12 over by your name tells me about your actions in the
13 crime scene perimeter.
14     A.   This is just a time frame of entering the
15 crime scene and exiting the crime scene.
16     Q.   And then what is over here in the
17 "Comments"?
18     A.   It says "Crime scene tape" so --
19     Q.   Tell me what you did for the ten minutes
20 that you were inside the crime scene perimeter.
21     A.   I -- well, it is indicated here that I
22 hung up crime scene tape. I don't remember doing
23 that. I very well could have. The main thing I did
24 do that I do remember is standing just west of this
25 backyard fence to maintain -- so when the shot was

Exhibit 6
Page 7 of 26

Joseph Anthony Kidd

25

1  made, I was here on this roof.  I relocated to the
2  backyard or the back of this fence just to maintain
3  crime scene security there.  I stood there for quite
4  a while.  And I don't remember if this crime scene
5  tape activity was before that or after that.  I am
6  not sure.
7      Q.    Okay.  So let's start with the beginning
8  of your involvement with this case.  You can look at
9  your report if you need to.
10     A.    Okay.
11     Q.    I always ask officers if they can testify
12 independent of the report, but if you are not able
13 to do that, I may have you clarify that, that you
14 have no independent recollection.  I mean, you
15 know --
16     A.    Right.
17     Q.    -- the drill here.
18     A.    Yes, ma'am.
19     Q.    So what time was it when you first heard
20 that there was activity going on at the Devos Street
21 address?
22     A.    I don't remember the time.  I remember it
23 was at the end of my shift, and I was driving.  I
24 had secured all of my SWAT equipment at the SWAT
25 office, and I was driving back to the police

26

1  headquarters to secure and the call came out.  I
2  wasn't dispatched to the call, but because of the
3  nature of the call, I went to the call of my own
4  initiative.
5      Q.    And sitting here today -- I am going to
6  show you the -- if you could look at the dispatch
7  record, which is Exhibit 7 from the dispatch
8  depositions.  And according to the dispatchers that
9  we have deposed, the first section called Notes
10 really relates to the dispatch activity, their
11 activity, and that the officers' activity is
12 generally under Radio Log.
13         But if you will look at page 2 and 3 of
14 11, there are some officer indicators on this.
15 Could you tell me -- if you could look down through
16 page 2 and 3, and see if you recollect which of
17 those call signs was yours that day?
18     A.    Yeah.  I think I am 2 Edward 13, because I
19 reported information about shouts that were being
20 made from within the house and people appearing in
21 the door, things like that.
22     Q.    I see a 2 Edward 13 on page 2, the sixth
23 entry down, at 5:18:39 p.m.  Is that you?
24     A.    I am sorry.  Can you repeat that, the
25 sixth line?

27

1      Q.    Yeah.  5:18:39 is the time.
2      A.    Yes.
3      Q.    "Large gray house with white trim, five
4  houses north of Cody"?
5      A.    Yes.  I think that is my designator,
6  2 Edward 13.
7      Q.    So let's use that timeline to see if we
8  can back up when you think you arrived at the scene.
9      A.    I was the first one to arrive on scene.  I
10 don't know if I checked out on the radio at that
11 time or not.  It might indicate on here.
12     Q.    So a better summary of officers' location
13 and activity information starts on page 4.
14     A.    Okay.
15     Q.    And if you could just scroll down page 4
16 onward and tell me where it is that you first appear
17 on this record.
18     A.    On page 4?
19     Q.    Anywhere from 4 on.
20     A.    Oh, okay.  Well, right here it says
21 2 Edward 13 Code 4.  That was at -- what is that?
22 One, two, three -- nine lines down.
23     Q.    If you could look up at 2 Edward 13 at
24 5:08:51, is that you dispatched?  I am on page 5.
25     A.    Okay.

28

1      Q.    Fourth entry down.
2      A.    Which line are you on, ma'am?
3      Q.    2 Edward 13.
4      A.    Oh, here you go.  Sorry.  Yes.
5      Q.    Is that you?
6      A.    Yes.
7      Q.    Is this -- it says "Dispatched," and you
8  said you self-dispatched to this call?
9      A.    I did.
10     Q.    Is that about when you dispatched yourself
11 to this call?
12     A.    When did the call first begin?
13     Q.    According --
14     A.    What is that time frame?
15     Q.    -- to the records, it was about 5:03:06.
16     A.    So that would be about right.
17     Q.    Okay.
18     A.    Because the dispatcher airs quite a bit of
19 information at the beginning, and other officers
20 don't want to jump in there and get in the way when
21 that is happening.
22     Q.    So at least as of 5:08:51 you were
23 en route to this call?
24     A.    Yes, ma'am.
25     Q.    Tell me at that point, when you are first

Exhibit 6
Page 8 of 26

---

29

1  dispatching to the call, what do you remember about
2  the call?  What information did you have?
3      A.   That it was a man who was suicidal, had a
4  gun, had fired a round, was having some kind of
5  mental health crisis.  There was some information
6  that came out that he had -- was a veteran, had
7  military -- military history.  Those are the key
8  elements I remember.
9      Q.   And were you listening to the radio the
10 entire time that you were driving to the scene?
11     A.   Yes.
12     Q.   And you had an onboard computer in your
13 patrol vehicle?
14     A.   Yes.
15     Q.   Was there also additional information
16 scrolling on the screen at that time?
17     A.   Yes.  All these -- all these notes, CAD
18 notes, were streamed into it.  I don't recall
19 reading them.  I do remember listening to the
20 information from dispatch on the radio at the time.
21     Q.   And thank you for that answer.  I
22 appreciate that.  Because I know it is -- I watched
23 a lot of the videos from the patrol cars, and
24 everyone was driving very quickly through city
25 traffic, but I wanted to find out if any of this CAD

---

30

1  information, which seems to be captured on page 1, 2
2  and 3 of Exhibit 7 -- do you recall -- and you can
3  scroll through and read through it for me if you
4  want to.
5      A.   Okay.
6      Q.   If you can go through this, pages 1
7  through 3, and tell me, of this CAD-delivered
8  information, what you recall learning or knowing
9  en route to the scene.
10     A.   I remember that -- that the caller was
11 actually a therapist that was on line with Mr. Babb.
12     Q.   Uh-huh.
13     A.   That he'd fired a shot, that he was
14 possibly intoxicated.  I think most of the
15 information that I remember when I was driving there
16 was just information I had heard on the radio.
17     Q.   Okay.  Do you know at any point after your
18 arrival at the scene if there was any conversation
19 or information from other officers that you weren't
20 sure whether or not that shot had been fired?
21     A.   No.
22     Q.   No one ever questioned that?
23     A.   No.  I don't recall any conversations
24 about that.
25     Q.   All right.  Was there any development in

---

31

1  this issue of Mr. Babb being suicidal that you heard
2  from other officers?
3      A.   I think that was some of the initial
4  information put out by dispatch.
5      Q.   Okay.
6      A.   There was a therapist who had called with
7  concern about him because he was suicidal, possibly
8  intoxicated, had fired a round with a handgun.  From
9  what I can remember, that detail about him possibly
10 being suicidal was a detail that came out fairly
11 early on, best I can remember.
12     Q.   So the only thing I think -- see about
13 that in the early part is on the third entry here
14 the caller, who was the therapist, is stating that
15 Mr. Babb has a nine millimeter to his head and has
16 already shot one bullet into the window.  Is that
17 the information you are referring to?
18     A.   I don't know the exact verbiage or if
19 there was a reference to who gave that information
20 or not.
21     Q.   That is part of the reason I am exploring
22 your memory with you is that is what we have in the
23 official record.
24     A.   Uh-huh.
25     Q.   And I also have the transcripts of the

---

32

1  call between the call taker and the therapist.  Is
2  there anything beyond this initial information that
3  came out during the incident that confirmed or
4  denied or changed that initial information about
5  Mr. Babb being suicidal?
6      A.   I don't remember.
7      Q.   All right.  That is fair.
8           And that is another point.  If you don't
9  remember or you don't know, those are perfectly fine
10 answers for the record.  I would rather you do that
11 than guess or make up or suppose things for me.
12     A.   Yes, ma'am.
13     Q.   Is that fair?  Thank you.
14          How long did it take you to get to the
15 scene, if you recall?
16     A.   I don't remember.  I was driving -- I
17 think I was on 105 heading to the police
18 headquarters eastbound from the SWAT office, so that
19 would probably be about a two-minute drive Code 3.
20     Q.   And you recall being the first unit on the
21 scene?
22     A.   Yes.
23     Q.   Now, if you could take a look again at the
24 radio log, are you supposed to call in to dispatch
25 and tell them that you have arrived?

---

Exhibit 6
Page 9 of 26

Joseph Anthony Kidd

33

1    A.    That is the protocol, yes.
2    Q.    Could you look on this -- and I don't want
3  to put words in your mouth, but could you look on
4  this and tell me when it is that you called in that
5  you had arrived at the scene?
6    A.    I don't -- I don't know.  I don't see it.
7    Q.    I am looking at page 5, and I hesitate to
8  tell you, because I don't want it to be my
9  testimony.  I want it to be yours.
10   A.    Go ahead, ma'am.
11   Q.    Look at -- 2E13 is your --
12   A.    Yes.
13   Q.    It looks as if you arrived at 5:13:37.  Is
14  that correct?
15   A.    That is indicated here, yes.
16   Q.    And that information would have come from
17  you on here?
18   A.    Correct.  But that isn't necessarily an
19  accurate time.  It doesn't necessarily accurately
20  reflect when I arrived.  So in other words, if I
21  come to a call and there is many officers
22  responding, there is a lot of radio traffic that is
23  happening, sometimes I will be at a call for a
24  couple minutes before I have a chance to get on the
25  air and say that I have arrived.  So it is not

34

1  necessarily a real precise notation of my arrival
2  time.
3    Q.    All right.  So the best that we can say
4  from this entry is that is at least when you called
5  in that you arrived?
6    A.    Yes.
7    Q.    And where did you -- let's use Exhibit 16.
8  Where were you located upon your first arrival?
9    A.    Can I use your pen?
10   Q.    Absolutely.
11   A.    Thank you.
12        I saw that there was this long driveway
13  and this panhandle lot and a house kind of sitting
14  at a diagonal position.  So I came up to the corner
15  of this house right here, and I could see a couple
16  vehicles in the driveway.  I believe there was a
17  truck with the driver's door open, standing open.
18  So I waited there.
19        And I was trying to get a view of the
20  house.  It was a difficult spot to get a view from.
21  A couple other officers showed up a short time after
22  I was there.
23   Q.    So you are pointing to a house that is
24  marked as 2244 Devos Street.  Correct?
25   A.    Yes, ma'am.

35

1    Q.    Did you pull your vehicle into the
2  driveway of 2244 Devos?
3    A.    I don't think so.
4    Q.    Where did you put your vehicle?
5    A.    I am trying to -- I think I parked out
6  back here to the south and walked northbound on
7  Devos and walked into this position.
8    Q.    And were you listening to the radio
9  traffic as you are walking up to the corner of 2244
10  Devos Street?
11   A.    Yes.
12   Q.    Could you hear any more information coming
13  in as you are walking up to the house?
14   A.    I don't recall.
15   Q.    All right.  I am asking these detailed
16  timeline questions because the evolution of cases
17  depend upon the information known to the officer at
18  the time that it is happening.
19   A.    Yes, ma'am.
20   Q.    So -- and I know it is a long time ago and
21  you have probably been on a thousand calls since
22  then, but bear with me, because I am going to keep
23  asking you those types of questions.
24   A.    Okay.
25   Q.    From this location at the corner of the

36

1  house of 2244 Devos, what could you see of the Babb
2  home?
3    A.    Not very much.  There was a motor home
4  here, a couple vehicles in the driveway.  There is a
5  cedar fence that runs -- or wood fence that runs
6  along here, and so the downstairs portion -- I don't
7  think I could see the downstairs portion from here,
8  just on foot.
9        From where I was at -- I was actually at
10  the very corner of this building.  There was a
11  carport or something like that.  So I was trying to
12  get a better view of the front of the house.
13        One of my thoughts was that if a person
14  were to come out with a gun and walk down the
15  driveway, that we would need some advance notice so
16  that they don't just suddenly appear 3 feet from us
17  and have an encounter like that.
18   Q.    Sure.
19   A.    So I ended up going in the backyard of
20  2244 Devos and came over here by the motor home
21  where the fence is to see if I could get a position
22  over here where I could see the downstairs, the
23  front door, and the windows downstairs.  And that
24  was a very exposed position, and the view was
25  difficult from there also because the motor home was

Exhibit 6
Page 10 of 26

Joseph Anthony Kidd

37

1    in the way and the angles just didn't work out.
2        Q.    Let me stop you for a second.
3             At the time of the incident, was there not
4    a fence along the entirety of the length here of the
5    driveway on the south side?
6        A.    I don't remember.
7        Q.    All right.
8        A.    I do remember the vehicles parked in the
9    drive, and I think it was a truck that had -- the
10   driver's door was standing open.  And I could see
11   that clearly from my spot right here on the corner
12   of this house, but I don't recall the position of
13   the fence there.
14       Q.    You said that there was a truck there?
15       A.    I think it was a truck.
16       Q.    Were there more than one truck in the
17   driveway when you first arrived?
18       A.    I think there were two vehicles, from what
19   I remember.  I don't really remember precisely what
20   make or model or anything like that.
21       Q.    The resident of 2244 has marked this
22   particular Exhibit 16 and the "B" is for boat.  Do
23   you recall a boat being there?
24       A.    I do.
25       Q.    And there is another boat back here at the

38

1    back of the property.  Do you recall that boat?
2        A.    No.  Well, I remember there was a boat on
3    scene somewhere in proximity of the motor home, and
4    I don't recall if it was here or here, but I do
5    remember there was a boat.
6        Q.    And behind the boat, do you recall a truck
7    then?
8        A.    I do remember a truck with a driver's door
9    open.
10       Q.    Just one truck?  Do you remember what it
11   looked like, what kind of truck?
12       A.    It was white.
13       Q.    Okay.  Later on in this incident, did a
14   second truck drive up to the driveway?
15       A.    I don't -- I don't remember.  I don't
16   recall.
17       Q.    Mr. Antonini's truck?
18       A.    I am not -- I don't know.
19       Q.    Okay.  Did you contact the residents of
20   2244 when you were there?
21       A.    Yes.  I told them -- they actually
22   arrived -- I remember them pulling up when I was at
23   this spot at the northeast corner of their house.  I
24   don't know -- some of them arrived in a car, and I
25   explained to them what was happening, and so they

39

1    went inside their house.
2        Q.    This -- we have deposed a couple of
3    residents of this house.  You said that a car
4    arrived.  Do you remember where that car parked
5    while you were there?
6        A.    I think just in this driveway area in
7    front of the house.
8        Q.    Okay.  And did a second car arrive at the
9    house while you were there?
10       A.    I don't remember.  I remember having a
11   brief discussion with them, and I told them a little
12   bit about the nature of the call.  I wanted for them
13   to understand that there was an element of risk
14   involved for people who were near the house.  I told
15   them he was possibly intoxicated, and they -- I
16   remember one of them saying to me that that was
17   often the case.  And then I believe they went inside
18   their house.
19       Q.    I am sorry.  I had like three different
20   lines of questioning I wanted to go down, so let me
21   do it in order.
22             You said while you were here at 2244
23   Devos -- I have been saying that name wrong for two
24   weeks now -- you said other officers arrived.  Do
25   you recall where they were located?

40

1        A.    I think they stayed in this spot here and
2    then eventually we got a rescue vehicle up here to a
3    position near this location.
4        Q.    And you are pointing to the driveway of
5    2244 Devos Street.  Correct?
6        A.    Yes.
7        Q.    Was there a -- like a command vehicle or
8    van that arrived at any point?
9        A.    Not that I remember.
10       Q.    Okay.  And the -- you called it a rescue
11   vehicle.  Is that the BearCat?
12       A.    Yes.
13       Q.    And it -- did it also park here in this
14   driveway at 2244?
15       A.    Yes, somewhere in this area.  I can't say
16   if it was on this property line or this side of the
17   property line or that, but somewhere in this area
18   right in here.
19       Q.    All right.  And you said that from your
20   location at the front of the house you circled
21   around to the southern side of the residence and
22   then around in back?
23       A.    Yes.
24       Q.    Is that correct?
25       A.    Yes.

Exhibit 6
Page 11 of 26

Joseph Anthony Kidd

41

1    Q.    So let's start at your position 1, which
2  is here in the driveway at the -- so what would this
3  corner of the house, you call it?
4    A.    The northeast corner.
5    Q.    Northeast corner.  Officer Vinje gave me a
6  really good explanation of how you number and
7  identify the corners of houses.  What could you see
8  of the front door from the northeast corner in the
9  driveway where you were located?
10   A.    I don't remember exactly.  The main thing
11 that I remember is that my view of the whole front
12 of the house was very limited.  My goal was -- I am
13 on SWAT, and one of my main jobs is to look at
14 buildings and report activity to other operators or
15 to the command post about what is happening.  And in
16 order to do that, I need the best view I can of the
17 full front of the house.  So that was what I was
18 trying to do when I repositioned back here to look
19 for a better spot.
20   Q.    And that is part of what I am following up
21 on.  If this was not the most advantageous view for
22 you to do your reconnaissance and evaluation, do you
23 remember what you could see that precipitated the
24 move around the house?
25   A.    No.  I don't remember.

42

1    Q.    Okay.
2    A.    I mean, there is upper floor windows, and
3  those were fairly easy to see from different points
4  out here, but it was difficult to see the
5  downstairs.  But I was on foot here and didn't have
6  an elevated position.  I eventually ended up on the
7  roof of this house.
8    Q.    I am getting there.
9    A.    All right.
10   Q.    So you said you moved -- so we go -- I am
11 saying this out loud because of the record.
12   A.    Yes.
13   Q.    Nobody can see what I am pointing at.
14         So going around the circle south -- and I
15 understand from the owner that where this balloon
16 marker is here on this map --
17   A.    Yes.
18   Q.    -- is a porch.  Is that correct?
19   A.    Yes.
20   Q.    Is it an open porch?
21   A.    I don't remember.
22   Q.    Okay.  And you said that you came -- show
23 me where your second position was.
24   A.    Well, I didn't really take a position.  I
25 was just looking for a better spot to view the whole

43

1  front of the house, and I -- so I came up to this
2  fence line here and tried to find a place that would
3  be on this end of the motor home or this end of the
4  motor home or somewhere where I wouldn't be very
5  visible, but I could still see almost the entire
6  front of the house, and it really wasn't doable.
7    Q.    Wasn't a good place?
8    A.    No.
9    Q.    So you said you eventually got on the
10 roof.  How did that happen?
11   A.    Well, I need to clarify one thing.
12   Q.    Okay.
13   A.    They had a carport here.  I think it is an
14 open carport, so my passage to the backyard could
15 have been through there initially.  I can't
16 remember.  I can't remember if I went all the way
17 around and into the backyard.  I don't think that is
18 necessarily that relevant, but just for clarity.
19   Q.    Well, I am a plaintiff's lawyer.
20 Everything is relevant.
21   A.    Okay.  So anyway, there is a carport here.
22 I can't remember if I went through that and then
23 popped out a back door here or if I went all the way
24 back around.
25         But after this, I realized this spot

44

1  wasn't workable, so then I did come back over here.
2  I got a ladder, climbed up on the roof back towards
3  this corner of the roof, and ended up near the
4  chimney right here on top.
5    Q.    Let's talk about that for a second.
6         The owner says you climbed up back here by
7  the porch.
8    A.    No.  I am pretty sure it was over here.
9    Q.    Did you have the owner get you the ladder?
10   A.    Yes.
11   Q.    Okay.  So however you got up there, you
12 got on the roof?
13   A.    Yes.
14   Q.    And where were you positioned once you got
15 up on the roof?
16   A.    Just the north side of the chimney.
17   Q.    Is it like a brick chimney?
18   A.    It is a brick chimney.  It is almost the
19 middle.  It might be right in the middle of the
20 roof, close to the middle of the roof.
21   Q.    Could you physically describe what it
22 looks like, the chimney?
23   A.    Probably about 3 feet above -- extends
24 maybe 3 feet above the actual roof.
25   Q.    Uh-huh.

Exhibit 6
Page 12 of 26

Joseph Anthony Kidd

45

1      A.    And it is probably 4 by 5 feet rectangular
2    shape, something like that.  Maybe 3 by 4 feet.
3      Q.    So you see the roof line here --
4      A.    Yes.
5      Q.    -- on -- does the chimney -- is it
6    perpendicular or --
7      A.    I think it is.
8      Q.    Okay.
9      A.    I mean, I don't know for certain.
10     Q.    You felt it gave you good cover from
11   the --
12     A.    No.
13     Q.    Okay.  You couldn't hide behind it and
14   still do your job?
15     A.    Correct.
16     Q.    Okay.  So from your point on the roof by
17   the chimney, what could you see of the front of the
18   Babb house?
19     A.    I could see all of the upper floor
20   windows.  I could see a portion of the main door
21   downstairs, and I think there was a garage to the
22   left of it.  I can't remember.  But a portion of the
23   front door downstairs and then all of the upper
24   floor windows.
25     Q.    Was there anything obscuring the front

46

1    door?
2      A.    There were two big pillars, like
3    colonial-style pillars, and from my position here,
4    one of the pillars was basically -- I can't remember
5    exactly where, left or right, but it was obscuring
6    part of the doorway when the -- if you were to open
7    the door.  I think it was the pillar to the south,
8    but I am -- I am not certain of that.
9      Q.    Was there a tree that obscured your view?
10     A.    I don't recall.
11     Q.    Okay.  Now, did you tell anyone -- scratch
12   that.
13           Did you make the decision to put yourself
14   on the roof at 2244?
15     A.    Yes.
16     Q.    And who did you communicate your location
17   to once you got up there?
18     A.    The units that were down here where the
19   BearCat ended up being positioned, I was
20   communicating with them.
21     Q.    Through the radio or just shouting down?
22     A.    Both.
23     Q.    Okay.  Now, several neighbors saw you up
24   on the roof.  Were you concerned that Mr. Babb could
25   see you on the roof?

47

1      A.    Yes.
2      Q.    Was there an officer on the rooftop of the
3    house to the immediate north of 2244?
4      A.    I don't know.
5      Q.    Several neighbors saw another officer on
6    this rooftop.
7      A.    I don't know.  I do know that my sniper
8    partner was somewhere over here on a perimeter
9    position.  That would be Kirk Farley.  So he and I
10   were basically sniper partners on SWAT at that time,
11   but he was in a perimeter capacity here --
12     Q.    He wasn't on a roof?
13     A.    -- with somebody else.  I don't know.
14     Q.    How many snipers -- and I am -- let me --
15   define the word "sniper" for me for the record,
16   please.
17     A.    Okay.  The SWAT team -- our SWAT team
18   generally has -- we try to maintain four people who
19   that is their primary function.  The main job that
20   we have is to report intelligence, report activity,
21   report behavior, to move into a position where we
22   are not seen but we can report whatever is happening
23   that is sort of the genesis of whatever call we are
24   dealing with.
25           We are able to deliver precision fire if

48

1    that is necessary, but by and large our primary job
2    is just to report intelligence, report information
3    back to the command post and other people involved
4    in the call.
5      Q.    Now, do the snipers have to qualify at a
6    certain competency with the rifle?
7      A.    Yes.
8      Q.    And you had AR-15s that day or some
9    other --
10     A.    I had already taken all of my equipment to
11   the SWAT office, all of my SWAT equipment, so I
12   didn't have all of that with me.
13     Q.    All you had was your handgun?
14     A.    Yes.
15     Q.    What kind of weapon were you carrying that
16   day?
17     A.    I am not -- it might have been a Sig 220.
18   We switched from Sigs to Glocks.
19     Q.    I heard that from somebody else.
20     A.    It might have been the Sig 220.  That
21   might have been before we switched to the Glocks.
22     Q.    So the handgun wouldn't be terribly
23   accurate from the rooftop to the Babb house?
24     A.    No.  And eventually I asked -- I think it
25   was -- well, the group of officers that ended up

Exhibit 6
Page 13 of 26

Joseph Anthony Kidd

49

1  here at the BearCat, I asked if anybody could spare
2  a carbine for me, and I think it was Malcolm
3  McAlpine handed me his carbine, which would have
4  been a .223 caliber H & K 416.
5      Q.    You keep -- you have mentioned several
6  times that there were officers in the driveway of
7  2244.  Which officers do you recall being there?
8      A.    Well, I remember Malcolm McAlpine being
9  there, Scott Vinje, Will Stutesman.  I thought -- I
10 think Derek DeWitt was there, but I am not certain
11 about that.
12     Q.    Who was that?
13     A.    Derek DeWitt.  I am not certain of that.
14 Those are the ones that come to mind specifically.
15     Q.    I think Officer DeWitt did tell me he was
16 there at the BearCat.
17     A.    Like I said, I can't remember if the
18 BearCat was actually in the driveway of 2244 Devos
19 or midway between that and this panhandle lot
20 driveway or in this -- it was just somewhere in this
21 proximity.
22     Q.    Okay.
23     A.    I can't speak to the actual positioning of
24 it.
25     Q.    But it was not in this driveway.  Is that

50

1  correct?
2      A.    I don't know.
3      Q.    All right.
4      A.    I was up here.  My attention was focused
5  on the front of the house.  I was communicating with
6  these officers via the radio and just yelling back
7  and forth, but I wasn't really looking specifically
8  at exactly where they were at.
9      Q.    The officers behind you, you mean?
10     A.    Yes.
11     Q.    Okay.  And you don't remember anyone on
12 top of this roof.  Do you remember anyone on top
13 of --
14     A.    No, I don't.  I mean, I just don't know.
15     Q.    All right.
16     A.    That could have been the case, but I don't
17 know.  The reason I mentioned Farley was because he
18 was on a perimeter spot over here with somebody
19 else.  And I still wasn't real happy with my
20 position here.  I had a fairly good view of the
21 front of the house, but I was very exposed.
22          And then when the information developed
23 that Mr. Babb was getting rifles, had access to
24 rifles and was trying to -- opening his gun safe, I
25 figured, well, I am sort of a sitting duck up here.

51

1  And so I asked Kirk to come -- to get relieved from
2  his perimeter spot to scout around and try and find
3  a better position where he and I could be together
4  and still accomplish those two goals of being able
5  to see the whole front side and yet not be super
6  exposed.
7      Q.    At what point in this incident did you --
8  were you handed Sergeant McAlpine's long rifle?
9      A.    I don't recall.
10     Q.    Was the BearCat still back here in this
11 position?
12     A.    Yes.
13     Q.    Okay.  And so who are all of the snipers
14 on the SWAT team?
15     A.    Currently --
16     Q.    Well --
17     A.    -- or --
18     Q.    Good question.  At the time of the
19 incident.
20     A.    I know that Kirk and I were.  We have had
21 a couple others that have kind of floated on and off
22 the sniper element, so I can't say for certain, but
23 I know Kirk and I were.
24     Q.    Were -- was Officer Stutesman a sniper at
25 that time?

52

1      A.    No.
2      Q.    To the best of your recollection, in --
3  how long have you -- strike that.  I am going to
4  move back a couple questions.
5          How long have you been on SWAT?
6      A.    About 11 years.
7      Q.    And in 2015, when this incident occurred,
8  do you recall all the gentlemen -- are there any
9  women on SWAT?
10     A.    Our lieutenant is a female.
11     Q.    Okay.
12     A.    I am not sure if she was a lieutenant then
13 or not.  Might have been Lieutenant Klinko at that
14 time.
15     Q.    It was.  Klinko told me that.
16          So at the time, of the officers who were
17 on scene on 2015, do you recall any of them ever
18 having played the role or done the role of sniper on
19 the SWAT team?
20     A.    Officer Warden many years ago was.
21     Q.    Okay.
22     A.    I will probably have to look at a list of
23 who all was there.
24     Q.    Of the officers on scene that day?
25     A.    Yes.

Exhibit 6
Page 14 of 26

Joseph Anthony Kidd

53

1    Q.    I have two lists.  This is not necessarily
2    limited to the officers that day.
3    A.    Uh-huh.
4    Q.    And these check marks are mine that are
5    indicating which of the SWAT officers by the column
6    here marked --
7    A.    Okay.  Well, Kyle Evans is currently a
8    sniper on the -- was Kyle present on this scene or
9    not?
10   Q.    I don't know.
11   A.    I am not sure if he was.  Kyle is
12   currently a sniper.  I don't think he was at that
13   time, though.  I don't remember anybody else.
14   Q.    Take a look at this list, which is
15   Exhibit 30, which are those folks who went inside
16   the perimeter of the crime scene.
17   A.    I don't see any here that I recognize as
18   snipers on the team.
19   Q.    Okay.  I will just keep asking.
20   A.    Okay.
21   Q.    From your position once you got on the
22   roof, other than the officers who are right down
23   here below in the driveway of 2244, were you
24   communicating on the radio your location to any
25   other officers in the perimeter?

54

1    A.    I don't know.
2    Q.    Because I have talked to several officers
3    and of those that have testified thus far, nobody
4    remembers an officer on the roof, and that is why I
5    am trying to figure out if you had gotten into a
6    situation of firing towards the house, did you know
7    where your other officers were?
8    A.    I had a general idea, yes.
9    Q.    So tell me what your general idea of where
10   various officers --
11   A.    I know we had somebody back here, I think
12   in this field, but someone here off of the 3 side of
13   the house.  Kirk Farley and somebody else was --
14   they were over here.
15   Q.    So let's -- let's be a little more
16   descriptive.  You say Farley was here.  That is on
17   the house two lots north of 2244?
18   A.    Well, I don't know exactly where.
19   Q.    Okay.
20   A.    I just remember that he and somebody else
21   had taken a perimeter position basically northeast
22   of the primary house.
23   Q.    Okay.
24   A.    So I don't know if it was this actual tax
25   lot or this tax lot.

55

1    Q.    Okay.  Officer Farley, though, was on the
2    radio, I assume, and you knew --
3    A.    Yes.
4    Q.    -- he was somewhere over here?
5    A.    Yes.
6    Q.    And so when you pointed to this grassy
7    field behind the Babb home, did you see officers in
8    this field anywhere?
9    A.    Not that I can recall.
10   Q.    So I have got two officers who have told
11   me they were posted up down here towards the street.
12   A.    Okay.
13   Q.    Did you see them towards the street?
14   A.    Not that I can recall.
15   Q.    Okay.  Did you see after the shot was
16   fired -- and I am using that as sort of a beginning
17   point.  After the shot is fired, did you see any
18   officers run forward in this field toward the Babb
19   home?
20   A.    I -- not that I recall.
21   Q.    From your viewpoint on top of the roof,
22   what could you see of this field?
23   A.    I am sure I could see much of it, but I
24   don't remember how much.  I mean, my focus was the
25   house, not these empty fields nearby.

56

1    Q.    You were also looking to see if Mr. Babb
2    left and maybe skirted over the fence to run away, I
3    am assuming.
4    A.    Well, yes, but I could hear yelling from
5    within the house.
6    Q.    I will talk about that in a second.
7          So we have got Farley, and you have got
8    some officers back here.  Where else do you remember
9    officers being located?
10   A.    The ones -- those are really the main
11   ones.  This team up here in the front with the
12   BearCat, Kirk's position with somebody else back
13   here, and then somebody back over here, and I don't
14   know exactly where that was.
15   Q.    Okay.  At the time of the scene, Sergeant
16   McAlpine and Sergeant Vinje were on location.  As
17   far as you are concerned, were one of those officers
18   in charge of this situation?
19   A.    Yes.
20   Q.    Which one?
21   A.    I was mostly communicating with Malcolm
22   McAlpine at the time.
23   Q.    Okay.
24   A.    I don't know technically which one was the
25   incident commander.

Exhibit 6
Page 15 of 26

57

1    Q.   All right.  Okay.  So let's -- is there --
2  could you take a look at the dispatch records again
3  for me, probably page 5, and if you could scan down
4  and see if there is anything on here that tells us
5  whether you called into dispatch your location as
6  the incident moved forward.
7    A.   There is a couple notations up high, just
8  that I was dispatched --
9    Q.   Uh-huh.
10   A.   -- which that doesn't necessarily -- I
11 mean, I started driving to the scene once the
12 initial information came out, so that was just a
13 matter of getting me included on the call in the
14 computer.
15        Then there is another notation that I had
16 arrived, and like I said, that is not necessarily a
17 precise notation of it based on radio traffic and
18 all that kind of stuff.
19        I don't see anything else on that page.
20   Q.   What about on page 6?
21   A.   I don't think I am on page 6.
22   Q.   Page 7?
23   A.   There is a notation almost midway down
24 location 400 Country Club.
25   Q.   That is at 8:25?

58

1    A.   That is later at the end of the call,
2  after the call.
3    Q.   So there is no real radio traffic being
4  recorded from you from the time you arrived until
5  8:25 p.m.?
6    A.   No.  I think if you go to page 1 -- let's
7  see -- page 2 maybe.
8    Q.   Okay.
9    A.   I think some of these details is
10 information that I put out.
11   Q.   Okay.  Find those.
12   A.   If you look on page 2 --
13   Q.   I am there.
14   A.   I am not scanning every line.  I don't
15 know if you want me to do that or not, but I noticed
16 earlier page 2 towards the bottom at 5:43 I reported
17 information about a person had come to the door.  In
18 other words, there was the radio traffic I put out,
19 and then the dispatcher entered those details into
20 the call.
21   Q.   It says here at 5:43:05, 2E13, I,
22 backslash, heavy build, LSW, backslash, blue?
23   A.   Correct.
24   Q.   What does LSW stand for?  Do you know?
25   A.   Last seen wearing.

59

1    Q.   Blue sweatshirt and shorts?
2    A.   Yes.
3    Q.   And then there is "Subject at door" just
4  below it about 30 seconds later.
5    A.   Yes.
6    Q.   "Subject at door, white male, last seen
7  wearing blue sweatshirt, blue shorts."
8        Is that the same person in both of those
9  entries?
10   A.   Yeah.  I think that was the roommate who
11 had come out.
12   Q.   Did anyone else see the roommate come out
13 besides you?
14   A.   I don't know.
15   Q.   So you called this information on
16 dispatch.  Why did you do that?
17   A.   My job at the time was just to relay
18 activity, that role that I talked about, sort of
19 relay what do I see, what am I hearing, is there any
20 development in the call, are things changing.
21   Q.   Okay.
22   A.   And that is for everybody's benefit to be
23 able to handle the call correctly.
24   Q.   So the heavy built, white male that came
25 out of the front door, could you see him leave the

60

1  front door?
2    A.   Yes.  The roommate.
3    Q.   The roommate, right.
4    A.   Yes.
5    Q.   And we now know that that gentleman's name
6  is Jim Antonini.
7    A.   Okay.
8    Q.   So when the roommate left the door, could
9  you see the door open as he was coming out?
10   A.   Yes.
11   Q.   And you could see him in the doorway?
12   A.   Yes.
13   Q.   You could see him step down to the porch
14 in front of the door?
15   A.   I don't have a recollection of that, but
16 he came out.
17   Q.   So after he came out the door, how long
18 did you watch him?
19   A.   The reason -- let me back up a second.
20   Q.   Sure.
21   A.   A different person had come to the door
22 briefly before that, and I am pretty sure I aired
23 that on the radio.  I believe that was Mr. Babb.
24   Q.   Can you find that on here?
25   A.   I don't know if it is in there.  I will

Joseph Anthony Kidd

---

61

1   look for it.  I am not seeing it.
2       Q.   Okay.  But sometime prior to 5:43:37,
3   which is when you saw someone we have now identified
4   as Mr. Antonini leave the house -- sometime prior to
5   that time you saw another individual come to the
6   door?
7       A.   Yes.
8       Q.   About how much before Mr. Antonini's
9   appearance?
10      A.   I don't remember.
11      Q.   What did that person do when you saw him?
12      A.   Opened the door, yelled out, and closed
13  the door.
14      Q.   What did he yell out?
15      A.   I don't remember.  It was something
16  hostile, but I don't remember exactly what he said.
17      Q.   And you recall, though, communicating to
18  the other officers via the radio that that gentleman
19  had come to the door?
20      A.   I believe I did.
21      Q.   Do you know if anyone else saw Mr. Babb
22  come to the door?
23      A.   I don't know.
24      Q.   Do you recall any information over the
25  radio communicated to you that Mr. Babb had come to

---

62

1   the door?
2       A.   I am pretty sure that I put out on radio
3   that -- sorry.  I have got a cramp in my leg, my
4   hamstring.
5       Q.   Do you need a break?
6       A.   Well --
7            MR. MATTHEWS:  Why don't we take a
8   short break.
9            MS. BURROWS:  Let's take a break.  We
10  all know what that feels like.
11           (Recess:  9:58 to 10:08 a.m.)
12  BY MS. BURROWS:
13      Q.   We were on page 2 of the dispatch
14  record --
15      A.   Yes.
16      Q.   -- and there was something that I saw that
17  I wanted to follow up with you.  If you can look --
18  it looks like your call sign, 2 Edward 13, is at
19  about 5:31:55 p.m.
20      A.   Okay.
21      Q.   The text reads "Unable to get view from
22  backyard."  Do you see that?
23      A.   Yes, I do.
24      Q.   Do you recall what you were
25  communicating -- what you were seeing and why you

---

63

1   communicated that particular --
2       A.   I am pretty sure that was when I was in
3   the backyard of 2244 Devos trying to find a better
4   position back there, and it wasn't workable.
5       Q.   Okay.  All right.  And then by 5:43 --
6   5:43 you were on the roof and you saw the roommate
7   come out of the house?
8       A.   Yes.
9       Q.   It would have taken me that long just to
10  get the ladder against the house but --
11           So it looks like the next information
12  coming from you is the roommate, and then down at
13  the bottom at 5:44, "Caller advised male is not
14  responding to her anymore.  Caller heard him
15  yelling, 'You are not going to do this to me.'  At
16  one point he said he took the round out of the
17  chamber, but he told her how fast he could reload."
18           Do you remember any of that information
19  being transmitted to you while you were on scene?
20      A.   I don't remember.
21      Q.   Okay.  Now, from the time you got on the
22  roof until the time Mr. Babb was shot, were you --
23  was that your location constantly?
24      A.   Yes.
25      Q.   All right.  You didn't leave the roof

---

64

1   until after the shot?
2       A.   Correct.
3       Q.   Okay.  So a neighbor in this northern lot
4   has told us that he saw Mr. Babb out here in the
5   yard talking or yelling at officers after you all
6   arrived but before the shot.  Do you remember seeing
7   Mr. Babb in the yard at any point in time?
8       A.   No.
9       Q.   So now that we have kind of a time
10  perspective, we know that at least by 5:43 the
11  roommate has come out.  Did you keep your eyes on
12  the roommate or were you watching the front of the
13  house then constantly?
14      A.   My primary focus was the front of the
15  house.  I saw him come to the door.  I remember
16  putting out the description of him, and my initial
17  concern was that it was Mr. Babb, because I had seen
18  him briefly in the doorway before that, but then I
19  quickly realized it was a different person and then
20  he came out.
21      Q.   So did you know Brian Babb before this
22  incident?
23      A.   No.
24      Q.   Did you know anyone in his family --
25      A.   No.

---

Exhibit 6
Page 17 of 26

Joseph Anthony Kidd

---

65

1    Q.    -- prior to this incident?
2    A.    No.
3          MR. MATTHEWS:  Make sure you wait.
4    Let her finish the question.
5          THE WITNESS:  Okay.
6    BY MS. BURROWS:
7    Q.    Yeah.  The court reporter yesterday had a
8    meltdown because people were not taking turns.
9          When Mr. Babb came out -- let me -- hang
10   on.  Let me back up, because I want to think about
11   how to ask these questions.
12         How many times did you actually observe
13   Mr. Babb come to the door?
14   A.    From what I remember, only twice.
15   Q.    Twice?
16   A.    That first time before the roommate came
17   out and then the second time.
18   Q.    All right.  Let's talk about the first
19   time.  What did he do?
20   A.    He yelled and then slammed the door.
21   Q.    Okay.  Let's back up.  Did he open the
22   door?
23   A.    Yes.
24   Q.    Did he step into the doorway?
25   A.    I don't remember.

---

66

1    Q.    Stick his head out?
2    A.    I don't remember.
3    Q.    Did you see him do anything in that first
4    incident?
5    A.    I saw a man in the doorway yelling, and
6    then that person slammed the door closed.
7    Q.    And I think you have told me you don't
8    remember what he yelled?
9    A.    I don't remember.
10   Q.    So tell me --
11   A.    It was of a hostile nature.  That is all I
12   remember.
13   Q.    Everyone concedes he was angry that day.
14         So what did he do the second time you saw
15   him come out?
16   A.    That was when he was shot, the second
17   time.
18   Q.    Yes.
19   A.    He came to the door -- I don't remember if
20   he opened the door or if it was already open.  Came
21   to the door.  I could see a portion -- the pillar
22   was obstructing my view, so I could see basically
23   like from here back, and then I heard a shot go out.
24   Q.    Did you see a rifle?
25   A.    I saw him positioning his body in a

---

67

1    certain way, and I thought there was a little bit of
2    something black, but I could only see a portion of
3    it because this column is essentially right here in
4    my view from that direction.  So I could see this
5    portion of him basically.
6    Q.    The arm?
7    A.    Yeah.
8    Q.    The shoulder?
9    A.    And it happened so quickly, that was it.
10   And then he went down in the doorway, and I could
11   see that he didn't move after that.
12   Q.    So we have a witness who has testified
13   that she saw Mr. Babb come out that time --
14   A.    Uh-huh.
15   Q.    -- and that he did not have a rifle
16   leveled.  Do you remember seeing any rifle at all?
17   A.    After he was down in the doorway and I
18   went up to the front of the house to help with the
19   crime scene security, it was right there.
20   Q.    After Mr. Babb was shot, do you remember
21   seeing a rifle?
22   A.    That is when I saw the full view of the
23   rifle was when I came up to the house --
24   Q.    All right.
25   A.    -- because they were trying to -- they

---

68

1    were attempting to get to him to render aid.
2    Q.    Let me ask my question a little bit more
3    clearly.  It is my fault, not yours.
4          When Mr. Babb was shot, at the moment he
5    was shot and he collapsed into the doorway, do you
6    remember seeing a rifle at any -- at that point?
7    A.    Before he went down I could see this much
8    of his body and something black, but I couldn't
9    identify it as a rifle.  I had a limited view
10   because of this column, and then he went down.  And
11   I didn't see the rifle at that time.  I could see I
12   think it was his legs at that time because of the
13   positioning of his body after he fell down, and I
14   could see that he wasn't moving.
15   Q.    Sure.
16   A.    So -- and I reported that on the radio
17   that --
18   Q.    Where was the rifle when he was collapsed
19   down?
20   A.    I couldn't see it at that time.
21   Q.    Could you see on the porch at that time?
22   A.    I couldn't see the rifle.
23   Q.    Could you see the porch?
24   A.    I don't recall.
25   Q.    Was it your job to look for any officer

---

Exhibit 6
Page 18 of 26

Joseph Anthony Kidd

69

1    security issues that might be presented?
2        A.    Yes.
3        Q.    And the location of the rifle or a weapon
4    would have been an officer security issue.  Correct?
5        A.    Yes.
6        Q.    Were you asked to look to see if there was
7    a weapon present by the body?
8        A.    I don't know if I was asked to do that.  I
9    would automatically try and do that if I had that
10   ability.
11       Q.    Did you do that?
12       A.    I was reporting everything I could see.
13       Q.    Did you look for a rifle?
14       A.    I was -- I was trying -- let me back up.
15   I was reporting what I could see, and what I could
16   see was -- after he went down, I could see his legs,
17   and I could see that he wasn't moving, and I could
18   not see the rifle at that time.
19       Q.    Can we take a break real quick?  I want to
20   get a picture to show you.
21       A.    Sure.
22             (Recess:  10:16 to 10:22 a.m.)
23             MS. BURROWS:  Back on the record.
24   BY MS. BURROWS:
25       Q.    Officer Kidd, I have been involved in this

70

1    case for quite some time.  I have asked my client to
2    step out, because these are pictures of his dead son
3    and he doesn't need to see those so --
4        A.    Okay.
5        Q.    These are pictures that appear to have
6    been taken at the night after the shooting.  They
7    appear to be taken by investigators who were
8    investigating the officer-involved shooting.  These
9    are not my pictures.  And I got these from Ben
10   Miller, the city attorney, way back before we filed
11   the lawsuit.  These are duplicated in the
12   information your lawyer has given me, so our
13   discussion before we came on the record was I can't
14   find exactly where they are in the discovery that
15   your lawyers gave me, but I am going to show you
16   these pictures.  God dang it.
17             This is a picture of the front door of the
18   Babb home after Mr. Babb has been shot.  You can see
19   that the BearCat is in the frame of this picture.
20   There is the doorway.  Mr. Babb is inside the house,
21   but there is a rifle a couple, 3 feet away from his
22   body.
23       A.    Yes.
24       Q.    When you saw Mr. Babb's body after he was
25   shot, do you remember seeing this rifle on the porch

71

1    as it is shown in this picture?
2             MR. MATTHEWS:  Just for clarification,
3    are you asking him whether he saw it from the roof
4    or -- he has already testified that he saw it --
5             MS. BURROWS:  From the roof.
6             MR. MATTHEWS:  -- after he moved.
7    BY MS. BURROWS:
8        Q.    From the roof.
9        A.    I remember seeing him go down.  I remember
10   watching his leg -- I could see his legs, the lower
11   part of his body as I was watching to see if he was
12   going to get up again, engage us.  I could see that
13   he wasn't moving.  I don't recall seeing a rifle at
14   that time.
15       Q.    So I realize that this picture is taken
16   from ground level just outside the door, and your
17   perspective was much different and further away.
18       A.    Yes.
19       Q.    And it was light.  These pictures appear
20   to be taken with a flash at night.
21             From your perspective on the roof, could
22   you see any of this porch area that was -- that is
23   shown in front of the door?
24       A.    I don't recall.
25       Q.    And this is the column that I think you

72

1    testified earlier that it was this column which
2    is -- as you face the picture to the left, is that
3    the one that you say was obstructing your view of
4    Mr. Babb?
5        A.    Yes.
6             MS. BURROWS:  And this is identified
7    from Miller's office as photo 645.  I will write
8    that down so I can email it to you, and I am going
9    to mark these pictures as soon as we get them
10   printed for your deposition.
11             MR. MATTHEWS:  So photo 645 that we
12   have been looking at I believe will be Exhibit 31.
13             (Deposition Exhibit No. 31 marked
14              for identification.)
15   BY MS. BURROWS:
16       Q.    Okay.  This is photograph 652.  It is a
17   closer perspective from the previous picture that we
18   saw.
19             When Mr. Babb fell after he was shot, the
20   location and the positioning of the body in this
21   picture, is that similar to what you saw the day of
22   the shooting?
23       A.    I believe so.  I remember I could see his
24   legs and that he didn't move.
25       Q.    Did you see any officer move the weapon at

Joseph Anthony Kidd

73

1  all?
2      A.    Not that I recall.  I just don't know.
3      Q.    Okay.  You can see in this picture that
4  Mr. Babb is wearing a dark blue shirt.  Is that
5  correct?
6      A.    It looks like it, yes.
7      Q.    And the strap on the rifle that is on the
8  porch is also -- is black.  Is that correct?
9      A.    It appears to be, yes.
10     Q.    When you say you saw something dark on
11 Mr. Babb's arms, was it his shirt?
12     A.    I don't know.
13     Q.    Was it the entirety of his arm that was
14 dark?
15     A.    I don't know.
16     Q.    Do you remember seeing the strap of his
17 weapon at all?
18     A.    I don't recall.
19     Q.    Okay.  And again, just to make sure I have
20 exhausted this line of questioning, you have told me
21 a couple of times that your job was to see if Mr. --
22 after the shot, your job was to see if he was still
23 moving or if there was any other danger or threat
24 from the suspect.  Is that correct?
25     A.    Yes.

74

1      Q.    So part of that assessment would have been
2  the location of any weapon that Mr. Babb may have
3  had.  Is that correct?
4      A.    Certainly.
5      Q.    And so if you had seen this rifle, would
6  you have reported that to other officers?
7      A.    Most likely, yes.
8      Q.    And to this day, sitting here today, you
9  do not recall seeing a rifle after Mr. Babb fell?
10     A.    I don't.  I was focused on his legs and
11 whether he was going to move or get up or what his
12 status was or condition.  I don't --
13     Q.    I appreciate that answer, but it does --
14            MR. MATTHEWS:  And were you through
15 with your answer?
16     A.    Well, I was just going to follow up with
17 that I just don't recall seeing a rifle at that
18 time.
19 BY MS. BURROWS:
20     Q.    But wouldn't that be one of the most
21 important parts of your job that day is to know
22 where the weapon was?
23     A.    I was doing what I could at the time.
24     Q.    Okay.  So your testimony today -- please
25 forgive me if I am a little firm.

75

1            Your testimony today is that you do not
2  recall seeing a weapon at all from the time you were
3  on the roof that day?
4      A.    I don't recall seeing the rifle at the
5  time that he went down and that I was watching him,
6  what I could see of his body to see if he moved.  I
7  just don't recall seeing a rifle at that time.  I
8  was reporting what I could see on the radio, so that
9  would reflect some of what I could see.  I haven't
10 listened to the radio traffic to this incident.
11     Q.    Did anyone ask you if you could see a
12 rifle or a weapon?
13     A.    I don't remember.
14     Q.    Were you officers using a different
15 channel on the radios to communicate with each other
16 that day?
17            MR. MATTHEWS:  Objection.  Vague.
18 Different than what?
19 BY MS. BURROWS:
20     Q.    It is a bad question.  Let me back up and
21 see if I can start at it again.
22            I believe it was Sergeant Vinje who
23 explained to me that there are different channels on
24 the radio that you could use at any particular scene
25 or situation, and that what was being transmitted

76

1  via dispatch might not necessarily be the channel or
2  the frequency or whatever you call it that you were
3  using.  I can't remember what channel he said you
4  might have gone --
5      A.    Well, SWAT often operates on channel 8.
6  Our normal operational channel for the police
7  department is channel 1.  I think we stayed on
8  channel 1 for this event --
9      Q.    The whole event?
10     A.    -- but I am not certain of that.
11     Q.    Okay.  And I am trying to just find out
12 what went on out there.  So channel 1 is typically
13 what the police use?
14     A.    Correct.
15     Q.    And channel 8 is what SWAT switches to
16 during a particular mission or operation.  Is that
17 correct?
18     A.    Oftentimes, yes.
19     Q.    Do you recall anyone going to a different
20 channel or asking that you go to a different channel
21 on March 30th?
22     A.    I don't remember.
23     Q.    Now, I heard testimony -- we have deposed
24 a number of witnesses who were neighbors whose
25 interviews were done by a couple of different

Joseph Anthony Kidd

77

1   detectives, including a Detective Simons.  Do you
2   know Detective Simons?
3       A.    Is he with the County?
4       Q.    I don't know who he is with.
5       A.    Oh, I met -- recently met a detective who
6   is on IDFIT, Simons or Simonson.
7       Q.    Okay.
8       A.    He is a County, Lane County Sheriff's
9   Office detective.
10      Q.    Do you remember -- did you answer any
11  questions of -- from Detective Simons at the time?
12      A.    I didn't -- I didn't have any encounters
13  with him during this incident.  I just happened to
14  meet him recently.
15      Q.    Okay.  So those two photos are all I am
16  going to show you, and I will get those to Jeff here
17  in a second.
18              (Deposition Exhibit No. 32 marked
19                for identification.)
20              MR. MATTHEWS:  So I am sorry.
21              MS. BURROWS:  Go ahead.
22              MR. MATTHEWS:  So photo 652 is going
23  to be Exhibit 32.
24              MS. BURROWS:  Maybe after I am
25  finished with Officer Kidd but before we start with

78

1   Officer Barnes, I can email them to you, or do you
2   want to do it while Kidd is still here?
3               MR. MATTHEWS:  We don't need to do it
4   while Officer Kidd is still here.
5   BY MS. BURROWS:
6       Q.    Officer Kidd, some of the other neighbors
7   or some of the neighbors we have deposed thus far
8   indicate -- and in fact, I think four neighbors say
9   this -- that the BearCat actually went up to the
10  house before the shot was fired.  In what order do
11  you remember those events happening?
12      A.    That is not accurate.
13      Q.    What do you recall?
14      A.    Because I was on the roof here at the
15  chimney, and the BearCat was somewhere in this
16  vicinity.  After the shot was made, I was trying to
17  clarify who made the shot.
18      Q.    Uh-huh.
19      A.    Was it Mr. Babb shooting at us?  Was it
20  one of us shooting at him?  I know that Will was
21  down in the hatch of the BearCat, and I called over
22  to Will -- I yelled over to him a couple times, "Did
23  you shoot?  Was that our shot?"  I was just -- there
24  was a little bit of a time there where there was a
25  delay in information, and that -- and Will and the

79

1   BearCat and the personnel with the BearCat were
2   right here at that time.
3       Q.    So when Mr. Babb came out that second time
4   you saw him, did you tell anyone that Mr. Babb had
5   come out?
6       A.    I don't know.  I remember hearing Will
7   yell "Rifle," and then there was a shot.  Okay.
8       Q.    Okay.  Do you remember anyone yelling,
9   "Drop the gun"?
10      A.    I don't recall.
11      Q.    When Officer Stutesman yelled "Rifle,"
12  tell me what you remember doing at that moment.
13      A.    Just trying to see what I could see and
14  report what I could report or respond appropriately.
15      Q.    How long after Mr. Babb made appearance in
16  the doorway did Officer Stutesman yell "Rifle"?
17      A.    I don't recall.  It was all very quick,
18  but I --
19      Q.    That is what I am trying to find out.  Do
20  you have any idea -- from the moment you heard
21  "Rifle" until Mr. Babb is shot, how long did that --
22      A.    It was a quick sequence of events.  I
23  don't recall.  It was not a protracted period at
24  all.
25      Q.    Okay.

80

1       A.    But I can't put seconds on it.
2       Q.    And then after the shot is fired, I
3   understand from other officers there was some
4   confusion generally about who fired the shot?
5       A.    Yes.
6       Q.    Tell me what you remember about -- and I
7   will call it confusion and that is my word, but tell
8   me about those few moments after the shot was fired.
9       A.    I heard the shot.  I saw Mr. Babb go down.
10  I realized he -- I could see his legs.  He wasn't
11  moving.  I believe I reported on the radio that I
12  could -- that he was down, that he wasn't moving.  I
13  didn't know who shot at who.  I yelled over to Will
14  once or twice, "Did you shoot him?"
15              And then at some point the people -- my
16  understanding is the people with the BearCat had
17  verbal contact with Will.  They figured it out and
18  then put out on the radio that it was an
19  officer-involved shooting, that one of our officers
20  had made the shot.
21      Q.    Do you recall Sergeant McAlpine asking for
22  a roll call of all officers present?
23      A.    Yes.
24      Q.    Was that on the radio?
25      A.    Yes.

Exhibit 6
Page 21 of 26

81

```
1      Q.    Okay.  And before the BearCat moved, did
2  that roll call get completed?
3      A.    I believe so.
4      Q.    Okay.
5      A.    I am --
6      Q.    And then did you watch the BearCat move up
7  to the front door?
8      A.    Yes.
9      Q.    And I'm assuming -- now, I have been in
10 it, but I -- in the daytime.  I am assuming that the
11 BearCat -- strike that.  Let me back up.
12          Do you remember who was in the BearCat as
13 it approached the house?
14     A.    No.  I don't know.
15     Q.    Did you see officers get out of the
16 BearCat once they arrived?
17     A.    I don't recall.
18     Q.    When -- about how long after the BearCat
19 arrived at the front of the house did you get off
20 the roof?
21     A.    I don't remember.  I mean, I stayed up
22 there for some time to provide overwatch, but I
23 don't recall.  And like I said earlier, eventually I
24 got down, came over, and assisted with crime scene
25 security mostly by getting on the west side of this
```

82

```
1  backyard fence and staying there.
2          The crime scene log indicates that I was
3  stringing crime scene tape in the crime scene for a
4  period of time as well, and I just don't recall the
5  sequence of those two things.
6      Q.    After the shot was fired, at any time
7  after the shot was fired and prior to its approach
8  to the house, did you see any officers come in from
9  the rear of the house?
10     A.    Not that I recall, no.
11     Q.    One of the officers on the first day of
12 depositions indicated that he -- that -- both
13 officers indicate that one of them ran up here and
14 may have crossed the fence.
15     A.    Uh-huh.
16     Q.    Did you see that happen?
17     A.    I don't have a recollection of that, no.
18     Q.    Okay.  During the time that you were
19 watching the house but prior to the shot, did you
20 see Mr. Babb come to any of the windows?
21     A.    I don't think so.  He yelled quite a bit,
22 and I reported that on the radio.  I don't -- the
23 blinds had changed, I think, in some of the windows
24 a little bit.  There was some change in the blinds,
25 but I don't recall seeing him in the window.
```

83

```
1      Q.    Okay.  On your report -- or not your
2  report, the statement that you gave to the
3  detective, Exhibit 29 -- I will read this:  "Kidd
4  told me while he was watching the house he could
5  hear a male inside the residence yelling things such
6  as 'Fuck you.  This is my property.'"
7      A.    Correct.
8      Q.    Do you remember anything else that
9  Mr. Babb -- well, first of all, is that true?  Did
10 you hear --
11     A.    Yes.
12     Q.    Okay.  Did you hear Mr. Babb yell anything
13 out from inside the house?
14     A.    To go away, that he wasn't a criminal,
15 statements like that.  Swore at us quite a bit.
16     Q.    But when he came outside that first time,
17 you don't recall what he said?
18     A.    When he came to the door?
19     Q.    The first time.
20     A.    Correct.  I don't remember.
21     Q.    Okay.
22     A.    It was in the same vein of those comments
23 that we were talking about.
24     Q.    Take a look at Exhibit 29.  And you have
25 already testified about the whole incident.  Is
```

84

```
1  there anything in that report that you believe -- or
2  that statement that you believe is maybe not
3  complete or inaccurate or doesn't reflect the
4  totality of what you told the detective?
5      A.    I will take a look at it.
6      Q.    Yeah.  Take your time.
7      A.    A couple of details here.  One, on the
8  second page where Officer Crolly -- or Detective
9  Crolly had written that the man exited via the front
10 door, exited the house via the front door, well, he
11 was in the doorway, so he didn't necessarily exit
12 the house.
13     Q.    Okay.
14     A.    That is a distinction.
15          The other thing is that Kidd told --
16 Detective Crolly wrote, "Kidd told me he then heard
17 one shot come from the area of the BearCat."
18          I didn't know where the shot had come
19 from.  It was a rifle shot for sure, but I wasn't
20 sure where it had come from.  So that is a
21 distinction I would make.
22     Q.    Okay.
23     A.    I think that is it.
24     Q.    Okay.  You said that you reviewed the
25 chief's use of force review report?
```

Exhibit 6
Page 22 of 26

Joseph Anthony Kidd

85

1      A.    I read some of it, maybe probably about
2    the first half of it.
3      Q.    That's right.  You told me you didn't read
4    the whole thing.
5            Could you turn to that?  I think it is
6    page -- or Exhibit 9.  Now, there are several
7    notations about information that he is attributing
8    to you.  Can you go to the first page where that is
9    being noted?
10     A.    Let's see.  It looks like it is going to
11   be the third page of the report.  I think this is
12   the beginning of it right there, third page, second
13   paragraph.
14     Q.    Okay.  What is the first thing he is
15   attributing to you?  Can you read that to yourself?
16     A.    (Reading):  Officer Kidd took up a
17         position with his rifle so that he could see
18         the involved residence, and he aired it
19         would be tactically dangerous to approach
20         the house on foot.
21     Q.    Is that correct?
22     A.    Well, I initially was on the roof with my
23   handgun, and eventually Malcolm McAlpine handed me
24   his carbine, so there was sort of a sequenced event
25   there.

86

1      Q.    Okay.
2      A.    And I think what they are talking about
3    here where it says I aired it would be tactically
4    dangerous to approach the house on foot, I think
5    what they are getting at there is that the -- to get
6    a full view of the front of the house, you had to
7    either stand directly in front of the house at the
8    end of the driveway leading to the house or some
9    other position.  That is why I ended up on the roof.
10     Q.    Uh-huh.
11     A.    Because the view of the front was pretty
12   limited from the street.
13     Q.    Well, the chief actually writes that you
14   determined it wasn't tactically safe to approach and
15   that you aired that information.  Did you, in fact,
16   air that information via dispatch?
17     A.    I --
18           MR. MATTHEWS:  I am going to object to
19   the form of the question because it misstates
20   evidence.
21           But go ahead.
22     A.    Well, let me -- I will read the rest of
23   the paragraph --
24   BY MS. BURROWS:
25     Q.    Okay.

87

1      A.    -- actually.  It goes on and says
2         (reading):  Anyone on the second floor of the
3         residence would have a clear view of
4         approaching officers coming through the
5         panhandle driveway.  Due to this and the
6         information that Babb was armed, Sergeant
7         McAlpine requested the armored vehicle.
8            When I -- I was the first officer there,
9    and I did report the positioning of the house, the
10   color of the house, the fact that it was five houses
11   north of the cross street --
12     Q.    Sure.
13     A.    -- that it was a panhandle lot, that the
14   approach was difficult, because the view of the
15   house was very limited from the front.  The -- so
16   officers approaching would have to be basically
17   right in front of the house to have a full view if
18   they were to be on the ground, on foot.  And for
19   somebody with a weapon, the elevated bedroom windows
20   looking down and looking out gave the person --
21   anybody in the house a tactical advantage.
22           So that is a lot of information.  I didn't
23   say all of that on the radio, but I tried to paint a
24   picture for officers coming.  I remember describing
25   the panhandle lot and the position of the house.

88

1      Q.    The chief, however, writes that you aired
2    some information.
3      A.    Yes.
4      Q.    And he is suggesting that the information
5    you aired indicated that it was not safe to approach
6    the house.  Can you look at the dispatch record and
7    tell me where you aired?
8      A.    Well, this --
9      Q.    The information.
10     A.    Well, this -- kind of as an aside, this --
11   these CAD entries are a reflection of some of the
12   radio traffic.  The dispatcher is typing these CAD
13   entries into the computer to make a record of key
14   things that are being transmitted on the radio.  It
15   is not necessarily an exhaustive list of everything
16   that is said on the radio throughout the call.
17     Q.    But I don't even see your call sign with
18   anything other than the description of the house.
19     A.    Oh, I see.  Well, I will have to look.
20     Q.    Okay.
21     A.    Can I use this copy?
22     Q.    Yeah, you can use that.
23     A.    Okay.
24           MR. MATTHEWS:  Yeah.
25           THE WITNESS:  I see that.

Exhibit 6
Page 23 of 26

Joseph Anthony Kidd

89

1      A.    I don't know.  I haven't listened to the
2   radio traffic, the recording of it, so that would be
3   the best authoritative source about what I actually
4   aired on the radio to other officers.
5   BY MS. BURROWS:
6      Q.    Okay.
7      A.    I remember giving that description and I
8   remember having concerns about sort of a tactical
9   advantage that somebody in the house might have
10  being in upper floor windows.  Even after I was on
11  the roof of 2244 Devos Street, that was a concern.
12  As the information developed --
13     Q.    I appreciate that those were your
14  concerns.  I do.  I am just wondering how -- what
15  the chief is relying on to write what he did in
16  Exhibit 9, that you aired --
17           MR. MATTHEWS:  Again, misstates
18  evidence but --
19     A.    I am assuming a recording of the radio
20  traffic.  I don't know.  I haven't listened to that
21  recording.
22  BY MS. BURROWS:
23     Q.    Okay.
24     A.    So I don't know.
25     Q.    Where is -- where does the chief reference

90

1   you again next in that report?
2            MR. MATTHEWS:  Objection.  Misstates
3   evidence.
4      A.    I think -- I might have missed something
5   here, but I am thinking it is page 4, bottom
6   paragraph.
7   BY MS. BURROWS:
8      Q.    Why don't you read to me what --
9      A.    I am thinking I might have missed a
10  reference in between.  Tell me if I did.
11           That page 4, bottom paragraph, about
12  halfway into the paragraph says, "Officer Stutesman
13  knew that other officers were exposed to danger from
14  the rifle because Officer Kidd had aired this
15  information."
16     Q.    Do you understand what that references?  I
17  am trying to get the broader context here.
18     A.    Yes.  I think I understand what he is
19  trying to say there.
20     Q.    Tell me what you think he is trying to say
21  there.
22     A.    Well, I had -- after I was on the roof of
23  2244 Devos Street, I reported that -- I mean, there
24  was -- the call evolved after the roommate came out,
25  and the roommate told police that Mr. Babb was

91

1   trying to access a gun safe, that he had access to
2   rifles, and that -- so initially it was a handgun
3   that he had shot.  The rifle information changes
4   things quite a bit.  The rifle you can shoot
5   precisely at long distances, and high capacity
6   magazines, and the terminal ballistics of it are
7   much more dangerous than the terminal ballistics of
8   a handgun bullet.  The risk elevates a lot.
9            And my position here was a very exposed
10  position.  And the flip side of that is I think at
11  the time I was the one who had the best view of the
12  front of the house to be able to report anything
13  that would occur.  So I do remember airing that my
14  position was a vulnerable position.  I remember
15  asking Officer Farley to relocate, to be replaced in
16  his perimeter spot and to scout for a better spot
17  that he and I could relocate to to where I could
18  still have a good view of the front of the house but
19  not be so exposed.
20           So I am assuming that this reference
21  here -- Officer Stutesman knew that other officers
22  were exposed to danger from a rifle because I,
23  Officer Kidd, had aired this information.  I think
24  that this reference and this knowledge that Officer
25  Stutesman has was partly because of the information

92

1   I had aired on the radio.
2      Q.    About where you were located?
3      A.    That -- yeah.
4      Q.    Okay.
5      A.    Yes.
6      Q.    Do you remember telling Officer Stutesman
7   that you felt exposed and not safe on the roof?
8      A.    I think I actually said that on the radio.
9      Q.    Okay.
10     A.    I haven't listened to a recording, but I
11  am pretty sure I actually aired that on the radio,
12  and that led to the discussion of -- over the radio
13  of me asking Officer Farley to either -- over the
14  radio or a phone call.  I think it was on the radio.
15  But me asking Officer Farley to relocate or to get a
16  replacement and then go find a better spot for us.
17     Q.    Okay.  And are there any other references
18  in the chief's report or the use of force review
19  that involve you?
20     A.    I didn't see any other references to me.
21     Q.    Okay.  Other than the interview with
22  Detective Crolly, have you been interviewed by
23  anybody else about this incident?
24     A.    I don't think so.
25     Q.    Did anyone from the Use of Force Review

Exhibit 6
Page 24 of 26

Joseph Anthony Kidd

93

1  Board speak to you about your participation in this
2  incident?
3      A.   I don't think so.
4      Q.   And other than your lawyers -- I don't
5  want to know anything you may have talked about with
6  them -- have you spoken with anyone else in the
7  police department about your testimony today and
8  what you are going to testify to?
9      A.   No.  I mean, just -- there is general
10  discussion about media coverage and police.
11      Q.   Sure.
12      A.   Pay attention to the media and that kind
13  of thing, but other than that, no.
14      Q.   Do you remember reading any newspaper
15  articles about this incident after it happened?
16      A.   I was aware of the media coverage
17  generally.  I don't remember if it was from
18  television or the newspapers.
19      Q.   How did you feel the media was covering
20  this shooting?  What -- did you have any feelings
21  about what they were doing?
22      A.   My professional opinion?
23      Q.   Yes.  Trick question.
24      A.   I -- I think our department -- one of my
25  feelings or opinions about it is that I think our

94

1  department at that time should have done a better
2  job of explaining to the public what happened and
3  why and doing that in a more timely manner.  I think
4  that would be helpful to the public, so that is the
5  main thing that comes to my mind.
6      Q.   Prior to this incident with Mr. Babb, did
7  you have any training in how to approach
8  specifically veterans, combat veterans who were in
9  crisis?
10      A.   I have had a week of crisis intervention
11  training, and it covered a broad spectrum of mental
12  health conditions and strategies to communicate and
13  persuade and to relate to people with different
14  mental health conditions, and there might have been
15  something in there in the PTSD line that related
16  specifically to veterans.  I don't remember
17  specifically, but that was a pretty exhaustive
18  course on mental health statuses or whatever you
19  want to call it and helping officers diffuse
20  situations, communicate with people better, explain
21  our expectations better, that kind of thing.
22           I don't recall anything that was like a
23  separate class related specifically to veterans.  We
24  did have an in-service training on this topic, but I
25  don't know if it was before or after this incident.

95

1      Q.   That was my next question.  I read in one
2  of the chief's memos that your department went to
3  Boise, Idaho, and studied a program used in Boise
4  about how to address combat veterans in crises.  Did
5  you receive any training after this incident
6  about --
7      A.   Well, there was -- I do recall one
8  in-service training that was on this topic specific
9  to veterans, and the presenters were veterans
10  themselves.  I just don't recall the timing of it,
11  if it was before this incident or after this
12  incident.
13      Q.   Do you recall if you got any new insights
14  in how to respond to combat veterans in crises?
15      A.   I am not sure.  I would have to think
16  about that for a while.
17      Q.   Okay.  Were there suggestions made on how
18  to approach a veteran who may be having a difficult
19  time?
20      A.   Well, one thing we do is -- I mean, we
21  have veteran pins now.  This is, I think, post this
22  incident.  That is what -- this is pretty minor, I
23  suppose, but we have veteran pins that veterans can
24  wear on their uniforms, and that is something that
25  we can use as a way to engage somebody who is a

96

1  veteran or currently in the military that we are
2  dealing with who is having an issue or they are
3  embroiled in something that we are helping resolve.
4  It is a point of contact and connection and a way to
5  establish rapport quickly.  That is kind of minor,
6  but that is one of those steps you are asking about.
7      Q.   Sure.
8           Do you remember anything else you may have
9  personally gathered or learned from that in-service
10  training on how to approach combat veterans in
11  crises?
12      A.   There are resources out there that are
13  available.  I'm more aware of that now.  Resources
14  that we can refer people to, things like that.
15      Q.   Okay.  At some point during this incident
16  at Mr. Babb's house, I understand from other
17  witnesses that there were discussions about leaving,
18  about just backing out and going away and letting
19  Mr. Babb calm down.  Do you remember any of that?
20      A.   I wasn't privy to that.
21      Q.   Okay.  Is there anything we have not yet
22  talked about that you want to make sure I know about
23  this incident, whether it is your opinion or facts
24  or your assessment?
25      A.   No.

Exhibit 6
Page 25 of 26

97

```
1      Q.    Okay.  I have no more questions.  Thank
2   you very much, Officer.
3      A.    Thank you.
4            MR. MATTHEWS:  No questions.  We will
5   read and sign.
6            (The deposition was concluded at
7             11:00 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1   Joseph Kidd
2   McGowan vs. Stutesman, et al.
3   October 13, 2017
4
5   PAGE/LINE.....................................CHANGE
6   |_____
7   |_____
8   |_____
9   |_____
10  |_____
11  |_____
12  |_____
13  |_____
14  |_____
15  |_____
16  |_____
17
18       I declare under penalty of perjury that the 97
19   pages referenced above are true and correct except
20   for such corrections as noted.  Executed this ......
21   day of ................. 2017.
22            |...........................|
23            Joseph Kidd
24
25
```

98

```
1   State of Oregon   )
                      )  ss.
2   County of Lane    )
3        I, Christine Oljace, CSR-RPR, a Certified
4   Shorthand Reporter for the State of Oregon, certify
5   that the witness was sworn and the transcript is a
6   true record of the testimony given by the witness;
7   that at said time and place I reported by stenotype
8   all testimony and other oral proceedings had in the
9   foregoing matter; that the foregoing transcript
10  consisting of 97 pages contains a full, true and
11  correct transcript of said proceedings reported by
12  me to the best of my ability on said date.
13       If any of the parties or the witness requested
14  review of the transcript at the time of the
15  proceedings, correction pages are attached.
16       IN WITNESS WHEREOF, I have set my hand this 31st
17  day of October 2017, in the City of Eugene, County
18  of Lane, State of Oregon.
19
20
21       Christine L Oljace
22  Christine Oljace, CSR-RPR
23  CSR No. 05-0397
24  Expiration Date:  September 30, 2018
25
```