*David Clark*

*McGowan v Stutesman, et al.*

*October 3rd, 2017*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 11
Page 1 of 21

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

RONDA MCGOWAN, Personal         )
Representative for Estate of    )
Brian Babb, LEE BABB, CONNOR    )
BABB, by and through Guardian   )
ad litem, STEPHANIE WOODCOOK,   )
KAYLEE BABB,                    )
                                )
         Plaintiffs,            )
    v.                          ) No. 6:17-cv-00424-TC
                                )
WILL STUTESMAN, OFFICER GROSE,  )
OFFICER PIESKE, Sgt. MCALPINE,  )
CITY OF EUGENE, a municipal     )
subdivision of the State of     )
Oregon, JANE DOE CALL TAKER,    )
John and Jane Does 1-10,        )
                                )
         Defendants.            )

DEPOSITION OF DAVID CLARK

October 3, 2017

Tuesday

2:04 P.M.

         THE DEPOSITION OF DAVID CLARK was taken at

Harrang Long Gary Rudnick, 360 East 10th Avenue,

Suite 300, Eugene, Oregon, before Christine Oljace,

CSR, RPR, CRC, Certified Shorthand Reporter in and

for the State of Oregon.

2

1

2                        APPEARANCES

3    For the Plaintiffs:

4        MS. MICHELLE R. BURROWS
         420 SW Washington, Suite 300
5        Portland, Oregon  97204
         503/241-1955
6        michelle.r.burrows@gmail.com

7    For the Defendants:

8        HARRANG LONG GARY RUDNICK, PC
         360 East 10th Avenue, Suite 300
9        Eugene, Oregon  97401
         541/485-0220
10       BY:  MR. JEFFERY MATTHEWS
         jeff.matthews@harrang.com
11

12   Also Present:

13       MS. JAMIE IBOA

14       WILL STUTESMAN

15       MATTHEW GROSE

16

17   Reported by:

18       CHRISTINE OLJACE, CSR-RPR

19       CC REPORTING & VIDEOCONFERENCING

20       EUGENE      541/485-0111

21

22

23

24

25

3

1

2                          INDEX

3

4    WITNESS........................................PAGE

5    DAVID CLARK

6        BY MS. BURROWS                              4

7

8    EXHIBITS...................................MARKED

9    Exhibit 1    Diagram; Bates No. COE 000611     16

10   Exhibit 2    Photograph; Bates No. COE 001044   19

11   Exhibit 3    Case Supplemental Report; Bates    21

12                No. COE 000652

13   Exhibit 4    Case Supplemental Report; Bates    22

14                Nos. COE 000650 - COE 000651

15   Exhibit 5    ICV summaries; Bates               24

16                Nos. COE 000505 - COE 000509

17

18

19

20

21

22

23

24

25

4

1                    DAVID CLARK,

2    having been first duly sworn to testify the truth,

3    the whole truth, and nothing but the truth, was

4    examined and testified as follows:

5

6                     EXAMINATION

7    BY MS. BURROWS:

8        Q.    Could you state your name for the record,

9    please.

10       A.    David Clark.  C-l-a-r-k.

11       Q.    You are in uniform today.  Am I safe to

12   assume you are a police officer?

13       A.    Yes.  I am a full-time police officer in

14   the City of Eugene.

15       Q.    Officer Clark --

16       A.    Yes.

17       Q.    -- Eugene Police Department.

18             Have you ever had your deposition taken

19   before?

20       A.    Not with this department, no.

21       Q.    Other departments?

22       A.    Yes.

23       Q.    How many times have you had your

24   deposition taken?

25       A.    Once.

Exhibit 11
Page 2 of 21

David Clark

---

5

1    Q.    And what was the nature of that case or
2  the purpose for your deposition?
3    A.    A witness, I believe, for maybe a DUI.
4    Q.    Was it a civil case?
5    A.    Yes.
6    Q.    Okay.  How long have you been a police
7  officer?
8    A.    13 years.
9    Q.    How long have you worked for the City of
10 Eugene?
11   A.    Nine years.
12   Q.    Before the City of Eugene, where did you
13 work?
14   A.    Burlington, Vermont.
15   Q.    That is a big leap.
16   A.    Yes.
17   Q.    Officer Clark, this is the time set for
18 your deposition in a civil rights case that has been
19 brought by the Estate of Brian Babb against Officer
20 Stutesman and the City of Eugene.  You are here to
21 hopefully answer my questions about your
22 participation in an event or an incident that
23 occurred on March 30th of 2015.
24         Have you reviewed any records in
25 preparation for today's deposition?

---

6

1    A.    Yes.
2    Q.    What records have you reviewed?
3    A.    I reviewed the statement that I made to
4  one of the investigating officers, I read the
5  overall memorandum that was sent out, and then my
6  ICV.
7    Q.    Okay.  Have you reviewed anybody else's
8  statement?
9    A.    No.
10   Q.    How long ago did you review those
11 documents?
12   A.    Yesterday.
13   Q.    As you probably know -- because I know
14 your attorneys relatively well, you have probably
15 been fully advised as to what we are doing here
16 today and what the rules of the road are.  I like to
17 go over those ever so briefly with each witness.
18         You have testified in court before, have
19 you not?
20   A.    Yes.
21   Q.    Do you have a rough estimate of about how
22 many times you have testified?
23   A.    Five to ten.
24   Q.    Okay.  Well, the rules are generally the
25 same as when you testified in court.  We don't have

---

7

1  a judge here, but we do have a court reporter, and
2  the rules of testifying are generally the same
3  except hopefully it is not quite as formal and it is
4  not quite as maybe intimidating to folks who don't
5  testify all of the time, but there are some things
6  that are a little bit different.
7          I want you to understand all of my
8  questions.  Sometimes I may get ahead of myself and
9  my questions may not make sense.  If you don't
10 understand what I am asking or it is somehow
11 confusing, can you please ask me to rephrase it
12 until we can get to sort of a meeting of the minds
13 about what information I am trying to get from you?
14   A.    Yes.
15   Q.    Likewise, if I don't understand your
16 answer or if I think your answer isn't what I was
17 trying to ask, I will probably rephrase the question
18 and try and go at it a different way.
19         If at any point in time you need to take a
20 break, please let me know, and we can take a break.
21 The only rule, because this is a federal court case,
22 is that you have to wait for the -- you have to
23 answer the question pending, whatever I have asked
24 you, and then we can take a break.  Is that okay?
25   A.    Yes.

---

8

1    Q.    I can tell that you are a very smart
2  witness and you are anticipating my questions.  What
3  I will just remind you ever so gently is please let
4  me complete my question, and I will let you complete
5  your answer, because the court reporter cannot type
6  both of us speaking at the same time.  And that is
7  the only real reason for that rule other than some
8  judges get really mad about it.
9          The other little note I would make for you
10 is that every once in a while defense attorneys
11 object to questions in depositions.  It doesn't
12 happen a lot, but it does happen.  Generally
13 speaking, very few objections must be made in a
14 deposition.  Most objections are automatically held
15 until the end when we go to court.  If I want to use
16 part of your transcript, Mr. Matthews can say,
17 "Well, these questions shouldn't have been asked.
18 This is not relevant."  We do that later when we
19 have the transcript and we have a judge present.  So
20 the general premise here is that I get as much
21 information from you as I can and then we figure out
22 whether it can be used later in court, which raises
23 the next problem.
24         You have the right to read and review the
25 transcript this lady is creating for us if you

---

Exhibit 11
Page 3 of 21

David Clark

9

1    reserve that right to do so.  Once it is completed,
2    that transcript can be used as actual evidence in
3    any future proceeding in this case or it can be used
4    to show conflict in testimony, in your own testimony
5    or amongst other officers who I will be questioning,
6    so when you read and review that transcript, please
7    do so carefully.  Is that okay?
8        A.    Yes.
9        Q.    So how long -- you said that you have
10   worked for the City of Eugene for nine years, you
11   said?
12       A.    Yes.
13       Q.    What positions have you held with the City
14   of Eugene?
15       A.    Strictly patrol officer.
16       Q.    And what did you do in Vermont?
17       A.    Patrol office.
18       Q.    What department did you work for in
19   Vermont?
20       A.    Burlington Police Department.
21       Q.    Burlington.  And you were always, then, a
22   patrol officer the entirety of your --
23       A.    Yes.
24       Q.    -- law enforcement career?
25             When did you become certified with the

10

1    Oregon DPSST?
2        A.    I believe it was November of 2008.
3        Q.    Did you have to get completely recertified
4    or was there some reciprocity for your work in
5    Vermont?
6        A.    There was some carryover.  I had to go
7    through a two-week lateral academy and then some
8    in-house stuff.
9        Q.    What levels of certification do you
10   presently hold?
11       A.    Advanced certificate.
12       Q.    Do you have plans to become certified
13   above advanced?
14       A.    That is, I believe, as far as I can go.
15       Q.    Okay.  Where did you graduate from high
16   school?
17       A.    Portsmouth Abbey School in Portsmouth,
18   Rhode Island.
19       Q.    Did you go to college?
20       A.    Yes.
21       Q.    Where did you go?
22       A.    University of Vermont.
23       Q.    Do you have a degree?
24       A.    Yes.
25       Q.    What is your degree in?

11

1        A.    Small business administration and studio
2    art.
3        Q.    Are you an artist?
4        A.    Kind of, yes, at times.  I was in the day.
5        Q.    And do you have any advanced degrees
6    beyond your bachelor's?
7        A.    Yes.
8        Q.    What degrees do you have?
9        A.    I have a master's in teaching from Pacific
10   University.
11       Q.    Have you ever taught before?
12       A.    My student teaching and I ran the
13   education program for Boys and Girls Club of
14   America.
15       Q.    Okay.  What year did you start becoming a
16   police officer?
17       A.    2004.
18       Q.    What made you go from your educational
19   background choices into law enforcement?
20       A.    I was running an after school program with
21   Boys and Girls Clubs, got laid off on that.  And
22   worked with at-risk youth and families a lot, and
23   when I saw a position in the paper for police
24   department, I figured it was along the same lines of
25   doing the work with at-risk youth and things that I

12

1    was doing, but I was able to have a larger role in
2    maybe the children's lives as working with their
3    parents and things than I was in my present job.
4        Q.    Okay.  May I ask what made you move from
5    Vermont to Oregon?
6        A.    Navy brat on the East Coast and wanted to
7    get out of the East Coast.
8        Q.    Do you like the West Coast better?
9        A.    I do.
10       Q.    Okay.  So you are the first witness in
11   this case, so I may ask you some questions about
12   areas that I may not go into with other officers.
13   That is the luck of the draw, Officer Clark.
14             So do you remember the events -- at least
15   your role in the events in the Brian Babb incident?
16       A.    Yes.
17       Q.    Could you tell me what shift you were
18   working that day?
19       A.    I believe I was third watch.  It was
20   11 a.m. to 9 p.m.
21       Q.    How many watches does EPD have?
22       A.    At that time there was seven, but there is
23   six now.
24       Q.    How many patrol officers were on third
25   watch at that time?

Exhibit 11
Page 4 of 21

13

1    A.    I don't know the staffing levels that day.
2    Q.    Do you have an immediate supervisor
3  sergeant that you answer to?
4    A.    Right now it is Sergeant Dawson.
5    Q.    And at that time -- and again, we are
6  talking about March 30th of 2015 -- who was your
7  immediate sergeant?
8    A.    I believe it was Malcolm McAlpine.
9    Q.    And he was the sergeant who took over the
10 Babb incident.  Is that correct?
11   A.    Yes.
12   Q.    How long had Sergeant McAlpine been your
13 supervisor as of March 30th, 2015?
14   A.    Since the beginning of January.
15   Q.    Okay.
16   A.    Of the same year.
17   Q.    Three months?
18   A.    Yes.
19   Q.    Again, I am sorry about the dates.  I
20 didn't do a timeline with you, but as of 2015, how
21 long had you been with the department?
22   A.    With the department since 2008, so
23 approximately seven years.
24   Q.    All right.  On third watch in 2015, how
25 many sergeants were there assigned to third watch

14

1  for patrol?
2    A.    I don't know if there was one or two at
3  the time.  Malcolm was our main sergeant at the
4  time.
5              (Reporter clarification.)
6  BY MS. BURROWS:
7    Q.    Now, normally on third watch, in March of
8  2015, were there particular areas of the city that
9  you were assigned to patrol?
10   A.    Yes.
11   Q.    Which area?
12   A.    What was called beat 5.
13   Q.    Beat 5?
14   A.    Beat 5.  There are six beats within the
15 city.  Beat 5 is approximately Jefferson Street to
16 Jerry's, Highway 99, and then 11th to Northwest
17 Expressway, that block right there.
18   Q.    So does third watch cover everybody who
19 works 11 to 5?
20   A.    Yes.
21   Q.    All beats?
22   A.    Yes.
23   Q.    Okay.  And how many beats were working on
24 March 30th, 2015?
25   A.    There's people assigned to every beat

15

1  within our team, and then depending on who shows up
2  is how that beat is covered.
3    Q.    Okay.
4    A.    But we are always called to fill in other
5  beats as needed also.  Our primary assignment is one
6  beat.
7    Q.    And on March 30th, how many officers were
8  assigned to beat 5, if you know?
9    A.    I would say probably at most there is two
10 for my shift.
11   Q.    For third watch there were --
12   A.    Correct.
13   Q.    -- at least two patrol officers?
14   A.    Yes.
15   Q.    Now, do you know if there is an order
16 within Eugene Police Department -- if there was an
17 incident in beat 5 and you needed to draw other
18 officers, is there an order from the location those
19 officers are drawn or just everybody shows up?
20   A.    For a critical incident of that sort, I
21 believe dispatch starts off if they have a beat 5
22 car as the primary officer, and then, based on the
23 availability of what they see on the screen, they
24 start sending people from that.
25   Q.    Okay.  Do you remember what you were doing

16

1  when you first heard about this incident on Devos
2  Street?
3    A.    I just remember I was on patrol.  I don't
4  remember if I was currently on reports or anything.
5    Q.    Let me see if I have got it.  I have got a
6  couple of things I am going to start out with here
7  with you.  One of the things I like to do -- and I
8  do an awful lot of police litigation.  Oftentimes
9  they do involve a very rapidly moving sort of
10 dynamic situation, so I oftentimes will use maps or
11 schematics to try and get a location that every
12 officer recalls being.
13           And I know that there was a Use of Force
14 Review Board that did a lot of this, but what I
15 would like you to use when I ask you my questions on
16 this is to use your best recollection.  Again, if
17 you don't know, "I don't know" is a perfectly fine
18 answer, and if you don't remember, that is a
19 perfectly fine answer.  I would rather have that
20 than you just sort of guess or, you know, come up
21 with something that is not based upon your best
22 recollection.
23           MS. BURROWS:  So let's mark this as
24 the first in order.
25           (Deposition Exhibit No. 1 marked

David Clark

---

17

1          for identification.)
2    BY MS. BURROWS:
3        Q.    That is Exhibit 1.
4              MS. BURROWS:  Officer Stutesman, I
5    have an extra one.  Do you want one?
6              OFFICER STUTESMAN:  Thank you.
7    BY MS. BURROWS:
8        Q.    So this I took out of -- I believe it was
9    the investigation file conducted by the Oregon State
10   Police and a number of other agencies, and if you
11   will look at the bottom, this is a number that was
12   assigned by Mr. Matthews' firm.  We call it lovingly
13   a Bates stamp number.  I am not sure why we still
14   call it that, but it is basically a page number
15   assigned in a litigation that tells us where all of
16   the various pieces of paper are located.  So I am
17   going to refer to this document as Bates No. 611,
18   just for the record.
19          Do you recognize -- is this schematic
20   familiar to you?
21       A.    Yes.
22       Q.    To the best of your ability, tell me what
23   this is.
24       A.    This is the driveway leading to the
25   residence of where Mr. Babb was located.

---

18

1        Q.    Have you seen this schematic before today?
2        A.    Yes.
3        Q.    Could you tell me where you have seen this
4    before?
5        A.    On the review paperwork that the gentleman
6    here gave me.
7        Q.    And the gentleman, Mr. Matthews?
8        A.    Yes.
9        Q.    I don't want to know anything you and he
10   spoke about --
11       A.    That is fine.
12       Q.    -- or any information you may have
13   gathered from him, but this is -- there is a lot of
14   redundancy in some of the paperwork I got, but I
15   received a document called Use of Deadly Force
16   Review Board, and it is both -- there is this
17   PowerPoint presentation and then there is lots and
18   lots and lots of paperwork in it.
19          Do you know what you reviewed that had
20   that schematic in it?
21       A.    By schematic, I actually meant I have seen
22   this overview before.  It was from the photographs
23   that you have right there.
24       Q.    Okay.  Let's give you a photograph too.
25   And they are not as clear as the color photographs.

---

19

1              MR. MATTHEWS:  I put all three of them
2    together, but maybe you didn't want them that way.
3    BY MS. BURROWS:
4        Q.    Yeah.  Let's just use the top one right
5    now.  Because I know you were not assigned right in
6    front of the house, were you?
7        A.    That's correct.
8        Q.    Okay.
9              (Deposition Exhibit No. 2 marked
10             for identification.)
11   BY MS. BURROWS:
12       Q.    Do you recognize Exhibit 2?
13       A.    Yes.
14       Q.    What is Exhibit 2?
15       A.    It shows a larger overview satellite image
16   of the location.
17       Q.    Have you seen this photograph before
18   today?
19       A.    Yes.
20       Q.    And where did you last see this
21   photograph?
22       A.    In the paperwork I received.
23       Q.    Okay.  Now, let's start with the
24   beginning.  Your shift started at 11 a.m.  This
25   incident took place later in the afternoon, did it

---

20

1    not?
2        A.    Yes.
3        Q.    Okay.  Do you recall where you were when
4    you first heard about the incident on Devos Street?
5        A.    No.  Just in my patrol vehicle.
6        Q.    I have received -- strike that.  Let me
7    back up.
8              Did you write a report about what you did
9    or saw that day?
10       A.    No.
11       Q.    Did you give an interview to someone?
12       A.    Yes.
13       Q.    Do you recall which officer you gave that
14   interview to?
15       A.    I think it was Detective Mel Thompson.
16       Q.    And have you reviewed his summary of the
17   interview he conducted with you?
18       A.    Yes.
19       Q.    Again, that was in the paperwork you
20   reviewed in preparation for today?
21       A.    Yes.
22       Q.    And were you assigned call sign 3E59 that
23   day?
24       A.    Yes.
25       Q.    Is that still your call sign?

---

---

21

1    A.    Yes.
2    Q.    And were you assigned the same vehicle to
3  drive each shift, or did you just --
4    A.    In general, if it is available and not
5  broken.
6    Q.    Okay.  I have -- hang on a second.  What I
7  have -- and I may have gathered the wrong
8  documentation, because I was trying to make sense of
9  what -- of how all of the officers' memories were
10 captured in this investigation.
11         Can I hand you Exhibit 3 and see if that
12 is at least part of the statement you gave to
13 Officer Thompson?
14   A.    Yes.
15         (Deposition Exhibit No. 3 marked
16            for identification.)
17 BY MS. BURROWS:
18   Q.    Did you give him more information than is
19 contained on this page?
20   A.    I don't recall.  I recall answering his
21 questions.
22   Q.    Okay.  And your statement was not
23 recorded.  Is that correct?
24   A.    I do not recall if he recorded our
25 statements or not.

---

22

1    Q.    Does he have to tell you if he is
2  recording your statements?
3    A.    Policy as far as that goes, I don't know.
4          (Deposition Exhibit No. 4 marked
5            for identification.)
6  BY MS. BURROWS:
7    Q.    Okay.  Now, this is Exhibit 4.  This is
8  the summary of interviews with Officer Warden.
9          MR. MATTHEWS:  Can I get a copy of 3?
10         MS. BURROWS:  Oh, yes.  Sorry about
11 that.
12         MR. MATTHEWS:  Thank you.
13         MS. BURROWS:  And let me give you 4.
14 BY MS. BURROWS:
15   Q.    Could you take a look at Exhibit 4 and
16 tell me if you have reviewed that document prior to
17 today.
18   A.    Yes, I have.
19   Q.    Was that also in the packet of materials
20 you were given to review?
21   A.    Yes.
22   Q.    So when you reviewed what I have marked as
23 3 and 4, did they appear to be accurate to you?
24   A.    Yes.
25   Q.    Do you remember whether or not anything

---

23

1  was left out of these reports from your interview?
2    A.    I don't recall who asked me to meet up
3  with Mrs. Woodcook at the very end to go talk to the
4  family.
5          MR. MATTHEWS:  So just for
6  clarification, Exhibit 4 is the interview with
7  Officer Warden?
8          MS. BURROWS:  Yes.
9          MR. MATTHEWS:  And that is what you
10 are -- you understand that is the interview with
11 Officer Warden and not you.
12         THE WITNESS:  Oh, with Officer Warden,
13 I have not reviewed that.
14 BY MS. BURROWS:
15   Q.    Okay.  Because see on page 651, the second
16 page of Exhibit 4, it looks as if you and Warden
17 were working together at the Devos --
18   A.    I don't have it.
19   Q.    This is Exhibit 4, the second page or
20 throughout that report.
21         MR. MATTHEWS:  I think she is
22 referring to this.
23         THE WITNESS:  Okay.
24 BY MS. BURROWS:
25   Q.    Were you and Officer Warden assigned to

---

24

1  work together on the Devos Street incident?
2    A.    Initially, yes.
3    Q.    Okay.  And you actually were the one who
4  interviewed Mrs. Woodcook?
5    A.    Did not interview her.  I just went to her
6  residence with her.
7    Q.    Okay.  So let's start -- oh, one more
8  document that might help us.  I sometimes give
9  everything to an officer ahead of time because it
10 helps remind them of what we are talking about.
11 Sometimes I don't just to see what they will tell me
12 but --
13   A.    Okay.
14         MS. BURROWS:  Can I mark this as the
15 next in order.
16         (Deposition Exhibit No. 5 marked
17            for identification.)
18 BY MS. BURROWS:
19   Q.    This is Exhibit 5.  This appears to be a
20 compilation conducted by one of the investigators of
21 ICVs.  Do you know what ICV stands for?
22   A.    Intercar video, I believe.
23   Q.    Okay.  And have you reviewed any of these
24 records in preparation for today's deposition?
25   A.    The ICV video, but not these records

---

Exhibit 11
Page 7 of 21

David Clark

25

1    exactly.
2        Q.    All right.  So you did look at your -- the
3    video from your patrol car in preparation for
4    today's deposition?
5        A.    Yes.
6        Q.    I had a problem.  I can't figure out, of
7    the videos that I have, which belong to which car,
8    so I am going to talk to the lawyers about whether I
9    can get a better identification.  I have a whole
10   bunch of them and I have looked at all of them, and
11   all I can tell is you guys drove really fast.  I
12   don't know whose video belongs to which vehicle.
13          If you will look at the bottom on the
14   right lower corner where it says page 508 and 509,
15   this appears to be a review by an officer of your --
16   of the ICV from your vehicle on 3/30/2015 starting
17   at 1644 hours.  Is that what it appears to be to
18   you?
19       A.    Yes.
20       Q.    Could you read through this for me very
21   quickly so I can ask you a couple questions.
22       A.    Okay.
23       Q.    Okay.  Because I don't know which of the
24   videos is related to the vehicle you were driving,
25   does this summary of the ICV sound accurate to you?

26

1        A.    Yes.
2        Q.    All right.  So now you have all of these
3    pieces of paper in front of you.  I would like to go
4    through sort of a timeline with you about what you
5    did that day, and any concerns or questions I have
6    from the documents I will follow up with you.
7          You went on shift at your regular time at
8    11?
9        A.    I believe so, yes.
10       Q.    Do you ever get there early?
11       A.    Yes.
12       Q.    How early do you get to shift?
13       A.    Usually about an hour.
14       Q.    And what do you do in that hour before
15   shift?
16       A.    Shine my boots, get my uniform ready, load
17   up my car.
18       Q.    What do you put in your vehicle?
19       A.    I put a patrol rifle, usually a
20   40-millimeter sponge-round gun, my patrol bag.
21       Q.    Okay.
22       A.    ICV mic or ICV hard drive.
23       Q.    Tell me about that.  What is the -- is
24   your understanding of the Eugene Police Department
25   use of the onboard video recording devices?

27

1        A.    Use it whenever possible.
2        Q.    Are you supposed to have it on all the
3    time or do you key it on for certain kinds of calls?
4        A.    Key it on for certain kinds of calls.
5        Q.    What kinds of calls do you key yours on?
6        A.    People -- person contacts.
7        Q.    It says in the report that I have up here,
8    the summary interview, Exhibit 3, that you were --
9    you were working and you heard officers being
10   dispatched for, quote, armed suicidal subject at
11   2248 Devos Street.
12          Could you tell me exactly what you recall
13   hearing on the dispatch?
14       A.    From my recollection, I recall that there
15   was a shot fired, that the person was a combat
16   veteran, that his counselor had called into the
17   police department, and he was suicidal.
18       Q.    And I just want to see if I can follow up
19   on a couple of those points that you raised.
20       A.    Uh-huh.
21       Q.    Did you actually hear dispatch say that
22   the subject was suicidal?
23       A.    I don't recall.
24       Q.    Okay.  And you did hear on dispatch that
25   there was a shot fired at the Devos Street address?

28

1        A.    Yes.
2        Q.    Was there any information about who heard
3    the shot fired?
4        A.    No.
5        Q.    Was there --
6        A.    Not that I recall.
7        Q.    Okay.  Was there any information about
8    where the shot was fired from or to?
9        A.    I just recall it was inside the residence.
10       Q.    So what is your understanding of someone
11   who shoots inside their house?  Is that illegal?
12       A.    It is.
13       Q.    Just shooting a weapon inside your house?
14       A.    Yes.
15       Q.    Okay.  Do you remember anything else
16   besides the four things that you have just
17   identified for me about that initial dispatch call?
18       A.    Not at this time, no.
19       Q.    Did anyone send you to the Devos Street
20   address?
21       A.    I believe I sent myself.
22       Q.    Okay.  So you self-initiated to that call?
23       A.    Correct.
24       Q.    And how did you let anyone know that you
25   were on the way there?

Exhibit 11
Page 8 of 21

David Clark

---

29

1      A.    I don't recall if I aired it or just went
2  en route just to stay off the radio.
3      Q.    Okay.  Is there some requirement that you
4  are to let dispatch know if you are en route to a
5  call?
6      A.    Not that I am aware of, no.
7      Q.    Okay.  Did you communicate with any
8  officer at the scene that you were en route?
9      A.    At the scene, no, I do not believe so.
10     Q.    Okay.  If you had called in your location
11 and that you were en route, how would that call have
12 sounded?  What would you have said?
13     A.    My recollection, I believe I heard
14 officers dispatched, and based on the officers that
15 were dispatched, I knew that we would have to get
16 people to the back of the house, and so I notified
17 dispatch that I would be responding to the west side
18 of the residence.
19     Q.    Did you know what street was on the west
20 side of the residence?
21     A.    Once I looked at my map, I found out that
22 it was East Irwin.
23     Q.    Okay.  So I have some dispatch records
24 here.  What is the code for you're en route
25 somewhere?  Is there a code?

---

30

1      A.    En route, I can say Code 3 or Code 2 or
2  Code 1.
3      Q.    What do those codes mean?
4      A.    Code 1 is normal driving, Code 2 is using
5  your lights and/or sirens to kind of expedite, and
6  then Code 3 is lights and sirens.
7      Q.    Do you remember if you called a code for
8  your --
9      A.    I believe it was Code 3.
10     Q.    Code 3.  And did you run your sirens and
11 lights the entire time?
12     A.    In this case, I don't believe I would
13 have, because you try to make it quiet when you get
14 close to the scene.
15     Q.    Okay.  When you said that you called in
16 that you were going to go to the Irving Street
17 location --
18     A.    Irwin.
19     Q.    -- Irwin, sorry -- did someone send you
20 there or did you just decide that that would be a
21 place for you to go?
22     A.    I decided it would be the place to go.
23     Q.    Who did you communicate that with?
24 Dispatch?
25     A.    Yes.

---

31

1      Q.    All right.  And did you expect dispatch to
2  let other officers know that that is where you were?
3      A.    I expected them to know where I was.
4      Q.    So they were all on the same radio
5  frequencies you are?
6      A.    Yes.
7      Q.    At that time when you are en route to the
8  Devos Street incident, did you know whether there
9  was an officer in charge of the scene yet?
10     A.    No.
11     Q.    What did you know about what was going on
12 at the scene at that point?
13     A.    That officers were responding to the front
14 of the scene, and I was just focused on my mission
15 of getting eyes on the back of the house.
16     Q.    What was -- why did you want to get eyes
17 on the back of the house?
18     A.    For containment purposes.
19     Q.    Who were you containing?
20     A.    The concern for Mr. Babb inside the
21 residence.
22     Q.    Were you familiar with that residence
23 before you dispatched there?
24     A.    No.
25     Q.    Did you know Mr. Babb before you

---

32

1  dispatched there?
2      A.    Not at all.
3      Q.    Did you drive in front of Mr. Babb's home
4  prior to going to the Irwin Street address?
5      A.    No.
6      Q.    And you chose the Irwin Street address
7  when you looked up your map program on your onboard
8  computer?
9      A.    Yes.
10     Q.    Okay.  And did you know whether there were
11 other officers going anywhere else besides the
12 actual address?
13     A.    I do not know if anybody -- I did not hear
14 anybody going anywhere else besides the front of the
15 residence.
16     Q.    Could you take a look at Exhibit 2.  It is
17 the picture that looks like Google Maps, but it may
18 be something else.  Could you, with my pen, if it is
19 on this picture, show me where you posted.
20     A.    Originally on East Irwin right here, and
21 then I went down the driveway to about here.
22     Q.    So you put an X.  Would you put your
23 initials by the X.  So your first position is sort
24 of off the picture a bit.  Could you put a No. 1
25 there.  Is that where you parked your vehicle?

Exhibit 11
Page 9 of 21

David Clark

33

1    A.    Yes.
2    Q.    And when you got out of your vehicle --
3  let's look at what you are wearing.  Were you
4  wearing this exact uniform that day?
5    A.    No.  I did not have the exterior carrier
6  at the time.
7    Q.    What is the exterior carrier?
8    A.    This vest right here.
9    Q.    Okay.  What -- did you have something
10 underneath your uniform, some protective gear?
11   A.    Yes.
12   Q.    Do you have protective gear under your
13 uniform and that exterior vest now?
14   A.    No.  Just my exterior vest right now.
15   Q.    What -- is that a new part of the uniform?
16   A.    Yes.
17   Q.    When did those go into effect?
18   A.    Approximately a year ago.
19   Q.    Okay.  At the time of this incident, what
20 did your uniform look like?
21   A.    The things that -- items that are on my
22 carrier right now were on my belt and -- except for
23 the body camera, and I just had the uniform shirt on
24 top with my metal badge and then the shoulder
25 patches.

34

1    Q.    Where did the radio go?
2    A.    Radio on my belt.
3    Q.    Okay.  And where did the mic go?
4    A.    I am trying to remember how I used to wear
5  it.  I believe I had it up over my shoulder and then
6  hooking on the front.
7    Q.    Okay.  You have a TASER?
8    A.    Yes.
9    Q.    When did you get certified with the TASER?
10   A.    With this department, I believe shortly
11 after I got here, so around 2009, 2010.
12   Q.    You had your sidearm on that day?
13   A.    Yes.
14   Q.    Same one?
15   A.    No.  It was prior to our transition to
16 Glocks.  I believe we had Sig Sauer at that time.
17   Q.    Why did you go from Sig Sauer?
18   A.    The contract ran out, and they chose to go
19 with these.
20   Q.    Okay.  Did you have a backup weapon?
21   A.    No.
22   Q.    So -- and you didn't have the cameras at
23 the time.  Is that fair?
24   A.    Correct.
25   Q.    Those cameras went in about a year ago,

35

1  you said, or did I misunderstand you?
2    A.    About a year -- these cameras went in
3  months ago.  They are relatively new to us.
4    Q.    At the time of this incident, did any
5  officer have a personal camera?
6    A.    Not that I am aware of, no.
7    Q.    But most of your vehicles had cameras,
8  videos onboard?
9    A.    Correct.  We have a mounted camera that
10 shows the front of the vehicle and then a camera
11 that captures the back seat of the car.
12   Q.    Earlier when you -- we were speaking, you
13 said you put a disc in.  Is that how your video for
14 your shift was captured?
15   A.    Yes.
16   Q.    What do you do with those discs -- what at
17 the time did you do with those discs at the end of
18 shift?
19   A.    We plug them in and download them.
20   Q.    Where did you plug them in?
21   A.    At headquarters.
22   Q.    Is there a designated computer to do that
23 with?
24   A.    Any computer that has the hardware to do
25 that.

36

1    Q.    Okay.  Did you have to save it into a
2  particular kind of file?
3    A.    No.  It automatically -- we go into COBAN,
4  which is the program that runs it, and press on
5  upload, and it uploads it.
6    Q.    Do you have to type in any kind of
7  identifier for you?
8    A.    My initials and CEPDDXC.
9    Q.    Okay.  So the videos are saved by your
10 initials, then, you think?
11   A.    Yes.  That is how you look them up.
12   Q.    Okay.  So if we look at that document --
13        MR. MATTHEWS:  5.
14 BY MS. BURROWS:
15   Q.    -- Exhibit 5 and it says under Officer
16 Clark, which is page 508 and 509, CEPDDXC.  Is
17 that --
18   A.    Yes.
19   Q.    Do you know what each of those letters
20 stand for?
21   A.    City of Eugene Police Department.  And
22 then it is our three initials.  I am David Clark.
23 At that time or just before that time, when I first
24 started here -- my middle initial is F., Frank.
25 There was another person that had the middle F.,

David Clark

37

1    Frank, so I defaulted to an X.
2        Q.    Okay.  Thank you.  That is very helpful.
3              And each day that you upload your video
4    discs, is it also dated the day that you --
5        A.    Yes.
6        Q.    -- upload it?
7              Okay.  And if you need to retrieve those
8    videos later like for court or something, can you do
9    that?
10       A.    Just our own, yes.
11       Q.    Just your own?
12       A.    Yes.
13       Q.    You can't get anyone else's?
14       A.    Only supervisors.
15       Q.    And supervisor being sergeant and above?
16       A.    Correct.
17       Q.    Okay.  Now, with your videos on your vest
18   right now, how are those recorded and preserved?
19       A.    They have a built-in hard drive, and the
20   beginning of our shift, we pull them out of a --
21   there is a big bank of hardware things --
22       Q.    Yeah.
23       A.    -- that we plug them into upside down like
24   this and have our name on it.  We plug it in and it
25   charges it as well as downloads it at the end of our

38

1    day.  And in the morning we take it out, put it on
2    our person, and turn it on, and then activate it as
3    needed.
4        Q.    Okay.  So it is not on all of the time?
5        A.    No.
6        Q.    How long is the battery on those?
7        A.    Rarely -- just over a shift, I found out.
8        Q.    Okay.  So I know this is a little bit
9    outside of the case, but when you plug your camera
10   in, is your hard drive already coded with your name
11   and --
12       A.    Yes.
13       Q.    -- identifier?
14       A.    It uploads it under my name.
15       Q.    So it just automatically uploads it as
16   your video?
17       A.    Yes.
18       Q.    Again, can you access those videos at some
19   point?
20       A.    Yes.
21       Q.    Can anyone else?
22       A.    I am not aware if they can or not.
23       Q.    All right.  Thank you.  That has been very
24   helpful.
25              So back to Exhibit 2, which is the

39

1    photograph.  From your X1 position, were you
2    listening to the radio or the dispatch during the
3    time that you are at that location?
4        A.    Yes.
5        Q.    There was something in the report that
6    said that your -- the feed, the microphone feed was
7    unintelligible --
8        A.    Yes.
9        Q.    -- when you walked away from the vehicle.
10       A.    That's correct.
11       Q.    Do you know how that works?
12       A.    They are so finicky and they have a little
13   wire that comes off and you have to communicate with
14   a base antenna in the car, and a lot of times it --
15   distance is its enemy, and it will just stop giving
16   good feedback as soon as you get without good --
17   just outside of a certain distance, which --
18       Q.    Is that the radio you have got on your
19   vest?  Is that the one --
20       A.    No.  At the time we had a little teeny box
21   like a pack of cigarettes that had a -- that was our
22   portable microphone.  It has a little teeny antenna
23   on it, and it would automatically activate when we'd
24   turn on our lights and sirens, but it is strictly
25   audio.  And then as we are walking, the little

40

1    antenna that is on our portable microphone is
2    communicating with the antenna that is in our base
3    car where the hard drive is.
4              And so once you get a certain distance,
5    kind of like walkie-talkies, it doesn't work very
6    well at all, and so as soon as I left my vehicle and
7    went a little further up and in different places, it
8    will cut in and out.
9        Q.    Were you still able to communicate with
10   other officers?
11       A.    Yes, through my main radio.
12       Q.    So that is a different system?
13       A.    Yes.  The little box was strictly a
14   microphone talking to my hard drive, and then this
15   is the radio that I talk to dispatch and other
16   officers with.
17       Q.    So from the first position on Exhibit 2,
18   you said you walked up a driveway, and you drew a
19   line that showed roughly your path.  Could you,
20   during that whole time, hear what was going on on
21   the radio?
22       A.    Yes.
23       Q.    Could you hear things evolving?
24       A.    Yes.
25       Q.    Could you tell me how things were

Exhibit 11
Page 11 of 21

David Clark

41

1   evolving?  And I just want to focus on the time from
2   No. 1 position to your No. 2 position there.
3       A.   I don't remember like what was said over
4   the radio between those two positions.  I remember
5   when I first got out of my car I was by myself, and
6   I requested that someone cover me so that I am not
7   by myself on the back side.
8            There was a fence that came up along this
9   house right here, and there was a telephone pole in
10  between the fence and the house.  So I had my long
11  rifle right next to that telephone pole up for
12  cover, and I was just keeping an eye from a distance
13  towards the back of the house until a cover officer
14  arrived.
15           Once Officer Warden arrived, then I had a
16  cover officer with me, and the two of us walked down
17  the driveway to where the X is.
18      Q.   Okay.  So you said that you -- this house,
19  that is the one you pointed to and I am using my pen
20  to indicate it right now.
21      A.   Yes.
22      Q.   There is a fence along here.  Is there
23  also a fence on -- I don't know what direction we
24  are looking at now.
25      A.   Yes.  There is fence along the whole

42

1   perimeter of the back side right here.
2       Q.   So I have been in the Devos Street house,
3   and the lot that you pointed to is a gigantic lot,
4   is it not?
5       A.   Yes.
6       Q.   And there is a house that sits just off
7   the picture.  Is that correct?
8       A.   Yes.
9       Q.   So can you write on here -- what should we
10  call that?  Neighbor house.
11      A.   Okay.
12      Q.   How about writing that?  Is it dying on
13  you?
14      A.   No.  It is good.
15      Q.   Have you ever contacted the neighbor who
16  lives at that lot?
17      A.   Yes.
18      Q.   What is his name?  Do you remember?
19      A.   I do not recall his name.
20      Q.   Tell me when you contacted that neighbor.
21      A.   When I pulled up here, there was people
22  and children playing in this backyard.
23      Q.   Did they know what was going on here?
24      A.   No.  I just asked them to go inside.
25      Q.   Now, how tall is the fence that surrounds

43

1   that neighbor house?
2       A.   I believe about 6 feet.
3       Q.   Now, the -- from X1 position to X2
4   position, how big a distance -- how long a distance
5   is that?
6       A.   30 yards, long driveway.
7       Q.   And on this picture it looks like there is
8   some foliage here and some bare ground here.
9       A.   Yes.
10      Q.   Could you describe that particular lot to
11  me?
12      A.   This is a little foliage island, this is
13  the house, and this is their garage.
14      Q.   Did you speak to the neighbors -- I guess
15  it is on the left side of your position 1?
16      A.   I don't believe anybody was home at the
17  time.
18      Q.   Do you remember any of the address numbers
19  of these houses sitting here today?
20      A.   Not right now, no.
21      Q.   Okay.  That is fair.
22           Could you, from your X2 position, see into
23  the back of the Babb home?
24      A.   I could see -- I could see top of windows,
25  and I believe a little side door on the side right

44

1   here.
2       Q.   And the Babb home is a two-story home.  Is
3   that correct?
4       A.   Correct.
5       Q.   Did you ever -- during the time you were
6   posted there at X2 position, could you see anyone in
7   those windows?
8       A.   No.  The reflection was -- it was solid
9   black, so I could not see in.
10      Q.   Okay.  How close to the back fence line of
11  the neighbor house, as we have called it, into the
12  Babb yard could you get from the X -- from this
13  position?
14      A.   If I wanted to, I could crawl -- go along
15  the -- the house here and actually go into that
16  yard.
17      Q.   Uh-huh.
18      A.   But at that time, from what I recall,
19  there was a car parked right here, and so we were
20  using that as cover, because that way we could still
21  see these windows as best we could.  So we were
22  right -- hunched down behind that car.
23      Q.   Okay.  I don't have any pictures from the
24  angle where you were at X2.  Could you see any
25  officers in the front of the Babb home?

Exhibit 11
Page 12 of 21

David Clark

45

1     A.     I could not see anybody.
2     Q.     Okay.  Could you hear any officers in the
3   front of the Babb home?
4     A.     Only the ones that were yelling and
5   talking on the loud speaker eventually.
6     Q.     Okay.  You said that another officer
7   joined you.  Was that Officer Warden?
8     A.     Yes.
9     Q.     And you also said that you drew your long
10  rifle out of the vehicle before you posted at X2.
11  Is that correct?
12    A.     Yes.
13    Q.     Why did you do that?
14    A.     From what I recall, it was said that he
15  had other firearms, and he had -- he had shot, and
16  so I wanted to give myself instead of -- an
17  advantage of being able to, if I had to respond in
18  any way, have a better firearm to respond from
19  further away.  Handguns are meant more for close
20  borders, and so any time that we have a reported
21  armed person, ideally we use our long rifle, which
22  is much more accurate from -- create distance as we
23  can.
24    Q.     Your Sig Sauer at the time, was it a
25  9-millimeter or a .45?

46

1     A.     .45.
2     Q.     And the long rifle you had, was it an
3   AR-15?
4     A.     Yes.
5     Q.     And you also said that you had the
6   shotgun?
7     A.     The 40-millimeter.  It is a -- larger
8   rounds you see for a grenade launcher looking thing.
9     Q.     Yeah.  I had a client who got shot by one,
10  and it is a pretty intense weapon.
11           So do you know how Officer Warden was
12  armed when he arrived?
13    A.     I don't believe offhand.  He usually
14  carries a different kind of rifle since he is on
15  SWAT.
16    Q.     Do you know what kind of rifle he had?
17    A.     I don't.  Fancy.
18    Q.     Did anyone give you directions?  And I am
19  thinking of Sergeant McAlpine or some other command
20  officer.  Did anyone give you any directions to
21  where you should post or what weapon or what you
22  should be doing, looking for?
23    A.     No.
24    Q.     Okay.  Did you know that there were other
25  officers on the other side of Mr. Babb's house?

47

1     A.     Yes.
2     Q.     So any shot you took or would have had to
3   have taken, you would have had to have been mindful
4   of those officers on the other side?
5     A.     That's correct, unless it was the second
6   story.
7     Q.     Okay.  Are you a member of any specialty
8   team with Eugene Police Department?
9     A.     Not for munitions or anything of that
10  sort, no.
11    Q.     Use of force trainer?
12    A.     No.
13    Q.     FTO?  Anything like that.
14    A.     I was not an FTO at the time.
15    Q.     You are now?
16    A.     Yes.
17    Q.     Okay.  Anything -- were you ever on SWAT?
18    A.     No.
19    Q.     In Vermont?
20    A.     No.
21    Q.     Any kind of reconstruction team or
22  specialty investigative team?
23    A.     No.
24    Q.     Okay.  Was -- so you said that Officer
25  Warden is -- was on the SWAT team at the time, and

48

1   he had a different kind of rifle with him.  Do you
2   know what kind he had?
3     A.     I don't.
4     Q.     All right.  Do you know where Officer
5   Warden posted up when you were at the X2 position?
6     A.     He came to meet me, and we were both there
7   together behind the car.
8     Q.     And this is a really unfair lawyer
9   question.
10           So you posted behind this car.  What can
11  you see?  What angle do you have?
12    A.     Mostly the second story.
13    Q.     Okay.  Were you aware of where all of the
14  civilians were at the time you were at X2?
15           MR. MATTHEWS:  Objection.  Vague as to
16  all of the civilians.
17           MS. BURROWS:  That is a fair
18  objection.  Let me back up.
19  BY MS. BURROWS:
20    Q.     You said there were civilians in the
21  backyard, and you asked them to go inside.  Is that
22  correct?
23    A.     Yes.
24    Q.     Were you aware of any other civilians
25  around your position?

Exhibit 11
Page 13 of 21

David Clark

49

1    A.    There was a crowd gathering eventually
2  here where I am making a circle.
3    Q.    I know which video is yours now, because I
4  saw them gathering.
5          Were they gathering as the events were
6  taking place?
7    A.    Yes.
8    Q.    And did the crowd get biggest when the
9  shot rang out or just before?
10   A.    I don't know.  My attention was over here.
11   Q.    Right.  How -- were you concerned that
12 those civilians might be in danger from any shooting
13 from the Babb house?
14   A.    Yes.
15   Q.    Did either you or Officer Warden make any
16 attempt to clear those civilians out of the street?
17   A.    I yelled to them to go inside their
18 residence.
19   Q.    Did they do that?
20   A.    No.
21   Q.    Okay.  Did you radio to anyone that you
22 needed some help with the civilians and security
23 back here?
24   A.    Not that I recall, no.
25   Q.    Do you know whether Officer Warden did?

50

1    A.    Not that I recall, no.
2    Q.    How long were you in this X2 position?
3    A.    Until I -- until after the scene had
4  stabilized.
5    Q.    Did you hear the shot ring out that we
6  eventually --
7    A.    Yes.
8    Q.    Okay.  Prior to -- I don't know exactly
9  how long the dispatch records say you were there,
10 but the video is about two, two and a half hours on
11 your rig.  Do you know how long you were at the X2
12 position today?
13   A.    I would guess and say 45 minutes.  It
14 would be a guess based on the -- if it is a two-hour
15 video from when it showed me going around to the
16 front of the building and then kind of moving around
17 in my perimeter spots.
18   Q.    Okay.  So in that period of time that you
19 were at the X2, however long that was, could you
20 tell me what you heard on the radio as the situation
21 evolved?
22   A.    I heard on the radio just updates as far
23 as observations of officers in the front of the
24 building and what they saw and heard and -- up until
25 the gunshot and then the roll call that happened.

51

1    Q.    Okay.  Because nobody knew who fired that
2  round.  Correct?
3    A.    That's correct.
4    Q.    And you were trying --
5    A.    Initially.
6    Q.    Okay.  I have read that there were some
7  officers on rooftops.  Did you see any officer on
8  any rooftops from your X1 or X2 position?
9    A.    No.
10   Q.    Did you hear any information on the radio
11 about officers who had posted on rooftops?
12   A.    Not that I recall, no.
13   Q.    If I asked you today if you knew which
14 officers posted on rooftops, would you be able to
15 answer that question?
16   A.    A sniper officer.  I don't recall which
17 one, specifically which name.
18   Q.    Were you aware that there was someone in a
19 sniper position?
20   A.    Not at the time, no.
21   Q.    Did you later learn that someone was in a
22 sniper position?
23   A.    I don't recall.
24   Q.    Okay.  All right.  Now, at some point the
25 BearCat was brought in.  Do you know where the

52

1  BearCat went?
2    A.    Just after I moved around front and
3  actually saw everything.  I didn't see this until
4  everything had stopped.
5    Q.    Okay.  From your X2 position, could you
6  see the BearCat --
7    A.    No.
8    Q.    -- come down the road?
9          No?
10   A.    No.
11   Q.    Okay.  Did you hear anything over the
12 radio about the BearCat arriving or being sent for?
13   A.    Probably, but I don't recall what the
14 specifics were.
15   Q.    Okay.  All right.  Now, there is some
16 crazy information about the therapist of Mr. Babb
17 being on the phone with him during a large portion
18 of this incident.  Do you remember receiving
19 information about the therapist being on the phone
20 with Mr. Babb?
21   A.    From what I can recall, I remember her --
22 being told that she was on the phone and then she
23 had lost contact and then she wasn't able to regain
24 that contact with him.
25   Q.    Do you know who she was on the phone with?

Exhibit 11
Page 14 of 21

David Clark

53

1    Do you have any information about that?
2        A.    I assume it was Mr. Babb.
3        Q.    I mean -- that was a bad question.  Let me
4    back up a couple steps.
5              So the therapist called someone.  Do you
6    know whether it was dispatch?
7        A.    Dispatch.  It would be dispatch.
8        Q.    Were you able to hear any portion of the
9    conversation between Ms. Higgins, the therapist, and
10   dispatch?
11       A.    No.
12       Q.    Were you able to hear any portions of the
13   conversation between the therapist and any officers
14   at the scene?
15       A.    No.
16       Q.    How about between the therapist and
17   Mr. Babb?
18       A.    No.
19       Q.    So all you knew is that there was some
20   kind of conversation, but you didn't know anything
21   more than that basic fact?
22       A.    That's correct.
23       Q.    Okay.  Could you hear Mr. Babb yelling
24   inside the house?
25       A.    Yes.

54

1        Q.    Could you tell me what you heard him yell?
2        A.    From my recollection, "Fuck you," things
3    like "Fuck you," "Go away," and "I didn't do
4    anything wrong."
5        Q.    Okay.  Did he make any -- did he yell out
6    the back windows of the house in your direction?
7        A.    I never saw him or heard him yelling from
8    the back of the house.
9        Q.    Did you ever see any officer approach the
10   back of Mr. Babb's house at any time?
11       A.    Officer Warden, after the incident had
12   stopped.
13       Q.    What did he -- what did you see Warden do?
14       A.    I helped him over a back fence.
15       Q.    And where did he go?
16       A.    Somewhere in the yard.  I did not follow
17   him.
18       Q.    Did you see him go inside the house?
19       A.    I did not see him.  I just helped him over
20   the fence.
21       Q.    Okay.  And that was after the shot?
22       A.    Yes.
23       Q.    Why did he go in there?
24       A.    I think he was going up front in case they
25   needed more people to clear the residence or help

55

1    with any of the officers in the front.
2        Q.    So other than the neighbors here in the
3    neighbor house we have identified, the folks
4    gathering on the street behind you, could you see
5    any other civilians from post -- your position 2?
6        A.    No.
7        Q.    Okay.  Did you learn -- from your
8    position 2 until the shot was fired, did you learn
9    anything more about Mr. Babb through the dispatch or
10   your other officers?
11       A.    Not that I recall besides the initial
12   information.
13       Q.    Did you learn at any point that he was a
14   war veteran?
15       A.    Yes.
16       Q.    Do you remember when you obtained that
17   information?
18       A.    I believe I heard that prior, as we were
19   dispatched, as the initial information was let out.
20       Q.    Did you learn anything about his mental
21   health or his medical problems?
22       A.    Medical, no.  Mental health, just
23   assumptions from him being a combat war vet and
24   talking to that counselor.
25       Q.    Okay.  Did anyone -- did you receive any

56

1    information from anyone while you are posted here
2    that Mr. Babb had been -- suffered some neurologic
3    damage?
4        A.    I seem to recall there may have been a --
5    some talk of that, but I don't remember how I
6    received the information.
7        Q.    Okay.  Anybody -- any information while
8    you are on scene that day that Mr. Babb had PTSD
9    or other mental health issues?
10       A.    It may have been all associated with the
11   dissemination of information that we received.
12       Q.    Do you remember who may have disseminated
13   that information to you?
14       A.    All my information would come from
15   dispatch.
16       Q.    So I have never been a police officer.  I
17   have never been on a scene like this.  You are out
18   there.  It is a very tense situation.  And from your
19   position, you may not know exactly what is going on
20   in the front of the house.  So tell me how
21   information is getting to you, all information.  Is
22   it all through dispatch or is some of it from other
23   officers?
24       A.    I am strictly hearing whatever is being
25   talked over the radio.

Exhibit 11
Page 15 of 21

David Clark

57

```
1      Q.    And that would include other officers?
2      A.    Yes.
3      Q.    Okay.  Was there a lot of information
4  being exchanged from other officers on the radio?
5      A.    There was conversations, but I don't know
6  with "a lot."  They would talk about their movement
7  or their observations, but a lot is relative to the
8  chaotic scene.
9      Q.    Right.  Okay.
10         At some point were you aware that Sergeant
11 McAlpine was on scene?  Am I saying that right?
12     A.    McAlpine.
13     Q.    McAlpine?
14     A.    Yes.
15     Q.    About how long after you had posted at X2
16 was Sergeant McAlpine on scene?
17     A.    I have no idea.
18     Q.    Was it after you arrived there?
19     A.    I couldn't tell you if he was -- it was
20 all close in proximity.
21     Q.    Okay.  Did a lieutenant arrive at some
22 point?
23     A.    I am sure many of them did.
24     Q.    Do you remember a lieutenant arriving on
25 board and hearing them on the radio?
```

58

```
1      A.    I don't recall hearing them on the air,
2  but I believe Lieutenant Reynolds was one of the
3  lieutenants that was on the scene.
4      Q.    Okay.  So you heard Mr. Babb yelling,
5  "Fuck you, I didn't do anything wrong, go away."
6  Did you hear any officers yelling at him or
7  communicating with him?
8      A.    I heard the BearCat talking to him.
9      Q.    How did you know it was the BearCat?
10     A.    It is a very obvious PA sound voice.
11     Q.    Were there other devices there that you
12 could hear people talking on to Mr. Babb?
13     A.    No.
14     Q.    Just the -- just the BearCat?
15     A.    Just the PA, yes.
16     Q.    Do you recognize the voice of the officer
17 using the PA on the BearCat?
18     A.    I don't recall now.
19     Q.    Do you remember what was said over the
20 BearCat PA?
21     A.    I don't recall now, no.
22     Q.    Could you hear on the radio other officers
23 saying anything about what they observed Mr. Babb
24 doing or saying?
25     A.    Not saying.  I recall -- I want to say I
```

59

```
1  recall them seeing him open the door and then close
2  it maybe at one point and then yelling at them, but
3  not offhand that I can make any quotes or anything.
4      Q.    Okay.  Were you ever asking on the radio,
5  "What is going on?  Let us know."  I mean, you are
6  in the back.
7      A.    Correct.
8      Q.    So how are you finding out what you need
9  to know, whether you need to move up or go around or
10 what you need to do?
11     A.    I am not moving anywhere until I am told
12 to do so or I have information that he is fleeing
13 out the back coming my way or anything.  I am just
14 letting them do their thing, and I just keep an eye
15 on my area and that is it.
16     Q.    Did anyone give you a physical description
17 of Mr. Babb?
18     A.    Not that I recall, no.
19     Q.    So you -- if someone had come back where
20 you were, how would you know it was Mr. Babb?
21     A.    I believe the only information that we had
22 of people in the house was Mr. Babb and possibly his
23 roommate.
24     Q.    Was there a point in time in this incident
25 that the roommate, Mr. Antonini, was -- left the
```

60

```
1  house?
2      A.    Yes.
3      Q.    About how far into your position here was
4  Mr. Antonini removed from the house or left the
5  house?
6      A.    I couldn't tell you exactly.
7      Q.    Had you been at X2 when Mr. Antonini left?
8      A.    I believe so, yes.
9      Q.    How did you learn that Mr. Antonini left
10 the house?
11     A.    I would have heard it over the radio.
12     Q.    There is information that Mr. Antonini
13 spoke with some of the officers in front of the Babb
14 home.  Were you given any information about what
15 Mr. Antonini was telling them?
16     A.    They would have aired that over the radio
17 as far as if he had any insight into Mr. Babb's
18 condition, or if there was anybody else in the house
19 and things of that sort, they would have aired that
20 through their interviews.
21     Q.    As we know now, there apparently were
22 conversations and Mr. Antonini told officers -- I
23 believe Sergeant Vinje, maybe Officer Pieske, and
24 Grose and maybe Officer Stutesman -- that Mr. Babb
25 had a lot of weapons and that he was very agitated
```

Exhibit 11
Page 16 of 21

David Clark

---

**61**

1  and that Mr. Antonini had never seen him this bad.
2  Do you remember receiving any of that type of
3  information over the radio?
4      A.    Not specifically over the radio.  I
5  imagine it would have been aired, but between
6  preparing for today and my recollection of what was
7  said over the radio that day, I don't know when
8  exactly that information came out.
9      Q.    But sitting here today, you do know that
10  some of that information was given to you.  You just
11  don't know when?
12     A.    Yes.
13     Q.    Okay.  Did you -- were you privy to any
14  radio traffic where officers were discussing whether
15  to retreat?
16     A.    I don't recall that at all.
17     Q.    Were you privy to any communications
18  whether anyone was prepared to go into the house and
19  forcibly remove Mr. Babb?
20     A.    I don't recall them mentioning that.
21     Q.    What was the plan?  When you are at X2,
22  did anyone tell you, well, here is what we are going
23  to do?  We are going to try certain things and then
24  we are going to go to this stage?  What was the plan
25  as far as you know?

---

**62**

1      A.    That is something that is not always
2  discussed on the radio.  That is something that they
3  are conversing about in the front, so I am just
4  waiting for them to air anything that would be
5  relevant to me in my role of any plan.
6      Q.    So have you been involved in any other
7  kinds of situations where there was a barricaded
8  individual?
9      A.    Yes.
10     Q.    How many times have you been involved in
11  that kind of situation?
12     A.    I would say several.
13     Q.    Okay.  And is there usually a strategic
14  plan developed prior to taking any big action?
15     A.    There is always steps that are taken, yes.
16     Q.    Could you -- in your experience in those
17  other barricaded individual situations, what are the
18  steps that are normally gone through?
19     A.    It is transforming as time goes on.
20     Q.    I get that part.
21     A.    Usually if a person is only a threat to
22  themself and not to anybody outside of the house,
23  and they are home alone, then we do not force an
24  issue.  We -- they are only a danger to themself,
25  and we try to keep verbal communication with them

---

**63**

1  but not force an issue.
2          When there is a case where there is
3  neighbors or outside people, safety is an issue,
4  then usually it has been my experience that we will
5  stay on scene and try to act as the first line of
6  protection for all of the local area residents.
7      Q.    So I understand that experience and
8  judgment and training go into making a lot of those
9  decisions on scene.  When you say that when someone
10  is only a threat to themselves, does -- what are the
11  hallmarks of that situation?
12     A.    If I can use an example --
13     Q.    Sure.
14     A.    We go into a house.  I am contacting you,
15  who has a knife and locked himself in the bathroom.
16  There is nobody else in the house.  You do not want
17  to answer the door.  You don't want anything to do
18  with us.
19          In that case, you are only a threat to
20  yourself.  We are not going to go and force an issue
21  of going into that house to try to save you if that
22  means putting us at risk and forcing the escalation
23  of the situation.
24     Q.    Okay.
25     A.    We will just either walk away, try to make

---

**64**

1  phone contact until another person who does not have
2  a choice in the matter is at risk.
3      Q.    Does the presence of weapons in such a
4  situation change your evaluation of the risk?
5      A.    Yes.
6          MR. MATTHEWS:  Objection.  Vague as to
7  weapons.  He just described a weapon, which was a
8  knife.
9  BY MS. BURROWS:
10     Q.    Guns.
11     A.    Yes.
12     Q.    So if someone is barricaded in a house and
13  they have guns, do you approach that situation
14  differently than someone in the example that you
15  gave me with the knife?
16     A.    Yes.
17     Q.    And how do you approach that situation?
18     A.    We would have a larger setback.
19     Q.    What do you mean by setback?
20     A.    Instead of standing at the front door and
21  knocking, we would try to call inside and try to
22  make contact from a further distance.
23     Q.    So in a situation with a suspect with a
24  gun who is barricaded, is part of the plan to remove
25  the neighbors who are around and in immediate

---

David Clark

65

1   danger?
2       A.    Or at least shelter in place.
3       Q.    What does that mean, shelter in place?
4       A.    Have them go inside their house and stay
5   inside their house.
6       Q.    Okay.  And what was your understanding of
7   how the Eugene Police Department, the folks on the
8   ground on this day, how did they view this
9   situation?
10      A.    My understanding is that if it was just
11  him with a gun, that is just him with a gun.  Once
12  there was a shot fired, that changes, because it
13  shows an actual intent to use a weapon of some sort.
14  And so it changes it from just you inside your house
15  suicidal with a gun to you have already shot once.
16  We don't know where that shot went, and if that
17  affects, you know, your state of wanting to harm
18  yourself or possibly others by actually firing the
19  gun.  So we have a duty to protect the area around.
20      Q.    Okay.  Now, I know that you told me
21  earlier that some of your initial information was
22  that Mr. Babb had fired a shot.
23      A.    Yes.
24      Q.    Do you know when that shot occurred?
25      A.    No.  Prior to our arrival.

66

1       Q.    Was it that day or days preceding this
2   incident?
3       A.    My understanding was that day.
4       Q.    And do you know where you got that
5   information from?
6       A.    That was aired over the radio.
7       Q.    Okay.  And that is all you know is that it
8   came over the radio?
9       A.    Yes.
10      Q.    Do you know if it was accurate?
11      A.    Not without walking in the house, no.
12      Q.    Okay.  So during the time that the police
13  department is at Mr. Babb's home, did he ever once
14  fire anything -- any weapons towards any officer or
15  civilian?
16      A.    Not that I heard.
17      Q.    Now, during the time of this incident, I
18  have read that someone from the Eugene Police
19  Department with expertise in hostage negotiation and
20  crisis management showed up.  Do you know who that
21  person --
22      A.    I believe that was Officer Grose.
23      Q.    And did you hear Officer Grose communicate
24  with Mr. Babb during the time that you were at the
25  scene?

67

1       A.    I don't recall if it was by phone or he
2   was the one on the PA.
3       Q.    Okay.  Do you know what kind of
4   communication Officer Grose had with Mr. Babb, if
5   any?
6       A.    Not -- just I would assume the normal
7   crisis negotiation verbiage of we don't mean you any
8   harm, please come out unarmed, those sort of things,
9   but I can't quote right now, no.
10      Q.    Did you hear any of that kind of language?
11      A.    That kind of language, yes.
12      Q.    How did you -- where was that?
13      A.    Through the PA.
14      Q.    Okay.  Do you know what Mr. Babb's
15  response was to?
16      A.    I believe it was a lot of the -- that we
17  were hearing him just yelling of, "Go away.  I
18  didn't do anything wrong.  Fuck you."  A lot of
19  swears.
20      Q.    Okay.  Now, at some point Mr. Babb was
21  shot.  Do you recall hearing Officer Stutesman say
22  anything just prior to the shot?
23      A.    Not that I recall, no.
24      Q.    I am just about done with you.  Hang on a
25  second.

68

1             After the shot is fired, did you receive
2   any -- any communications from anyone?
3       A.    Me personally?
4       Q.    Yeah.
5       A.    No.  No one called out to me except for
6   the roll call that we did.
7       Q.    All right.  Let's talk about that.  That
8   is kind of where I was going, but I was thinking
9   about something else.
10            Did you know who fired the shot?
11      A.    Not initially, no.
12      Q.    When you said a roll call was called, can
13  you tell me what happened after the shot is fired,
14  in the next few minutes after that?
15      A.    It was quiet, and then I don't remember if
16  it was my confusion or confusion on the radio as far
17  as what the shot -- who fired the shot, but then I
18  believe Sergeant McAlpine said let's do a roll call
19  to find out -- make sure that everybody is
20  responding back.  And so that is what everyone --
21  they started calling out -- everyone started calling
22  out their designated --
23      Q.    Did this position at X2 have a position
24  number?
25      A.    Position number?  No.

Exhibit 11
Page 18 of 21

David Clark

---

69

1    Q.    Sometimes in a situation different
2  officers will be assigned to different locations and
3  they will be given a position number.
4    A.    No.
5    Q.    Who knew you were here besides yourself
6  and Officer Warden?
7    A.    Dispatch.
8    Q.    Did you assume that Officer McAlpine knew
9  where you were, Sergeant --
10    A.    Yes.
11    Q.    Okay.  Now, when you say a roll call, was
12  that just -- I am not exactly sure how that worked.
13  Can you explain to me?
14    A.    Usually they will say, "We will perform a
15  roll call."  Dispatch will have a list of all of the
16  officers on scene.  They will call out a number.
17  3 Edward 59, that is me.  I will say "Code 4."
18    Q.    Okay.  Code 4 means?
19    A.    It means I am okay.
20    Q.    Okay.  How many officers then called in
21  Code 4?
22    A.    I don't recall.
23    Q.    How long did it take to call roll call?
24    A.    Probably a couple minutes.
25    Q.    And at some point after roll call, did you

---

70

1  learn who fired the shot and what had happened?
2    A.    Yes.  I believe I heard Officer Stutesman
3  over the radio say, "He had a rifle" or something.
4  I don't remember what the quote was.
5    Q.    So you learned it was -- Stutesman had
6  shot Mr. Babb?
7    A.    Yes.
8    Q.    What -- after that shot, what did you do?
9    A.    I stayed there and then I heard them make
10  a plan to go up and make contact with Mr. Babb and
11  clear the residence.
12    Q.    When you say they were going to make a
13  plan, who was --
14    A.    Whoever was on the front of the house.
15    Q.    Could you hear what was going on?
16    A.    No.
17    Q.    Did you hear the BearCat move?
18    A.    No.
19    Q.    Hear any crashing, banging?
20    A.    No.
21    Q.    How long did it take from the time that
22  they said they were going to make their plan until
23  you left your position at X2?
24    A.    I don't remember a period of time.
25    Q.    Huh?

---

71

1    A.    I don't remember how long that took or
2  would have taken.
3    Q.    What did you do after you left X2?
4    A.    I helped Officer Warden over the fence,
5  and then I drove around to the front of the
6  residence and was asked to sit in my vehicle.
7          Should I just do a No. 3?
8    Q.    Do an X3.  Yes.
9    A.    Approximately up here.  I don't remember
10  exactly where it was.
11    Q.    Okay.
12    A.    And I stayed there on perimeter while the
13  special teams and IDFIT and people came and arrived
14  and supervisors, and then once that was calmer, I
15  moved down to approximately No. 4, where some of the
16  family members were.
17    Q.    Mr. Babb's family members?
18    A.    Yes.  His ex-wife, I believe, was there.
19    Q.    Did you contact any of those family
20  members?
21    A.    Yes.  I was asked to make contact with
22  them.  I don't remember exactly what I was asked to
23  do for them, but I made contact with them.  And at
24  some point they said that they were going to go and
25  let his son know that he had died, and I offered --

---

72

1  I asked them if it would help at all if an officer
2  also went with them, not for safety purposes but
3  just a kind of showing of us also.  And she said she
4  thought it might, and so I went with her to her
5  house.
6    Q.    And did you speak to Connor Babb?
7    A.    I did not speak to him that I recall, no.
8  I was just there as -- if he approached me, I was
9  going to talk to him, but I just kind of wanted to
10  be there to kind of show support for him.
11    Q.    How did he take the news of his father's
12  death?
13    A.    From what I recall, he got very upset and
14  went to his room and closed the door.
15    Q.    Did he start crying?
16    A.    From what I recall.  I remember the mom
17  going and talking to him inside the room, but
18  nothing more than that.
19    Q.    How long did you stay at the house?
20    A.    Probably 15 minutes.
21    Q.    Did you write any kind of report on
22  your --
23    A.    No.
24    Q.    -- on that?  Okay.
25          How long after the incident were you

---

Exhibit 11
Page 19 of 21

David Clark

73

```
1   interviewed by officers?
2       A.    I would have to look at the time stamp
3   of -- I don't know which day Detective Thompson
4   interviewed me.
5       Q.    Okay.
6       A.    There is a time stamp at the top that says
7   April 6, but I am not sure if that is the day we
8   spoke or not.
9       Q.    Okay.  Was it close in time to the
10  incident?
11      A.    I believe so.
12      Q.    Have you spoken to Officer Warden --
13           MR. MATTHEWS:  Michelle, you have
14  Exhibit 3?
15           MS. BURROWS:  Yes.
16           MR. MATTHEWS:  Where the narrative
17  starts, it says on March 30th, 2015, at
18  approximately 2130.
19  BY MS. BURROWS:
20      Q.    So does that jive with your memory,
21  about --
22      A.    Yes.
23      Q.    -- a few hours after the incident?
24      A.    Yes.
25      Q.    All right.  It was at the Eugene Police
```

74

```
1   Employees Association business office?
2       A.    Correct.
3       Q.    And you had a representative there?
4       A.    Yes.
5       Q.    Did you ask to have a representative?
6       A.    No.
7       Q.    They just showed up?
8       A.    They always show up.
9       Q.    Okay.  Did they take your picture or
10  anything?
11      A.    Not my picture, no.
12      Q.    Okay.  So since the incident, have you
13  spoken with any of the officers who were at the
14  scene about the incident?
15      A.    No.  Well, not -- you mean specifics?
16  Not, you know, a major debrief or anything of that
17  sort.  Of course we talk about it.
18      Q.    Were you -- other than the interview that
19  is documented on Exhibit 3, were you interviewed as
20  part of the use of force review?
21      A.    No.  I believe it was just my interview
22  with Detective Thompson.
23      Q.    All right.  Have you ever been personally
24  involved in any use of force, deadly force?
25      A.    No.
```

75

```
1       Q.    I think I am just about done with you.
2             This incident made the newspapers, made
3   the television news, very high publicity at the
4   time.  Were you ever approached by any neighbors or
5   citizens to ask about this incident?
6       A.    They always talk about it, but I don't get
7   involved in it.  I just say it was a very, very sad
8   event and just leave it at that.  My opinion steps
9   aside in situations like this.
10      Q.    Okay.  So while you were sitting out in
11  the X3 and 4 positions, were -- was there a crime
12  scene perimeter created at the Babb house?
13      A.    Yes.
14      Q.    Did you ever go inside that crime scene
15  perimeter?
16      A.    No.
17      Q.    So you never signed into the crime scene?
18      A.    That's correct.
19      Q.    Okay.  And if you had gone inside the
20  perimeter, you would have had to be logged in?
21      A.    Notify the person keeping the journal.
22      Q.    Did you take any evidence, secure any
23  evidence?
24      A.    Not that I recall, no --
25      Q.    Okay.
```

76

```
1       A.    -- besides my hard drive.
2       Q.    From your --
3       A.    ICV.
4       Q.    Okay.  And normally, if there is a crime
5   scene that is investigated, there is a forensic team
6   that collects evidence.  Is that correct?
7       A.    That's correct.
8       Q.    So this is going to sound like an odd
9   couple questions, but at some point the City and the
10  plaintiff, my clients, entered into a settlement
11  mediation discussion and we provided a document to
12  them.  Have you been shown a copy of the document we
13  gave?
14      A.    No.
15      Q.    Okay.  I have no more questions, Officer
16  Clark.  Thank you so much for your time.
17           MR. MATTHEWS:  I have no questions.
18  We will read and sign.
19           (The deposition was concluded at
20            3:24 p.m.)
21
22
23
24
25
```

77

1    State of Oregon    )
                        )    ss.
2    County of Lane    )

3       I, Christine Oljace, CSR-RPR, a Certified

4    Shorthand Reporter for the State of Oregon, certify

5    that the witness was sworn and the transcript is a

6    true record of the testimony given by the witness;

7    that at said time and place I reported by stenotype

8    all testimony and other oral proceedings had in the

9    foregoing matter; that the foregoing transcript

10   consisting of 76 pages contains a full, true and

11   correct transcript of said proceedings reported by

12   me to the best of my ability on said date.

13      If any of the parties or the witness requested

14   review of the transcript at the time of the

15   proceedings, correction pages are attached.

16      IN WITNESS WHEREOF, I have set my hand this 7th

17   day of November 2017, in the City of Eugene, County

18   of Lane, State of Oregon.

19

20

21   _Christine L Oljace_

22   Christine Oljace, CSR-RPR

23   CSR No. 05-0397

24   Expiration Date:  September 30, 2018

25

---

1    David Clark

2    McGowan, et al., vs. Stutesman, et al.

3    October 3, 2017

4

5    PAGE/LINE....................................CHANGE

6    |_____

7    |_____

8    |_____

9    |_____

10   |_____

11   |_____

12   |_____

13   |_____

14   |_____

15   |_____

16   |_____

17

18      I declare under penalty of perjury that the 76

19   pages referenced above are true and correct except

20   for such corrections as noted.  Executed this ......

21   day of ................. 2017.

22       |.............................|

23         David Clark

24

25

Exhibit 11
Page 21 of 21