*Judson Warden*

*McGowan v Stutesman, et al.*

*October 3rd, 2017*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 12
Page 1 of 18

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

RONDA MCGOWAN, Personal         )
Representative for Estate of    )
Brian Babb, LEE BABB, CONNOR    )
BABB, by and through Guardian   )
ad litem, STEPHANIE WOODCOCK,   )
KAYLEE BABB,                    )
                                )
            Plaintiffs,         )
        v.                      ) No. 6:17-cv-00424-TC
                                )
WILL STUTESMAN, OFFICER GROSE,  )
OFFICER PIESKE, Sgt. MCALPINE,  )
CITY OF EUGENE, a municipal     )
subdivision of the State of     )
Oregon, JANE DOE CALL TAKER,    )
John and Jane Does 1-10,        )
                                )
            Defendants.         )

DEPOSITION OF JUDSON WARDEN

October 3, 2017

Tuesday

3:31 P.M.

THE DEPOSITION OF JUDSON WARDEN was taken at Harrang Long Gary Rudnick, 360 East 10th Avenue, Suite 300, Eugene, Oregon, before Christine Oljace, CSR, RPR, CRC, Certified Shorthand Reporter in and for the State of Oregon.

**Page 2**

APPEARANCES

For the Plaintiffs:

  MS. MICHELLE R. BURROWS
  420 SW Washington, Suite 300
  Portland, Oregon 97204
  503/241-1955
  michelle.r.burrows@gmail.com

For the Defendants:

  HARRANG LONG GARY RUDNICK, PC
  360 East 10th Avenue, Suite 300
  Eugene, Oregon 97401
  541/485-0220
  BY: MR. JEFFERY MATTHEWS
  jeff.matthews@harrang.com

Also Present:

  MS. JAMIE IBOA

  WILL STUTESMAN

  MATTHEW GROSE

Reported by:

  CHRISTINE OLJACE, CSR-RPR

  CC REPORTING & VIDEOCONFERENCING

  EUGENE     541/485-0111

**Page 3**

INDEX

WITNESS.........................................PAGE

JUDSON WARDEN

    BY MS. BURROWS                                 4

EXHIBITS: NONE

**Page 4**

JUDSON WARDEN, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. BURROWS:

  Q.   Officer Warden, my name is Michelle Burrows. I am an attorney for the Estate of Brian Babb. This is the time set for your deposition in a federal civil rights lawsuit filed against Officer Stutesman and the City of Eugene, and you are here to talk to me about your participation in an incident on March 30th of 2015.
       Have you ever been deposed before?
  A.   Yes, ma'am.
  Q.   How many times have you been deposed?
  A.   I think two times.
  Q.   Two times. Could you tell me why you were deposed? What kind of case was it?
  A.   Civil rights violation for Ian Van Orman, and I think there was one more, but I don't recall which one that was.
  Q.   Have we ever faced each other in a deposition?

Exhibit 12
Page 2 of 18

Page 5

1     A.    No, ma'am. Not that I recall.
2     Q.    Okay. How long ago was the last
3 deposition?
4     A.    Maybe ten years ago.
5     Q.    Okay. The rules really haven't changed in
6 ten years. So this is your time to give me some
7 testimony. I am not allowed to just give you a call
8 and take you out for a cup of coffee, so we have to
9 do it this more formal way.
10         Everything we say to each other is being
11 taken down by this lady, the court reporter, and you
12 will have the opportunity to read and review the
13 transcript that she creates.
14         So I know that you have probably testified
15 in court before, have you not?
16     A.    Yes, ma'am.
17     Q.    So the rules are kind of the same. You
18 are under oath. Everything you say is going to be
19 taken down. I can use it as actual evidence in the
20 future or I can use it to impeach or just show
21 differences of testimony. Do you understand that?
22     A.    Yes, ma'am.
23     Q.    Okay. If you don't understand my
24 questions, I ask you to please ask me to clarify.
25 It is more important to me that we understand each

Page 6

1 other than anything else here today, because I don't
2 get to come back. This is all I get with you is
3 today.
4         On the other side, if you don't -- if I
5 don't understand your answers, I am probably going
6 to ask you to explain it to me or clarify it, and it
7 is not because I am trying to trick you. I just
8 don't really understand what you are telling me,
9 because I have never done your job. I don't
10 understand really what you do from the level that
11 you do it, so sometimes I need a little extra help
12 in understanding the situation.
13         Have you reviewed any records in
14 preparation for today's deposition?
15     A.    Yes, ma'am.
16     Q.    What have you reviewed?
17     A.    I reviewed the report written by Detective
18 Mel Thompson regarding my statement to him.
19     Q.    Anything else?
20     A.    No, ma'am.
21     Q.    Okay. We have a few exhibits that we
22 started with Officer Clark, and I may use some of
23 the same with you. I do have some additional to
24 show you today. If you have not seen an exhibit I
25 give you, you have the right to read it and become

Page 7

1 familiar with it before I ask you questions, so just
2 let me know if you need a few minutes to read
3 anything I give you.
4     A.    Okay.
5     Q.    There's usually another advice I give, but
6 I just completely forgot.
7         So if you don't mind, I would like to go
8 through your background just a little bit.
9     A.    Okay.
10     Q.    How long have you been a police officer?
11     A.    21 years.
12     Q.    Where did you start in law enforcement?
13     A.    As a reserve deputy with Lane County
14 Sheriff's Office.
15     Q.    What year was that?
16     A.    1996.
17     Q.    How long were you a reserve officer?
18     A.    Two years.
19     Q.    Then what you did do?
20     A.    Actually it was '94 to '96, and then I got
21 hired with Eugene.
22     Q.    And did you go to the academy at that
23 point?
24     A.    Yes, ma'am.
25     Q.    Patrol?

Page 8

1     A.    Yes.
2     Q.    And are you a certified police officer
3 right now?
4     A.    Yes, ma'am.
5     Q.    What levels of certification do you hold?
6     A.    I have my advanced certificate.
7     Q.    So we have a fan going on in here, and she
8 has explained to me that it affects her ability
9 sometimes to hear the witnesses speak, so I am going
10 to just let her jog you if she can't hear your
11 answer, so that is why we are having a little
12 trouble hearing you.
13         MR. MATTHEWS: Do speak up a bit.
14         THE WITNESS: Okay.
15 BY MS. BURROWS:
16     Q.    Okay. So I see that you have "Veteran" on
17 your name tag and "SWAT" above it.
18     A.    Yes, ma'am.
19     Q.    Are you presently a member of the SWAT
20 team?
21     A.    Yes, ma'am.
22     Q.    How long have you been a member of the
23 SWAT team?
24     A.    18 years.
25     Q.    What position do you hold on the SWAT team

Page 9

```
 1  now?
 2       A.    Right now?
 3       Q.    Yes.
 4       A.    Just a member.  We don't have it like
 5  specific -- I am just an operator.  Operator on the
 6  team.
 7       Q.    What does an operator on your SWAT team
 8  mean?
 9       A.    I do everything.
10       Q.    Everything?  Because -- I asked because I
11  have deposed a lot of SWAT officers over the last 31
12  years, and they have explained that they are either
13  a sniper or they are a specialist in deployment of
14  gas, things like that.  Do you do everything?
15       A.    Pretty much.
16       Q.    So are you certified on gas?
17       A.    Yes, ma'am.
18       Q.    And are you a sniper, qualified?
19       A.    No, ma'am.  I have been.
20       Q.    Okay.  Are you ever on an entry team?
21       A.    Yes, ma'am.
22       Q.    So it is just whatever they need, you can
23  do?
24       A.    Yes, ma'am.
25       Q.    All righty.  How long -- and you have done
```

Page 10

```
 1  that for 18 years?
 2       A.    Yes, ma'am.
 3       Q.    And are you still on the team?
 4       A.    Yes, ma'am.
 5       Q.    Okay.  And the veteran, does that signify
 6  you have been in the military?
 7       A.    Yes, ma'am.
 8       Q.    And when were you in the military?
 9       A.    From 1991 to 1998 in the Oregon National
10  Guard.
11       Q.    Were you ever deployed overseas?
12       A.    No, ma'am.
13       Q.    Okay.
14       A.    Only for training.
15       Q.    Okay.  Are you still in any position in
16  the military?
17       A.    No, ma'am.
18       Q.    Okay.  Other than the SWAT team, have you
19  served on any other specialty teams within the
20  Eugene Police Department?
21       A.    Yes, ma'am.
22       Q.    What have you served on?
23       A.    I am a firearms instructor, I am a field
24  training officer, I am a bike instructor, and that
25  is it.
```

Page 11

```
 1       Q.    Okay.  How long have you been an FTO?
 2       A.    Probably for about 15 years.
 3       Q.    Okay.  Are you presently working as an
 4  FTO?
 5       A.    Yes, ma'am.
 6       Q.    Do you have a trainee working with you
 7  now?
 8       A.    Yes, ma'am.
 9       Q.    Okay.  Are we taking you away from any
10  specific thing you are supposed to be doing today?
11       A.    I am supposed to be shadowing him today.
12       Q.    Is he -- which phase of FTEP is he in?
13       A.    Fourth phase.
14       Q.    He will be fine.
15       A.    Yes, ma'am.
16       Q.    Okay.  So I want to talk to you about the
17  incident on March 30th of 2015.  Do you remember
18  that day?
19       A.    Yes, ma'am.
20       Q.    Do you remember what you did that day?
21       A.    Yes, ma'am.
22       Q.    Let's ask -- let me ask you -- let's start
23  with the beginning.  What shift were you working?
24       A.    Third watch.  11 a.m. to 9 p.m.
25       Q.    Were you also on beat 5?
```

Page 12

```
 1       A.    I was a wild card.
 2       Q.    What does a wild card mean?
 3       A.    It means I go wherever they need me.
 4       Q.    And you were working patrol?
 5       A.    Yes, ma'am.
 6       Q.    Do you just drive all over the city?
 7       A.    Mainly just the west side of town.
 8       Q.    Okay.  How did you hear about the incident
 9  at the Devos Street address?
10       A.    Via the radio.
11       Q.    What were you doing when you got that
12  information?
13       A.    I was following up on a different
14  investigation at headquarters.
15       Q.    Okay.  Now, here we have Exhibit 1.  Do
16  you recognize Exhibit 1?
17       A.    I have never seen it, but it looks like
18  probably the Devos address.
19       Q.    Okay.  And Exhibit 2, do you recognize
20  Exhibit 2?
21       A.    Exhibit 2 looks like an aerial photo of
22  that --
23       Q.    And --
24       A.    -- reversed from Exhibit 1.
25       Q.    Okay.  Exhibit 5 is the summary done by
```

13

1   the investigators of the various video that was
2   cap- -- that was captured on March 30th of the
3   incident we are talking about. Have you looked at
4   the video from your vehicle from that day?
5       A.   No, ma'am.
6       Q.   Ever?
7       A.   No.
8       Q.   Okay. Never mind about Exhibit 5.
9            Exhibit 4 is a summary of an interview
10  conducted of you by Officer Thompson, and could you
11  take a look at Exhibit 4 and see if this is the
12  document you reviewed in preparation for today's
13  deposition?
14      A.   Yes, ma'am.
15      Q.   And is everything in that Exhibit 4
16  accurate and a fair rendition of your statements to
17  the officer?
18      A.   Yes, ma'am.
19      Q.   And as I understand it, your statement was
20  not recorded by Officer Thompson. Is that correct?
21      A.   Yes, ma'am.
22      Q.   Do you know why your statement was not
23  recorded?
24      A.   No, ma'am.
25      Q.   Did you have a discussion with Officer

14

1   Thompson about whether he felt he needed to record
2   your statement?
3       A.   No, ma'am.
4       Q.   Okay. So let's -- tell me where you were
5   when you first received information about the
6   situation at the Devos Street -- is it Devos or
7   Devos?
8       A.   Devos.
9       Q.   Devos. I had one in 100 chances there.
10           MR. MATTHEWS: And you missed it.
11  Dang.
12  BY MS. BURROWS:
13      Q.   So this Exhibit 2, there is some markings
14  on it from the previous witness, Officer Clark. And
15  I may have you write on this one as well and do a
16  clean one for the next witness, but can you orient
17  yourself to the layout of this picture and see if
18  you recognize where you eventually were that day at
19  this address?
20      A.   Yes, ma'am.
21      Q.   So tell me, when you first received
22  information on dispatch about this situation, what
23  initial information did you receive?
24      A.   Overhearing the radio traffic, I heard
25  that there was shots fired with an intoxicated

15

1   person at the Devos address.
2       Q.   Do you remember anything else about the
3   situation at the Devos?
4       A.   Shots fired and that there was still a
5   roommate inside the house.
6       Q.   Do you remember anything about the -- any
7   information about the occupant of the Devos Street
8   address?
9       A.   The occupant as in --
10      Q.   Mr. Babb.
11      A.   I -- vaguely that he was a veteran, that
12  he had been on the phone with a counselor.
13      Q.   The shot fired, did you learn when that
14  shot had been fired?
15      A.   No, ma'am.
16      Q.   Was it your assumption that it had been
17  recently fired?
18      A.   Yes, ma'am.
19      Q.   Did you learn anything about Mr. Babb
20  being suicidal?
21      A.   I think there was some mention of that.
22  He had been talking to his counselor.
23      Q.   Okay. During the entirety of March 30th,
24  while you are part of this incident at the Babb
25  residence, do you remember hearing anything from the

16

1   counselor on dispatch? Any conversations? Any
2   statements? Anything from the counselor?
3       A.   That he had guns. It is like thousands of
4   calls ago for me so --
5       Q.   Okay.
6       A.   He had some guns. He was a veteran that
7   had been suffering from PTSD.
8       Q.   Did you learn that he had also been
9   injured and had neurologic problems?
10      A.   I don't recall that.
11      Q.   Okay. There is some information that the
12  counselor was on the phone with dispatch during a
13  part of this incident on March 30th. Do you
14  remember hearing on the radio the counselor actually
15  talking or speaking?
16      A.   I didn't -- I never heard the counselor --
17      Q.   Okay.
18      A.   -- speaking.
19      Q.   So the information that you are getting
20  about Mr. Babb and the situation is coming from
21  dispatch?
22      A.   Yes, ma'am.
23      Q.   Did you get any information from fellow
24  officers of what was going on?
25      A.   No. Just the radio traffic that was going

17

1   on where he had been off and on with his counselor,
2   the dispatcher.
3        Q.   Okay.  So on this Exhibit 2, you will see
4   at the -- right there by the bottom, towards you,
5   those markings are from Officer Clark, so there is
6   an X1 which he has testified was the first position
7   he took when he got to the scene.  And then X2 is
8   the second position he got at the scene, so he moved
9   up from here to here, and then he drove around here.
10            MR. MATTHEWS:  And just for
11  clarification, we were talking about X2, and I
12  believe we can say that it was accurately X -- the X
13  with the DC next to it.
14            MS. BURROWS:  Okay.
15  BY MS. BURROWS:
16       Q.   Can you tell me where you first -- from
17  the first point in time you heard information on the
18  radio, where did you go?  I am talking about this
19  incident.
20       A.   I went to East Irwin.
21            MS. BURROWS:  Do we have a
22  different-colored pen anywhere, like a red one?
23            MR. MATTHEWS:  I don't.
24  BY MS. BURROWS:
25       Q.   I do.

18

1            So using a red pen, could you please put
2   on there an X with your initials the very original
3   point you parked your car where you stopped.
4        A.   Somewhere over here.
5        Q.   Put your initials by it, please.  Thank
6   you.
7            And was Officer Clark already present?
8        A.   Yes, ma'am.
9        Q.   Could you see his vehicle?
10       A.   Yes, ma'am.
11       Q.   And your call sign that day was 3E88?
12       A.   3 Edward 88.
13       Q.   Is that still your call sign?
14       A.   No, ma'am.
15       Q.   What is your call sign today?
16       A.   3 zebra 38.
17       Q.   3 zero 88?
18       A.   3 zebra 38.
19       Q.   But it was 3 Edward 88 on that day?
20       A.   Yes, ma'am.
21       Q.   Did you just decide to dispatch yourself
22  to that location?
23       A.   Yes, ma'am.
24       Q.   No one told you to go to that particular
25  place?

19

1        A.   No, ma'am.  Well --
2        Q.   Go ahead.
3        A.   -- no one told me to go to the address.
4   They sent me here specifically after I was en route.
5        Q.   Did you go somewhere else before you went
6   to the X position you have marked for me?
7        A.   No, ma'am.
8        Q.   Who told you to go to the X position?
9        A.   I believe it was Sergeant McAlpine.
10       Q.   Do you remember why he told you to go to
11  that X position?
12       A.   To take up a perimeter spot with Officer
13  Clark.
14       Q.   Okay.  Was Officer Clark still in his
15  vehicle when you arrived at your X position?
16       A.   I don't recall.
17       Q.   Okay.  Did you speak to Officer Clark when
18  you arrived?
19       A.   Yes.
20       Q.   What did you two decide you were going to
21  do?
22       A.   We were going to move up where we could
23  actually see the back of the residence and provide a
24  perimeter spot.
25       Q.   Did you contact any neighbors upon your

20

1   first arrival?
2        A.   I didn't.  I think Officer Clark had
3   talked to the folks here at this house right here.
4        Q.   And you are pointing to what I have had
5   him mark as neighbor house?
6        A.   Yes, ma'am.
7        Q.   Did you see any civilians around when you
8   first pulled in?
9        A.   Yes, ma'am.
10       Q.   Where were they located?
11       A.   I think they were in the front of the
12  residence here.
13       Q.   Did you make -- did you tell them to do
14  anything, direct them anywhere?
15       A.   I think Officer Clark had taken care of
16  that, so I don't recall that I did.
17       Q.   Okay.  What was your understanding of what
18  was going on in the Babb house?
19       A.   Basically a hostage situation, almost
20  sounded like.
21       Q.   Who was being held hostage?
22       A.   The roommate.
23       Q.   By whom?
24       A.   Mr. Babb.
25       Q.   How did you get that information?

21

1   A.   The roommate not free to go and shots
2   being fired in a house.
3   Q.   And who told you that the roommate was not
4   free to go?
5   A.   That was my understanding that it was
6   going to turn into this.  I wasn't necessarily told
7   that he wasn't free to go, but most people don't
8   stay in a house when shots are being fired.
9   Q.   And how did you get that particular body
10  of information about the roommate?
11  A.   Being in the house?
12  Q.   Yes.
13  A.   From the dispatcher.
14  Q.   And the fact that you thought he might be
15  a hostage, what information were you given?  Were
16  you told the roommate is a hostage?
17  A.   No.
18  Q.   Okay.
19  A.   I was told there is a roommate in this
20  house, and there is shots being fired.  And like I
21  said, most people don't stick around when shots are
22  being fired inside a house.
23  Q.   Do you remember receiving information when
24  the roommate left the house?
25  A.   Yes, ma'am.

22

1   Q.   Do you recognize the name Antonini as the
2   roommate's name?
3   A.   Yes, ma'am.
4   Q.   And at the time when you arrived at the X
5   position originally, you were informed that
6   Mr. Antonini was still in the house?
7   A.   Yes, ma'am.
8   Q.   Okay.  Officer Clark tells me that he drew
9   out his long rifle upon arrival.  Did you also take
10  out a rifle?
11  A.   Yes, ma'am.
12  Q.   Why did you both pull out your rifles?
13  A.   We were on a perimeter position further
14  away from the house, and we were able to deliver
15  more accurate fire should that need be the case than
16  with our handguns.
17  Q.   So your goal -- you might have to shoot
18  somebody, and you wanted to be accurate.  Is that
19  fair?
20  A.   Yes, ma'am.
21  Q.   Okay.  So from the X position, where did
22  you go?
23  A.   Up in this area here with Officer Clark.
24  Q.   Okay.  You made a red X at the DC
25  position.  So could you put a 2 under that red X?

23

1   Under the red X up here.
2   A.   Yes, ma'am.
3   Q.   So we will call that your X2 position.
4   A.   Okay.
5   Q.   What could you see from the X2 position?
6   A.   The lower portion of this house here.
7   Q.   The lower portion?
8   A.   The lower and upper portion, but the
9   glare -- there was glare on the windows, so it was
10  hard to see in some of the windows.
11  Q.   And I know -- I understand from Officer
12  Clark and the fact that I have been at this location
13  there is a fence along the entirety of the back of
14  the Babb lot.
15  A.   Yes, ma'am.
16  Q.   Is that correct?
17  A.   Yes.
18  Q.   Do you remember what the fence looked
19  like?
20  A.   No, ma'am.
21  Q.   How tall it was?
22  A.   Standard 6-foot fence, I do believe.
23  Q.   Okay.  At some point you did scale that
24  fence.  Is that correct?
25  A.   Yes, ma'am.

24

1   Q.   Do you remember how tall it was from
2   scaling it, then?
3   A.   No, ma'am.  I didn't measure it.
4   Q.   Okay.  Did you need help getting over the
5   fence or --
6   A.   Yes, ma'am.
7   Q.   Okay.  So from your X2 position, could you
8   see the bottom floor of the Babb house?
9   A.   I think part of the time.  If I was
10  standing, I could see it due to the angle, part of
11  the lower portion of the house, but not a clear
12  view.
13  Q.   All right.  Did you ever see Mr. Babb show
14  up in any of the windows at the back of the house?
15  A.   No, ma'am.
16  Q.   Did you ever hear him yelling out of the
17  house?
18  A.   Yes, ma'am.
19  Q.   What could you hear him yelling?
20  A.   I could hear him yelling to go away, that
21  he wasn't a criminal.
22  Q.   Had you personally ever run any kind of
23  calls for service at that address?
24  A.   No, ma'am.
25  Q.   Any criminal history on Mr. Babb?

Page 25

1  A.  (Shakes head.)
2  Q.  Is that a no?
3  A.  No, ma'am.
4  Q.  Do you know whether any other officer ran
5  a criminal history of Mr. Babb?
6  A.  No, ma'am.
7  Q.  Do you know whether any other officer did
8  a call for service at -- how many calls for service
9  had been made at that house?
10  A.  No, ma'am.
11  Q.  Did you know anything about Brian Babb
12  before you showed up other than what you told me?
13  A.  No, ma'am.  That he was veteran.  That was
14  it.
15  Q.  Did you know him?
16  A.  No, ma'am.
17  Q.  You never ran into him?
18  A.  I can't say a hundred percent yes or no.
19  Q.  Okay.
20  A.  I used to work for a relative of his.
21  Q.  Which relative did you used to work for?
22  A.  Bert Babb.
23  Q.  What do you know about the Babb family, if
24  anything?
25  A.  Nothing about that portion of the Babb

Page 26

1  family.
2  Q.  Anything at all about the Babb family?
3  A.  Not anybody directly associated with him.
4  I knew his -- I guess it was his uncle or a cousin,
5  Bert, but that was it.
6  Q.  Okay.  What did you do for Bert Babb?
7  A.  I worked as a store clerk for him when I
8  was in high school.
9  Q.  Okay.  So how long were you at the X2
10  position before the shot was fired?
11  A.  I couldn't tell you.
12  Q.  And from the X2 position and until the
13  shot was fired, what other information were you
14  learning over the radio about that situation?
15  A.  That the roommate had came out and that
16  Mr. Babb was being addressed with the loud hailer to
17  come out with his hands empty.
18  Q.  You could hear that being called over
19  the --
20  A.  Yes, ma'am.
21  Q.  All right.  And do you remember seeing the
22  BearCat show up?
23  A.  No, ma'am.
24  Q.  Did you know when it showed up?
25  A.  Before I did.

Page 27

1  Q.  So the BearCat was already there on scene
2  when you got to the X1 position?
3  A.  Yes, ma'am.
4  Q.  All right.  And how did you know that?
5  A.  Because I was going to get the BearCat to
6  bring it out there, but Officer Pieske had already
7  taken it out to the scene.
8  Q.  Did someone ask you to get the BearCat
9  originally?
10  A.  Yes, ma'am.  Sergeant McAlpine.
11  Q.  And were you still at the -- where were
12  you when McAlpine asked you to do that?
13  A.  I was probably somewhere between
14  headquarters and 2 and Lincoln, where we keep the
15  BearCat.
16  Q.  Did he call you on the radio?
17  A.  I called him on the phone.
18  Q.  On the phone.  Why did you do that?
19  A.  To see if they wanted that, because it is
20  an armored vehicle.
21  Q.  Why did you think they would need the
22  armored vehicle?
23  A.  Because shots had been fired.
24  Q.  Did you understand what the plan was for
25  the scene?

Page 28

1  A.  No, ma'am.  I didn't know what the plan
2  was.
3  Q.  Do you know whether they were going to
4  call a hostage negotiator or a crisis negotiator out
5  there?
6  A.  I am assuming that eventually that would
7  be the case.
8  Q.  What is the typical plan for a barricaded
9  individual with a gun?
10  A.  Depends.
11  Q.  Explain your answer, please.
12  A.  Depends on the circumstances, who the
13  person is, prior history, if they have shots fired.
14  I mean, there is so many other variables I can't
15  even give you a specific answer to that.
16  Q.  Okay.  So is it normal procedure within
17  EPD if you have a hostage situation that there is a
18  command structure that sets up a plan for everybody?
19  A.  Yes, ma'am.
20  Q.  And do you know why there is a plan set
21  up?
22  A.  For the safety of everybody.
23  Q.  So what was your understanding of what the
24  plan was when you were asked to bring the BearCat?
25  A.  Eventually that we were going to hail in

Page 29

1  the BearCat because it is armored.
2      Q.   Okay.  Were you going to be using the
3  BearCat for anything other than hailing the house?
4      A.   I have no idea.
5      Q.   Do you know whether there was a plan to
6  evacuate the neighbors?
7      A.   No, ma'am.  I don't know.
8      Q.   Okay.  So what was the overall goal of
9  this incident plan?  Get Mr. Babb out of the house?
10     A.   I don't know what the goal was.
11     Q.   Okay.
12     A.   Eventually that is generally the goal that
13  we try to achieve.
14     Q.   When you spoke to Sergeant McAlpine on the
15  phone --
16     A.   Yes, ma'am.
17     Q.   -- about the BearCat, what information did
18  he give you about the situation?
19     A.   More than what I have already said?  He
20  didn't elaborate on what his plan was with the
21  BearCat.  It was to be taken out there just in case
22  we needed it.
23     Q.   Why were you the one who was volunteering
24  to get the BearCat?
25     A.   Because I hadn't heard that it was being

Page 30

1  deployed, and other officers are out there already
2  that had access to that.
3      Q.   Okay.  So is there a limitation on who can
4  drive that BearCat?
5      A.   No.
6      Q.   Do you have to be certified or qualified
7  to drive and utilize the BearCat?
8      A.   No, ma'am.
9      Q.   You don't have to go through any training
10  to use the BearCat?
11     A.   There has been training given to patrol on
12  how they can come get it.
13     Q.   Okay.  And how do you -- how do you get
14  the BearCat out of the garage?
15     A.   Well, there is a lock, so you have to
16  unlock it and then gain access to the keys.
17     Q.   Where are the keys kept?
18     A.   Well, I know that there is a set kept in
19  the SWAT office, and there might be a lockbox where
20  people can get it if they are regular patrol, not
21  SWAT.
22     Q.   Okay.  So I have seen the BearCat.  It is
23  a big, expensive-looking piece of equipment.
24     A.   Yes, ma'am.
25     Q.   There is no limitation on which officer

Page 31

1  can drive that and access it?
2      A.   No.
3      Q.   Any uniformed officer can say "I want to
4  go get this for this incident"?
5      A.   Well, they can't just randomly choose to
6  go get it.  It usually goes through the chain of
7  command.
8      Q.   And besides the sergeant, does there need
9  to be higher authority to deploy the BearCat?
10     A.   I think usually they notify the
11  lieutenant, SWAT lieutenant that the BearCat is
12  going to be deployed.
13     Q.   Okay.  And when you spoke to -- back up.
14  Strike that question.
15          Was there a reason why you called Sergeant
16  McAlpine versus some other officer about the
17  BearCat?
18     A.   Because he was the sergeant going to the
19  scene or on the scene.
20     Q.   Okay.  And how did you know that?
21     A.   Via the radio.
22     Q.   All right.  And Officer Pieske had already
23  taken the BearCat to the scene?
24     A.   Correct.
25     Q.   Do you know whether Officer Pieske -- am I

Page 32

1  saying that right?
2      A.   Pieske.
3      Q.   Is Officer Pieske on the SWAT team?
4      A.   No, ma'am.
5      Q.   Do you know whether he has ever driven the
6  BearCat before?
7      A.   No, ma'am.
8      Q.   So I don't know a lot about vehicles.  Is
9  there anything special about the BearCat that
10  requires any kind of --
11     A.   No, ma'am.
12     Q.   So it is just like driving a big old
13  truck?
14     A.   Yes, ma'am.  Actually, it drives better
15  than our cars.
16     Q.   Okay.  Do you know how long before you
17  spoke to McAlpine about the BearCat Pieske had taken
18  it?
19     A.   No.
20     Q.   When you -- I'm looking at this report.
21  How did you learn that Pieske had taken it?  Was it
22  just gone when you got there?
23     A.   Yes, ma'am.
24     Q.   Okay.  Then did you call McAlpine back to
25  say Pieske had already taken the BearCat?

**Page 33**

1  A.   I am assuming there was some
2  communication.  I don't know -- recall if it was via
3  phone or radio --
4  Q.   Okay.
5  A.   -- that it was already gone, and I was
6  just headed out there in my car.
7  Q.   So then you left to go to the scene --
8  A.   Yes, ma'am.
9  Q.   -- from the department, the lot where the
10 BearCat is kept?
11 A.   Correct.
12 Q.   And you went -- and McAlpine told you to
13 go to the X1 position?
14 A.   Yes, ma'am.
15 Q.   To back up Officer Clark?
16 A.   Yes, ma'am.
17 Q.   Okay.  And besides all of -- I know I have
18 asked you some of these questions different ways,
19 and I know there is a little bit of repetition here,
20 but I am trying to get all this complicated
21 situation in my head.
22      Were there any other instructions that
23 McAlpine gave you about what you were supposed to do
24 back here at the X1 and 2 positions?
25 A.   No, ma'am.

**Page 34**

1  Q.   You were just supposed to cover the back
2  of the house?
3  A.   Yes, ma'am.
4  Q.   So was there any order or direction that,
5  if Mr. Babb left the house through the rear, that
6  you were to apprehend him?
7  A.   There was no order given.  That is,
8  obviously, the assumption.
9  Q.   Okay.  And were there any orders to shoot
10 him should he try to leave the house?
11 A.   No, ma'am.
12 Q.   Okay.  And if he had tried to leave the
13 house through the rear, Mr. Babb, what -- how -- do
14 you have any idea of what you had planned or what
15 you were going to do?
16      MR. MATTHEWS:  Objection.  Calls for
17 speculation.
18      Go ahead.
19 A.   That would be based on what he was doing.
20 BY MS. BURROWS:
21 Q.   Okay.  Let me back that question up just a
22 tad bit.  I am making some assumptions, and probably
23 I should not do that.
24      You and Clark are there at the X2
25 position.  Are you talking about what might happen

**Page 35**

1  and how you are going to respond to it?
2  A.   Yes, ma'am.
3  Q.   Okay.  So do you normally do that with
4  another officer on a call like this?
5  A.   Yes, ma'am.
6  Q.   And tell me about those conversations.
7  What did the two of you think might happen and what
8  your potential response would be to that?
9  A.   Well, one of the assumptions is he is just
10 going to run out the back of the house and try to
11 just get away.
12 Q.   Okay.  Anything else that you talked about
13 that he -- that Mr. Babb might do?
14 A.   Well, if he came out with the weapon or
15 firing, I mean, what we would do.
16 Q.   Sure.  You are just talking?
17 A.   Right.
18 Q.   You are getting prepared?
19 A.   Correct.
20 Q.   And in that preparation, in that
21 discussion with Officer Clark, were one of you going
22 to take the position of being the shooter and the
23 other was backup if that was needed?
24 A.   We didn't have a designated role.
25 Q.   Okay.  At the time -- and I spoke to

**Page 36**

1  Officer Clark.  He had a different uniform on today.
2  I mean, it is probably the same uniform, but he had
3  a vest on with all of his equipment.  You don't have
4  one on today.  Is there some reason?
5  A.   Yes.
6  Q.   What is that reason?
7  A.   I don't like the way they look.
8  Q.   Okay.  But you are wearing protective gear
9  underneath your uniform.  Correct?
10 A.   Yes, ma'am.
11 Q.   All right.  Do you have a camera?
12 A.   Yes, ma'am.
13 Q.   Where is your camera?
14 A.   It is on my belt.
15 Q.   All right.  Was there anything else about
16 that vest that you don't like besides the way it
17 looks?
18 A.   No.
19 Q.   Okay.  Is it easier to use the uniform
20 this way than with the vest?
21 A.   I don't know the answer to that.
22 Q.   Okay.  Are you given, then, the choice of
23 whether to use that vest or not?
24 A.   Yes, ma'am.
25 Q.   All right.  So you don't recall, sitting

Page 37

1  here today, how long you and Officer Clark were at
2  the X2 position?
3      A.   No, ma'am.
4      Q.   So during the time that you are there for
5  however long it is -- and I am sure it will show up
6  on dispatch.  I can figure that out.
7      A.   Yes, ma'am.
8      Q.   I just haven't been able to track that
9  yet.
10          Did you hear any other information coming
11 over the radio about what was going on at the front
12 of the house?
13     A.   Meaning --
14     Q.   Well, you knew the BearCat was there.
15 Right?
16     A.   Right.
17     Q.   Okay.  So do you know whether anyone was
18 deployed to take a position on a rooftop, a sniper
19 position?
20     A.   No, ma'am.  I didn't know where they were
21 being sent.  I knew eventually that there was people
22 around the front of the house.
23     Q.   But you don't know where they were
24 stationed?
25     A.   No, ma'am.  I think eventually I did hear

Page 38

1  that Officer Kidd was on a roof someplace, but I
2  didn't know where that was 100 percent.  A general
3  area where he was.
4      Q.   Okay.  Fair enough.
5           Again, getting back to these discussions
6  that you had with Officer Clark, would it be
7  important to you to know where other officers were
8  posted if you had to use force, deadly force?
9      A.   General knowledge of where they were.
10     Q.   Okay.  So sitting here today, do you have
11 general knowledge of where any of the other officers
12 were located while you were at the X2 position?
13     A.   Specifically?
14     Q.   Yes.
15     A.   No, ma'am.  I knew Officer Kidd was off to
16 this area here, I do believe.
17     Q.   Okay.
18     A.   And then I don't recall who was on this
19 side of the house.
20     Q.   And you are pointing to the -- your
21 left -- your right of the Babb home?
22     A.   Correct.  It would be the southeast.
23     Q.   Thank you for that.
24          Where is north on this picture?  Can you
25 tell?

Page 39

1      A.   North would be to the left.
2      Q.   Could you put an N where north is?  Thank
3  you.  I couldn't get myself oriented earlier.  Thank
4  you so much.
5           Anything else that you heard over the
6  radio from the X2 position about what was going on
7  up front?
8      A.   I knew that they were hailing the front.
9      Q.   Okay.
10     A.   And the occupants to come out with their
11 hands empty.
12     Q.   Did I already ask you whether or not
13 Mr. Babb came to the window in back?
14     A.   No, you didn't.
15     Q.   Did he?  Did you ever see him come to the
16 window in back?
17     A.   I never saw him come to the window.
18     Q.   And you heard someone hailing Babb from
19 the front of the house?
20     A.   Correct.
21     Q.   Was that coming from the BearCat?
22     A.   Yes, ma'am.
23     Q.   Could you tell who was doing the hailing?
24     A.   I don't recall right off the top of my
25 head.

Page 40

1      Q.   All right.  But did you know at that time
2  by the voice?  Could you recognize the voice?
3      A.   Yes, ma'am.
4      Q.   Do you know what they were saying when
5  they were hailing?
6      A.   They were telling the occupants of the
7  house to come out with their hands empty.
8      Q.   And I think you told me earlier that you
9  knew Mr. Antonini, the roommate, had come out of the
10 house at some point.  How did you learn that?
11     A.   Via the radio.
12     Q.   Did you -- did anyone give you information
13 about what Mr. Antonini said about what was going on
14 inside the house?
15     A.   I do recall something about Babb having
16 access to rifles.
17     Q.   Do you remember anything -- do you know
18 who gave you that information?
19     A.   It was just over the radio.
20     Q.   Do you know the names of any of the
21 officers that spoke with Mr. Antonini in the front
22 of the house?
23     A.   Not directly.  Assumptions.
24     Q.   Are they educated guesses about what
25 happened?  Because assumptions implies that you

Page 41

1  don't know or --
2  A.  No.  The assumption is that the officers
3  in front, which were Barnes, Stutesman, Grose,
4  Pieske, McAlpine, Vinje, spoke with him, but I
5  couldn't tell you specifically which one spoke with
6  him.
7  Q.  So that list of officers you just gave me,
8  how do you know they were in front?
9  A.  Radio traffic.
10 Q.  Okay.  Do you know where they were in
11 front, any specific location?
12 A.  No, ma'am.
13 Q.  Was -- while -- and we all know now,
14 looking backwards, that there was a fair amount of
15 activity going on in the front of the house at
16 various points.  How were you being informed of how
17 the situation was evolving?
18 A.  Via the radio.
19 Q.  And was someone in command saying here is
20 what is going on, here is what we are going to do?
21 A.  They are not specifically.
22 Q.  So is it just chatter between officers?
23 A.  Yes, ma'am.
24 Q.  So you are having to interpret this
25 chatter between officers about what is going on?

Page 42

1  A.  Correct.
2  Q.  Okay.  During the time that you were at
3  X2 --
4  A.  Yes, ma'am.
5  Q.  -- did you receive any direct commands
6  from any officer to do anything?
7  A.  No.
8  Q.  All right.  So at some point there was a
9  shot fired?
10 A.  Yes, ma'am.
11 Q.  Tell me what was going on at your location
12 when the shot was fired.
13 A.  Officer Clark and I were standing -- or
14 kneeling at our perimeter position when the shot
15 went out.
16 Q.  Did you know who fired?
17 A.  Not initially.
18 Q.  Who did you think fired?
19 A.  To me, based on past experience of
20 gunfire, it sounded like it was from one of us
21 shooting into the house, but I wasn't a hundred
22 percent sure of that at first.
23 Q.  Could you tell what kind of weapon was
24 used?
25 A.  No, ma'am.

Page 43

1  Q.  So I understand from reading all of this
2  material that there was a period when no one knew
3  who fired.
4  A.  Correct.
5  Q.  Was there some conversation going on on
6  the radio about people trying to figure out what was
7  going on?
8  A.  Yes, ma'am.
9  Q.  Can you tell me what those comments were?
10 A.  Just trying to figure out who the shot was
11 from, was that from us or was it from him.
12 Q.  Nobody knew?
13 A.  Well, the people up front obviously knew,
14 but no one around the perimeter probably knew.
15 Q.  Well, the people in front -- who in front
16 knew that that shot was fired by a police officer?
17     MR. MATTHEWS:  Objection.  Calls for
18 speculation.
19 BY MS. BURROWS:
20 Q.  If you know.
21 A.  I don't know.
22 Q.  So how do you know that the people in
23 front knew who fired the shot?
24 A.  Because that is where the shot sounded
25 like it was directed -- or was in the front.  It

Page 44

1  wasn't like someone came to the back and shot out
2  the back.
3  Q.  Okay.  So how long did it take you to
4  learn that Officer Stutesman had fired that shot?
5  A.  It wasn't until I got to the front that I
6  knew it was Officer Stutesman.
7  Q.  Okay.  Let me rephrase the question.
8      How long did it take you to receive
9  information that an officer fired that shot?
10 A.  Seconds.
11 Q.  Seconds?  Didn't you do a roll call?
12 A.  We did a roll call.
13 Q.  Okay.  When did you learn that it was an
14 officer-fired round?
15 A.  They -- I want to say that it was -- it
16 was broadcast that it was an officer, and then I
17 think they did a roll call just to make sure
18 everybody was okay.
19 Q.  Okay.  So just so I understand, after the
20 shot's fired, did you hear anyone communicate who
21 fired that, where did that shot come from, anything
22 like that?
23 A.  I recall asking on the radio if that was
24 us or him.
25 Q.  Okay.  Did anyone respond to your

Page 45

1  question?
2  A.  I did get a response that it was an
3  officer.
4  Q.  Okay.  How long did it take them to figure
5  out who had fired?
6  A.  I don't know, ma'am.
7  Q.  Okay.  And then the roll call happened on
8  the radio?
9  A.  Yes, ma'am.
10  Q.  So dispatch called out everyone's call
11  sign?
12  A.  Yes, ma'am.
13  Q.  And you reported Code 4?
14  A.  Yes, ma'am.
15  Q.  You are fine.  Okay.
16      How long did that process take?
17  A.  I don't know, ma'am.
18  Q.  So Officer Clark told me that at some
19  point you moved from the X2 position to the fence?
20  A.  Yes, ma'am.
21  Q.  How long after roll call was called did
22  you move up to the fence?
23  A.  I don't recall, ma'am.
24  Q.  Why did you go to the fence?
25  A.  Because I was going to go to the front.

Page 46

1  Q.  The front of what?
2  A.  The residence here.
3  Q.  Why did you -- were you going to go over
4  the fence to do that?
5  A.  Because I was called to the front by
6  Sergeant McAlpine.
7  Q.  Did you know the house had been cleared
8  when you did that?
9  A.  No, ma'am.
10  Q.  Had anyone cleared the house when you went
11  over the fence?
12  A.  I don't recall.
13  Q.  Did you know whether there was anyone else
14  in the house who was armed?
15  A.  No, ma'am.
16  Q.  So did anyone tell you to come over the
17  fence and run through the yard?
18  A.  I didn't go into the backyard of the house
19  in question.
20  Q.  Well, where did you go?
21  A.  To the house to the north of it.
22  Q.  So Officer Clark testified and even made a
23  little mark there that you went over the fence right
24  there.  Where did you go over the fence?
25  A.  Further to the north.

Page 47

1  Q.  Put an X3, please, where you went over the
2  fence.
3      And where did you move from the X3
4  position?
5  A.  To Devos Street.
6  Q.  So did you go into the Babb yard at all?
7  A.  No, ma'am.
8  Q.  Did you go up to the Babb house at all?
9  A.  I don't recall.  I don't think I ever did.
10  Q.  So Officer Clark says you went into the
11  Babb yard.  Are you sure you didn't go into the Babb
12  yard?
13  A.  I am pretty sure I didn't go into the Babb
14  yard.
15  Q.  Okay.  Do you know any other officer that
16  went into the backyard of the Babb house?
17  A.  No, ma'am.
18  Q.  Did you see anyone go into the Babb house?
19  A.  No, ma'am.
20  Q.  So could you draw a line of the path you
21  took from the X3 position to the front of the house?
22  A.  I want to say it was just through the
23  backyard here and to the front.  I mean -- I don't
24  know what this is right here.
25  Q.  Well, this looks like it is another fence

Page 48

1  across the back of this house.  Did you have to
2  cross a second fence?
3  A.  I think I went through the fence somewhere
4  along the way here.
5  Q.  Were there any civilians that you
6  encountered from X3 in your trajectory to the front
7  of the house?
8  A.  No, ma'am.
9  Q.  What did you do once you got to the front
10  of the Babb home?
11  A.  To Devos Street?
12  Q.  Yeah.
13  A.  I never went to the direct front of the
14  Babb house.
15  Q.  Okay.  Where did you end up after you --
16  A.  On Devos.
17  Q.  -- crossed the fence?
18  A.  On Devos.
19  Q.  Could you put an X4?
20  A.  Sure.
21  Q.  What could you see when you got to X4?
22  A.  The cars on Devos.
23  Q.  Could you see the BearCat?
24  A.  No, ma'am.
25  Q.  Did you see any officers?

Page 49

```
 1       A.   Eventually Officer Stutesman.
 2       Q.   Did anybody contact you to give you more
 3  assignments or direction as to what to do?
 4       A.   Sergeant McAlpine did.
 5       Q.   What did he tell you to do when you were
 6  at the X4 position?
 7       A.   That I was supposed to stand by with
 8  Officer Stutesman.
 9       Q.   And Officer Stutesman, this is the
10  officer --
11            MS. BURROWS:  I'm sorry.  I don't mean
12  to point at you.
13  BY MS. BURROWS:
14       Q.   Officer Stutesman is the gentleman to the
15  right here?
16       A.   Yes, ma'am.
17       Q.   And when you say you were ordered to stand
18  with Officer Stutesman, had he come down to the
19  street with you?
20       A.   Yes, ma'am.
21       Q.   What were you supposed to do with Officer
22  Stutesman?
23       A.   Stand by with him.
24       Q.   And just watch him?
25       A.   Yes, ma'am.
```

Page 50

```
 1       Q.   Were you supposed to take anything from
 2  him?  Weapons, evidence, anything?
 3       A.   No, ma'am.
 4       Q.   What was the purpose of standing with
 5  Officer Stutesman at the X4 position?
 6       A.   Because he had been the shooter.
 7       Q.   Tell me why -- pretend I don't know
 8  anything at all about what is going on.  Why is the
 9  protocol that you stand with an officer involved in
10  a shooting?
11       A.   For support.
12       Q.   Okay.  Were you supposed to keep him from
13  speaking to other people?
14       A.   No.  I was just there to help him.
15       Q.   Just to help him?
16       A.   Whatever he needed.
17       Q.   Okay.  Did Officer Stutesman say anything
18  to you at the X4 position?
19       A.   I am sure we had some conversation,
20  obviously.  At that point in time I figured out that
21  he was the shooter.
22       Q.   Well, did you know that from Sergeant
23  McAlpine?  Isn't that why --
24       A.   That is why I was called to the front.
25       Q.   Okay.  Why you?  Because there is a whole
```

Page 51

```
 1  bunch of officers up here.  Why did you -- why were
 2  you ordered from the back to come up?
 3       A.   Because I was asked to come there for him.
 4       Q.   I am trying to find out -- did Sergeant
 5  McAlpine tell you why he wanted you specifically --
 6       A.   Because I think I was the one requested by
 7  Officer Stutesman.
 8       Q.   Okay.  So it was a personal request by
 9  him?
10       A.   Yes, ma'am.
11       Q.   Because you are good friends?
12       A.   Yes, ma'am.
13       Q.   How long have you known Officer Stutesman?
14       A.   Seven years, eight years.
15       Q.   So --
16       A.   Maybe longer.
17       Q.   Okay.  And what makes you -- you have a
18  friendship.  You do things outside of work?
19       A.   We have occasionally.
20       Q.   Okay.  Did he tell you -- Officer
21  Stutesman, did he tell you why he wanted you to come
22  up?
23       A.   No, ma'am.
24       Q.   Was he upset when you were there at the --
25  with him?
```

Page 52

```
 1       A.   He was stoic.
 2       Q.   Stoic.  Okay.  What does that mean?
 3       A.   Calm.
 4       Q.   Tell me what that looks like.
 5       A.   He doesn't talk very much as it is so --
 6       Q.   Okay.  Did he tell you about what had
 7  happened?
 8       A.   No, ma'am.  We didn't discuss it.
 9       Q.   Tell you what he felt?
10       A.   No, ma'am.  We didn't discuss it.
11       Q.   Tell you about anything that had happened?
12       A.   No, ma'am.  We didn't discuss anything.
13       Q.   How long did you stand there with Officer
14  Stutesman?
15       A.   A short period of time.  I don't know how
16  long.
17       Q.   Five minutes?
18       A.   Maybe.
19       Q.   Longer?
20       A.   Maybe.  I don't know.
21       Q.   What was going on while you were standing
22  with the officer there on the street?
23       A.   I think they were clearing the residence.
24       Q.   Do you know what Officer Clark did after
25  you made your crossing?
```

Page 53

```
 1    A.   No, I don't.
 2    Q.   Did you ever go into the house?
 3    A.   No, ma'am.
 4    Q.   Now, at some point they set up a crime
 5  scene perimeter around the house.  Is that correct?
 6    A.   Yes, ma'am.
 7    Q.   Did you ever enter into the crime scene
 8  perimeter?
 9    A.   No, ma'am.
10    Q.   So where did -- did you leave with
11  Stutesman from the location?
12    A.   Yes, ma'am.
13    Q.   So your car is way over here?
14    A.   Yes.
15    Q.   How did you get your car?
16    A.   Someone brought it back to headquarters
17  for me.
18    Q.   And where did you and Stutesman go from
19  the X4 position?
20    A.   We eventually got in the sergeant's
21  Suburban and drove to headquarters.
22    Q.   How many people drove?
23    A.   Sergeant McAlpine drove.
24    Q.   And you were there with Officer Stutesman?
25    A.   Yes, ma'am.
```

Page 54

```
 1    Q.   And you went directly to headquarters?
 2    A.   I think we stopped and got a cup of coffee
 3  and then went there.
 4    Q.   Okay.  Were you still with Officer
 5  Stutesman when you were at headquarters?
 6    A.   Yes, ma'am.
 7    Q.   How long were you with him?
 8    A.   Until he got sent home.
 9    Q.   How long a period of time?
10    A.   Ma'am, I couldn't tell you.
11    Q.   Have you ever spoken to Officer Stutesman
12  about what happened since that day?
13    A.   Yes, ma'am.
14    Q.   Boy, that was a really bad lawyer
15  question, wasn't it?
16         Have you ever spoken to Officer Stutesman
17  about the incident since that day?
18    A.   Yes, ma'am.
19    Q.   Could you tell me what you have talked to
20  him -- your conversations, what have you discussed?
21    A.   What happened.
22    Q.   What did he tell you?
23    A.   Babb came out with a rifle and pointed it
24  at him, and he shot him.
25    Q.   Anything else?
```

Page 55

```
 1    A.   No.
 2    Q.   Okay.  How many times have you talked to
 3  Officer Stutesman about the shooting?
 4    A.   Once or twice.
 5    Q.   Have you spoken to any other officer who
 6  was at the scene about the shooting or about the
 7  incident?
 8    A.   Not specific details, but yes.
 9    Q.   Who have you spoken with?
10    A.   I can't give you all of the names, ma'am.
11    Q.   Well, have you spoken with Officer Clark?
12    A.   Yeah, I have talked to him about that.
13    Q.   About the incident?
14    A.   Yes, ma'am.
15    Q.   What did Officer Clark tell you?
16    A.   I couldn't tell you.
17    Q.   Okay.  What about Pieske?  Have you spoken
18  with Officer Pieske?
19    A.   No, not about this.
20    Q.   Officer Vinje?
21    A.   No.
22    Q.   Officer McAlpine?  Sergeant McAlpine?
23    A.   Yeah, we have talked about that.
24    Q.   What did he tell you about what happened?
25    A.   He didn't give me the specific details of
```

Page 56

```
 1  what happened.  We have discussed what the
 2  expectation of someone pointing a rifle at other
 3  officers is.
 4    Q.   Okay.  Why did he tell you that?
 5    A.   Why did he tell me?
 6    Q.   Yeah.  Don't you know what you are
 7  supposed to do if someone points a rifle at you?
 8    A.   Yeah, I know what to do.
 9    Q.   Why did Officer McAlpine tell you?
10    A.   He didn't tell me specifically what I was
11  supposed to do.  We just talked about is it the
12  right thing, the wrong thing.
13    Q.   So did Officer McAlpine tell you that it
14  was the right thing to shoot Brian Babb?
15    A.   No.
16    Q.   What did he tell you?
17    A.   I don't recall the specifics of that.
18    Q.   So you can remember these conversations,
19  you can remember the people you had them with, but
20  you don't remember what you talked about.  Is that
21  fair?
22    A.   Sure.
23    Q.   Okay.  It also says here that you took the
24  ICV hard drive from Stutesman's patrol car.  Is that
25  correct?
```

Page 57

1   A.   Yes, ma'am.
2   Q.   And you handed that over to Detective
3  Jones.  Is that correct?
4   A.   Correct.
5   Q.   Was -- did you have anything to do with
6  removing the video or any information from the
7  BearCat?
8   A.   No, ma'am.
9   Q.   All right.  When you were here at the X4
10 position, where was the BearCat located?
11  A.   Somewhere in the front here.  I couldn't
12 even see it.
13  Q.   So at some point the BearCat was driven
14 from this location -- approximately this location up
15 to the front of the house.  Did you hear that
16 happening when you are back here?
17  A.   Yes, ma'am.
18  Q.   Where were you located when that happened?
19  A.   Somewhere between point 3 and point 4.
20  Q.   Okay.  As you are moving from point 3 to
21 point 4, are you trying to see what is happening
22 over here in the Babb --
23  A.   No.
24  Q.   Why not?
25  A.   Because it is of no concern to me.

Page 58

1   Q.   What is going on over here where -- is no
2  concern of yours?
3   A.   No.
4   Q.   Did you know if there were anyone else in
5  the Babb home?
6   A.   No.
7   Q.   Could you see the Babb home from this
8  field here?  From the point 3 down to the 4,
9  anywhere in here could you see the Babb home?
10  A.   I could see it.
11  Q.   Could you see what was going on in there?
12  A.   No, ma'am.
13  Q.   Did you see anyone else?
14  A.   No.
15  Q.   Did you see any officer go inside the Babb
16 home?
17  A.   No.
18  Q.   I am looking for something here.
19  A.   You know, actually, thinking about this
20 here, there is a chance that I could have ended up
21 in the backyard, because originally I might have
22 thought about helping clear the house.
23  Q.   Okay.
24  A.   Because I had been on SWAT, and they
25 generally like to use experienced people to --

Page 59

1   Q.   Do a house clearing?
2   A.   So there is a chance I could have ended up
3  in the backyard there, but I never went in the
4  house.
5   Q.   Okay.  So now my lawyer brain --
6   A.   Okay.
7   Q.   -- is going a little bit crazy here.
8   A.   That is fine.
9   Q.   Which is it?  You went into the backyard
10 of the Babb or you went in next door?  And I
11 understand if you want to think about it, but I
12 really need your best answer here.
13  A.   You know, like I said, there is a chance
14 that I could have went in the backyard thinking that
15 I was going to go help clear the house before I was
16 sent to the front.
17  Q.   That makes more sense to me, but I want to
18 know what you remember doing.
19  A.   That is what I am just telling you.
20  Q.   Okay.  Now, let's see if we can work on
21 that a little bit.
22       Do you remember what you did from X3
23 forward?
24  A.   If I was in the backyard of the Babb
25 house, it was the expectation that I was going to go

Page 60

1  clear the house.
2   Q.   Okay.  Did you check with somebody on the
3  radio?  "What do you want me to do?  Here I am."
4   A.   And then I got sent to the front.
5   Q.   How did you get to the front?
6   A.   I -- I went through this yard here and
7  this field here.
8   Q.   So you went back over the fence?
9   A.   Yes, ma'am, if I did -- I didn't walk
10 through the yard and -- haphazardly while they were
11 doing whatever they were doing there.
12  Q.   Okay.  I apologize.  I am looking for --
13  A.   You are fine.
14  Q.   -- something that I wanted to ask you
15 about based on your testimony.
16       Did anyone ever talk to you about some
17 officer accessing the Babb house right after the
18 shooting but before the house had been formally
19 cleared?  Somebody went in and probably shouldn't
20 have gone in, anything like that?
21  A.   No, ma'am.
22  Q.   Okay.  Prior to arriving at the scene, did
23 you do any kind of criminal history check on Brian
24 Babb?
25  A.   No.

Page 61

1  Q.  Or any calls for service at that address?
2  A.  No.
3  Q.  So as part of the lawsuit, I get sent a
4  lot of information, and your attorneys have done a
5  really good job of giving a pretty good, fair amount
6  of information.
7      The after-action report -- and I don't
8  know whether it was part of the homicide
9  investigation or part of the use of force
10 investigation, but some unknown officer went into
11 the residence after the shooting.  Do you have any
12 information about who that was?
13 A.  No, ma'am.
14 Q.  Okay.  And it wasn't you?
15 A.  It was not me.
16 Q.  All right.  Were you -- other than Officer
17 Thompson -- Detective Thompson, were you interviewed
18 by anyone in any form as a result of this shooting?
19 A.  No, ma'am.
20 Q.  So since Thompson interviewed you, is this
21 the first formal interview of you about the
22 incident?
23 A.  Yes, ma'am.
24 Q.  Okay.  Did you read any of the media
25 reports about this shooting in the newspaper?

Page 62

1  A.  Probably.  I generally don't read the
2  newspaper or watch TV.
3  Q.  Okay.  So you didn't see any of the news
4  reports on it?
5  A.  I am sure I did see some.
6  Q.  Okay.  Did you see any of the reports or
7  read any of the reports that you felt were unfair --
8  A.  Like from --
9  Q.  -- towards the police?
10 A.  From the news or --
11 Q.  Yeah.
12 A.  -- like --
13     No.
14 Q.  Or inaccurate?
15 A.  Well, most of the news is inaccurate.
16 Q.  Okay.  All right.
17 A.  So if I read something, there is a chance
18 that I could have thought that.
19 Q.  Do you remember any specific report that
20 you felt was inaccurate about this incident?
21 A.  No, ma'am.
22 Q.  Okay.  I think that is all I have for you.
23 I do believe that is it.
24     MR. MATTHEWS:  No questions.  We will
25 read and sign.

Page 63

1     (The deposition was concluded at
2     4:25 p.m.)

Page 64

1  State of Oregon    )
                      ) ss.
2  County of Lane     )
3     I, Christine Oljace, CSR-RPR, a Certified
4  Shorthand Reporter for the State of Oregon, certify
5  that the witness was sworn and the transcript is a
6  true record of the testimony given by the witness;
7  that at said time and place I reported by stenotype
8  all testimony and other oral proceedings had in the
9  foregoing matter; that the foregoing transcript
10 consisting of 63 pages contains a full, true and
11 correct transcript of said proceedings reported by
12 me to the best of my ability on said date.
13    If any of the parties or the witness requested
14 review of the transcript at the time of the
15 proceedings, correction pages are attached.
16    IN WITNESS WHEREOF, I have set my hand this 6th
17 day of November 2017, in the City of Eugene, County
18 of Lane, State of Oregon.
19
20
21 *[signature: Christine L. Oljace]*
22 Christine Oljace, CSR-RPR
23 CSR No. 05-0397
24 Expiration Date:  September 30, 2018
25

Judson Warden

```
1   Judson Warden
2   McGowan, et al., vs. Stutesman, et al.
3   October 3, 2017
4
5   PAGE/LINE.....................................CHANGE
6   |_____
7   |_____
8   |_____
9   |_____
10  |_____
11  |_____
12  |_____
13  |_____
14  |_____
15  |_____
16  |_____
17
18       I declare under penalty of perjury that the 63
19  pages referenced above are true and correct except
20  for such corrections as noted.  Executed this ......
21  day of ................. 2017.
22          |.............................|
23          Judson Warden
24
25
```