**City of Eugene Police Department**
Investigations Division
541.682.8374
541.682.6804 FAX

## PROTECT. SERVE. CARE

# MEMORANDUM

| | |
|---|---|
| **Date:** | **September 8, 2015** |
| **To:** | **Pete Kerns, Chief of Police** |
| **From:** | **Lt. Jennifer Bills**<br>**Chair, Deadly Force Review Board** |
| **Subject:** | Adjudication and Findings: Use of Deadly Force Review Board<br>IA 15-100 |
| **Employee:** | Officer Will Stutesman<br>Patrol Division |
| **Board Members:** | Lt. Jennifer Bills, Chair (Voting)<br>Sgt. Derel Schulz, Training/Firearms (Voting)<br>Sgt. Ryan Molony, Defensive tactics (Voting)<br>Sgt. Tim Haywood, Patrol Division (Voting)<br>Sgt. Dale Dawson, IA (Non-voting)<br>AIC Management Analyst, Cindy Coleman, IA (Non-voting)<br>Mark Gissiner, Police Auditor (Non-voting)<br>Chief Steve Ijames, Subject Matter Expert, Use of Force Response and MH<br>Dr. Michael Leeds, Subject Matter Expert, Mental Health/Veterans Services |
| **Primary**<br>**Policies Reviewed:** | **300 Use of Force**<br>**301 Use of Force Reporting**<br>**901 Police Firearms** |
| **Recommended**<br>**Adjudication:** | **Within Policy** |
| **Secondary**<br>**Policies Reviewed:** | **310 Use of Deadly Force Investigations**<br>**418 Mental Health Crisis Response**<br>**801 Hostage/Barricaded Subjects**<br>**1200 Crisis Intervention Team**<br>**1201 Crisis Negotiation Team** |



The Use of Force Review Board was appointed to review the facts and circumstances of Eugene Police Officer Will Stutesman's use of deadly force on March 30, 2015. The board convened on Monday, August 10, from 0800 to 1400. All appointed board members were present. In addition to the normally appointed voting members, Sgt. Dale Dawson, IA A/Management Analyst Cindy Coleman, Independent Police Auditor Mark Gissiner, Chief Steve Ijames and Dr. Michael Leeds participated in the discussion as non-voting members. Chief Ijames was brought in as a subject matter expert in officer use of force, crisis intervention and Special Weapons and Tactics. Dr. Leeds was brought in as a subject matter expert in mental health and veterans issues.

This review is unique in that subject matter experts were brought in to advise and discuss both the use of force policies, and other policies related to the incident but not normally reviewed by an empaneled use of force board. An in-depth review into the agency's overall response, especially to incidents involving veterans in crisis, was needed. For logistical reasons, the force policies (POM 300, 301, 901) were voted on and bifurcated from the other policies (POM 310, 418, 801, 1200, 1201), which were not voted upon but required discussion and review.

The board and the subject matter experts were provided the complete case file, interviews, photographs, in-car-video, police reports and autopsy report, and all applicable policies. In addition, Sgt. Dawson walked the board through a PowerPoint presentation of the incident and answered questions.

## Incident Summary:

The incident summary is to provide a brief overview of the facts; it is not intended to provide a detailed and sequential account of the entire incident. Specific policies and areas needing discussion are listed in the below sub-sections. For a detailed account, reference the Oregon State Police IDFIT report.

On March 30, 2015, officers were dispatched to 2248 Devos, Brian Babb's residence, for an armed suicidal subject. 2248 Devos is a two story house, sitting at the end of a panhandle lot. On that day, there were two vehicles parked in the long driveway. One vehicle belonged to Babb; the other belonged to his roommate, James Antonini. The front door is located in the center of the home, facing at an angle to Devos Street and the driveway.

The call to the 911 Regional Communications Center was made by Becky Higgins, LCSW, who was Mr. Babb's mental health therapist and was on the phone speaking with him. Ms. Higgins told the emergency call taker, "I'm a therapist and I'm calling about a client...He's got a 9 millimeter gun. He just shot once through the ceiling, I think he said. And, um, obviously he's having a really hard time and he's been drinking." Ms. Higgins went on to say Mr. Babb was a veteran from the war in Afghanistan, had "severe PTSD" and a traumatic brain injury (TBI), and he was "high risk."

Officer Barnes was dispatched to 2248 Devos for an armed suicidal subject "armed with a 9 millimeter to his head." The dispatcher requested a second unit respond and Ofc. Stutesman cleared from writing a report at the Evidence Control Unit and responded to Devos. Additional details were aired, indicating the involved was Brian Babb, he was a veteran with PTSD, he sounded intoxicated, he may have been on pain medication, and he may have shot a bullet through a window or elsewhere in the house. Along with Officer Barnes, Sgt. McAlpine and three other police units copied up and responded. Additional units subsequently responded to set up a containment perimeter and block traffic.

Dispatch further advised responding units that a roommate may be inside, but Ms. Higgins had not heard him, leaving his presence inside unverified. Sgt. McAlpine immediately requested dispatch start working on contact information for the roommate, so his whereabouts could be knowm. Later in the call, on scene

Exhibit 13
Page 2 of 10

COE 000113

units were told the only person listed for the address was Mr. Babb. After a license plate check, one of the vehicles in the driveway was confirmed registered to the roommate, Mr. Antonini, but with a different address.

Officer Kidd took up a position with his rifle so that he could see the involved residence and he aired it would be tactically dangerous to approach the house on foot. Anyone on the second floor of the residence would have a clear view of approaching officers coming through the panhandle driveway. Due to this, and the information that Babb was armed, Sgt. McAlpine requested the armored vehicle.

The Eugene Police Armored Rescue Vehicle (ARV) was brought to the scene to provide ballistic coverage for officers and to provide a safe place for any civilians needing rescuing. The vehicle was placed at a distance from the residence, in an adjoining driveway. A fence blocked a portion of the view for those inside. An Emergency Vehicle Operations instructor, Officer Pieske happened to be the driver of the ARV. Officer Grose took up a position in the passenger seat so he would have access to the PA. Sergeants McAlpine and Vinje, along with Officer Dewitt carrying a less lethal 40 mm launcher, took up exterior positions to the rear of the ARV in the event they needed to urgently respond into the residence or take persons into custody. Officer Stutesman took his long rifle and took a position to gain over-watch in the hatch of the ARV, using the lid as cover, and obtaining a view of the involved house's second story windows, lower level window and top half of the front door; his view of the lower part of the front door was partially obstructed by a fence. Once they were set, CNT Officer Grose began loud hailing Mr. Babb on the PA, telling him he wanted to help and keep him safe and to come out with his hands up.

Per normal procedures, Eugene/Springfield EMS and Fire was requested to stage nearby. This was to facilitate immediate aid should anyone suffer an injury.

As the incident unfolded, Becky Higgins continued to speak to Mr. Babb on her landline, while relaying information to a call-taker, who relayed information to the station one dispatcher, who then relayed the information to units on scene. At one point, Higgins goes off-line with the call-taker and when she calls back she is routed to a new call-taker. This created problems with timely and accurate information getting from the therapist speaking with Babb to on-scene officers and decision makers (covered under policy review 1201). During this time period, Babb would come to the door periodically and yell "Fuck you" and "Go away!" Hails continued but were not effective in getting Babb to exit unarmed.

Conversely, the hails to the residence were effective in alerting Babb's roommate, Jim Antonini, of police presence outside. He was upstairs and came down, observing Babb trying to open the gun safe. Antonini told investigators he thought it would take Babb a long time to open the safe due to his elevated and agitated demeanor. He said that Babb on his "best days" would take "sixty" attempts to open the safe. Antonini was a childhood friend of Babb's and had been attending counseling appointments with him and trying to help him with his physical and mental pain. During the post incident interview, he described Babb as not taking his medication and drinking all day long. He said on that specific day he was worried for his own safety and the safety of others. He told investigators that Babb was armed and was unpredictable; he had not seen him in this state before and he said "[Babb] was past the point of return." He also told detectives Babb was in a state of mind where he thought Babb was going to kill himself or make officers kill him.

Antonini exited the residence and was taken into police protective custody behind the ARV. Officer Stutesman overheard Antonini telling Sgt. McAlpine that Babb was going for his hunting rifles and that officers should be careful. He repeatedly said something similar to, "he's going for his guns." Sgt. McAlpine was considering pulling back once Antonini was out of the house and asked him if he would feel comfortable if they [police] left or if he was comfortable in going back in. Antonini was adamant it would not be safe for officers to leave or for him to go inside. He did offer to speak with Babb.

Exhibit 13
Page 3 of 10

COE 000114

When communication from Higgins to Babb was lost, the decision was made to have CNT take over calling Babb. Officer Grose made attempts to call Babb but initial calls went to voicemail. When he was able to reach Babb by phone, Babb was highly agitated. He told Officer Grose that he had a gun pointed at him [Grose or Stutesman] and that they should not come on his property and they should leave. Officer Grose told Babb that they [police] could not leave. Babb disconnected the call.

Officer Grose observed the door open and he could see the top of Babb's head; his view was partially obstructed by the fence. He tried to air on the radio his observations, but radio traffic was too heavy. He then heard Officer Stutesman say Babb was pointing a rifle at him and then heard Officer Stutesman fire his rifle. Officer Grose said the police radios were silent and then there was confusion over who fired a weapon. He then heard Stutesman yell that he had fired a shot, but he did not air it on the radio.

Officer Stutesman stated he observed Babb exit the front door, raise his rifle to his shoulder and aim it at him. Officer Stutesman fired one round from his rifle, striking Babb in his cheek. The round exited at the base of his neck and lodged in the wall at the back of the residence. Babb fell to the ground inside the door frame, dropping the rifle. (Covered under policy review 300, Use of Force)

The ARV was moved up to the house and officers checked on Babb, summoned medics and cleared the residence. Antonini was removed from the back of the ARV by officer Dewitt before the vehicle was moved up to the residence.

The IDFIT investigation revealed Babb's rifle was empty. The type of rifle Babb shouldered, a Remington 700, 300 win mag, is capable of firing a round from 800 up to 1600 meters. The 9 mm semi-automatic handgun Babb had allegedly fired and had to his head was located inside Babb's pick-up truck. It was not in his possession while he was on the phone threatening suicide to Ms. Higgins. It was confirmed however, that at some point Babb had fired the gun from his upstairs bedroom into the floor. Furthermore, Babb had laid out his house and vehicle documents, personal identification documents and a folded American flag on the counter in his home. Whether symbolic of a suicide ritual, or related to another matter, will never be determined.

**Recommended Policy/Findings:**           **300 Use of Force/Within Policy**

The Deadly Force Review Board unanimously found Officer Stutesman was within department policy when he used what constituted deadly force with his department issued firearm against Brian Babb. Generally, an officer "may only use reasonable force to overcome or prevent resistance to [your] lawful actions or requests." Deadly force may be used when an officer "reasonably believes there is a threat of death or serious physical injury."

The evaluation is based upon the fact set and circumstances the involved officer was aware of at the time the force was used, not the facts learned after the incident. In this case, Babb pointed a firearm (rifle) at Officer Stutesman. Officer Stutesman, from his vantage point in the hatch atop the ARV, could clearly see Babb raise the rifle to shoulder height and aim it at him. Officer Stutesman was aware Babb had already fired a round inside his home, was highly agitated, had military experience and hunted. Officer Stutesman knew that other officers were exposed to danger from the rifle because Officer Kidd had aired this information. Because of his position, Officer Stutesman had a responsibility to protect the officers and the surrounding public from a shot fired from Babb's high capacity rifle. Officer Stutesman was also at risk, and had reasonable fear of serious injury or death from Babb, should he had decided to fire his rifle at him. Prior to firing his department issued rifle, Officer Stutesman yelled at Babb to drop his weapon, giving him an opportunity to comply with the order. Babb did not lower the rifle, continuing to pose a threat to the public and to officers. Officer Stutesman fired one round from his assigned HK 416

Exhibit 13
Page 4 of 10

COE 000115

rifle, striking Babb in the cheek. Babb then fell out of Officer Stutesman's view. Officer Stutesman's use of deadly force to overcome armed resistance was reasonable under the totality of the circumstances of this case.

Officer Stutesman said he either yelled or aired on his radio that he had shot Babb; he could not exactly recall. Dispatch tapes never captured him saying he had fired his weapon. Officer Stutesman could tell there was confusion over who fired, Babb or an officer, and he could not get on the radio to air the information. He finally had to lean into the vehicle and yell he had fired the weapon. Before he was able to tell the supervisors he had fired his weapon, Sgt. McAlpine ordered a roll-call to determine if personnel on scene were accounted for. Doing so was an appropriate decision given the confusion, despite taking over the radio air-time. Nonetheless, the board felt this lack of timely and clear communication over who fired was problematic and could have resulted in officers believing they were fired upon and firing back at the residence in self-defense, or in Mr. Babb having an opportunity to fire at officers had he been the initial shooter. Continued training and practical exercises in lethal force encounters is appropriate. Also, additional supervisor training in managing major incidents is recommended.

After the officers had breached the threshold of the residence, Sgt. McAlpine checked Mr. Babb for a pulse. He then called for Medics to come render aid and he moved to clear the residence. Medics arrived within 47 seconds per the CAD details, checked on Babb but did not provide aid. Babb was pronounced deceased within a minute. The Medical Examiner said it was "highly unlikely" Babb could have survived the initial gunshot because of the concussion to his brain stem area and his voluminous loss of blood.

#### Recommended Policy Findings:        901 Police Firearms/Within Policy

The Deadly Force Review Board unanimously found Officer Stutesman complied with the department's firearm policy. Officer Stutesman is a sworn police officer and was wearing a Eugene Police uniform and badge, along with a SWAT plate carrier, also marked with a Eugene Police badge. Officer Stutesman had qualified with his SWAT issued HK 416. The SWAT standard for qualification is higher than that of patrol's and he had met the SWAT standard. The weapon was in working condition at the time of the shooting. It was issued to Officer Stutesman by the SWAT Commander as part of his assigned weaponry.

#### Recommended Policy/Findings:        301Use of Force Reporting/Within Policy

The Deadly Force Review Board unanimously found Officer Stutesman complied with the agency's policy. This qualifies as a *Major Incident* under 301.4.a, b, c. IDFIT, Internal Affairs and the Police Auditor were notified of the use of force. IDFIT concluded its investigation and submitted it to the District Attorney, who found the use of force was lawful. After, a Use of Force Board was empaneled and Internal Affairs commenced its investigation.

#### Policy/Recommendation:        310 Use of Deadly Force Investigation

The joint Inter-Agency Deadly Force Investigation Team was activated to respond to the officer involved shooting of Brian Babb. The investigation was adequate, but several points concerned the board. First, there was no notation of who moved Brian Babb's rifle or rendered it safe. The board felt this would be a basic report notation and was concerned with the oversight. Secondly, the Police Auditor opined it would be beneficial to have a practice where a subject's firearm would be fingerprinted. While there was no question the rifle was Babb's and that he had it in his possession at the time of the shooting, such a practice would be beneficial in a deadly force incident where the suspect's weapon was in question. Thirdly, the board felt interviews of all involved, including Officer Stutesman, should be recorded.

Exhibit 13
Page 5 of 10

COE 000116

Recorded interviews provide broader information than a written synopsis by an investigator. Lastly, EPD Detective Thompson was assigned as the secondary detective on the case and as the agency liaison. However, rather than entering the home and being paired with the primary detective from Oregon State Police, he was sent away from the scene, causing confusion and lack of communication regarding the case.

*Recommendations:*   1.   Fingerprint weapon(s) possessed by the deceased subject.
                      2.   Clear and thorough reports and documentation by IDFIT.
                      3.   Audio-record all interviews.
                      4.   Agency liaison detective should remain on scene and be partnered with the IDFIT primary detective.

## Policy/Recommendation:      418 Mental Health Crisis Response

Brian Babb clearly fell under the department's Mental Health Crisis Response. He was under medical treatment and outpatient therapy for Post-Traumatic Stress Disorder. He also suffered from a traumatic brain injury and had a substance abuse problem. His roommate, Jim Antonini, said Babb was an alcoholic and could be non-compliant with taking his medication. At the time of the incident, he was on the phone with his therapist, indicating he had suicidal ideations. He also told her he had a gun to his head and he had previously fired a round inside his house.

The policy requires a police response to "…de-escalate the situation and deal with such a person in a compassionate yet safe manner in order to protect the individual, the public and officers." (POM 418.1 Purpose and Scope) It also allows for the person in crisis to be taken into custody when they have committed a crime or are believed to be a danger to themselves or others. In this case, Babb said he had fired a weapon inside his home, which is an arrestable offense under Oregon Revised Statute 166.220.1.(b), Unlawful Use of a Weapon. A similar law is adopted under the Eugene Municipal Code.

Sgt. McAlpine's use of CNT Officer Grose was appropriate in attempting to use a resource to de-escalate the situation. Officer Grose is a trained negotiator with experience in de-escalation. He is also trained in Crisis Intervention (Memphis Model) and has practical training and experience in dealing with high-risk situations involving armed suicidal subjects.

Had the situation been less volatile, CAHOOTS would have been an appropriate resource to consider. However, the use of CAHOOTS would not have been feasible given the knowledge of weapons in the home and the on-going threat to the public and officers.

*Recommendation:*   1.   Policy 418 needs to be updated and merged with POM 1200, Crisis Intervention Team (CIT). The policy, while clear in its intent, discusses the use of a "CIT team," which no longer exists. The policy has not been updated since 04/20/2009.
                    2.   Review current ORS/Case law and update 418.7, Firearms Seizure.

## Policy/Recommendation:      810 Hostage/Barricade Subjects

The board discussed the current policy in relation to the deadly force investigation, but without delving into the minutiae that a thorough After Action Review (AAR) conducted by the on-scene officers would reveal. A post-incident AAR by involved employees is recommended after the Deadly Force Investigation is completed.

Exhibit 13
Page 6 of 10

COE 000117

A barricaded subject is defined as, " A person who is reasonably believed to be a threat to commit serious physical injury to hostages, officers, or others in the community, who is in a stronghold position, and who is refusing or failing to surrender to police. Also included is a person threatening suicide who is armed with a deadly or dangerous weapon which could be a threat to others." (POM 801.1.B Hostage/Barricaded Subjects) Brian Babb fell under the definition of a barricaded subject; he was in possession of a weapon(s), he had committed a crime, he was refusing to exit, and he told his therapist he had a gun to his head and he wanted to die. Responding officers had a reasonable belief that Babb posed a continued danger to himself, anyone else inside the home, and to the public. While armed and with the tactical advantage of a two story home, he also posed a threat to adjoining homes, community members and responding officers.

Every action on scene should be to move the incident toward the desired outcome of a peaceful resolution. Responses should be adapted to the fact set presented at the time rather than using a "one response fits all procedure." The on-scene supervisor should explicitly state the objective and inform responding personnel of who is in-charge of the incident.

In this case, the initial response of isolate, contain and contact was appropriate and per policy. While the tactical response was being managed, Sgt. McAlpine continued to have Becky Higgins communicate with Brian Babb in hopes of a peaceful resolution. Both the communication and tactical responses worked toward a similar resolution.

Also within best practice was the attempt by Sgt. McAlpine to determine the location of Mr. Antonini, Babb's roommate. Ms. Higgins did not believe Mr. Antonini was present in the home, but this was an assumption on her part, not based on real knowledge. It was incumbent upon officers to confirm one way or the other, his whereabouts. His location had direct bearing on the tactical plan and the type of actions the on-scene commander could take. Depending on the mental state of Babb, Antonini could have been taken hostage, drastically changing the tactical dynamics and the urgency to push police action. Once Antonini exited, Sgt. McAlpine and Sgt. Vinje discussed pulling back the police presence. This would have been an appropriate plan with the information they had. However, due to Babb's altered mental state and his possession of high-powered rifles, they would not be able to leave entirely due to the continued risk to the public. Mr. Babb exited before any additional plan could be put in place.

In police practice, standard priority of life is as follows: 1. Victims/Innocents, 2. Community, 3. Police, and 4. Suspects. The priority of life includes officers, and commanders would be negligent if they placed the life of an officer below that of an armed subject. In this case, the use of the armored vehicle was appropriate due to the location of the residence and the need to protect responding officers. It also provided a safe platform for officers to use the loud hailer to communicate with Babb. And when Antonini exited the residence, it allowed for a safe location for him to be debriefed by the on-scene commander. During the incident, Antonini, Officer Grose and Officer Pieske all questioned the ballistic capability of the ARV and had concerns for their safety. This concern could have an impact in how the vehicle is used during an emerging violent confrontation.

The use of the loud hailer was discussed at length. The primary concern was that a person experiencing a mental health crisis could be further inflamed by the use of a loud bull-horn. Like in every case, the use of the hailer should be considered during each specific situation. Will it be effective in furthering the goal of a peaceful resolution or will it have an adverse impact on the involved subject? The on-scene commander should weigh the need to alert a civilian or get an innocent to safety with the potential impact of adversely affecting the armed subject. In this case, the hailer was used per standard protocol. It was effective in alerting Antonini to the police presence and getting him to exit. Given Babb's agitated mental state, the hailer may have had an adverse impact on his response to the presence of law enforcement. Had the hailer

Exhibit 13
Page 7 of 10

COE 000118

not been used, Antonini may not have been alerted and his presence would not have been known. This would have changed the tactical considerations for the on-scene commander.

The policy of Hostage/Barricaded Subjects melds the two together, though the response and tactical considerations are very different. A true hostage situation is a high-risk, low-frequency event and the police response is considerably different. Law enforcement is trained to take more risks and exert higher levels of force to secure the rescue of a hostage. Conversely, barricaded subject calls, while still high risk, occur more frequently. The approach to a barricaded subject call can be handled in a manner where less risk and more flexibility may be taken by law enforcement.

*Recommendations*:
1. Educate officers on the use and capabilities of the armored vehicles.
2. Bifurcate policy 810, creating a separate policy for hostage response and barricaded subject response. Consider the IACP policies on barricaded subjects.
3. Educate and train supervisors on responding to Barricaded subject and Hostage calls for service. Allow for scenario-based training.
4. Train supervisors to be adaptable to each situation and base actions upon whether it furthers the overall mission.
5. Explicitly state over the radio who is in-charge of the incident.

## Policy/Recommendation:     1200 Crisis Intervention Team

Well over 90% of Eugene Police sworn employees are trained in the Crisis Intervention model (Memphis model). This is the gold-standard in responding to persons in mental crisis or in dealing with persons who have cognitive disabilities. CIT provides education in de-escalation techniques, basic knowledge of mental disorders, dealing with persons in crisis and dealing with veterans and PTSD.

Eugene Police Department's CIT program was developed in partnership with Lane County Behavioral Health, NAMI, police officers, family members of persons living with mental illness, and consumers of local mental health services. The program was specifically designed to assist officers in handling emerging crisis involving mental illness and other disorders. The CIT policy was written and published in 12/16/2008.

*Recommendation*:
1. Continue training sworn officers in CIT.
2. Provide 40 hour CIT to telecommunications (911).
3. Update the policy to reflect current practices.

## Policy/Recommendation:     1201 Crisis Negotiation Team (CNT)

As officers were arriving to 2248 Devos and were being deployed, Sgt. McAlpine asked Officer Grose to respond to the front of the residence in the event his CNT skills were needed. Officer Grose was already responding as part of his normal patrol duties. As a negotiator, he had 285 documented hours of training in Crisis Negotiation, Crisis Intervention, Hostage Negotiation and Suicide Intervention. He had practical experience as well as scenario-based training. The request for Officer Grose's specialized skill was an appropriate use of CNT under our current policy and practices. The CNT policy reads, "CNT may also be used in other situations where the expertise of a negotiator would be valuable, such as a suicidal person." Additionally, "supervisors are encouraged to use on-duty negotiators whenever possible."

The policy also discusses notification of the CNT supervisor when CNT is used. In this instance it did not occur. In practice, it would be difficult for a negotiator or a supervisor immersed in a developing incident

Exhibit 13
Page 8 of 10

COE 000119

to divert their attention and make notifications. The policy also speaks to calling out more than one negotiator, "a minimum of three," when CNT is utilized. Again, only Officer Grose was used and no other CNT call-outs were made.

The board also discussed at length the use of a third party negotiator, Ms. Higgins, to assist with the call. During the incident, Ms. Higgins offered to come to the scene to speak with Babb. This request was not relayed to on-scene command, and likely would not have been used as it is not a common practice. In this incident, Sgt. McAlpine asked to keep Ms. Higgins on the phone with Mr. Babb if she had rapport with him. Once Mr. Babb was no longer speaking with her, she was asked to disconnect so that CNT could take over the call.

As crisis negotiation has evolved, so has the use of third party negotiators. Standard procedure is for the negotiator to make contact or take over the conversation so that police have direct communication with the subject. It also mitigates the damage which can occur from a third-party who may make the situation much worse. Lastly, it provides more direct information to the on-scene commander by removing the layers of the communication center and the third-party. Sgt. McAlpine's request to keep Ms. Higgins on the phone was unusual yet appropriate. She had the best rapport with Babb and was able to keep him talking for quite a long time. He continued to permit this until she had lost contact with him, at which point it was appropriate to take over direct communications.

*Recommendation:*      1.      On-scene commanders should consider embedding a negotiator with the mental health practitioner if they have an already established rapport with the subject. Or, if feasible and safety can be ensured, permit the therapist to come to the scene. In either case, directly partnering a negotiator with the therapist will facilitate getting intelligence and sharing information among all partners.
                             2.      Utilize dispatch to contact the CNT supervisor and other negotiators in the event of an on-going high risk suicidal/barricaded subject incident. The policy should be revised to reflect enhanced call-out procedures.
                             3.      Have Crisis Negotiators train on hot-lines to increase their experience in dealing with persons in crisis.
                             4.      Require three (3) negotiators to respond.

## **Other Considerations**

Radio Procedures/Communications Center:
The Board noted that the radio communications throughout the deadly force encounter were calm and measured. On-scene officers and supervisors maintained calmness, even during the confusion of who had fired the weapon. This is an indication of solid preparation and practice by those involved.

During the initial call to the 911 Communication Center, Becky Higgins was disconnected. When she called back, she was transferred to a different call-taker. Also, Higgins tells the call-taker Babb shot a round in the house, but when the message is typed in, it is put as he "shot out a window." It is later clarified, but the difference can impact officer response and other tactics.

*Recommendation:*      1.      Best practice would be to maintain one call-taker with Ms. Higgins. 911 is already considering this change.

Technology:
The Armored Rescue Vehicle has an in-car video system but lacks audio. It also lacks a pole camera and a means for persons inside the vehicle to get a view of a location or suspect from the safety of inside the armor. The vehicle is used in situations where ballistic protection is needed. It is also used regularly by

Exhibit 13
Page 9 of 10

COE 000120

SWAT and CNT during tactical operations. Given public interest in these high risk police encounters, it is important that agencies be as transparent as possible. While cameras only provide one vantage of the incident, they can aid in the investigation and after-action review. The same holds true for providing body-worn cameras for law enforcement officers, including SWAT, CNT and K9.

*Recommendation*:    1.    Install Audio and video recording for the ARV.

2.    Install a pole-camera and hands-free viewing capability for the ARV.

3.    Equip officers with body-worn cameras.

4.    Provide smart phones to CNT so that cell phone calls can be recorded using certain aps.

5.    Provide supervisors with smart phones so that the incident can be viewed in real time from a position of safety.

Mental Health/Veteran Response:

The Eugene/Springfield area has a large number of veterans who have recent combat related experience. The majority of returning veterans have little police contact. However, some of those who have suffered trauma can be volatile and unpredictable. The agency should continue to outreach to various organizations to help prepare officers to better respond to veterans in crisis.

*Recommendation*:    1.    Create a Veteran's Response Team to examine how best to work with the veteran's community, especially veterans in immediate crisis.

**Conclusion**

Police officers are required to act upon the information they know at the time and evaluate the facts against current policies and their police training. For this reason the board found Officer Stutesman was within policy in his force decision. It is also incumbent upon agencies to closely examine each incident, and its related policies and practices, to learn what went well and what needs improving. It is tragic when a life is taken under circumstances such as those presented in this case. Whether it was an intentional act to commit suicide by police officer, or whether alcohol and PTSD coupled with other trauma impacted Mr. Babb's sense of time and cognitive reasoning, we will never know. The desire is that something is learned in this incident review which may alter the course of a future similar case.

Exhibit 13
Page 10 of 10

COE 000121