*Will Stutesman*

*McGowan v Stutesman, et al.*

*October 19th, 2017*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Exhibit 17
Page 1 of 75

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

RONDA MCGOWAN, Personal          )
Representative for Estate of     )
Brian Babb, LEE BABB, CONNOR     )
BABB, by and through Guardian    )
ad litem, STEPHANIE WOODCOOK,    )
KAYLEE BABB,                     )
                                 )
          Plaintiffs,            )
     v.                          ) No. 6:17-cv-00424-TC
                                 )
WILL STUTESMAN, OFFICER GROSE,   )
OFFICER PIESKE, Sgt. MCALPINE,   )
CITY OF EUGENE, a municipal      )
subdivision of the State of      )
Oregon, JANE DOE CALL TAKER,     )
John and Jane Does 1-10,         )
                                 )
          Defendants.            )


DEPOSITION OF WILL STUTESMAN

October 19, 2017

Thursday

1:52 P.M.


     THE VIDEOTAPED DEPOSITION OF WILL STUTESMAN

was taken at Harrang Long Gary Rudnick, 360 East

10th Avenue, Suite 300, Eugene, Oregon, before

Christine Oljace, CSR, RPR, CRC, Certified Shorthand

Reporter in and for the State of Oregon.

```
 1

 2                    APPEARANCES

 3  For the Plaintiffs:

 4      MS. MICHELLE R. BURROWS
        420 SW Washington, Suite 300
 5      Portland, Oregon  97204
        503/241-1955
 6      michelle.r.burrows@gmail.com

 7  For the Defendants:

 8      HARRANG LONG GARY RUDNICK, PC
        360 East 10th Avenue, Suite 300
 9      Eugene, Oregon  97401
        541/485-0220
10      BY:  MR. JENS SCHMIDT
        jens.schmidt@harrang.com
11

12  Also Present:

13      LEE BABB

14      STEPHANIE WOODCOOK

15      MS. JAMIE IBOA

16      NATHAN PIESKE

17      MATTHEW GROSE

18      MALCOLM McALPINE

19

20  Videotaped by:  DAVID McGINNIS

21  Reported by:  CHRISTINE OLJACE, CSR-RPR

22      CC REPORTING & VIDEOCONFERENCING

23      EUGENE      541/485-0111

24

25
```

3

```
 1

 2                          INDEX

 3

 4   WITNESS.......................................PAGE

 5   WILL STUTESMAN

 6        BY MS. BURROWS                              4

 7

 8   EXHIBITS....................................MARKED

 9   Exhibit 46   Report of interview;              60

10              Bates COE 000588 - COE 00594

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  Good afternoon.

2    Today's date is August 19, 2017.  The time is

3    1:52 p.m.

4                I ask now if the court reporter would

5    please swear in the witness.

6

7                     WILL STUTESMAN,

8    having been first duly sworn to testify the truth,

9    the whole truth, and nothing but the truth, was

10   examined and testified as follows:

11

12                     EXAMINATION

13   BY MS. BURROWS:

14       Q.    Officer Stutesman, can you state your name

15   for the record, please?

16       A.    Will Stutesman.

17       Q.    And you are a police officer with the

18   Eugene Police Department?

19       A.    I am.

20       Q.    So you are the latest in three weeks of

21   witnesses, so you have heard all of the admonitions

22   and instructions and background?

23       A.    Yes.

24       Q.    Have you missed any depositions?

25       A.    Some of the neighbors and the dispatcher,

1   call taker depositions so --

2        Q.   Do you have any questions about the

3   instructions or what we are going to do now?

4        A.   No.

5        Q.   Okay.  I am not going to give them all to

6   you --

7        A.   Okay.

8        Q.   -- again other than offer you the

9   opportunity to read and sign the transcript once it

10  is created.

11           In addition, you are being videotaped

12  today, along with the transcript, and both will be

13  created and are available to use later in future

14  proceedings.

15       A.   Okay.

16       Q.   Have you ever had your deposition taken

17  before?

18       A.   No.

19       Q.   Well, I don't have to tell you how it is

20  going to go, because you have watched a number of

21  them.

22           Beyond the deposition testimony that you

23  have heard of your fellow officers, have you or --

24  have you spoken with any of them about the

25  deposition or the incident other than in meetings

1   with your lawyer?

2       A.     About the depositions, no, other than in

3   with Counsel.

4       Q.     Okay.  Have you spoken with any of your

5   fellow officers about the March 30th incident?

6       A.     We had a critical incident debrief several

7   months afterwards.  I don't remember the exact date

8   or time that was held.

9       Q.     So Officer Grose testified he thought that

10  was sometime in the fall of 2015.  Is that the same

11  debrief you are talking about?

12      A.     Yes.

13      Q.     And do you remember any notes or reports

14  or information handed out or distributed at that

15  debriefing?

16      A.     I don't, and I don't believe there was

17  anything that was handed out or notes taken.

18      Q.     And Officer Grose recalled that there were

19  dispatch recordings played during that debriefing.

20  Do you recall that as well?

21      A.     I do.

22      Q.     Was there anything else that may have been

23  demonstrated to the group that may not have been

24  handed out, but something that may have been

25  demonstrated?  Pictures?  Maps?  Anything like that?

1     A.    There -- there may have been some pictures

2  or maps along with the audio of the dispatch tapes.

3  Oftentimes with these critical incident debriefs,

4  some of those tools are used to assist with these

5  kinds of things.

6     Q.    Okay.  Did you review any records in

7  preparation for your deposition?

8     A.    I did.

9     Q.    And I want to make sure I say it broadly

10  enough.  Did you review any materials -- and by

11  review, hear, watch, look at, read.  Anything like

12  that?

13     A.    I reviewed the pack of materials that was

14  provided by my attorney, which included the black

15  and white color -- or sorry -- black and white

16  pictures, aerial photographs of the area, portions

17  of the IDFIT report, which included my statement and

18  other officers' statements that have been deposed,

19  and then the Use of Force Review Board memo --

20     Q.    Okay.

21     A.    -- that was produced.

22     Q.    Did you review any videos?

23     A.    Yeah.  I reviewed the BearCat in-car

24  video.

25     Q.    Okay.  I just had a thought.

8

```
 1              You said that you have never been deposed
 2    before.  Is that correct?
 3        A.    Correct.
 4        Q.    But you have testified in court before?
 5        A.    I have.
 6        Q.    Okay.  So the act of testifying is not
 7    unusual to you?
 8        A.    Correct.
 9        Q.    Are you feeling okay today?
10        A.    I am.
11        Q.    All right.  Are you nervous?
12        A.    Yeah.
13        Q.    Okay.  I don't want you to be nervous
14    so -- I can get a sense from you you are a little
15    bit nervous right now.
16              So in the materials that you reviewed, did
17    you review the statements, the narrated statements
18    of all of the officers who have already testified in
19    these depositions?
20        A.    Yes, I did.
21        Q.    All right.  When was the last time you
22    reviewed your statement?
23        A.    It would have been earlier this morning.
24        Q.    Earlier when?
25        A.    This morning.
```

Exhibit 17
Page 9 of 75

1    Q.    This morning?  All right.

2          And prior to this morning, when was the

3  last time you looked at it?

4    A.    I am not sure.  It would have been over

5  the last couple weeks.

6    Q.    Okay.  Did you at any -- and because you

7  have sat in on all these depositions and there has

8  been an awful lot of testimony gathered, at any

9  point during the last three weeks did you go home

10 and review anybody's records because of something

11 that was said in the deposition?

12   A.    No.  I don't believe there was any

13 specific testimony that caused me to review the --

14 any reports again.

15   Q.    Okay.  We have the notebook of exhibits

16 here, and I might ask you just simply to review some

17 of the same exhibits we have been looking at

18 before --

19   A.    Okay.

20   Q.    -- with all of the other witnesses.  The

21 dispatch record is at the very bottom, Exhibit 7.

22          What was your call sign that day?

23   A.    I will have to look and double-check, but

24 I believe it was 3E56.  3 Edward 56.

25   Q.    And again, with the same sort of provisos

Will Stutesman

10

```
1   that I used with Officer Grose, I understand that

2   there may be -- these dispatch records may not be

3   precise in the time that the events happened, so

4   given that proviso -- and I accept that -- can you

5   evaluate on Exhibit 7 when you recall first being

6   dispatched to this call at the Devos Street address?

7       A.    Yes.

8       Q.    Either self-dispatched or somebody sent

9   you.

10      A.    Okay.  Looks like the first time I'm

11  mentioned is on page 4 of 11, very bottom line.

12  3E56 dispatched at 5:07.

13      Q.    How long have you been a police officer?

14      A.    Since August of 2009.

15      Q.    At Eugene Police Department?

16      A.    Yes.

17      Q.    Did you work at any other agency prior to

18  EPD?

19      A.    I worked at the Lane County Sheriff's

20  Office as a corrections deputy from 2006 to 2008.

21      Q.    And prior to Lane County?

22      A.    No.

23      Q.    When did you graduate from high school?

24      A.    1999.

25      Q.    What did you do between 1999 and 2006?
```

1    A.    Construction, logging jobs.  Did that for

2    quite a while.  Got married and had a family.

3    Q.    What made you decide to go into law

4    enforcement?

5    A.    It's something I have always wanted to do,

6    been interested in.  I kind of finally decided that

7    I wasn't getting any older, and if I didn't try --

8    start applying myself and trying to apply with the

9    different agencies, that I would never have the

10   chance.  So kind of part of the first part of that

11   was the job I had at the time.  I was out of town

12   all of the time, never home, so I got a job where I

13   was home more often and started volunteering for the

14   fire department out where I lived and -- in Dexter.

15   And I did that for a couple years and was finally

16   able to get hired with the sheriff's office as a

17   corrections deputy.

18   Q.    You were a volunteer firefighter in

19   Dexter?

20   A.    Uh-huh.

21   Q.    Is that a yes?

22   A.    Yes.  Sorry.

23   Q.    Okay.  Did you also become a medic?

24   A.    No.

25   Q.    So what state certifications do you hold?

1  Do you have a corrections certification?

2      A.    I did.  I believe that's since lapsed.

3  And I currently have basic police certifications.

4      Q.    Did you have to get a firefighter

5  certification to be a volunteer?

6      A.    That was part of the process of going

7  through -- I don't remember if I ever was there long

8  enough to complete the entire packet to become a

9  certified firefighter, I guess.

10     Q.    But you had started it?

11     A.    Uh-huh.

12     Q.    Yes?

13     A.    Yes.

14     Q.    And then why did you start at Lane County

15  in the corrections?  Was it just because that was a

16  job that was open?

17     A.    Partly.  Partly also it was kind of a foot

18  in the door, a place to start.  It was local, so I

19  wouldn't have to move my family out of the area.

20     Q.    You said that you left in 2008.  Was that

21  to take a job at Eugene?

22     A.    I was laid off due to budget cuts.

23     Q.    Oh, okay.  And how did you get on with

24  Eugene then?

25     A.    Through the application process.  I was --

1   in between the time I got laid off and when I got

2   hired with Eugene, I was off for about a year and a

3   half, so I went back to working construction jobs

4   when they were available or kind of whatever I could

5   do in between.

6       Q.   Okay.  And you were hired, then, I take it

7   at Eugene before you went to the academy?

8       A.   Yes.

9       Q.   Did you go to DPSST?

10      A.   Yes.

11      Q.   And what is your highest level of

12   certification right now?

13      A.   Basic police.

14      Q.   Okay.  What specialty team -- I know you

15   are on SWAT, but besides SWAT what other specialty

16   teams have you worked on with Eugene?

17      A.   I have done park patrol occasionally.

18   Otherwise just a patrol officer.  There was a street

19   crimes team that ran for a couple months a couple

20   years ago that was a handful of officers on

21   different shifts that were basically focused on

22   prolific offenders, and I was part of that.  And

23   that was just a temporary assignment.

24      Q.   Okay.  Have you ever been an FTO?

25      A.   I just recently began being an FTO.

Exhibit 17
Page 14 of 75

Will Stutesman

14

```
 1      Q.    When did you start working as an FTO?

 2      A.    A month or two ago.

 3      Q.    Okay.  Oh, you are brand new.

 4      A.    So very recent, yes.

 5      Q.    So you have just had your first recruits

 6  assigned to you?

 7      A.    Yeah.  I just had my first recruit for

 8  about a month before he was scheduled to go up to

 9  the academy.

10      Q.    How is that going?

11      A.    Good so far.

12      Q.    You like it?

13      A.    Uh-huh.

14      Q.    All right.

15      A.    Yes.

16      Q.    And then consistently since 2009 you have

17  always been a patrol officer?

18      A.    Yes.

19      Q.    Okay.  And how long have you been on the

20  SWAT team?

21      A.    Since 2014.

22      Q.    So about three years?

23      A.    Yeah.

24      Q.    Yes?

25            And at the time of the March 30th
```

Will Stutesman

15

1  incident, how long had you been on there?

2      A.      Right about a year.

3      Q.      Okay.  And I have heard from various

4  officers -- and tell me if you agree with this --

5  that you were a sniper.

6      A.      No, I am not.

7      Q.      Okay.  I apologize.  I misunderstood it.

8              Did you have a particular position or role

9  that you filled on the SWAT team?

10     A.      No.  We are trained to basically fulfill

11 all of the roles on the team currently.  The sniper

12 position is a separate position that requires

13 additional training.

14     Q.      Okay.  Have you ever been a sniper?

15     A.      No.

16     Q.      At the -- on the March 30th incident, I

17 saw from the roster that there were a number of SWAT

18 officers there.  Besides yourself, do you remember

19 which other officers present on March 30th were SWAT

20 officers?

21     A.      I remember Sergeant McAlpine, Sergeant

22 Vinje, Officer Farley, and Officer Kidd, and Officer

23 Warden.

24     Q.      Okay.  Of those officers, do you recall

25 who had received the sniper training?

Exhibit 17
Page 16 of 75

1      A.     Officer Farley and Officer Kidd.

2      Q.     Okay.  Do you know why you were placed in

3  the turret of the BearCat that day versus Kidd or

4  Farley?

5      A.     From our discussions that we had had kind

6  of while we were at the driveway, we knew that Kidd

7  and Farley were going to try and gain observation of

8  the house somewhere else, you know, see if they

9  could get a better view of the house while we were

10  waiting for the BearCat to arrive.

11         When the BearCat arrived, they were

12  already out in their positions looking -- you know,

13  trying to find a better view of things.  So I was

14  there with my rifle.  I am assuming that is why I

15  was asked to get in the turret, in the hatch, to be

16  able to have that overwatch position so we could see

17  over those fences.

18      Q.     And when you were placed in the turret

19  position by Sergeant McAlpine, did you understand

20  that you might have to shoot someone?

21      A.     That is always a possibility in our job.

22      Q.     Okay.  And the -- Officer Kidd was placed

23  at least on one rooftop position, and I believe

24  Officer Grose told us that he thought Farley was

25  en route or in process of taking another rooftop

1  position.  Do you remember that as well?

2      A.    Yes.

3      Q.    Okay.  Could you see where Farley was --

4      A.    No.

5      Q.    -- from the turret?

6      A.    I could not see where Farley was.

7      Q.    Okay.  Could you see Officer Kidd from the

8  turret position?

9      A.    I could.

10     Q.    And you heard his description of where he

11  was located on that 2244 rooftop?

12     A.    I did.

13     Q.    Did you see him change position at all

14  during that evening time period?

15     A.    I could hear, and he had also -- we were

16  talking back and forth occasionally, because we

17  could communicate -- we were close enough together

18  we could talk back and forth, too, instead of tying

19  up the radio traffic sometimes.  But I could hear

20  him trying to move around on the roof to see if he

21  could get a better position or less-exposed position

22  on the roof --

23     Q.    Okay.

24     A.    -- once he was there.

25     Q.    And you could actually yell up at him on

1  the roof and talk to him?

2      A.    Yes.

3      Q.    Okay.  At -- on the time of this incident,

4  what beat were you working?

5      A.    Beat 5.

6      Q.    Beat 5?  And what shift were you working

7  at that time?

8      A.    Third watch, which is --

9      Q.    Third watch?

10     A.    -- 11 a.m. to 9 p.m. Sunday through

11  Wednesday.

12     Q.    And presently what watch are you working?

13     A.    The same shift.

14     Q.    Same?

15           Are you the same beat?

16     A.    No.

17     Q.    What beat are you on now?

18     A.    Beat 2, which would be downtown.

19     Q.    Okay.  You -- we were on the dispatch

20  record, and you recall being called out or

21  dispatched at 5:07?

22     A.    Yes.  That is what the record indicates

23  here.

24     Q.    Did you self-dispatch or did someone --

25     A.    Yes, I self-dispatched.

1    Q.    Okay.  And at 5:07 -- I have asked every

2 officer this, so you know what I am about to ask

3 you -- do you recall what information you had about

4 the call you were going to on Devos Street?

5    A.    I believe on the initial dispatch,

6 Station 1 asked for the -- I believe it was Officer

7 Barnes and then for any other unit that could clear

8 and assist for an armed, suicidal subject that

9 possibly had a gun to his head.  That is -- when I

10 copied up, I was right at ECU writing reports next

11 to Officer Barnes.  And several other officers

12 copied up with that information and began going --

13 going to the call.

14    Q.    When you use the term "copy up," what do

15 you mean?

16    A.    Get on the radio and say that they are

17 en route.

18    Q.    Okay.

19    A.    So self-dispatched themselves.

20    Q.    So how many officers were with you in the

21 office when that call came over the radio?

22    A.    I was in my car writing a report.

23    Q.    Oh.

24    A.    So I was in the car by myself.  I knew

25 Officer Barnes was at ECU.  I don't know if she was

Will Stutesman

1  inside writing the report or if she was in her car.

2  And I don't remember how many other people were

3  there, if any.

4      Q.    And from the 5:07 time, then you

5  immediately took off towards --

6      A.    Yes.

7      Q.    -- the call?

8      A.    Yes.

9      Q.    Okay.  Did you know Mr. Babb prior to this

10 call?

11     A.    No.

12     Q.    Did you know Ms. Woodcook?

13     A.    No.

14     Q.    Do you know if your wife knows her?

15     A.    I don't think my wife does.

16     Q.    Okay.  Let's look at Exhibit 16, which is

17 the Google maps picture.

18     A.    Okay.

19     Q.    Could you tell me where you parked when

20 you arrived at Devos Street?

21     A.    So I parked off to the southeast on Cody,

22 kind of back a little ways on Cody from east of

23 Devos.

24     Q.    Okay.  And then you approached the

25 residence or the location on foot?

Exhibit 17
Page 21 of 75

1    A.    Yes.

2    Q.    Were you alone?

3    A.    Officer DeWitt pulled up about the same

4    time I did.  He parked right behind me.

5    Q.    And did you walk up together?

6    A.    Yes.

7    Q.    When you got to Devos Street, were there

8    any patrol vehicles parked at the end of the street?

9    A.    I don't remember.  I don't specifically

10   remember seeing where other patrol vehicles were

11   parked on Devos.

12   Q.    Okay.  Describe your route for me up to

13   the 2244 address.

14   A.    I just walked west to Devos.  I think we

15   walked to the west side of Devos Street and then

16   north until we met up with Officer Kidd somewhere

17   here at the 2244 Devos.  And I am not sure if we

18   came into the driveway or if we stood back here a

19   little ways.  It was right in this general area of

20   the 2244.

21   Q.    In the front yard?

22   A.    Yeah.

23   Q.    Okay.  So it is Kidd, DeWitt, and you in

24   the front yard at that point?

25   A.    Yes.

1      Q.    Did you see any other officers present at

2  or near that location?

3      A.    Not initially.

4      Q.    Okay.  And you said that Officer Barnes --

5  you knew that she was at some point en route.  Is

6  that correct?

7      A.    Yes.

8      Q.    Did you see her at anytime in the

9  location?

10      A.    I don't remember seeing her initially.

11      Q.    Initially.  At some point, though, did you

12  see her?

13      A.    Yes.

14      Q.    Where was she when you saw her the first

15  time?

16      A.    When I saw her the first time it was

17  after -- after the shot had been fired and I was

18  walking back to the street, and she was back here.

19      Q.    Okay.  I am going to ask you the same

20  thing I have asked other officers to see if anybody

21  knows what is going on.  As you may or may not know,

22  a couple of neighbors have told us that an officer

23  went to their front door to tell them to shelter

24  inside.  Did you see officers do that with any of

25  the neighbors?

1    A.    No, I did not see any officers do that.

2    Q.    Were there any officers in plainclothes

3  there that day that you know about?

4    A.    None that I knew about or remember.

5    Q.    Okay.  Do you have any idea who may have

6  gone up to these folks's house and --

7    A.    I don't.

8    Q.    -- said, "We are the police; stay inside"?

9    A.    No.

10    Q.    Okay.  And you didn't do that, did you?

11    A.    No.

12    Q.    All right.  So I am trying to do a

13  timeline, so let's just walk through it a little

14  bit.  You -- can you tell me -- if you need to flip

15  through the dispatch record again, do that.

16    A.    Okay.

17    Q.    My next piece of information I would like

18  from you is when we know you arrived approximately,

19  and besides the other two officers with you, who

20  were the next officers you saw arrive?

21    A.    So I remember -- I will have to flip

22  through for the timeline.  I remember at some point

23  Sergeant McAlpine joining us here.  So me, DeWitt,

24  Officer Kidd, and then Sergeant McAlpine were here

25  initially before the -- before the BearCat ever

1   showed up.

2       Q.    Okay.

3       A.    And I will --

4       Q.    Go ahead.

5       A.    -- review the records to get you about a

6   timeline on when I arrived.

7       Q.    Okay.

8       A.    So 3 Edward 56 arrived at 5:13 p.m.  It is

9   on page 5 of 11.

10      Q.    Okay.  5:13?

11      A.    Yes.

12      Q.    Okay.  So it was about six minutes.  You

13  must have been close.

14      A.    Yes.

15      Q.    Okay.  And Kidd -- excuse me -- DeWitt

16  arrived about the same time you did?

17      A.    Yes.

18      Q.    And Kidd arrived shortly thereafter, or

19  was he already there?

20      A.    Officer Kidd was the first one there.

21      Q.    Okay.

22      A.    He began giving some updates on the radio

23  as we were approaching on foot.

24      Q.    And McAlpine -- can you tell by looking at

25  that when McAlpine arrived?

Will Stutesman

25

1    A.    Looks like 3 X-ray 31 arrived at 5:19 p.m.

2    Q.    So he is about six minutes after you?

3    A.    Yes.

4    Q.    So did anyone else arrive before McAlpine

5    got there that you recall?

6    A.    I don't remember seeing any other officers

7    with us.  I remember hearing other officers checking

8    out on perimeter positions.

9    Q.    Okay.

10    A.    But I don't specifically remember the

11    timeline of that.  This record kind of shows --

12    shows when people are checking out.

13    Q.    So when McAlpine gets there, he is the

14    incident commander?

15    A.    Yes.

16    Q.    Is that -- okay.  Did he -- did you have a

17    discussion amongst -- I guess there is four officers

18    at that point.

19    A.    I believe so.

20    Q.    Was there a discussion about what was

21    going on and what you were going to do next, you

22    being collectively, all of you officers?

23    A.    I think we were talking about trying to

24    figure out what our plan was.  I don't specifically

25    remember what the discussion covered.  I just

1  remember that we were kind of discussing what --

2  kind of our options and kind of what we were going

3  to do.

4       Q.    What options did you all discuss?

5       A.    Well, with the way the house was set up,

6  because it was a two-story house, we could see that

7  the upstairs windows -- at least one of them

8  appeared to be open.  It was really dark inside, so

9  you couldn't see inside that -- inside the window

10  very well.  Another one of the windows had the

11  blinds closed on it.  We couldn't see anything in

12  the downstairs really, maybe the top part of the

13  window and maybe part of the door from where we

14  were.

15            With the information that he had possibly

16  already shot a round, that there was possibly a

17  roommate inside still, we wanted to try and get

18  basically eyes on all sides of the house to kind of

19  see what we had, and if somebody did decide to come

20  out quickly, we wanted to be able to see somebody

21  and address them before they kind of came around the

22  corner and surprised us.

23       Q.    Okay.  Go back to 16 for me, will you?

24       A.    Okay.

25       Q.    So at least by 5:19, McAlpine arrives and

1   you are having the discussion you have described to

2   me.  Do you recall any other officers arriving in

3   that time period?

4       A.    I remember hearing Officer Clark saying he

5   was arriving and going to take a position to the

6   west somewhere off of East Irwin, and Officer Barnes

7   and Officer Farley arrived somewhere to the north to

8   try and get a position from there.

9       Q.    Okay.  And at what point in all of this

10  discussion did the BearCat arrive?

11      A.    This was a continual discussion that was

12  going on the entire incident.

13      Q.    Okay.  Did -- you heard Officer Grose

14  testify that he believes he got into the BearCat out

15  here on the road.  Do you remember getting in the

16  BearCat when it is out on the road?

17      A.    I can't remember if I got into the BearCat

18  when it was on the road or once it was parked.  I

19  want to -- I want to say that we got into it while

20  it was still on the road or at least around the

21  corner, not directly in front of the house.

22      Q.    Okay.  Was there a discussion about where

23  to place the BearCat?

24      A.    Yes.

25      Q.    Tell me about that discussion.

1    A.    We wanted it in a position to where we

2  would kind of have the best view of the front of the

3  house.  And the -- really the way -- the layout of

4  the terrain and the other properties around here, it

5  was in the driveway here of this 2244 house, so it

6  was basically to get the BearCat pointed at the best

7  angle facing -- facing the house.  And then from the

8  elevated position of the turret, once I got in

9  there, that would give us a little bit better view

10  of the front door and other things going on in case

11  somebody came out or started coming towards us.  We

12  could address them from there without them coming

13  around and --

14    Q.    The access to the Babb house presented

15  some tactical challenges, didn't it?

16    A.    Yes.

17    Q.    Why don't you explain the tactical

18  challenges that you saw and were discussed with you,

19  the officers.

20    A.    So again, with it being a two-story house

21  and not sure where Mr. Babb was in the house, we

22  knew that from those second-story windows, it would

23  be very easy for anyone inside the house to see

24  where we are at.  That long driveway presented the

25  same problem.  There is no cover or concealment of

1  any kind really, making any approach to the house

2  difficult and extremely dangerous for a call where a

3  person had reportedly already shot a round off.

4      Q.    And there were also a lot of cars and

5  trucks and things in that driveway.  Is that

6  correct?

7      A.    Yes.  I remember the two white pickups

8  here.

9      Q.    Did that present any concerns for how you

10 would access the house should you need to move the

11 BearCat forward?

12     A.    I don't specifically remember us having a

13 discussion about driving up in the BearCat.  That

14 wasn't really part of the initial plan at first.

15     Q.    What -- so what would -- the initial plan

16 was to park in the driveway and do what?

17     A.    Basically try to call Mr. Babb and anybody

18 else outside to try and resolve this peacefully.

19 Ideally -- we were having the discussion -- the

20 dispatcher was telling us that the call taker, his

21 therapist, was still on the phone with him, so there

22 was kind of some limited communication issues

23 that -- I remember Sergeant McAlpine airing some

24 requests to dispatch, and whether that got relayed

25 or not, it was hard to tell, because we got told

1   several times that dispatch just had an open line

2   with the call taker and that she was talking to

3   Mr. Babb.  Later during the call I remember dispatch

4   saying that Mr. Babb wasn't responding at all to

5   the -- to the therapist at all.

6       Q.    Uh-huh.

7       A.    So does that answer your question?

8       Q.    Yes.

9       A.    I am not sure if that was a complete

10  answer or not.

11      Q.    You are doing fine.  You are doing fine.

12            I have gone over this story so many times

13  with so many people, it is kind of blurring a little

14  bit in my mind, and I want to make sure I get your

15  story to the best of your ability to tell it to me.

16            Who made the decision to put you in the

17  turret of the BearCat?

18      A.    Sergeant McAlpine.

19      Q.    Do you know why he picked you?

20      A.    Not --

21            MR. SCHMIDT:  Objection.  Asked and

22  answered.

23            MS. BURROWS:  Pardon?

24            MR. SCHMIDT:  I said objection.  Asked

25  and answered.

1    A.    And not specifically.  Kind of like I said

2  before, Officer Kidd was tasked with trying to get a

3  different view of the area.  Officer DeWitt had the

4  40mm less lethal launcher.  I was there with my SWAT

5  rifle.

6  BY MS. BURROWS:

7    Q.    Okay.  How many long rifles were there

8  present at the scene at that time, if you remember?

9    A.    I don't remember.  I remember I had mine.

10   Q.    Okay.

11   A.    And I am not -- I don't remember

12  specifically who else had theirs with them.

13   Q.    The long rifles are normally kept in the

14  patrol vehicle.  Correct?

15   A.    Yes.

16   Q.    Are they in a lockbox in the trunk or

17  somewhere else inside the vehicle?

18   A.    Mine was kept in a hard rifle case in the

19  trunk of the car.

20   Q.    And you had grabbed it before you left

21  your vehicle?

22   A.    Yes.

23   Q.    Do all officers have access to a long

24  rifle in their patrol vehicle?

25   A.    No.

Will Stutesman

1      Q.     What -- is there some particular criteria

2   in order to have a long rifle with you in your

3   patrol car?

4      A.     Yeah.  You have to go through an

5   additional long rifle training course through the

6   department to get qualified with a patrol rifle to

7   be able to carry one.  And then depending on --

8   basically depending on whether the department has

9   enough, you will either be issued one of your own or

10  there are some pool rifles that are kept in the safe

11  at the police department that officers can utilize

12  during their shift.

13     Q.     So the rifle you had, was that one that

14  had been issued to you?

15     A.     It was through the SWAT team.

16     Q.     When was the last time you had sighted it

17  in?

18     A.     I don't remember.

19     Q.     Are you required to sight it in regularly?

20     A.     We do qualifications with them, yes.

21     Q.     Maybe I should make myself a little

22  clearer.

23            So you have to qualify on the range

24  regularly with your weapons.  Correct?

25     A.     Yes.

Exhibit 17
Page 33 of 75

1    Q.    That includes your side arm and the long

2    rifle?

3    A.    Yes.

4    Q.    Now, the reason I am asking about sighting

5    in the rifle is that Department of Corrections has a

6    requirement that rifles used in the tower have to be

7    regularly sighted in.  Is there such a requirement

8    for the long rifles that you have access to?

9    A.    Not that I am aware of.

10   Q.    Okay.

11   A.    With the training that we do, if we feel

12   like our sighting system is off for whatever reason,

13   then we will take the time to adjust it to make sure

14   it is where we think it needs to be.

15   Q.    Prior to March 30th of 2015, when was the

16   last time -- is that the right way to say that

17   sentence?  What was the most recent time you had

18   used -- fired that long rifle?

19   A.    I don't remember specifically.  I know we

20   have -- it would have been on our SWAT training

21   days, which are typically held on the last two

22   Wednesdays of every month and -- but not all of

23   those training days were at the range.  Oftentimes

24   they are different scenario training or other

25   things.  So I don't remember the last time I had

1    shot it before this incident.

2        Q.    Now, I know that qualifying on a weapon --

3    usually it is an annual qualification, isn't it?

4        A.    I think our department is semi-annually.

5        Q.    Okay.  And do you, though -- other than

6    those qualification events when you qualify, do you

7    otherwise practice with the long rifle?

8        A.    Yes.

9        Q.    And how often would you say you do that?

10        A.    Again, it varies.  Being on the SWAT team,

11    we get more practice than patrol officers in

12    general, but I can't tell you specifically how --

13    how much more.  But they are something that we

14    utilize, whether it is live fire at the range or

15    Simunition training, which are basically -- they are

16    like a paintball bullet that -- force-on-force

17    training --

18        Q.    Okay.

19        A.    -- that we use in scenarios sometimes.

20        Q.    Okay.  Let's talk about the live shooting

21    events that -- I am going to take it from your SWAT

22    exercises.  Is there any way that we could look at

23    your records and find out the last time prior to

24    March 30th you may have used that rifle in a live

25    shooting exercise?

1      A.    It is possible.  Oftentimes -- we usually

2  have -- we try to remember to fill out an F6 through

3  the DPSST to submit fire training records for the

4  day.  It usually explains what our training was for

5  that day.  Whether that happened or not, I don't

6  know.

7      Q.    Okay.

8      A.    So I guess going through our training

9  records through the training department would

10  probably be your best source of trying to find that

11  information.

12      Q.    Well, you heard me ask Officer Grose about

13  his training.  I can get all your DPSST training

14  records online, and I normally do that anyway, but

15  are there other training -- trainings that you may

16  have gone through that would not necessarily have

17  been submitted to DPSST?

18      A.    Yeah.  Some of our SWAT training days,

19  especially if it is -- well, once in a while we will

20  have an equipment day or some of our other training,

21  if it is put on maybe by somebody that doesn't

22  normally put on training or it is -- you know, there

23  may not have been an F6 filled out and submitted to

24  DPSST.  Again, we try to be -- make sure we get that

25  done, but again, it doesn't -- doesn't always

1   happen.

2        Q.    Sure.

3        A.    Sometimes people forget to -- forget to do

4   things so --

5        Q.    But if you are doing training and you want

6   to get paid for that day, do you have to submit some

7   kind of records to the department?

8        A.    We turn in -- fill out our time sheet.

9   Our time sheet doesn't necessarily -- when it is a

10  regular day that we work, it won't necessarily have

11  a -- there may be different hours, like if we work

12  different hours that day than our normal patrol

13  shift, but there won't necessarily be anything else

14  to indicate that -- what specifically we did that

15  day.

16       Q.    So the time sheet wouldn't show that you

17  were out shooting on the range for SWAT?

18       A.    No.

19       Q.    Okay.  All right.  What is the minimum

20  qualification score when you are shooting with the

21  long rifle?

22       A.    I don't remember.

23       Q.    You have always qualified?

24       A.    Yes.

25       Q.    And at what distance are you having to

1  qualify?

2      A.     With the rifle, we start -- start at a

3  hundred yards and work in from there.

4      Q.     A hundred yards?

5      A.     There is different stations.

6      Q.     Wow.   That is a long distance with a

7  rifle.   Okay.

8              So back to this date.

9      A.     Okay.

10      Q.     You had your SWAT rifle.   What was the

11  make and model of that rifle?

12      A.     It was an HK, Heckler Koch, 416 .223

13  caliber rifle.

14      Q.     And you had fired that weapon before this

15  date?

16      A.     Yes.

17      Q.     Okay.   And I understand that Officer Kidd

18  was given a long rifle from Sergeant McAlpine.   Did

19  you see that happen?

20      A.     I did not see it happen, no.

21      Q.     Are you aware that it happened?

22      A.     Yes.

23      Q.     All right.   Any other officer that you

24  know who was on that scene who had their long rifle

25  with them?

1    A.    Not that I know of.  I couldn't see the

2  other officers on the perimeter positions, and the

3  other officers that showed up after we got into

4  position with the BearCat, I wasn't looking behind

5  me really to see what they were doing.

6    Q.    Okay.  So it seems to me after talking to

7  all of the officers that everyone parked away from

8  the actual Babb address.  Is that correct?

9    A.    Yes.

10   Q.    And why is that -- why do you park away

11  from the address that you are investigating?

12   A.    Well, we don't want the person or people

13  inside to basically be waiting for us to show up and

14  basically have a big police car to target right

15  away.

16   Q.    Okay.  So if all of the officers then

17  walked to this -- the address -- and I am using 2244

18  because that sounds like where you all converged

19  originally.  The officers who would have had their

20  rifles, you would have expected them to bring them

21  with them to the driveway here to this location?

22   A.    Yes.

23   Q.    And you said that Officer Kidd had a less

24  lethal?

25   A.    Officer DeWitt.

1        Q.    DeWitt.  I am sorry.

2              Anybody else bring a less lethal?

3        A.    I had my TASER.  There were several other

4    officers there that had TASERs as well.

5        Q.    When did you get certified on the TASER?

6        A.    I don't know specifically.  It would have

7    been -- it was after I completed the -- basically

8    completed my rotation or probationary period, I

9    think.  It was sometime after that that I went

10   through the TASER course through the department.  So

11   18 plus months after my initial hire.

12       Q.    Okay.  Are all officers with Eugene

13   required to become certified on the TASER?

14       A.    I don't know if that is a requirement now.

15   I think all of the new officers are being certified

16   in TASER.  I am not sure if it is a requirement for

17   everybody to be certified with it or not.

18       Q.    At one point in time, I snuck into a TASER

19   conference, and there was some discussion about

20   officers in the certification training getting tased

21   themselves.  It wasn't mandatory.  Did you get tased

22   in the training?

23       A.    No.

24       Q.    Okay.  So you were placed up in the turret

25   of the BearCat once it arrived.  Tell me what you

1  could see of the front of the house from the turret.

2      A.    From the front of the house, kind of the

3  top -- I could see all of the upper windows.  There

4  was a -- on the left side facing the house, which

5  would be I guess the south side of the house, there

6  is -- it appeared to be a big bedroom window that

7  the blinds were open.  I am not sure if the window

8  was open or if there were just no blinds, but you

9  could see a big dark room inside.

10          Next to that, a little ways to the right

11  in the middle was a smaller window that, based on

12  the size, it looked like maybe a bathroom type

13  window or something.

14          And then to the right of that was another

15  like a room-sized window that had some blinds closed

16  covering it from the inside.

17          On the bottom floor, first floor, there

18  was a large like picture window on the south side of

19  the house on the left.

20      Q.    On the left as you look at the house?

21      A.    Yes.

22      Q.    That is not where the garage is?

23      A.    I don't remember specifically seeing the

24  garage.  I remember there was also a large RV-type

25  trailer or something.

1      Q.    Okay.

2      A.    I remember seeing a -- my impression was

3  of a larger window which -- possibly like a living

4  room type window.

5      Q.    Okay.

6      A.    Next to that was the front door.  I

7  remember it had kind of a porch -- small overhang

8  coming off it with some pillars coming down from the

9  sides.  And I can't remember if there was another

10  window off to the right of that.

11         I remember there was kind of a -- kind of

12  in that same area on the right side of the house

13  there was a tree that kind of branched -- you know,

14  went up and kind of branched off a little bit.  Some

15  of those branches were covering parts of that window

16  that had the blinds closed and covering it, but I

17  could see most of the window kind of through those

18  branches in that tree.

19      Q.    How tall are you, Officer?

20      A.    Six foot.

21      Q.    Six foot even?

22      A.    Yes.

23      Q.    Okay.  Could you see the bottom of the

24  doorjamb of the front door?

25      A.    No.

Will Stutesman

42

1      Q.    This is an awkwardly asked question, and I

2   will admit it right up front.  How much of that door

3   could you see standing in the turret of that

4   BearCat?

5      A.    So I would estimate about half the door,

6   the top half of the door.  I could see about the

7   door handle up.

8      Q.    Okay.  In the BearCat, at least the day

9   that we looked at it and did our evaluation, there

10  was a stool, a step stool.  Did you stand on that

11  step stool?

12     A.    I did not.

13     Q.    So all of this that you are telling me you

14  could see, you were flatfooted in the BearCat?

15     A.    Yes.  I pulled the stool out in case I

16  felt like I needed to get higher in there, and I may

17  have initially stepped up to see if that gave me a

18  better position, but it felt like it just put me up

19  too high, so I stepped off that.  But I left the

20  stool in the position directly under the turret

21  there, and then from there I could see out the top

22  of the vehicle.

23     Q.    Now, the turret has a hatch that comes up.

24  Does it move?  Does the hatch move?

25     A.    It does.

Will Stutesman

43

```
1      Q.    And obviously it was open when you were

2   standing in the turret area.  Did you move that lid,

3   that hatch, at all?

4      A.    I did.

5      Q.    And could you tell me in what position --

6   if you pretend that you are looking at Mr. Babb's

7   house, pretend you are in the turret and you are

8   looking at Mr. Babb's house, where is that hatch lid

9   positioned?

10      A.    So basically I positioned it so it was

11   kind of, from what I remember, basically flat facing

12   the -- facing the front of the house, and I just

13   kind of leaned just a little bit just so that, you

14   know, just the side of my head and face was exposed.

15   I was trying to expose as little as possible during

16   that incident.

17      Q.    Now, Officer Grose testified that he was

18   confident in the ballistic resistance of that

19   armored vehicle.  Were you equally confident in its

20   ability to withstand gunfire?

21      A.    In the vehicle's ability to withstand

22   gunfire, yes.  Kind of the biggest thing that gave

23   me some concern there was in order to see any of

24   this house, I still had to have part of my head

25   exposed and in view, and I couldn't see inside the
```

1  windows or inside the house to see where anyone was

2  unless they were right up front up close to the

3  doors or windows.

4      Q.    Where did you keep your rifle while you

5  were up in that turret?

6      A.    I kept it -- I rested my hand on the edge

7  of the turret and then -- so I rested the rifle on

8  the edge of that, just on the right side of the

9  hatch.  The reason I did that is because the way the

10  hatch is, if I did need to address a deadly threat

11  quickly, trying to bring the rifle up through that

12  wouldn't have been possible.  It would have jammed.

13  It would have -- could have possibly hurt somebody

14  inside if there was an accidental discharge or

15  something.  So having it just to the right side for

16  me, the right side of the lid, basically just

17  resting there with the safety on while I kind of

18  kept my head up trying to watch -- watch what was

19  going on at the house.

20      Q.    Is this rifle a semi-auto?

21      A.    Yes.

22      Q.    And you had a round chambered?

23      A.    Yes.

24      Q.    Did you do that inside the turret while

25  you were standing there or before you went up?

Will Stutesman

45

1     A.    I did that back when I was at my vehicle.

2     Q.    Okay.  And so the barrel -- so was the

3   entire rifle then out ready to be used?

4     A.    Yes.

5     Q.    Okay.  And you had it resting on one -- on

6   the hand that you had on the turret?

7     A.    Yeah, off and on.  If I needed to try and

8   talk on my radio, I would have to rest the front of

9   the gun basically on the metal top part of the

10  turret or hatch there.  But yeah, my right hand

11  stayed on the handle controlling the -- making sure

12  the safety stayed on and --

13    Q.    On the rifle?

14    A.    Yeah.

15    Q.    Are you right-handed?

16    A.    Yes.

17    Q.    And -- okay.  At what point in this

18  proceeding did you actually get up inside the

19  turret?  And there are different markers that the

20  different officers have given us.  Officer Grose was

21  talking on the phone.  There was hailing going on on

22  the loud speaker.  I mean, there were different

23  things going on.  In that process, do you recall

24  what was going on when you got up in the turret?

25    A.    I didn't get up there until the BearCat

Exhibit 17
Page 46 of 75

1    was set, and I don't remember -- I don't believe it

2    made any more movements once I got up there until we

3    decided to move on the house.  If it did, they would

4    have been very, very minor and -- but I don't

5    specifically remember any of that.  It was before

6    any hails started.

7        Q.    Was it before Mr. Antonini came out?

8        A.    Yes.

9        Q.    Was it before Officer Grose started making

10   calls trying to call Mr. Babb?

11       A.    I am not sure when Officer Grose started

12   trying to call him.

13       Q.    So you are up in the turret, and I

14   understand that you are on a fairly high level of

15   alert while you are up there, because theoretically

16   you could be a target easier than some of the other

17   officers.  Could you hear what was going on down in

18   the BearCat?

19       A.    Portions of it, yes.

20       Q.    Tell me what you remember hearing.

21       A.    So I remember just kind of the continuing

22   discussion of, you know, kind of trying to -- how we

23   are going to resolve this.  I don't remember

24   specifically what was said.

25             I remember once I got up there and set, at

1   some point that is when Officer Grose started

2   hailing the house.  And those were fairly loud from

3   my position, because the speaker is attached

4   outside, so that kind of drowned a lot of what

5   was -- kind of what other people were talking about,

6   if anything.

7       Q.    Now, I know your focus was then on the

8   house.  Once you are up in the turret, can you see

9   any other officers around you?

10      A.    I can see Officer Kidd on the roof of

11  2244.

12      Q.    What was his physical position when you

13  saw him at that point?

14      A.    I remember him -- he was trying to -- he

15  appeared to be laying down or trying to kind of hide

16  behind the chimney and the peak of the roof.  He was

17  trying to stay in a position where he wasn't too

18  exposed but where he could still see -- get some

19  view of the front of the house.  And we were kind of

20  having the discussion, some over the radio and with

21  him and Officer Farley in between us that he was

22  kind of having a difficult time seeing, especially

23  parts of the front door, due to those pillars that

24  were kind of holding up that overhang.

25      Q.    Is that why Farley was going to go up on

Will Stutesman

1    the roof of this house to the north of 2244?

2        A.    I believe so.  I knew they were having

3    that discussion of trying to get a better view of

4    where -- trying to get the best view possible.  And

5    Officer Kidd said that his view wasn't the best, he

6    felt, and so he thought maybe Officer Farley could

7    find a better vantage point from his position

8    somewhere to the north.

9        Q.    Okay.  Now, there has been testimony that

10   Mr. Babb came out of the front door at least twice.

11   Do you remember two visits by Mr. Babb to the front

12   door?

13       A.    I remember him opening the door, coming to

14   the front door.  I don't remember if he actually

15   came out of the house or not, but I just remember

16   him kind of at that threshold doorway area.

17       Q.    What did he do?

18       A.    Yelling at us to go away and slamming the

19   door.

20       Q.    At some point after the hailing on the

21   loud speaker, Mr. Antonini did exit the house, did

22   he not?

23       A.    He did.

24       Q.    Did you see him do that?

25       A.    Yes.

1    Q.   Tell me -- did Mr. Babb come to the door

2  with Mr. Antonini?

3    A.   No.

4    Q.   Mr. Antonini just opened the door and

5  walked out?

6    A.   He didn't just walk out.  He -- when he

7  came to the door, it looked like he was kind of

8  looking back inside.  And as some of the hails

9  continued, he came back to the BearCat, but he kept

10  kind of looking behind him.  As he got closer, I

11  could hear Mr. Antonini saying that he is going for

12  his guns, he is -- you know, he is going for his

13  guns inside.

14    Q.   Was Mr. Antonini running?

15    A.   I don't think he was running.

16    Q.   Was his -- were his hands up?

17    A.   Yeah, he was keeping his hands up.

18    Q.   Was he looking at you guys at all?

19    A.   Yeah.  I think he was kind of dividing his

20  attention, it felt like, between trying to see where

21  he was going towards us and looking back at the

22  house.

23    Q.   So you could hear Mr. Antonini as he is

24  moving towards you saying, "He is going for his

25  guns, he is going for his guns"?

1    A.    Yes.

2    Q.    Okay.  And did you keep track of

3    Mr. Antonini all the way down the driveway?

4    A.    Yes.  I kept track of him until -- it was

5    pretty apparent initially that he was compliant

6    with -- he was doing what we asked him to.  He was

7    coming out.  He kept his hands up.  I didn't see any

8    obvious weapons on him at all.  So once he got -- I

9    was -- as he was coming towards us, I was kind of

10   dividing my attention between him and the rest of

11   the house.  Once he got basically past my view or

12   past the front of the BearCat, I focused more of my

13   attention on the house again and let the other

14   officers that were on the ground kind of deal with

15   Mr. Antonini.

16          And at some point I remember them putting

17   him in the back, where they continued to talk to him

18   about what is going on.

19   Q.    Could you hear any of that conversation

20   between Mr. Antonini and the officers?

21   A.    Portions of it, yes.

22   Q.    Tell me what you remember hearing.

23   A.    I remember officers -- I can't remember

24   who was asking who the questions.  I couldn't tell.

25   I remember Mr. Antonini saying that Mr. Babb had,

1    you know, numerous rifles in the house.  I remember

2    specifically he -- him saying that he doesn't have

3    any assault rifles, but he has hunting rifles.  For

4    me -- you know, a hunting rifle is generally a

5    larger -- larger caliber and with a higher power

6    scope that could be more dangerous to us and other

7    people, especially in this setting where these rooms

8    and these open windows are dark and you can't really

9    see inside.  And somebody can be standing basically

10   in the shadows, and you would never be able to see

11   them.

12       Q.    Okay.  Do you remember anything else that

13   Mr. Antonini shared with the officers?

14       A.    Off the top of my head, I don't.  I

15   remember there was some more that I mentioned in my

16   initial statement, but right now it is not -- it is

17   not coming to mind.

18       Q.    Okay.

19       A.    Sorry.

20       Q.    Do you remember hearing Mr. Babb yelling

21   anything inside the house?

22       A.    Yes.

23       Q.    Could you tell me -- could you make out

24   what he was saying?

25       A.    He was yelling at us to go away, not to

1   come inside, using lot of profanity.

2            I remember after Mr. Antonini left, he

3   left the door open.  At some point Mr. Babb came to

4   the door yelling at us again, and he slammed the

5   door behind him.  And then several times during the

6   course of events, he was either in an upstairs

7   window or would come back to the door.

8      Q.   So how many times -- including the time

9   Mr. Babb was shot, how many times did you see

10  Mr. Babb in the doorway?

11     A.   I don't remember specifically.  I remember

12  at least twice.  I can't remember if there was more

13  than that or not.

14     Q.   Okay.  So the -- what you have just told

15  me about Mr. Babb coming to the doorway to shut the

16  door after Antonini left, was that one of those two

17  times or was that a different time?

18     A.   That was one of those two times.

19     Q.   Okay.

20     A.   And I can't remember if he came to the

21  door at any point before then or if that was a -- or

22  if he came to a window kind of before Mr. Antonini

23  came out.

24     Q.   Okay.  Now, Officer Kidd testified that he

25  saw Mr. Babb come to the door at least once before

53

1    you shot Mr. Babb.  Do you know -- did you know what

2    Officer Kidd was talking about?  Do you remember

3    that?

4         A.    The one I specifically remember is that --

5    when Mr. Babb came to the door after Mr. Antonini

6    left where he yelled at us and then slammed the door

7    shut behind him.

8         Q.    In that particular appearance, did

9    Mr. Babb have a weapon with him?

10        A.    No.

11        Q.    Do you remember what Mr. Babb was wearing?

12        A.    Not specifically.  I remember it was -- I

13   could only see about the top half of him.  I

14   remember I couldn't see legs or waist at all.  I

15   just remember the sweatshirt was kind of a -- or the

16   shirt or sweatshirt -- I may have transposed that

17   with reading all of the reports.  I am sorry.

18        Q.    That is part of the risk of --

19        A.    But I remember the shirt -- whatever he

20   was wearing on top was kind of a darker color that

21   seemed to blend into the background a bit.  The

22   inside of the house seemed kind of dark.

23        Q.    Okay.  Then on that last visit to the

24   door, tell me what happened.

25        A.    So the last time he came to the door, I

1   remember he -- the door opening.  He came to the

2   door.  And it seemed like a long time.  I really --

3   in realtime I am not sure what -- how long that was.

4   It took my mind what felt like seconds, a few

5   seconds to process what I was seeing.

6           But I remember seeing Mr. Babb at the door

7   with a rifle up to his shoulder.  It was a large

8   black rifle.  I could see the hole in the barrel of

9   the gun.  I could see it had a scope on it.  I can't

10  remember if he was looking through the scope or not.

11  He had it up in a firing position.  I have -- I

12  remember feeling the impression that at least part

13  of the rifle was kind of covering part of his face,

14  so I remember thinking that I didn't want to hit --

15  if I needed to or when I needed to shoot, I didn't

16  want to hit the rifle and have it ricochet and

17  possibly injure him, which would give him the

18  opportunity to basically go back inside or start

19  shooting from where he was.

20          I remember his -- basically the things

21  that stood out were that rifle right there and then

22  his head right there.  Kind of the rest of him just

23  seemed to just blend into the background.

24          And I remember thinking that -- you know,

25  in my head, that this is -- this is taking too long.

Will Stutesman

55

1    Tried -- I remember trying to yell "Drop the gun" or

2    something similar.  I don't remember if that ever

3    came out or not.

4          And then kind of during this whole thing I

5    am thinking I am too late.  He is going to shoot me,

6    and then he is going to start, you know, shooting

7    everybody else, so that is when I took the shot.

8        Q.    Have you ever shot anybody before?

9        A.    No.

10       Q.    So I need you to do something for me right

11   now.  I need you to stand up, face the camera, and I

12   need you to, to the best of your ability, assume the

13   position that Mr. Babb had when you saw him with the

14   rifle.

15       A.    Okay.  To the best of my remembrance, it

16   was up like this.

17       Q.    Was it pointed upward towards anywhere in

18   particular?

19       A.    It felt like it was pointed at me, so you

20   know, it could have been up like this from -- I

21   estimate our distance to be about 25 to 30 yards.

22   And I know for -- you know, from our practice with

23   the rifles and stuff, that the farther distance you

24   go, you know, angle -- slight angle adjustments

25   aren't as obvious, you know, from a distance as they

1   are up close.  So again, I guess if it was like that

2   or like that -- you know, it was kind of in this

3   general area somewhere.

4       Q.    So your shot went through his cheek and

5   came out his neck, so I am trying to get, the best

6   of your ability, to tell me which way he might have

7   been located in the doorway.

8       A.    Okay.

9       Q.    I am going to show you a couple pictures.

10          You need a break?  You doing okay?

11      A.    I am okay.

12      Q.    Okay.  Have you reviewed the autopsy

13  report in this case?

14      A.    No.

15      Q.    Was Mr. Babb inside the doorjamb inside

16  the house, or was he out on the porch?

17      A.    I couldn't tell.  From my position, it

18  looked like he was taking up the doorway, but I

19  couldn't tell if he was outside the doorway or just

20  inside.

21      Q.    Okay.  So this is from a shooting

22  reconstruction.  You have heard me give the

23  explanation.  This is a page I have not copied for

24  an exhibit.  And your round went into his left face

25  right about the cheekbone there, and it came out

1   through the neck.

2       A.      Okay.

3       Q.      So I am trying to figure out what you

4   remember about how he was squared up in the doorway,

5   how he was facing.

6       A.      To the best of my remembrance, it appeared

7   that he was looking either at me or at the BearCat

8   with the rifle pointed in my direction.

9       Q.      Was the side of his face towards you at

10  all?

11      A.      What I remember seeing, kind of like I

12  said before, the rifle -- I had the impression that

13  the rifle was obscuring at least part of the right

14  side of his face, so I guess when you say the side,

15  I mean -- you know, I remember this.

16      Q.      Okay.  Was he -- was he -- he had the butt

17  of the gun in his shoulder?

18      A.      Uh-huh.

19      Q.      Yes?

20      A.      Yes.  Sorry.

21      Q.      Was his head down, as if he was looking in

22  the scope?

23      A.      I don't remember.  Like I said before when

24  I stood up, I couldn't remember if his head was down

25  looking through the scope or if it was up looking

1  over that.

2      Q.     So this, again, is a computer-generated

3  rendition based on the trajectory of the bullet and

4  all of the information that we have available to us

5  when we did this, and there was a bullet hole in the

6  back wall of the living room, and then we knew

7  approximately where you were and we knew the

8  trajectory through Mr. Babb's body.  If you could

9  take a look at this position of Mr. Babb in the

10  doorway as our computer has generated it, does that

11  look approximately the position that Mr. Babb had

12  when you shot him?

13      A.     It could be approximate.  Again, I don't

14  know his specific, you know, body position as far

15  as, you know, which way -- this way, I guess, you

16  know, specifically, but I think generally this

17  appears close.  But again, I couldn't tell how far

18  in or out of the doorway he was.

19      Q.     Okay.

20              MS. BURROWS:  Do you want to see?

21              MR. SCHMIDT:  Sure.  Thanks.

22  BY MS. BURROWS:

23      Q.     I am sure that you have been told -- but I

24  don't know -- that we have at least one, possibly

25  two neighbor witnesses who actually saw Mr. Babb

Will Stutesman

59

1    come to the door when you shot him, and they say

2    that the rifle was strung over Mr. Babb's back.  Is

3    it possible that you saw the barrel of the rifle

4    behind Mr. Babb?

5        A.    No.

6        Q.    Okay.  And when you saw Mr. Babb in the

7    doorway -- let's slow it down a little bit.  You

8    were hiding -- you were concealed behind the round

9    lid, the -- and did you actually see him open the

10   door and come out?

11       A.    I don't remember seeing the door open.  I

12   remember looking and seeing him standing there with

13   the rifle raised.

14       Q.    And he already had the rifle raised when

15   you first saw him?

16       A.    Yes.

17       Q.    You didn't see him actually raise it to

18   a raised position?

19       A.    Not that I remember.

20       Q.    Okay.  Now, you did do a report or you

21   gave a statement to the investigators afterwards.

22   Have you had a -- you reviewed it.  Was there

23   anything in the statement that you gave that you

24   feel was inaccurate or needed to be modified or

25   adjusted or changed?

1      A.    Not that I remember from my review of it.

2      Q.    So I have got some weird report documents

3   here from your statement, and I want to show you

4   what I have got.  Did you -- did you also give a

5   statement to the shooting review folks?

6      A.    No.

7      Q.    So I have got -- let's mark this the next

8   in order.  Let me get all of the right pages here.

9   It is Bates stamped pages 588 to 594.

10                 (Deposition Exhibit No. 46 marked

11                  for identification.)

12   BY MS. BURROWS:

13      Q.    Could you take a look at this and see if

14   this is the statement document you reviewed in

15   preparation for your deposition?

16                 MS. BURROWS:  I'm just going to give

17   you the whole thing.

18                 MR. SCHMIDT:  Thanks.  Through -- he

19   is just looking at through 594?  Is that the whole

20   thing?

21                 MS. BURROWS:  No.  I just gave him his

22   pages of his statement.

23                 MR. SCHMIDT:  All right.

24      A.    This looks like the document that I

25   reviewed.

1    BY MS. BURROWS:

2        Q.    Are there any other documents of your

3    statements that were created that you know about?

4        A.    Not that I am aware of.

5        Q.    Was your statement recorded?

6        A.    I don't believe so.

7        Q.    So most departments will record an officer

8    who is involved in a shooting.  Your department

9    didn't do that?

10       A.    I don't believe so.

11       Q.    Okay.  Were you given some time off?  Were

12   you put on leave after the shooting?

13       A.    Yes.

14       Q.    How much time were you given off?

15       A.    I think I was -- it ended up being about

16   six weeks of admin leave, and then I had a planned

17   two-week vacation at the end of that that I

18   completed, so a total of eight weeks, I believe.

19       Q.    And are you required to get any counseling

20   by your department after you are involved in a

21   shooting?

22       A.    Yes.

23       Q.    And did you, in fact, get that counseling?

24       A.    I did.

25       Q.    Do you have to be cleared to come back to

62

1   work after you get the -- you are involved in a

2   shooting?

3       A.    Yes.

4       Q.    And who clears you to come back to work?

5       A.    I don't remember who it was.  It was a

6   psychiatrist's office in Portland that the City

7   contracts with.

8       Q.    Oh, okay.  Did you have to go through --

9   do a psychological evaluation?

10      A.    Yeah.  There is some questions and answers

11  and some forms to fill out.

12      Q.    And psychologically how have you been

13  since the shooting?

14      A.    I have been okay.

15      Q.    Do you have any -- any nightmares or

16  flashbacks?

17      A.    No.

18      Q.    Do you have -- how do you feel about the

19  fact that you killed somebody?

20      A.    I don't feel good about it.

21      Q.    Okay.  But how do you feel?

22      A.    So kind of like I said before, I don't

23  feel good about the outcome of this.  I don't feel

24  good about what happened.  I am glad that I am okay,

25  my other officers are okay, and that the surrounding

1   citizens weren't hurt.

2       Q.    Does it cause you emotional distress

3   knowing that you have taken someone's life?

4       A.    I wouldn't say it causes me any distress.

5   It is -- unfortunately, it is part of -- it could be

6   a part of our job doing this, part of protecting the

7   community, ourselves, and other officers, and if

8   somebody's actions determine that we need to use

9   deadly force, we need to be prepared to do that so

10  that somebody doesn't get hurt or killed that

11  shouldn't be.

12      Q.    Okay.  Have you ever had -- besides this

13  time with Mr. Babb, have you ever had anyone point a

14  weapon at you?

15      A.    Not that I can recall specifically.  We

16  have been -- I have been involved in several

17  high-risk incidents where people have either been

18  armed or had their weapons out that were -- they

19  followed commands, did what they were supposed to,

20  and we were able to take them into custody.

21      Q.    Now, after you fired at Mr. Babb, you have

22  heard the various officers testify that there was a

23  little bit of confusion about who fired.

24      A.    Yes.

25      Q.    Tell me what those moments were like right

1   after you fired and this confusion is going on.

2       A.    So in the first moments after, I just took

3   a breath just to kind of calm myself, because I knew

4   that I needed to get on the radio and kind of say

5   what happened.  I remember when I tried doing

6   that -- when I tried to talk on the radio, I kind of

7   got the tone that wouldn't allow me to talk at all.

8   I remember -- and then there was some -- a lot of

9   chatter on the radio trying to figure out what had

10  happened.  I tried a couple times to get on the air

11  to clarify that and whether -- and I am not sure

12  exactly why it didn't come across.

13          I remember talking -- Officer Kidd asked

14  me if I shot at one point.  I said I did.  And I

15  remember hearing the other discussions behind us,

16  and I -- not on the air, but said, "Yeah, that was

17  me."  So for me it was a little frustrating that

18  this wasn't getting through, that there was this

19  kind of confusion.

20          Once -- once the roll call got initiated,

21  I wanted to make sure we got that completed.  That

22  way we had everybody accounted for.  When there

23  still was some of that confusion, I finally had to

24  kind of put my head down through the hatch and kind

25  of yell back at the officers that, "Hey, that was --

1    "That was me.  That was my shot."

2        Q.    Okay.  Were you separated from your other

3    officers right away?

4        A.    Not right away.

5        Q.    Did you talk to someone at the moment?

6    Let me strike that.  Back up.

7              The BearCat moved forward at about that

8    time, didn't it?

9        A.    Shortly after that, yes.

10       Q.    Did you get out of the turret before it

11   moved?

12       A.    Yes.

13       Q.    Okay.  And did you ride in the BearCat all

14   the way up to the house?

15       A.    Yes.

16       Q.    And officers were able to confirm that

17   Mr. Babb was dead.  Correct?

18       A.    Yes.

19       Q.    And at some point were you separated from

20   the officers and removed from the scene?

21       A.    Yes.

22       Q.    And who did that?

23       A.    Initially -- so we get up to the house,

24   and I get back up in the turret to provide overwatch

25   for everybody while they start to kind of clear the

1    house.  It becomes pretty clear that they don't have

2    enough people to kind of deal with it initially.  I

3    know at some point that I am going to get, you know,

4    kind of removed from the scene, but we still have a

5    job to do to finish seeing this through.  So I go up

6    to the doorway to help clear if I need to, and that

7    is when Sergeant McAlpine tells me that, you know,

8    "Go stand down.  Go wait with Officer Grose in the

9    back of the BearCat."  And I knew from that point,

10   then, that we were trying to basically figure

11   out whether we were going to wait there at the scene

12   or whether we were going to go back to the police

13   department for the rest of the investigation.

14          So I walked back to the back of the

15   BearCat, secured my rifle, cleared -- emptied it,

16   left it back there with Officer Pieske, and then

17   waited at the end of the driveway with Officer Grose

18   until Officer Warden arrived.  And then from there,

19   Sergeant McAlpine took all of us, and we went back

20   to the police department.

21       Q.   Were you interviewed the same day of the

22   shooting?

23       A.   No.

24       Q.   Okay.  How long after the shooting were

25   you interviewed?

Will Stutesman

1      A.    It looks like it was April 2nd.

2      Q.    Did you -- are you a member of the union?

3      A.    Yes.

4      Q.    Did you have a union representative

5  present at the interview?

6      A.    Yes.

7      Q.    It looks like there is a whole bunch of

8  people at your interview.  Detective Dusty Sprague,

9  was he -- what was his role?

10      A.    He was the primary IDFIT investigator for

11  Oregon State Police.

12      Q.    And Ed Imholt?

13      A.    I believe he was an assistant or assisting

14  Detective Sprague with the interview and the

15  investigation.

16      Q.    And Jed McGuire was your rep?

17      A.    Yes.

18      Q.    And you also had a lawyer?

19      A.    Yes.

20      Q.    Now, so it wasn't that many days after the

21  shooting that you were interviewed?

22      A.    No.

23      Q.    And were you given your Garrity warnings

24  before this interview?

25      A.    What are the Garrity warnings?  I am --

Exhibit 17
Page 68 of 75

 1      Q.    Like if you don't answer questions, you

 2   can be disciplined.

 3            Were you given Miranda warnings, any of

 4   that?

 5      A.    I don't remember any Miranda warnings.

 6   This wasn't a forced interview or anything.

 7      Q.    Okay.  So --

 8      A.    So I don't remember any specific warnings

 9   like that, I guess.

10      Q.    Okay.  And you were off for approximately

11   six weeks.  Was that because the investigation was

12   lasting that long?

13      A.    Part of it.  I remember it took about four

14   weeks for the DA's office to come back with their

15   ruling on the incident.  And then from there, I

16   wanted to make sure that my family was ready for me

17   to go back to work, too, and that -- it kind of took

18   some time for that, especially with some -- it was

19   pretty heavily covered in the news, and it seemed

20   like every couple weeks there was another news

21   article coming out.

22      Q.    Did your family get any threats or --

23      A.    I did, yeah.

24      Q.    You did?  What kind of threats did you

25   get?

1      A.    I don't remember the specific threats.   I

2  remember Lieutenant Bills telling me that somebody

3  had made some threats to -- basically some death

4  threats of some kind.  I don't think I ever knew the

5  specifics of them, but they were serious enough to

6  where the department offered to have some cameras

7  installed at our home and provided the other law

8  enforcement agencies in our -- where we live, kind

9  of an update of our -- of where we lived and what

10  was going on in case something did happen.

11      Q.    At the time, did -- were your -- do you

12  have kids?

13      A.    Yes.

14      Q.    Were they in school?

15      A.    Yes.

16      Q.    Were there threats being made against your

17  children?

18      A.    None that I am aware of.

19      Q.    And the threats that you were aware of

20  were being made through the department, or were they

21  being made to you via email or text or calls or --

22      A.    We were getting them -- I was getting them

23  through the department.  There was none specifically

24  that I received personally.

25      Q.    Okay.  And Lieutenant Bills is the one who

1    shared the type of threats you were getting?

2        A.    Yeah.  And again, I don't remember the

3    specifics of them, but the nature was some death

4    threats towards me specifically.

5        Q.    Okay.  Was there a period of time that

6    those threats were being made?

7        A.    After the incident.

8        Q.    And for what -- for how long?  You are not

9    still getting death threats, are you?

10       A.    No, I am not.

11       Q.    Okay.

12       A.    I don't remember how long they went on.

13   It seemed like there was at least several weeks, you

14   know, afterwards, and then we kept the cameras

15   around for a while.  I guess once things kind of

16   calmed down -- I can't remember how long exactly we

17   had them there, but we went and purchased our own

18   cameras to have at our place kind of spurred partly

19   because of that so that we weren't relying on the

20   department equipment.

21       Q.    And was your wife afraid for everybody's

22   safety?

23       A.    Yes.

24       Q.    Were there -- but they -- you all stayed

25   in your house during all that time?

1     A.     Generally, yeah, we did.

2     Q.     I mean, you didn't send your wife and kids

3   away?

4     A.     (Shakes head.)

5     Q.     Okay.  Were there officers assigned to

6   protect you?

7     A.     No.

8     Q.     Okay.  Well, I am sorry that that

9   happened.  That was wrong.

10     A.     Thank you.

11     Q.     Let's just take a little bit of a break

12   and see if there is anything more that I want to

13   talk to you about.

14     A.     Okay.

15     Q.     Thank you, Officer.

16     A.     Thank you.

17              THE VIDEOGRAPHER:  We are going off

18   the record.  The time is 3:12 p.m.

19              (Recess:  3:12 to 3:32 p.m.)

20              THE VIDEOGRAPHER:  Okay.  We are back

21   on the record.  The time is 3:32 p.m.

22   BY MS. BURROWS:

23     Q.     Just a couple follow-up questions, Officer

24   Stutesman.

25              Was there a grand jury convened over this

1   shooting?

2       A.    I don't know.  I don't believe so.

3       Q.    Do you remember testifying for Mr. Gardner

4   or any of the prosecutors on this case?

5       A.    No.

6       Q.    Okay.  I have no more questions.  Thank

7   you so much.

8       A.    Thank you.

9             MR. SCHMIDT:  I don't have any

10  questions, but we will reserve his right to read and

11  sign his deposition.

12            MS. BURROWS:  Thank you.

13            THE WITNESS:  Thank you.

14            THE VIDEOGRAPHER:  And we are going

15  off the record.  The time is 3:33 p.m.

16            (The deposition was concluded at

17             3:33 p.m.)

18

19

20

21

22

23

24

25

Exhibit 17
Page 73 of 75

1  State of Oregon    )
                      )         ss.
2  County of Lane     )

3      I, Christine Oljace, CSR-RPR, a Certified

4  Shorthand Reporter for the State of Oregon, certify

5  that the witness was sworn and the transcript is a

6  true record of the testimony given by the witness;

7  that at said time and place I reported by stenotype

8  all testimony and other oral proceedings had in the

9  foregoing matter; that the foregoing transcript

10  consisting of 72 pages contains a full, true and

11  correct transcript of said proceedings reported by

12  me to the best of my ability on said date.

13      If any of the parties or the witness requested

14  review of the transcript at the time of the

15  proceedings, correction pages are attached.

16      IN WITNESS WHEREOF, I have set my hand this 30th

17  day of October 2017, in the City of Eugene, County

18  of Lane, State of Oregon.

19

20

21     *Christine L. Oljace*

22  Christine Oljace, CSR-RPR

23  CSR No. 05-0397

24  Expiration Date:  September 30, 2018

25

Exhibit 17
Page 74 of 75

```
 1  Will Stutesman

 2  McGowan, et al., vs. Stutesman, et al.

 3  October 19, 2017

 4

 5  PAGE/LINE...................................CHANGE

 6  |_____

 7  |_____

 8  |_____

 9  |_____

10  |_____

11  |_____

12  |_____

13  |_____

14  |_____

15  |_____

16  |_____

17

18      I declare under penalty of perjury that the 72

19  pages referenced above are true and correct except

20  for such corrections as noted.  Executed this ......

21  day of ................ 2017.

22          |.............................|

23              Will Stutesman

24

25
```