1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF OREGON

3          THE HON. THOMAS M. COFFIN, JUDGE PRESIDING

4

5

6    RONDA MCGOWAN, Personal         )
     Representative for the Estate of )
7    Brian Babb, through his Guardian )
     Ad Litem, STEPHANIE WOODCOCK, and )
8    KAYLEE BABB,                     )
                                      )
9                        Plaintiffs,  )
                                      )
10              v.                    ) No. 6:17-cv-00424-TC
                                      )
11   WILL STUTESMAN, OFFICER GROSE,   )
     OFFICER PIESKE, Sgt. MCALPINE,   )
12   CITY OF EUGENE, a municipal      )
     subdivision of the State of      )
13   Oregon, JANE DOE CALL TAKER, John )
     and Jane Does 1-10,              )
14                                    )
                         Defendants.  )
15   _____)

16

17              REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                        EUGENE, OREGON

19                   FRIDAY, JANUARY 18, 2019

20                        PAGES 1 - 46

21

22                        Kristi L. Anderson
                          Official Federal Reporter
23                        United States Courthouse
                          405 East Eighth Avenue
24                        Eugene, Oregon 97401
                          (541) 431-4112
25                        Kristi_Anderson@ord.uscourts.gov

09:52:15  1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFFS:

3    Carlton Odim
     Action Injury Law Group LLC
4    191 North Wacker Drive
     Suite 2300
5    Chicago, IL 60606
     312-771-2444
6    Fax: 312-641-6866
     Email: carlton@actioninjurylawgroup.com
7
     Andrew M. Stroth
8    Action Injury Law Group LLC
     191 North Wacker Drive
9    Suite 2300
     Chicago, IL 60606
10   312-771-2444
     Fax: 312-641-6866
11   Email: astroth@actioninjurylawgroup.com

12   Timothy R. Volpert
     Tim Volpert, P.C.
13   522-A NW 23rd Ave
     Portland, OR 97210
14   503-703-9054
     Email: tim@timvolpertlaw.com

15

16   FOR THE DEFENDANTS:

17   Robert E. Franz, Jr.
     Law Office of Robert E. Franz, Jr.
18   P.O. Box 62
     Springfield, OR 97477
19   541-741-8220
     Fax: 541-741-8234
20   Email: rfranz@franzlaw.comcastbiz.net

21

22

23

24

25

09:52:16

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | FRIDAY, JANUARY 18, 2019 |
| 3 | THE CLERK:  Please be seated. |
| 4 | Now is the time set for Civil Case No. 17-424, |
| 5 | McGowan, et al. versus Stutesman, et al. for oral argument. |
| 6 | THE COURT:  All right.  Good morning, everyone. |
| 7 | MR. VOLPERT:  Good morning. |
| 8 | MR. ODIM:  Good morning. |
| 9 | MR. STROTH:  Good morning. |
| 10 | MR. FRANZ:  Good morning. |
| 11 | THE COURT:  You might introduce yourselves because |
| 12 | I don't know all of you. |
| 13 | MR. ODIM:  Your Honor, my name is Carlton Odim, |
| 14 | one of the counsels for the plaintiff. |
| 15 | I have a motion pro hac vice which was filed a day |
| 16 | ago -- Wednesday, and I will be asking the court to allow me |
| 17 | to proceed to make the arguments on behalf of the plaintiff |
| 18 | even though that motion has not been ruled on. |
| 19 | THE COURT:  Very well.  Welcome.  And I will grant |
| 20 | the motion and you may make your argument. |
| 21 | MR. ODIM:  Thank you. |
| 22 | MR. STROTH:  Your Honor, Andrew Stroth, counsel |
| 23 | for the plaintiff with Action Injury Law Group in Chicago. |
| 24 | MR. VOLPERT:  And Tim Volpert, local counsel for |
| 25 | the plaintiff. |

10:03:02  1                THE COURT:  All right.

          2                MR. STROTH:  We also -- Your Honor, our client is

          3     also here with us today, the Babb family.

          4                THE COURT:  Okay.  You can introduce them.

          5                MR. STROTH:  Mr. Lee Babb, the father; Kaylee

          6     Babb, daughter; Stephanie Woodcook, former -- ex-wife; and

          7     Stephanie Babb, sister of the decedent.

          8                THE COURT:  Very well.  Thank you.

          9                MR. FRANZ:  Yes, Your Honor.  Robert Franz for the

         10     defendants.

         11                This is Sarah Henderson.  She is an associate in

         12     my office.  She will be assisting with the video.  And

         13     defendant Will Stutesman.

         14                MR. STUTESMAN:  Stutesman, Your Honor.

         15                THE COURT:  Very well.  Thank you.

         16                MR. FRANZ:  Stutesman.

         17                THE COURT:  I understand we are having some

         18     technical problems.

         19                Is that -- have they been rectified?

         20                THE CLERK:  Not quite.  There will just be a

         21     delay, as I need to message Dan and he changes it from the

         22     background.

         23                THE COURT:  Do you know how long it will take?

         24                THE CLERK:  Just maybe 30 extra seconds.

         25                THE COURT:  Oh, okay.  Apparently it's not that

10:03:55   1   long, less than a minute.

2            So how do you wish to proceed here today?

3            This is the defendants' motion for summary

4   judgment, so they typically go first.  But I think that you

5   wanted to make a presentation on video, and that apparently

6   is not up right now.

7            MR. FRANZ:  No.  It should -- the video is

8   working, right?

9            THE CLERK:  Yes.  Just if we need to change it at

10  all, Dan has to change it in the background.  I can't --

11           THE COURT:  Okay.  Do you wish to proceed with

12  that first or do you wish to proceed with the plaintiffs'

13  motion to reopen discovery?

14           MR. FRANZ:  Your choice.

15           THE COURT:  I have no preference, so I am asking

16  you folks.

17           MR. FRANZ:  Okay.  We can go --

18           MR. ODIM:  Well --

19           MR. FRANZ:  Go ahead.

20           MR. ODIM:  I hope you don't mind my sitting.  Is

21  it appropriate for me to sit?

22           THE COURT:  I don't mind.  In fact, it's better if

23  you sit because of our sound system.

24           So Mr. Franz, so, yeah, please, everyone, remain

25  seated.  I know that's not customary in most courts, but our

10:04:57   1    sound system works much better if you are seated.

2    MR. ODIM:  So the plaintiff would prefer to move

3    forward with the motion for sanctions and discovery to the

4    extent that the ruling on that motion may affect what

5    Mr. Franz is allowed to present to the court today.

6    THE COURT:  Well, in terms of those motions, let's

7    take the motion to reopen discovery first.  And I don't

8    intend to deal with sanctions today.

9    MR. ODIM:  Okay.

10    THE COURT:  But I do think that the motion to

11    reopen discovery needs to be addressed, and so you may go

12    ahead.

13    MR. ODIM:  Without repeating the substance of what

14    is in writing, plaintiffs' concern is that -- is to avoid

15    being sandbagged.  Photographs which were in the defense

16    possession which the defense knew about which the plaintiff

17    asked for were never turned over to the plaintiff.  I will

18    only use --

19    THE COURT:  Well, they weren't turned over until

20    recently.

21    MR. ODIM:  That's correct, until the plaintiff had

22    responded to the motion for summary judgment, and those

23    photographs were turned over and turned over in a -- in a

24    dark way in the sense that we have no idea the author of the

25    photographs.  We were told that there were four authors,

10:06:36  1  four people who took these photographs.  The photographs

2  were not indexed to any of those four individuals.  We had

3  not known the identity of three of those individuals prior

4  to that late disclosure.

5          Furthermore, we were not informed whether or not

6  the set of photographs that are allegedly attributable to

7  Officer DeWitt is complete; that is, did Mr. Franz just

8  submit seven photographs and DeWitt took 50.  If that's the

9  case, what do the 50 that he didn't disclose show?

10         Now, this is an adversarial process, and we are

11  not entitled to take on good faith words that opposing

12  counsel gives us.  Unfortunately, opposing counsel hasn't

13  given us any words in answer to that question about whether

14  or not he submitted a smaller subset of the whole set of

15  photographs DeWitt took.

16         I sent him an e-mail and he didn't respond to it.

17         THE COURT:  You want to reopen discovery to take

18  the depositions of those who took the photographs?

19         MR. ODIM:  Those four and to get a full disclosure

20  of the photographs that were taken by each of the four,

21  identified with each of the four, access to the camera that

22  was used by DeWitt to take the photo.  We understand that

23  camera came from Officer Stutesman.

24         We'd like all of that as part of the reopening and

25  limited to -- just limited to the issue of the photographs

10:08:28  1    and the people who took them.
          2              THE COURT:  Okay.
          3              MR. FRANZ:  Okay.  So let's start from the
          4    beginning.
          5              THE COURT:  I have read your response.  Go ahead.
          6              MR. FRANZ:  Okay.  So --
          7              THE COURT:  Why is the city reluctant to allow
          8    this discovery that's being asked for?
          9              Well, I am not here to play the blame game.  Okay,
         10    Mr. Franz?
         11              MR. FRANZ:  Yeah.  What --
         12              THE COURT:  Let me finish.
         13              But what seems vital to this court is that
         14    plaintiffs have a full opportunity to explore all the
         15    evidence that's pertinent to the issues in this case.  And
         16    certainly these photos are germane to the issues in the
         17    case, are they not?
         18              MR. FRANZ:  Yes.
         19              THE COURT:  Then why is the city reluctant to
         20    allow the reopening of discovery to allow that to occur?
         21              MR. FRANZ:  Well, first of all, let me go through
         22    the facts.
         23              Are you looking at the monitor?
         24              THE COURT:  I am not looking at it.  I am looking
         25    at you.

10:09:34    1          MR. FRANZ:  Okay.  Can you see what's on the

2    monitor?

3          THE COURT:  I see what's on the monitor.

4          MR. FRANZ:  Okay.  So I just want to show which

5    photographs we are talking about.  Okay?

6          So this is the BearCat video.

7          THE COURT:  Okay.

8          MR. FRANZ:  And you can see DeWitt taking

9    photographs.

10          THE COURT:  Yes.

11          MR. FRANZ:  Okay.

12          THE COURT:  Doesn't this go to the issue of the

13    summary judgment, though?

14          MR. FRANZ:  Well, no.  It goes to the photographs.

15    These are the -- the photographs -- he's taking a camera,

16    taking a picture of everybody.

17          THE COURT:  Okay.

18          MR. FRANZ:  Okay?  Those are the photographs we

19    are talking about.  Okay?

20          THE COURT:  These are the photographs that were

21    disclosed belatedly?

22          MR. FRANZ:  Yes.

23          Okay.  So those are the photographs that everybody

24    knew existed because they had this video before the lawsuit

25    was filed.  Everybody knew they existed.

10:10:22   1          THE COURT:  When you say "everybody knew they

2     existed," existed where?  They weren't disclosed

3     until belatedly.

4          MR. FRANZ:  Okay.  But everybody knew that they

5     had been taken.  They were in all the police reports,

6     everything.  All right?

7          Now, this is before I come in.  The lawsuit's

8     filed.  Okay?  And now -- and I get an e-mail.  We have the

9     motion for summary judgment conferral, and I am on the

10    telephone with these gentlemen, ready to go for motion for

11    summary judgment.  We file our motion for summary judgment.

12    We did not use the photographs at issue because I didn't

13    even know they existed at that time.

14         So they then -- their due date for their motion is

15    like on a Wednesday, and that Friday Mr. Odim sends me an

16    e-mail saying he requested the photos.

17         He then goes ahead and files his response.  I then

18    contact the city because I didn't know of the photos.  I

19    contact the city.  What about these photos?  They said, we

20    have them.  I said, do you know if they were disclosed.  No.

21    So I put them on a CD and sent them to Mr. Volpert.  I then

22    filed our response.

23         Now, I agree and now in the deposition of DeWitt,

24    Michelle Burrows is taking the deposition of Mr. DeWitt, and

25    she said, I noticed in the reports that you took photos.

10:11:59    1              Yes, I did.  And he describes the photos he takes.

2              And then she says to Jeff Matthews, I don't think

3    we have those.  Will you check.

4              Okay.  Counsel is then substituted.  I don't hear

5    anything about photos.  I don't even have them.  And I

6    didn't even use them in our initial motion for summary

7    judgment.

8              He contacts me.  He doesn't contact me until

9    December after I filed my reply.  And then he said, I think

10   both him and Andrew said, we don't have these photos.  The

11   first time we saw them is in your reply.

12             And I said I sent them to Mr. Volpert.

13             And they said, well, he doesn't have them.

14             And so I said, okay.  They set up a Dropbox for me

15   and I sent them to them.

16             Now, we didn't -- then I attached them.  I have no

17   problem with them having the photos.

18             THE COURT:  With them having the photos, but you

19   refuse to allow -- to agree to them reopening discovery.

20   You said discovery was closed in your e-mail.

21             MR. FRANZ:  They wanted me to withdraw my motion

22   for summary judgment and reopen discovery and I refused.  I

23   wasn't going to withdraw the motion for summary judgment.

24             The --

25             THE COURT:  You were asked to withdraw the motion

10:13:16    1    for summary judgment to reopen discovery.

2             MR. FRANZ:  Well, that's what they requested.

3             THE COURT:  Well, this court --

4             MR. FRANZ:  I am fine if you want -- if it's

5    limited to just those issues, Your Honor, then let's do it.

6             THE COURT:  This court is not about to decide this

7    case on a summary judgment basis without being assured that

8    full and complete discovery into all germane evidence

9    pertaining to this fatal use of force is allowed for the

10   plaintiffs and, quite frankly, for this whole community.

11            And so that motion is going to be granted.  And

12   the court will order the reopening of discovery to allow

13   inquiry into the photographs, the camera, et cetera, as

14   requested by the plaintiff.

15            Having said that, I will also allow supplemental

16   briefing after that discovery is closed of -- for each

17   party.

18            I will not address the motion for sanctions at

19   this time because it seems that that can come later after

20   the discovery has been taken and after more facts are known

21   and after we have another round of briefing.

22            MR. ODIM:  May I ask in clarification of the

23   court's order granting that plaintiff be allowed to submit

24   no more than ten interrogatories that simply address these

25   photographs so that we know in advance who took what?

10:15:15    1          THE COURT:  Yes, you may.

2          MR. ODIM:  And that the defense be directed to

3    answer those interrogatories on an expedited basis within 14

4    days of service.

5          THE COURT:  Yes.  I think it's appropriate to move

6    this case along because there's been a number of delays in

7    the case.  I am not attributing fault to anybody.  There's

8    been changes in counsel on both sides.  And so I want to --

9    I want to basically accelerate this case and get it moving

10   forward.

11         MR. ODIM:  And lastly, Your Honor, may we also

12   submit a request that the camera that was used by DeWitt and

13   any other cameras that are in possession of the Eugene

14   Police Department that were used to take any of the

15   photographs that are disclosed be disclosed to us for

16   inspection?

17         MR. FRANZ:  I object to that.  They can inspect it

18   at -- well, first let's find out if it exists, and then they

19   can inspect it at a location where we maintain the evidence.

20   I don't want it mailed back to you guys.

21         MR. ODIM:  No, we wouldn't do that.

22         THE COURT:  You folks can work out a protective

23   order, but it's my intent to allow them to inspect the

24   camera that's involved in this.

25         MR. FRANZ:  I do want to clarify one point.  First

10:16:41  1  of all, the photographs do nothing but support our position.

2  They are photographs of the rifle, and so it's to our

3  advantage to have them.  We wouldn't have withheld them if

4  they would have just followed the request.

5          And second of all, Mr. Odim says that he does not

6  know whether I put all the photographs in evidence.

7          THE COURT:  Whether what?

8          MR. FRANZ:  Whether I put all of the photographs

9  in evidence in our reply or if I did not.  And I told him

10  over the telephone, I selected photographs because all of

11  them were -- some of them gory but that all of the

12  photographs did go to Mr. Volpert.

13          THE COURT:  Okay.

14          MR. FRANZ:  So I want to make the record clear

15  that I did tell him that over the telephone.

16          MR. ODIM:  Well, again, I am not casting

17  aspersions, but when -- I am not entitled to take on the

18  words of opposing counsel without independently verifying as

19  a zealous advocate of my client, which is what I want to do.

20          THE COURT:  I am allowing you discovery into that,

21  into all these issues.  You will have discovery into that.

22          Okay.  Anything else on that issue?

23          MR. ODIM:  Nothing from the plaintiff.

24          THE COURT:  All right.  Then let's proceed to your

25  motion for summary judgment with the understanding that

10:17:50   1   after discovery on these other issues is conducted, I may

2   have everyone back here for further -- after further

3   briefing and for further oral argument.

4              MR. FRANZ:  Okay.  So let's -- I just want to

5   briefly go backwards, then, before I get to those -- the

6   photos.

7              I want to explain that we have two sources of

8   audio that we have submitted.  And one source is the

9   computer WAV file that can be played by any program, and

10   that's of the actual dispatch.

11             So the officers in the field and as they are

12   driving to the scene are in radio contact with dispatch, and

13   they can communicate with one another.  So that's one source

14   of the audio.

15             The second source of the audio is the in camera

16   video of DeWitt.  Now, Ms. Henderson has portions of the --

17   of that audio, and that -- when I refer to that in our oral

18   argument, that's Exhibit 108.  And I just kind of want to

19   explain that a little bit.

20             So here's -- the in camera video is on your

21   screen, Your Honor.

22             This is DeWitt's patrol car.  And, of course, if

23   you just -- as he's sitting there, his camera is on.

24             THE COURT:  Okay.

25             MR. FRANZ:  And then -- this thing goes for two

10:19:35   1   hours, so I am not going to -- but I will just give you a

2   brief.  So, for example, so you see when he's driving to the

3   scene you have constant sound.  And also if you watch this

4   entire video, you will hear dispatch -- okay.

5           Okay.  So now, that sound you hear you will also

6   hear on dispatch because dispatch is going to him.

7           So then when he gets to the scene, he will park

8   his vehicle.  Now, this situation, he just happened to park

9   behind Stutesman.  So that's Stutesman in that picture, and

10   this is the in camera video.  And you can see hear what they

11   are saying as they are loading up, going to the scene.

12           All right.  Now, that video, as you can see on the

13   right-hand side, is elapsed time.  There's eight minutes and

14   37 seconds, and then it keeps going.  When we refer to the

15   video exhibit, we refer to elapsed time to try to guide

16   people to that elapsed time.

17           All right.  So as everybody is going to the scene

18   and for the next couple hours that car is just parked behind

19   a couple blocks away.

20           All right.  So that's -- that's the first source

21   of sound.

22           Then the WAV file, and to give you an example,

23   when DeWitt goes to the scene, he goes to where the BearCat

24   is eventually parked.

25           So just kind of as a reminder, this is the scene.

10:21:24   1    It's a Google map, so it's not super accurate.  I mean, it's

           2    not the time, but you can see the house of Babb is in the

           3    background.  And then you can see, here's the fences that

           4    the BearCat eventually goes through, and the BearCat

           5    eventually will be sitting right there.

           6              This was just a diagram used throughout.  Another

           7    Google map.  It's not reflective of the actual day, but this

           8    is marked as Exhibit 105C in the deposition.  Shows various

           9    officers.  You will see Barnes and Farley.  Clark and Warden

          10    are in the back.  You can see the Babb house; has the two

          11    cars parked in front of it.  So Clark and Warden are behind

          12    the fence.

          13              Kidd is drawn on top of the roof.  He's on the top

          14    of the roof of that house.

          15              The BearCat is just put in there, and it had

          16    McAlpine, Vinje, Stutesman, DeWitt, Grose, and Pieske.

          17    Pieske was the driver of the BearCat.  Grose was sitting in

          18    the passenger seat, and he was -- he was the one doing the

          19    hailing.  Okay.

          20              (Video played; not reported.)

          21              MR. FRANZ:  Okay.  So where that sound is coming

          22    from, it's coming from the in camera video of DeWitt, which

          23    is parked blocks away, and DeWitt has the microphone on.  So

          24    DeWitt's at the back.  Oh, that's Grose.  So DeWitt's at the

          25    back of the BearCat.  Grose is in the passenger seat doing

10:23:27   1   that hailing.  DeWitt's microphone is picking that up.  So

           2   that's where that source is coming, and the hailing is heard

           3   intermittently.

           4            So sometimes you can hear stuff and sometimes you

           5   can't because it just depends on how that signal is being

           6   transferred from the IC unit of DeWitt to his microphone.

           7            So, for example -- can you go to shots fired.

           8            So we have the hailing that's taking place.  So if

           9   you go to the various elapsed places that we have referred

          10   to in our motion, you will hear hailing every once in a

          11   while, and you will hear -- actually, let's go to the --

          12   he's armed because I think we had that next.

          13            So we have the interplay of the officers over

          14   dispatch, the WAV file, and we have the IC unit.  And you

          15   have to -- we went to elapsed time so you don't have to

          16   listen to it for two hours.

          17            Now, the second source, as I said, is the WAV

          18   file, and that file is actual dispatch.  So that file would

          19   start out --

          20                 (Played video; not reported.)

          21            MR. FRANZ:  Okay.  So that's the computerized

          22   voice of dispatch.  That would be actual communication

          23   between the officers.

          24            So, for example, we know from the briefing that

          25   Mr. Antonini was in the house.  And he was referred to as

10:25:04

1    the person in the house with Babb.  He comes to the door and

2    puts his hands up because he heard the hailing.  So he comes

3    to the door, and he's walked out safely to the back of the

4    BearCat.

5            So you will hear the dispatch of what is being

6    said about what Mr. Antonini is saying.

7            So give an example of that.

8                    (Video played; not reported.)

9            MR. FRANZ:  Okay.  So that -- go ahead.

10                   (Video played; not reported.)

11           MR. FRANZ:  Okay.  So now, that's from the

12   dispatch tape.  So when we refer to that, we refer to that

13   as Exhibit 103.

14           So you can go through the combinations of the

15   dispatch tape, the IC video to get up to the time of the

16   shooting.

17           And when you do that, we set that out in our

18   memorandum, the fact -- how many times Brian came to the

19   door.  We did elapsed time for you showing the roommate

20   being -- coming out of the house, coming back to the back of

21   the BearCat.  That shows up on the video.

22           The third source of information is the BearCat

23   video.  So the BearCat video, when it got to the scene,

24   starts running.  And you can see the various -- you can see

25   the fence.  You can see some of the front door.  Up at the

10:27:21    1    right-hand bar is where you can -- you can move this around,
            2    you know, to various positions.
            3          Now, that has an elapsed time on that of 13:58.
            4    So that means that if you went back to the very beginning,
            5    you would see when the BearCat got there, and then you can
            6    see the elapsed time of that one is 15:38.
            7          We actually could -- you know, you could actually
            8    go all the way back and start it and then you just play it.
            9    It has no sound so you can hear Babb.  You can fast-forward
           10    it as fast as you want to pick up anything in between.
           11          And so you will get -- you will get the various
           12    sequences.  I saw him walking out.  I was going to try to
           13    find that again, but.
           14          Okay.  So right here is Jim Antonini coming out of
           15    the house that he has been talked out.  So the BearCat video
           16    picks him up walking to the back.
           17          You will notice that the front door is open.  And
           18    so then you can trace through how long that front door
           19    opens, and you can combine that with the audio on the WAV
           20    file, and you can hear the comments.  And some of it is
           21    picked up on the ICV.  So that door stays open, and then you
           22    will see -- I can kind of fast-forward there.  Then it
           23    closes.
           24          Okay.  So we know at elapsed time 15:37, okay,
           25    right there the door opened.  So I will just go back a

10:30:26   1    little bit.  The door is closed.  Door opens.

           2              Okay.  Now, from studying the IC -- I mean, from

           3    studying the BearCat, that's the last time the door opens.

           4              Okay.  Now, to switch to what -- we don't know

           5    exactly how long that door is opened before the shots were

           6    fired, but we know it's very close.

           7              So go to shots fired.

           8                      (Counsel conferred.)

           9                   (Video played; not reported.)

          10              MR. FRANZ:  Okay.  So you heard, drop it, drop it

          11    and then the gunshot.  That's coming from DeWitt's

          12    microphone, going back to his patrol car and coming over the

          13    air.

          14              Okay.  Now, we also --

          15              THE COURT:  When you say that's coming from

          16    DeWitt's microphone, that's the audio is coming?

          17              MR. FRANZ:  Yes.

          18              THE COURT:  Not the words drop it, drop it.

          19              MR. FRANZ:  Right.

          20              THE COURT:  That's coming from some other --

          21              MR. FRANZ:  That's Stutesman.

          22              THE COURT:  Yes.

          23              MR. FRANZ:  Yeah.  The mike is just on.  That's --

          24              THE COURT:  I just wanted to clarify that's not

          25    DeWitt, that's --

10:31:41   1            MR. FRANZ:  That's -- yeah.  That's Stutesman

         2    saying, drop it, drop it, but it's being conveyed over the

         3    microphone of DeWitt, who is in the BearCat.

         4            All right.  We also have the -- we also have the

         5    shots fired on the dispatch tape.

         6            So do you have that?

         7                 (Video played; not reported.)

         8            MR. FRANZ:  Okay.  So that was the description, I

         9    think it was from Vinje, as to the location of Mr. Babb.

        10    And then you heard the shot.  Now, that source of audio is

        11    from the WAV file.

        12            All right.  So now we know that the shots have

        13    been fired and at a certain point.

        14            Okay.  The BearCat video will sit there for six

        15    minutes and three seconds.  And so if we ran this for six

        16    minutes and three seconds, we'll see the BearCat is still in

        17    this same position.

        18            In the meantime --

        19            THE COURT:  You acknowledge that the BearCat video

        20    does not show a rifle at this time?

        21            MR. FRANZ:  It doesn't show a person.  At this

        22    time it doesn't --

        23            THE COURT:  It doesn't show a person firing.  All

        24    right.

        25            MR. FRANZ:  Yeah.  It shows exactly what you see.

10:33:03

1        THE COURT:  Okay.

2        MR. FRANZ:  Yeah.  And that shows an open door.

3        Okay.  So it sits at this position for six minutes

4    and three seconds.

5        Okay.  And then we can go to elapsed time 21:40.

6        Okay.  So -- well, that was a little bit --

7        Okay.  Not 21:40.  20:40.  So there we are at

8    elapsed time 21:37.

9        The door opened at elapsed time 15:37.  So if I

10   take the time that the door opened for the last time --

11       THE COURT:  And then shortly thereafter there's

12   the shot.

13       MR. FRANZ:  Right.  And then it sits there to

14   elapsed time 21:40 or 20:40, and that's six minutes, three

15   seconds.

16       And then we can see that the BearCat is starting

17   to move.

18       THE COURT:  Okay.

19            (Video played; not reported.)

20       MR. FRANZ:  Okay.  So you can see it's going

21   through the fence at 21:40.

22       You can see down here the rifle.  The plaintiff

23   causes a shadow at the left-hand side where my mouse is.

24   It's our position that's the rifle.

25       THE COURT:  It's your position that's the rifle.

10:35:54    1              MR. FRANZ:  Right.

         2              THE COURT:  Is that disputed?

         3              MR. FRANZ:  Yes.  They say that's not a rifle.

         4              THE COURT:  Are you contending that that's not a

         5    disputable issue?

         6              MR. FRANZ:  Well, I don't think it's a disputable

         7    issue, but I can tie it -- we see it -- we see a rifle.

         8              THE COURT:  Am I supposed to decide that as a

         9    matter of law?

        10              MR. FRANZ:  Well, let's say -- you won't need to

        11    based upon the other evidence.  So let me just go through

        12    this and I will explain that other evidence.

        13              THE COURT:  Okay.

        14              MR. FRANZ:  Then you can see it again.

        15              Okay.

        16              Then the BearCat video sits there for another two

        17    hours.  Okay.  For that two-hour period, you will see people

        18    go in and out, medics go in and out.

        19              And if I fast-forward it a little bit, you know,

        20    to speed it up, you can see the police approach.

        21              If you kept going, you know, you would see the

        22    medics show up.  There's the medics.

        23              And then eventually we get to the -- now, we --

        24    now, this is where we have DeWitt, who is going through

        25    there taking photographs.

10:37:50    1            THE COURT:  Which one is Mr. DeWitt?

    2            MR. FRANZ:  Right there with your back to it.  His

    3    right hand is up.

    4            THE COURT:  Okay.

    5            MR. FRANZ:  And you will see the camera when he --

    6    he will come around.

    7            This is 11 minutes after the door opened for the

    8    last time.

    9            And then these are the photographs that were

   10    recently produced that DeWitt's taken.

   11            And then the photographs that were produced will

   12    show the various -- it shows the various angles that he

   13    actually took photos.

   14            So he walks to the right there to take photos.

   15            And then we had attached some, but we didn't

   16    attach the ones that showed the body.

   17            These are the photos that we produced that show

   18    what DeWitt was taking a picture of.

   19            And then he has some of the inside.

   20            Now, the position that they set forth in their

   21    legal memorandum is that Officer Warden planted the rifle

   22    and that we know that you have evidence from Stutesman, drop

   23    it, drop it.

   24            So to believe the weapon was planted, you would

   25    have to believe that Stutesman just made that up.  He was

10:40:13   1   telling him just to drop it; that in the split-second that

2   that happened, he was just making it up.  That there was

3   nothing for Mr. Babb to drop.  We have his testimony that

4   the rifle was pointed at him.

5           THE COURT:  Let me stop you right there.

6           Is it your position that if Mr. Babb just

7   possessed a rifle that that merits summary judgment on

8   your -- in your favor on the use of deadly force?

9           MR. FRANZ:  Yes.

10          THE COURT:  Even if he did not point it at Officer

11  Stutesman?

12          MR. FRANZ:  Yes, under these circumstances.

13          THE COURT:  Even if he did not point it at Officer

14  Stutesman?

15          MR. FRANZ:  Yes, because of the circumstances.

16  The circumstances are that he fired a weapon before, shot a

17  hole in the ceiling.  So the officers knew that he had fired

18  a weapon and it had been shot.

19          We knew from -- he was agitated, obviously, and we

20  have the dispatch language of the words he said.

21          We knew he was --

22          THE COURT:  Before you get down that litany of

23  justifications, I want to know if it's your position that

24  any time a suspect possesses a weapon that that in and of

25  itself justifies the use of fatal force.

10:41:45   1              MR. FRANZ:  No.  You would have to have some other

           2   circumstances.

           3              THE COURT:  So it's possessing a weapon plus other

           4   circumstances?

           5              MR. FRANZ:  Well, it depends on how you talk about

           6   possess and possessing --

           7              THE COURT:  Certainly, one other circumstance

           8   would be pointing the weapon --

           9              MR. FRANZ:  Yes.

          10              THE COURT:  -- at the officer.

          11              And -- but is it your view that that is

          12   indisputable?  That he -- whether he pointed the weapon at

          13   Officer Stutesman or not, are you saying that that itself is

          14   not subject to being disputed?

          15              MR. FRANZ:  It's subject to being disputed, but it

          16   is --

          17              THE COURT:  If it is subject to being disputed,

          18   doesn't that implicate a factual controversy?

          19              MR. FRANZ:  Well, it has to be disputed, though.

          20   Just the fact that something is subject -- what's the

          21   dispute?

          22              THE COURT:  But if it's disputed, doesn't that

          23   implicate a factual controversy, and, if it does, doesn't

          24   that require a jury to resolve that factual issue?

          25              MR. FRANZ:  No.

10:42:47    1           THE COURT:  You want me to do it as a matter of

2    law?

3           MR. FRANZ:  Based on the evidence you have.  You

4    have to have evidence -- if he possessed a weapon coming

5    out, they don't have to wait for him to pick it up and shoot

6    somebody.

7           THE COURT:  Is it your position that Officer

8    Stutesman's statement that the rifle was pointed at him is

9    not subject to being probed, for example, by

10    cross-examination and other circumstances and is not subject

11    to being disputed by the plaintiffs?

12           MR. FRANZ:  With evidence.  If you had a witness

13    that said he came to the door and didn't point the weapon.

14           THE COURT:  Well, what about -- what about

15    cross-examination?  What about casting doubt on the

16    statement through the traditional means of examining the

17    witness at a trial?

18           MR. FRANZ:  They had the opportunity to do that at

19    deposition.

20           THE COURT:  And you are saying nothing came out at

21    deposition that would allow a jury to find a factual issue?

22           MR. FRANZ:  Correct.

23           THE COURT:  Okay.  Go ahead.

24           MR. FRANZ:  Okay.  So their position is that the

25    weapon was planted and that that weapon wasn't there.

10:44:07  1        Now, we have the neighbors' testimony, and her

2  testimony is, and she -- her testimony is that he came to

3  the door and she saw the strap to the gun.

4        THE COURT:  Here's what she said:

5        "We saw the shoulder strap of the gun -- well, of

6  something.  I don't know if it was a gun, but a shoulder

7  strap of something."

8        Is that not subject to a factual issue for a jury

9  to resolve?  What did she see?

10        MR. FRANZ:  You have to have some evidence that

11  there's some contrary evidence.  You just can't say you have

12  a right to credibility.  The fact -- the disputed fact -- a

13  dispute of a material fact, where is the dispute?  What

14  evidence?  You have a neighbor see a strap.  You have

15  Stutesman say there's a weapon.  You have a weapon on the

16  ground.  And nobody came out or in that house once that

17  BearCat got there because you had the BearCat video the

18  entire time.  The gun did not walk there.

19        THE COURT:  I don't know if you are aware or not,

20  but as a prosecutor for many years, I tried hundreds of

21  cases in front of a jury, and I cannot emphasize enough the

22  value of cross-examination in terms of the probity of

23  evidence.

24        I had one particular case that involved a rape

25  homicide at the border, and the issue was who committed the

10:45:58  1    rape and the homicide.  The defendant was a federal

2    protective officer.  And one of the issues was where the

3    body had been placed after it had happened.  And there was

4    testimony from other federal protective officers that they

5    had been at the scene patrolling and there was no body there

6    at a certain pertinent time.  And the issue was whether that

7    officer was correct in that statement or whether he just

8    didn't see it, and that was the subject of cross-examination

9    at trial.  And there was doubt cast on the accuracy of his

10   testimony.

11            I could cite you thousands of examples.

12            So I -- it's not -- it's not for me lightly to

13   dismiss the value of putting on a case before a jury and

14   allowing full cross-examination to allow the testing of a

15   witness's statement.

16            And you are asking me to do that at summary

17   judgment.  You are asking me to take it from a jury and just

18   to decide it as a pure matter of law.

19            That's the context of this hearing here today, and

20   that's exactly what you are asking me to do, correct?

21            MR. FRANZ:  No.  I am asking you to find that a

22   material fact is not in dispute.

23            THE COURT:  Okay.  Go ahead.

24            MR. FRANZ:  Okay.  So assuming that nothing is

25   further disclosed after the photographs and that those

10:47:57   1   photographs are actually not fake or whatever the plaintiff

2   is going to say, we know the weapon was there 11 minutes

3   after.

4          Okay.  Their theory is that Officer Warden jumped

5   the fence of the backyard, came around, planted the gun;

6   that he went into the house, he got the gun, he came out and

7   planted it.

8          We know that once the BearCat video got there six

9   minutes later no one came out of that house with a gun.  So

10  for Warden to have jumped the fence and planted the gun, he

11  had to do it within the six minutes and three seconds that

12  the BearCat sat there after the shot.

13         So what we have done is we have taken the audio of

14  the dispatch tape.

15         And can you get to where he jumps the fence?

16             (Video played; not reported.)

17         MR. FRANZ:  Okay.  So that was Officer Warden

18  calling Malcolm, who is Malcolm McAlpine, asking -- he said

19  he's jumping the fence.  Do you want me to come there and

20  help you?  And McAlpine said no.  Go to the front.

21         Okay.  So we know he's at the fence when that

22  comment was made.

23         So we can calculate from shots fired to the time

24  that that statement was made, and we know that the statement

25  was made nine minutes and 15 seconds after shots fired on

10:49:41   1    the dispatch tape.

2              So we can take that nine minutes and 15 seconds

3    and run it on the BearCat video from the time that the door

4    last opened, and we can see where the BearCat video is at

5    the time Warden jumps the fence.

6              And so by doing those calculations, elapsed time

7    is 24:52.

8              Okay.  So this is the scene nine minutes after

9    when Warden jumped the fence.  Okay?  The BearCat video was

10   already there when Warden jumped the fence.

11             So for their theory to be correct, the BearCat

12   video would have to show Warden going into the house,

13   getting the weapon, and already putting it down.  And so

14   Warden did not jump the fence and plant the gun.

15             So our theory and what we say the evidence shows

16   is that the testimony of Stutesman is credible.  You have

17   excited utterance.

18             THE COURT:  Well, when you say the testimony of

19   Officer Stutesman is credible, does that mean it must be

20   accepted and can't be subject to dispute?  Is that what you

21   are saying?

22             MR. FRANZ:  No.  If there is a fact --

23             THE COURT:  Because I noticed in your briefing,

24   you basically conflate the rules of admitting a statement as

25   an excited utterance as an exception to the hearsay rule,

10:51:36  1    and you seem to basically equate its admissibility with the

       2    proposition that it must be accepted as true, and that's not

       3    an accurate statement of the law.

       4            Excited utterance is admissible under the hearsay

       5    rule, but that doesn't take its effect away from the jury.

       6    They still must make the determination if they credit it,

       7    and if it's disputed, they can make that determination.

       8            So it's not -- it's not binding on the court as a

       9    matter of law to accept an excited utterance as something

      10    that can't be controverted.

      11            MR. FRANZ:  I agree, Your Honor.  I didn't mean it

      12    to be that way.

      13            THE COURT:  Okay.

      14            MR. FRANZ:  I meant if it is a credible statement,

      15    it has to be disputed by a material fact.

      16            THE COURT:  Okay.

      17            MR. FRANZ:  So, I mean, that's the issue.  Is

      18    there a fact disputing the statement.  Is there a fact

      19    disputing that the weapon was not there and carried out and

      20    is there a dispute of the fact that he didn't possess the

      21    weapon.  Our position is possession of the weapon plus the

      22    extra facts.

      23            THE COURT:  Okay.

      24            MR. FRANZ:  That's what it boils down to.

      25            Thank you.

10:52:53   1        THE COURT:  All right.  I will hear from the

2    plaintiffs.

3        MR. ODIM:  Counsel refers to the -- and has shown

4    the court the video.

5        MR. STROTH:  Can we take the video off the screen.

6        MR. ODIM:  And rightly says that the video is

7    running the whole time.

8        That video itself raises a material issue of fact

9    about whether or not Babb came to the front door, raised a

10   rifle, and pointed it at Stutesman.  That video doesn't show

11   any of that.

12       THE COURT:  Do you agree with Mr. Franz that even

13   if he didn't raise the rifle that fatal force was justified?

14       MR. ODIM:  No.

15       THE COURT:  Okay.

16       MR. ODIM:  Mere possession is not enough under the

17   appropriate authorities.  There must be an objective and

18   reasonable fear of an imminent threat to the officer or some

19   third party.

20       In trying to think about how to compress the

21   voluminous briefs and exhibits, I divided into two concepts

22   the essence, I think, of plaintiffs' position.  There is no

23   doubt; that is, both sides agree that one or more of the

24   Eugene officers said after the shooting that Babb is down.

25   Rifle in right hand.  We all agree to that.

10:55:02

1          The law of contradictions says that if one

2     thing -- that two things can't -- two things in

3     contradiction can't both be right.  If a gun, a rifle was in

4     Babb's right hand while he was down, then the pictures that

5     defendants produce that show a rifle on the front porch not

6     in Babb's right hand create a contradiction.  What's

7     correct?  Which one is correct?  Who gets to decide that if

8     not the jury?

9          And the jury is entitled to raise inferences about

10    the mere existence of the contradiction, especially the mere

11    existence of the contradiction unexplained.

12          Defendants' reply to our response had attached to

13    it a declaration by Officer Pieske.  Officer Pieske says

14    that he is the one speaking on the audio transmission saying

15    that Babb is down.  Rifle in his right hand.

16          Defendants make the implied argument that Pieske

17    is wrong about that.  Pieske was wrong when he said that.

18          Pieske's declaration was an opportunity for Pieske

19    to explain why it is he was wrong.  But that declaration is

20    silent.  Why?

21          I would put Pieske on the witness stand and have

22    him answer a question in front of a jury, why did you say

23    that the officer was down -- that Babb was down with a rifle

24    in his right hand?  To what end?  For what purpose?

25          Second point, concept:  If we accept that the gun

10:57:45  1    was not in Babb's right hand, as the photographs show, then

2    you ask why did Pieske lie?  It's a fair inference that can

3    be drawn from that fact that it was a lie.  It was an

4    attempt at a cover-up.

5            The jury's entitled to hear from Pieske why does

6    he say that.

7            Now, the defense misstates plaintiffs' position as

8    a fair way of trying to take it down, misstate it and then

9    take it down.  Possession, planting the concept of

10    possession inchoately, planting the concept that Babb had in

11    his possession a weapon would suggest is why one of the

12    officers, Pieske or others, used the phrase man down, gun in

13    right hand.

14            Pieske is not the only one to use that phrase.

15    McAlpine -- three officers used the phrase.  Why?  McAlpine

16    in one of the event reports, at -- is recorded in the event

17    report, which is what the dispatcher produces of traffic

18    over the airways, is credited with saying man down --

19    with -- rather, is credited with saying gun in right hand.

20            Plaintiffs' presentation describes Kidd as saying

21    that.

22            Well, the Oregon State Police report says Kidd

23    says that.  Well, who said it?  McAlpine, the supervisor on

24    the scene; Kidd; or Pieske?

25            We know that Pieske could not have seen what he

11:00:00   1   said he saw.  He was sitting in the BearCat.  He couldn't

2   have seen over the fence.  He admits that himself.

3          These officers, plaintiffs suggest, were trying to

4   create the cover story because they were conscious, they

5   were conscious of a weakness.  They were conscious of a bad

6   shoot, to use the street lingo.  They needed to shore up.

7   They needed it in the records, gun in right hand.

8          Plaintiff is simply use -- we don't need to drag

9   and regurgitate the Warden events to reach or answer the

10   question whether there's a material issue of fact.  But

11   Warden simply shows that -- the Warden events simply show

12   that there was someone who had access.

13          When did Warden jump the fence?  Was it before he

14   came on the airwaves?  Was it three minutes before that?  We

15   don't know.  He contradicts himself in his deposition.  He

16   says he went from the back to the front using a safe

17   pathway, meaning he didn't jump into the backyard, meaning

18   he didn't jump into the backyard because the -- he didn't

19   know that the -- whether the house was clear, whether he

20   would be shot.

21          So when he came to the front, he said he walked a

22   safe pathway outside of the yard.  When pressed at his

23   deposition, he changed his version and said, yes, I did jump

24   over the fence.

25          Now, is it that Warden moved to the rear -- or

11:02:05  1    moved from the rear to the front of the house twice and

2    that's what the confusion was?  He did it one time when he

3    went to check the scene, went back to the fence, used the

4    radio to get the recordation and then came up to the front?

5    The jury needs to hear that.

6              Why is that gun not in Babb's right hand?  Why did

7    Pieske say it was when it wasn't?

8              The plaintiff is entitled to the inferences that

9    there was a cover-up, that these officers together,

10   together, again, remember three officers used the phrase,

11   gun in right hand, these officers together were conscious of

12   this bad shoot, were conscious of the need to shore up

13   Stutesman's statement that the gun was raised.

14             That is the material fact.  Was a gun -- was Babb

15   in possession of a gun that presented an imminent threat to

16   Stutesman.

17             Without cross-examination, without inquiry into

18   the discrepancies between Pieske's statements, McAlpine's

19   statements, Kidd's statements about this weapon, defendant

20   is asking the court to simply take it on faith and as a

21   matter of law that there is no dispute.

22             Plaintiff isn't required to prove a case in

23   response to summary judgment.  Plaintiff is only directed to

24   raise, through inferences or otherwise, a material question

25   of fact, not as counsel states, an evidentiary fact alone.

11:04:37    1          Inferences, inferences are the scaffolding of the
         2    plaintiffs' response here.  And, of course, they would be.
         3    If somebody is covering up, they clean their tracks.  You
         4    rarely find direct evidence.  You rarely find direct
         5    evidence.
         6          We don't know for sure whether or not Stutesman
         7    made a mistake, intentionally shot, but I think plaintiff
         8    has raised sufficient inferences on the material question of
         9    whether or not Babb possessed a gun and, in possessing that
        10    gun, pointed it or did something with it to put Stutesman
        11    and others in imminent, imminent fear.
        12          I want to talk about -- now about the various
        13    audio and video that defense has raised.
        14          He uses the phrase elapsed time.  Elapsed time.
        15    Elapsed time.  What about realtime?  There is even a
        16    question about the timeline.  We have three sets of sound --
        17    or three sets of data that have time stamps on them.  They
        18    have realtime timestamps on them.  Right?
        19          What is the synchronicity between each of these
        20    three data sets?  We don't know whether or not the time
        21    stamps, the realtime stamps actually reflect the actual time
        22    of day.
        23          Counsel's presentation assumes that there's
        24    synchronicity across those three data sets.  That's an
        25    assumption.  There's no evidence of that.

11:07:18

1          Mere possession is not enough, Your Honor, and

2    that video does not show possession.  That video does not

3    show a rifle pointed.  And if we take counsel's argument at

4    face value, what that video shows is that there is an

5    unanswered question about the existence of a rifle in the

6    right hand of Babb and the location of that rifle a little

7    more than six feet away outside on the front porch.

8          It's not enough to say we don't have direct

9    evidence, meaning someone who says he didn't point a gun.

10   Stutesman took away the opportunity for that to happen.

11         And the authorities that we cite in our brief make

12   it clear that in circumstances where an officer makes

13   statements that support his version and the person who has

14   testimony that could rebut it has been shot by the officer

15   that the court ought to be very, very careful in accepting

16   that one-sided presentation.

17         So to wind up, we think that the plaintiff has

18   raised a material question of fact on the question of

19   possession, and we would ask ultimately, once the

20   supplemental briefing is done, that the court enter an order

21   denying that motion and then setting this case for a jury to

22   hear and decide what inferences to draw from the

23   discrepancies that litter this record.

24         Thank you.

25         THE COURT:  Thank you.

11:09:26   1          Well, just so everybody's on the same page, I want
          2   to make it clear that the law in federal court is well
          3   settled that circumstantial evidence is equally probative as
          4   direct evidence.
          5          So in other words, circumstantial evidence being
          6   evidence from which inferences can be drawn leading to a
          7   certain conclusion, that that is entitled and always has
          8   been to equal weight of direct evidence; that is, evidence
          9   of eyewitness testimony as to the facts.  So I am well aware
         10   of that case law.
         11          All right.  Mr. Franz, do you have any --
         12          MR. FRANZ:  Very briefly.
         13          Three officers did not say the weapon was in the
         14   right hand.  One officer said that over dispatch.
         15          And the officer that said that introduced himself
         16   as Mary 12, which is Pieske, and Pieske, in his declaration,
         17   said, I am the one who made that statement.
         18          We have calculated for you when that statement was
         19   made.  That statement was made six minutes and two seconds
         20   after the shot.
         21          If you calculate out through the BearCat, Pieske
         22   is going through the fence when he makes that statement.  So
         23   the statement was made well after the shooting, and it's
         24   made by the driver driving through the fence.  Why he said
         25   it they could have asked him in a deposition.

11:10:57

1        THE COURT:  I think his point is the statement was

2    that Mr. Babb was down, rifle in his right hand, and the

3    photographs show the rifle a distance away from Mr. Babb's

4    body, and he's citing that as a contradiction in the

5    statement and the photographic evidence.

6        MR. FRANZ:  Yes.

7        THE COURT:  And from that contradiction, he's

8    asserting that the jury can draw certain inferences.

9        And I get back to what you want this court to do,

10   which is to decide this as a matter of law and not submit it

11   to a jury.

12       And the evidence he's citing is circumstantial

13   evidence that I just talked about that can support

14   inferences, and it's entitled to equal weight to direct

15   evidence.

16       And so what am I to do with that in terms of your

17   motion for summary judgment?  You want me to decide this as

18   a matter of law.

19       MR. FRANZ:  Well, I think the fact that the

20   statement is made as Pieske is driving doesn't contradict

21   the statement of Stutesman.

22       THE COURT:  I am sorry?

23       MR. FRANZ:  The statement by Pieske does not

24   contradict the statement of Stutesman.

25       THE COURT:  The statement being that the rifle is

11:12:14  1    in his right hand?

2                MR. FRANZ:  That is inconsistent with his

3    statement being on the front porch.  I agree.  But we have

4    the BearCat video arriving at the same time the statement is

5    made.

6                THE COURT:  But the BearCat video doesn't show --

7    I -- I am not following.

8                MR. FRANZ:  Okay.  So if you conclude -- if you

9    conclude that's not a rifle on the BearCat video and that we

10   haven't tied that in.

11               THE COURT:  Well, I get back to that.  Is that

12   something I can conclude as a matter of law?  And you seem

13   to say it is.

14               MR. FRANZ:  It is, combined with the photographs

15   that Stutesman took.

16               THE COURT:  Well, when you combine it with the

17   photographs, aren't you asking me to engage in an

18   inferential process drawing inferences, and isn't that the

19   function and prerogative of a jury?

20               MR. FRANZ:  Inferences from material facts that

21   are not disputed.

22               THE COURT:  Okay.

23               MR. FRANZ:  And then as to the synchronization, it

24   was explained by the officers that each video on each

25   vehicle is not going to be synchronized with realtime.  They

11:13:19  1    are all different.  And that's why you will see the date

2    stamps that appear.

3            You know, for example, if I just run the BearCat

4    video, okay, that date stamp is not accurate.  The date

5    stamp on the ICV is not because they are not synchronized to

6    realtime.

7            So the only way to get actual realtime, they are

8    all being played in realtime.  So you can take the elapsed

9    time as being the realtime, not the date stamps.  That's why

10   we used -- and we have never said and we presented in a

11   declaration that they are not synchronized.  Otherwise we'd

12   just use the date stamp.

13           Thank you.

14           THE COURT:  Okay.  Well, I want to observe the

15   noted French historian de Tocqueville described in his

16   sojourn through the United States when it was a young

17   republic, he extolled the virtues of this country's jury

18   system as being the foundation of Democracy.  And I think

19   he's very correct.  It's a unique cornerstone of our form of

20   government that calls in juries to decide important issues

21   after a trial.  And I bear that in mind as I approach the

22   issues presented in this case.

23           We will allow the supplemental briefing, and the

24   case will -- if either party requests additional oral

25   argument in connection with the supplemental briefing, we

11:15:35   1   will reschedule that.  If neither party requests

2   supplemental argument, it will be taken under submission

3   when the supplemental briefing is submitted, and the court

4   will expedite its ruling on this case so that it can move

5   forward.

6           Thank you.

7           MR. FRANZ:  Your Honor, I have one more thing.

8           MR. ODIM:  Thank you, Your Honor.

9           THE COURT:  Yes.

10          MR. FRANZ:  They have agreed that defendant Pieske

11  and Grose can be dismissed.  Can we do a limited judgment to

12  get this off their record?

13          THE COURT:  Any objection to that?

14          MR. ODIM:  No objection.

15          THE COURT:  All right.  Then you can do that.

16  Submit it for the court.

17          MR. FRANZ:  Thank you.

18          THE COURT:  Anything else?

19          MR. ODIM:  Nothing from the plaintiff.

20          THE COURT:  All right.  Thank you.

21          MR. ODIM:  Thank you.

22          THE COURT:  Thank you for your presentations.

23          THE CLERK:  This court is in recess.

24          *(The proceedings were concluded this*

25          *18th day of January, 2019.)*

11:16:26   1             I hereby certify that the foregoing is a true and

2    correct transcript of the oral proceedings had in the

3    above-entitled matter, to the best of my skill and ability,

4    dated this 24th day of April, 2019.

5

6    /s/Kristi L. Anderson

7    Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25