IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


RONDA MCGOWAN, Personal          ) No. 6:17-cv-00424-MC

Representative for the Estate )

of Brian Babb, LEE BABB,          )

CONNOR BABB, by and through   )

his Guardian Ad Litem,          )

STEPHANIE WOODCOCK, and KAYLEE)

BABB,                              )

            Plaintiffs,      )

    v.                             )

WILL STUTESMAN, OFFICER GROSE,)

OFFICER PIESKE, SGT. MCALPINE,)

CITY OF EUGENE, a municipal    )

subdivision of the State of    )

Oregon, JANE DOE CALL TAKER,   )

and John and Jane Does 1-10, )

            Defendants.       )


PRETRIAL CONFERENCE

February 11, 2020

Tuesday

9:08 A.M.

```
 1                        APPEARANCES
 2     For the Plaintiffs:
 3          AMANDA S. YARUSSO
 4          111 West Washington Street, Suite 1500
 5          Chicago, Illinois 60602
 6          773/510-6198
 7          BY:  MS. AMANDA S. YARUSSO
 8          (Appearing by Phone)
 9          amanda@actioninjurylawgroup.com
10
11          ACTION INJURY LAW GROUP, LLC
12          191 North Wacker Drive, Suite 2300
13          Chicago, Illinois 60606
14          312/771-2444
15          BY:  MR. CARLTON ODIM
16          carlton@actioninjurylawgroup.com
17          BY:  MR. ANDREW M. STROTH
18          astroth@actioninjurylawgroup.com
19
20          TIM VOLPERT, P.C.
21          610 SW Alder Street, Suite 415
22          Portland, Oregon 97205
23          503/703-9054
24          BY:  MR. TIMOTHY R. VOLPERT
25          tim@timvolpertlaw.com
```

```
 1                      APPEARANCES

 2

 3    For the Defendants:

 4         LAW OFFICE OF ROBERT E. FRANZ, JR.

 5         P.O. Box 62

 6         Springfield, Oregon 97477

 7         541/741-8220

 8         BY:  MR. ROBERT E. FRANZ, JR.

 9         rfranz@franzlaw.comcastbiz.net

10         BY:  MS. SARAH HENDERSON

11         shenderson@franzlaw.comcastbiz.net

12

13         MR. BENJAMIN J. MILLER

14         City of Eugene

15         125 East 8th Avenue, 2nd Floor

16         Eugene, Oregon 97401

17         541/682-8447

18         ben.j.miller@ci.eugene.or.us

19

20    Reported by:

21         SARA FAHEY WILSON, CSR

22         EUGENE      541/485-0111

23         TOLL FREE   800/344-0983

24

25
```

```
1              TUESDAY, FEBRUARY 11, 2020; 9:08 A.M.

2                     P R O C E E D I N G S

3                           --o0o--

4

5              THE COURT:  Why don't we go ahead and

6    go on the record.  Ms. Pew, I'll have you call the

7    case.

8              THE CLERK:  The United States District

9    Court for the District of Oregon is now in session.

10   The Honorable Michael J. McShane presiding.

11             Now is the time set for civil case

12   17-00424, McGowan, et al., versus Stutesman, et al,

13   pretrial conference.

14             THE COURT:  All right.  Let's have the

15   attorneys before me please introduce themselves for

16   the record, and let's start with Plaintiffs'

17   counsel.

18             MR. ODIM:  Carlton Odim for the

19   plaintiff.

20             THE COURT:  Mr. Odim, thank you.

21             MR. STROTH:  Andrew Stroth for the

22   plaintiff.

23             THE COURT:  Mr. Stroth, thank you.

24             MR. VOLPERT:  Tim Volpert for the

25   plaintiff.
```

```
 1                    THE COURT:  Mr. Volpert, good to see
 2     you again.
 3                    All right.  For the defendants?
 4                    MS. YARUSSO:  And, Your Honor, this is
 5     Amanda Yarusso appearing by phone for the plaintiff.
 6                    THE COURT:  All right.  Thank you.  Is
 7     it Yarusso?  Correct?
 8                    MS. YARUSSO:  That's correct.
 9                    THE COURT:  Okay.  All right.  For
10     Plaintiff [sic]?
11                    MR. FRANZ:  For the defendant.  Robert
12     Franz for Defendants.
13                    THE COURT:  All right.  Good to see
14     you again.
15                    Mr. Miller, we've got you.
16                    MS. HENDERSON:  Sarah Henderson also
17     for Defendants.
18                    THE COURT:  Ms. Henderson and
19     Mr. Miller.  All right.  Thank you.
20                    Well, we have a lot of rulings to go
21     through.  I'll give you a spoiler alert.  Most of
22     the evidence is coming in.  Really, I don't think a
23     lot of the objections were particularly meritorious
24     when it came to the evidence.
25                    So I'll go through these.  If you need
```

1   some clarification, please interrupt me.  I think

2   they are pretty straightforward.

3              There are some exceptions.  There's

4   some things that I may need to ask you about, some

5   things that are not coming in.  But by and large,

6   both sides wanted to keep out certain kinds of

7   evidence that I think is going to be relevant for

8   the jury so a lot of it is coming in.

9              Let's start with motions in limine.

10  We have the plaintiffs' motion in limine.  First is

11  Plaintiffs' motion to bar evidence of consumption of

12  alcohol or medication, including photographs taken

13  at the home, the toxicology report, restraining

14  orders, medical records and testimony.

15             There is sufficient evidence to

16  reasonably suggest that Mr. Babb was intoxicated and

17  on medication and having a mental health episode at

18  the time, that he was suicidal at the time of the

19  incident, so this kind of evidence is relevant to

20  the defense contention that he was attempting to get

21  the police to kill him, so it does have relevance

22  there.

23             It's also relevant to his health

24  habits, his sobriety, and his life expectancy, and

25  his relationship with the individual plaintiffs.  So

1   when it comes to assessing damages, this is the kind

2   of evidence that typically would go to the jury.  I

3   realize some of it is not good evidence, it has some

4   prejudicial affect, but it's not out weighed by its

5   probative value.

6                    We'll talk about the kettle of fish,

7   or whatever that website is called, in a moment.

8   There's some questions about that.

9                    Motions in limine for the defense.

10  Motion number one -- a lot of these I would not -- I

11  would certainly not be expecting the plaintiff to

12  even consider introducing the evidence.  I know they

13  are somewhat prophylactic, but motion number one is

14  a reference to police actions in other locales.

15  I'll grant that motion.

16                   Motion two, a reference to people

17  dying to secure the rights founded in the

18  Constitution I'll grant.

19                   Motion three, putting the jury in the

20  shoes of the plaintiffs or family.  Of course I'll

21  grant that.

22                   Motion four, evidence that Mr. Babb

23  was a war hero.  I'm going to deny that motion.  I

24  think the witnesses can describe Mr. Babb's service

25  in the military and give a general background of his

1      life.  I mean, there are family members who are

2      going to testify how they viewed their relationship

3      with him, who he was, and that has something to do

4      with his history and how they looked at him.  And if

5      they looked at him as a war hero, that's how they

6      looked at him.

7                   Motion five, testimony of non

8      plaintiff family members regarding their loss.  I'll

9      deny that as well.  I think they can testify

10     generally about family relationships and the impact

11     on family members who are plaintiffs.  They can

12     testify to relevant character traits about

13     Mr. Babb's character as a father and a family

14     member.  Of course, that would be subject to

15     specific acts of impeachment, many of which is

16     coming in anyways, quite frankly, for other reasons.

17                  Motion six, expert testimony regarding

18     the reasonableness of the force used.  I haven't

19     seen that there is an expert planning on making that

20     contention.  But generally speaking I do not allow

21     that kind of testimony.  It's really an issue for

22     the jury to decide based on their common sense and

23     judgment, and they do not need the aid of an expert

24     in determining the reasonableness of the force.

25                  Then turning to exhibits.  The first

1    objection is to Exhibit 201, the training records of

2    Will Stutesman.  That's overruled.

3                     Exhibit Number 202, the firearm

4    training records of Will Stutesman.  I'm saying

5    "Stutesman."  Is it's Stutesman or Stutzman

6    (phonetic)?

7                     MR. FRANZ:  Stutesman.

8                     THE COURT:  So 202, overruled.

9                     207, photos of Officer Stutesman as

10   dressed that night.  Overruled.

11                    209, audio recording of Stephanie

12   Woodcock.  So she is a party opponent, so in that

13   respect it's not hearsay.

14                    Mr. Franz -- well, I tend to be

15   directing everything to Mr. Franz, probably.  Are

16   you the lead counsel?

17                    MR. FRANZ:  Yes, Your Honor.

18                    THE COURT:  Okay.  I'll direct things

19   at you then.

20                    Mr. Franz, I think it could be

21   cumulative.  I think we need to wait to see how she

22   testifies.  If she testifies inconsistent with

23   what's in this audio recording, you can enter it as

24   non hearsay substantive evidence as a party opponent

25   and use it as impeachment.  But if she testifies

1    consistently, it's just cumulative.

2              So I'm conditionally sustaining the

3    objection with the understanding you may move to

4    enter it at a later time.

5              Exhibit 210, restraining -- this is --

6    210 and 211 are restraining orders.  Again, at issue

7    is -- with regard to damages -- is the relationship

8    between Mr. Babb and his children, and it does

9    appear from these documents that there was a concern

10   of threats to his children in the context of

11   these -- this 2006, 2007 restraining order.  In that

12   respect it does have some relevance, so I will allow

13   it in.

14             215, scene photographs by Sprague,

15   overruled.

16             Exhibit 217, items returned to Ronda

17   McGowan.  I'm just not sure if this rabbit hole is

18   relevant or not.  I'm going to sustain at this time

19   on foundation.  If a foundation is laid that there

20   could be material items that were somehow destroyed,

21   I may allow it at a later time.

22             218, Babb phone records, overruled.

23             219, discharge summary of Roseburg

24   Hospital, overruled.  It is relevant to his mental

25   state going into this time frame.

```
 1                  The screen results, Exhibit 220,
 2      overruled.
 3                  221, the overlay video with sound.
 4      This gets into the expert testimony.  But I am
 5      overruling the objection.  This is the kind of
 6      technical support the jury is going to need to help
 7      them determine time frames.
 8                  Exhibit 222, Plenty of Fish.  I'll be
 9      honest, I just don't understand the relevance.  I
10      realize it might be a habit, but what's the habit
11      relevant to?
12                  MR. FRANZ:  Well, you know, that was
13      originally just coming in to show that's the only
14      thing we could get off the computer.
15                  THE COURT:  Well, then, sustained.  I
16      mean, it seems like it might be suggesting there's
17      some moral flaw, although reading what I saw --
18                  MR. FRANZ:  Well, Your Honor, I'd
19      offered that for that purpose, too, that this is
20      what he was doing the last two weeks of his life.
21                  THE COURT:  I need to get a date.
22                  MR. FRANZ:  That's what it is, yeah.
23                  THE COURT:  That's not relevant to
24      really damages or his relationship with anybody.
25      That's just a life habit.  And it suggests he had
```

1   some character flaw that I think is improper.  So

2   222 is out.

3                   223, the gun inspection photos,

4   overruled.

5                   224, the Higgins exhibit, I think it

6   will come in.  There would not be any privilege if

7   she testifies.  My understanding is Higgins is

8   testifying.  So I'll overrule the objection.

9                   225, Dr. Dan Davis exhibits,

10  overruled.

11                  226, investigation by Officer Hubbard.

12  I'm trying to jog my memory.  Is this the

13  investigation where Officer Hubbard speaks to the

14  son -- is it Connor?

15                  MR. FRANZ:  Yes.  The gun -- pointing

16  the gun incident.

17                  THE COURT:  Yes.

18                  MR. FRANZ:  And it would only be used

19  if Connor denies it.  Connor kind of admitted it

20  pretty much in his deposition.

21                  THE COURT:  So it is a statement of a

22  party opponent.  My only concern is if the report

23  comes in, there may be other statements by other

24  people within the report that would be hearsay so it

25  may need to be redacted.

1          MR. FRANZ:  Okay.

2          THE COURT:  228, Stutesman oath, I'll

3  sustain the objection on relevance.

4          229 and 230, audio and transcript of

5  Jim Antonini interview, it may come in if

6  Mr. Antonini testifies inconsistent with the

7  recording, and the transcript may be used as

8  impeachment in that case.  But it would not come in

9  as substantive evidence at this time.

10          MR. FRANZ:  A couple of questions,

11  Your Honor.

12          THE COURT:  Yes.

13          MR. FRANZ:  Can we use the overlay

14  from the very beginning of the trial?  Or do we have

15  to wait until our video expert testifies?

16          THE COURT:  You may use the overlay.

17          MR. FRANZ:  Okay.

18          THE COURT:  I mean, we need to be able

19  to assist the jury in understanding time frame, so

20  whether you're using it -- I mean, do you have a

21  pictorial of the time frames?  Is that what you want

22  to use?  Or are you wanting to play it right away?

23          MR. FRANZ:  Well -- okay, my plan

24  would be with the particular officers to play it to

25  show which officer is doing what at what time.  And

1    then to say, Okay, for example, start off with

2    Mr. Stutesman maybe from the time of the shooting

3    until the BearCat moves forward, and then that

4    elapsed time --

5                    THE COURT:  That's fine.

6                    MR. FRANZ:  -- and then what the sound

7    was at the same time so the jury can hear -- we have

8    the ability to turn off each track so we can play it

9    no sound, one track, or the third track.  And the

10   two tracks -- other tracks being the dispatch tape

11   and the ICV unit of DeWitt.

12                    THE COURT:  That's fine.  I'm finding

13   it admissible.

14                    You're going to have to put on your

15   expert at some point to talk about the data he used

16   to create this and he's then subject to

17   cross-examine to challenge any of that data.  And

18   the jury will get to decide just how much weight

19   they want to give the evidence.  I think this is the

20   kind of evidence we want the jury to have to help

21   them understand.  Now, it can be challenged in terms

22   of its accuracy, but I'm not finding that it's

23   unreliable under some scientific --

24                    MR. FRANZ:  And then on the audio of

25   Stephanie Woodcook, can I use that without any

1    further foundation, or do I have to bring OSP

2    detectives in who took the statement?  Because it's

3    her voice on it.  She can authenticate it.  It's her

4    voice.

5              THE COURT:  I would expect that to be

6    the case, that she would authenticate it.  You don't

7    need anything further.

8              And I will say that any exhibit that

9    has not been objected to or that I've overruled the

10   objection is deemed admitted for both sides.  Okay?

11             MR. ODIM:  Your Honor, one point of

12   clarification.

13             THE COURT:  Yes.

14             MR. ODIM:  The concern I have about

15   using the overlay is a concern relating to whether

16   or not the person who put that overlay together in

17   fact gets on the witness stand.  I mean, I hope that

18   if Mr. Franz uses it that he is committing himself

19   to produce that witness.

20             THE COURT:  He is.

21             MR. FRANZ:  But we wanted to do it by

22   phone.  He's the gentleman --

23             THE COURT:  Oh, right, right, right.

24   And we're able -- we're going to be able to connect

25   him via video.  We're working on that.

1          So Dan Philpott [sic] is our IT

2     person.  I am going to allow him to testify by --

3     via video or phone.  But, Mr. Franz, you need to

4     work with Mr. Philpott.  But he's going to set up a

5     particular software that will allow us to bring him

6     up to the screens and he can testify from his home.

7     But I am finding that he is having a family hardship

8     in which it would be difficult for him to testify in

9     person.  But he does need to testify -- to talk

10    about the data and be subject to cross-examination

11    about the data he used.

12          So now the defense exhibits [sic] to

13    Plaintiffs' exhibit list.  There's objections to

14    Exhibit 3, 4, and 5.  Those are overruled.

15          Objections to 15 and 18 overruled.

16          Objections to Exhibits 22 to 27

17    overruled.

18          Objections to the photographs, 13, 14,

19    30, 31, 32, and 34, it did seem to me that 30 and 32

20    are cumulative, so I would sustain an objection at

21    this time to them.  Otherwise, I would overrule the

22    objection.  So 13, 14, 31, and 34 would come in.

23          Now, if there's -- you know, somebody

24    is going to testify that 30 and 32 have some more

25    significant relevance then you can move to enter

1    them at that time.  But it just seemed like one was

2    a little further away and one was a little bit

3    closer.  And all of them show that there's no

4    firearm within the context of Mr. Babb.

5                39, this is the event report.  It does

6    seem to put things into some sort of chronological

7    order including the fact that these shots have been

8    fired, so I wasn't -- I was trying to read it.  It

9    was a little -- I read it a couple of days ago now.

10   And I'm trying to remember, are there particular

11   statements within the event report that you're

12   concerned about from the defense perspective?

13               MR. FRANZ:  I think there was one

14   statement -- let me see.  I just didn't want to

15   allow the -- to open the door to the subsequent

16   investigation by iFit.  And I think there was

17   something in here that -- about an auditor, or

18   something, so -- I don't mind it as long as we're

19   not considered opening the door to the investigation

20   done by OSP and iFit.

21               THE COURT:  Okay.  We're going to need

22   to -- talk about that more.  My inclination is to

23   not let that investigation in.  I guess I kind of

24   assumed the plaintiff did not want the investigation

25   in, but now I'm not completely clear.

1           Is it your contention that the

2    investigation that seems to exonerate Officer

3    Stutesman that, I believe, said the homicide was

4    justified should come in or should not come in?

5           MR. ODIM:  Not the investigation, per

6    se.  We don't want to use it for the justification

7    of the force.  We want to use it as evidence of post

8    event cover-up.  That is the failure to -- the

9    failure of the officers to clarify their statements

10   in a timely way; the failure of the investigators to

11   clearly look at and run down obvious inconsistencies

12   that might have produced, you know, relevant --

13           THE COURT:  So are you wanting the

14   report in, or is it your plan to cross-examine from

15   the report?

16           MR. ODIM:  We don't want the report

17   in.  We simply want to use verbal statements as

18   statements made -- non hearsay statements that were

19   at some point made.

20           THE COURT:  Okay.  All right.  That

21   makes sense.

22           So my understanding with respect to

23   39, it's primarily being introduced just to show the

24   sequence of when certain statements were made, like

25   the shot fired.

```
 1              MR. ODIM:  That's correct.

 2              THE COURT:  I'll allow 39 with the

 3    understanding it does not open the door for this

 4    report to come in in total, but the report may be

 5    used to examine some of the witnesses of what they

 6    did or did not do, what they said or did not say.

 7              Exhibit 40 is summary statements of --

 8    taken by unknown officer.  I think foundation is

 9    going to have to be laid before 40 would come in.

10    Otherwise, it does look to be hearsay.  So I'll

11    sustain the objection at this time with the

12    understanding a foundation may be laid later.

13              41, I may need help with that.  I

14    assume 41 was the report of the deadly force review

15    board, or is it more limited than that?

16              MR. ODIM:  The -- again, we have the

17    reduction of the statement -- the verbal statement

18    that I want to introduce on that one page.  So it's

19    the statement itself --

20              THE COURT:  All right.

21              MR. ODIM:  -- from that one page which

22    we're seeking to introduce, not the paper itself.

23              THE COURT:  I probably should have

24    looked at 41 instead of assumed what it was.  All

25    right.
```

1          Are you going to have some witness to

2    lay a foundation for this page?

3               MR. ODIM:  Yes.

4               THE COURT:  Okay.

5               MR. ODIM:  The witness scheduled on

6    that is Jennifer Bills.

7               MR. FRANZ:  The problem is, Your

8    Honor, Jennifer Bills was not at the scene so I

9    don't see how they bring someone to make a statement

10   about something they didn't -- don't have personal

11   knowledge.

12              THE COURT:  Well, are the witnesses

13   that she's referencing here going to testify?

14   Because otherwise it seems to me it's hearsay, that

15   she's just -- you know, we're just introducing

16   statements made to someone else.

17              But if they are going to testify and

18   they testify inconsistently with this, it seems to

19   me it would come in.

20              MR. ODIM:  To be clear, the verbal act

21   -- the verbal statement that we're looking to

22   introduce is in the third paragraph, and it's the

23   last sentence.  And it says quote, Babb fell to the

24   ground inside the door frame, dropping the rifle.

25              And that is -- that is the verbal act

```
 1    that we consider relevant.

 2                   THE COURT:  And that's a statement of

 3    Officer Stutesman.  Correct?

 4                   MR. ODIM:  No.  That's the statement

 5    of the deadly force review board of which Jennifer

 6    Bills was the chairman.

 7                   THE COURT:  Right.  But doesn't it say

 8    Officer -- it begins by saying Officer Stutesman

 9    stated, and then -- which would be a statement of a

10    party opponent and it would come in as non hearsay?

11                   MR. ODIM:  I'm sorry, I've missed

12    the -- that -- Officer Stutesman says he observed.

13                   THE COURT:  So if we're talking about

14    the third paragraph, and that's what you are hoping

15    to introduce, it seems to me that this is a

16    statement, including "Babb fell to the ground inside

17    the door frame, dropping the rifle," of Officer

18    Stutesman, so it would come in as his statement.

19                   MR. FRANZ:  It's not Officer

20    Stutesman's statement.

21                   MR. ODIM:  Yeah.  And so the -- the

22    point ultimately is that the prior statements made

23    by the officers was that Babb fell to the ground

24    with a rifle in his right hand.  But the statement

25    of the deadly force review board in issuing its
```

1    report was that the rifle dropped.  And it is that

2    inconsistency that this verbal statement intends to

3    contrast.

4                    THE COURT:  But where did that

5    statement come from?  I mean, I think you're going

6    to have to establish where that statement came from.

7    Otherwise, we're just having a non witness make a

8    finding.  How do we test that without knowing who

9    said it?

10                   MR. ODIM:  Well, Your Honor, that's

11   the point.

12                   Jennifer Bills was presented with a

13   PowerPoint by the lead investigator.  One of those

14   PowerPoint slides contains the language that Babb

15   fell back with a rifle in his right hand.  Yet, in

16   spite of -- that's the only data that we have that

17   appears to have been presented to the board.  Yet,

18   in spite of that, the final report says he dropped

19   the rifle.

20                   Now, I want to ask Jennifer Bills how

21   did you get from point A to point B.

22                   THE COURT:  Okay.  I'll let you

23   explore that.  Thank you.  So I'll overrule the

24   objection.

25                   MR. FRANZ:  Well, Your Honor, just to

```
 1    make it clear.  The lead investigator was OSP, so
 2    what OSP tells Bills is hearsay.
 3                    THE COURT:  Well, I think he gets to
 4    explore where that came from and why -- I mean, why
 5    is that in the report.  She may just say it's a
 6    mistake.
 7                    MR. FRANZ:  Well, it's not a mistake.
 8    I'm not even sure she made that statement.
 9                    THE COURT:  Well, I think they get to
10    explore why there seems to be an inconsistency in
11    this report with what the witnesses are saying.
12    It's not a huge inconsistency, and it may not go
13    anywhere, or it may, but I think they get to explore
14    it and use the exhibit.  So I'll allow it.
15                    MR. FRANZ:  Another thing, too, is
16    everything else going to be redacted?
17                    THE COURT:  I assume so.
18                    MR. ODIM:  Yes.  All I want is that
19    verbal statement.
20                    THE COURT:  Let's redact the rest of
21    it then.
22                    Exhibit 42, I think you're going to
23    have to lay a foundation for that as well.  If it is
24    a statement of Stutesman and he adopts it or if some
25    other witness can clarify that it's his statement it
```

1    would come in.  So 42 is subject to a foundation.

2                    Exhibit 43 and 44, overruled.

3                    I think that covers exhibits.

4                    And then there's objections to

5    witnesses.  So let's start with defense objections

6    to Plaintiff witnesses.  First, there's Lee Babb.

7    He's the father of Brian Babb.  Plaintiff agreed to

8    certain limitations.  With those, I'll -- he may

9    testify, understanding the limitations that the

10   plaintiff agreed to.

11                   There's an objection to the testimony

12   of Becky Higgins.  Overruled.  She may testify about

13   the facts surrounding her phone calls with Mr. Babb

14   both with the 9-1-1 and with him and her

15   relationship with him in general.

16                   MR. FRANZ:  Your Honor, you know, all

17   the information that she received -- is she limited

18   just for the information she received from Brian

19   Babb?  So she said a lot of other things that were

20   not conveyed to the officers and she conveyed her

21   own thoughts.

22                   THE COURT:  Who is she conveying them

23   to?

24                   MR. FRANZ:  She's talking to some

25   operator, 9-1-1.  That's one conversation.  Then

1    dispatch is relaying part of that to the officers.

2    Everything she's saying to dispatch is not going to

3    the officers.  But if she's going to testify as to

4    what Babb told her --

5              THE COURT:  I mean, my thought is

6    she's going to testify as to what Babb is telling

7    her on the phone and what she's trying to convey to

8    the police about what's going on.  And the jury will

9    -- I mean, obviously you're going to want to clarify

10   only if pieces of this were conveyed to the actual

11   officers at the scene.

12             I think it would be difficult to try

13   to narrow in on what specifically she's going to say

14   she said that was then forwarded to the officers at

15   the scene so --

16             MR. FRANZ:  We know exactly what was

17   forwarded to the officers on the scene because we

18   have the dispatch tape.

19             THE COURT:  But she doesn't.  How is

20   she going to testify to that?  Can you just testify

21   as to what you told the officers that got forwarded

22   to the scene?  What's in there that she said that

23   didn't get forwarded that's particularly

24   prejudicial?

25             MR. FRANZ:  I have no problem if it's

1    just what Babb said.  If she's just going to relay

2    what Babb said, I'm fine.

3                 MR. ODIM:  She is a fact witness, and

4    this is the start of the event.  The whole context

5    includes what she said and what was transmitted

6    about what she said.

7                 THE COURT:  I agree.  I'll allow in

8    the testimony.

9                 There's an objection to Dustin

10   Sprague.  He's the lead investigator into the

11   shooting.  It's overruled.

12                There's an objection to David Silano

13   testifying.  Overruled.  He can testify about the

14   presence and location of a 9 millimeter handgun.

15                MR. FRANZ:  Your Honor, can I touch on

16   that issue?

17                THE COURT:  Yes.

18                MR. FRANZ:  So Becky Higgins tells

19   dispatch that he has a 9 millimeter to his head.

20   Okay?  Now, they want to show that the 9 millimeter

21   was in the pickup.  Officers aren't told that the

22   9 millimeter is in the pickup.  What relevance does

23   that have?  That something's they absolutely did not

24   know.  But it proves Mr. Babb is lying?

25                THE COURT:  It's unclear to me what --

1    the relevance of it.  From what I'm hearing, there's

2    a 9 millimeter gun involved in a shooting.  I kind

3    of assume there's some relevance.

4                    But what is the relevance of the 9

5    millimeter?

6                    MR. ODIM:  Well, we don't -- the post

7    shooting investigation appeared to conclude

8    definitively that he had shot -- Babb had actually

9    shot a 9 millimeter pistol in his house in the hours

10   preceding -- or the hour or two preceding the

11   presence of the police.  Well, we don't think that's

12   the case.  We think that he hadn't shot anything.

13   That 9 millimeter pistol that he allegedly shot was

14   in the truck.

15                    And this gets back to the question of

16   imputing to Babb behavior that he didn't exhibit,

17   not following up clear inconsistencies in regard to

18   the investigation, so it's part of the whole scene

19   and so it's relevant in that respect.  It's not

20   frivolous in that sense.

21                    THE COURT:  All right.  I'm going to

22   allow it.

23                    Lieutenant Jennifer Bills, how limited

24   is her testimony going to be?

25                    MR. ODIM:  She is primarily very

1  limited, and it's on that verbal statement in the

2  report.

3           Point of clarification, though.  One

4  of the reports actually says that Jennifer Bills was

5  at the scene with Sprague.  This statement that she

6  wasn't at the scene is incorrect.  So if she opens

7  the door to something, then who knows.

8           THE COURT:  All right.  I mean, I

9  think -- well, I'm going to allow her testimony.

10  She can certainly as to that specific statement in

11  the exhibit that we discussed earlier.  And any

12  further testimony is going to just have to be

13  subject to ad hoc objections.

14           I don't think I can look at her

15  testimony as a whole right now and start determining

16  what she can and can't say.  A lot of it's going to

17  depend on whether there are any inconsistent

18  statements she can talk -- speak to or whether she

19  was at the scene.  But at least it sounds like right

20  now it's somewhat limited to the statement in the

21  exhibit that's been referenced.

22           MR. FRANZ:  So as my cross-examination

23  I can't -- can I go and say, Okay, did the board

24  find it was justified?  Yes.

25           THE COURT:  No.  I mean, I really

```
 1    don't want these other boards -- I mean, in any kind
 2    of civil case there's often some other board, Bureau
 3    of Labor and Industry, making findings that I would
 4    never allow in because I don't want the jury to
 5    decide, well, some important group has already
 6    decided this issue for us, so why should we?  So
 7    generally speaking I don't allow in those kinds of
 8    findings.
 9              If we start fighting about that, then
10    we start bringing in the DA and their findings.  We
11    start bringing in any group that decided that they
12    wanted to review what occurred and make a finding.
13    So I don't want the jury's decision being supplanted
14    by that.
15              Stephanie Babb, Brian Babb's mother,
16    the plaintiff has agreed to withdraw her as a
17    witness.
18              Ronda McGowan, Brian Babb's sister,
19    I'll overrule the objection.
20              Then Plaintiffs' objections to defense
21    witnesses.
22              Defendant William Stutesman, I'll
23    overrule the objections.  He may testify to his
24    training and may reference relevant sections of
25    Exhibit 203, the dispatch recording.
```

```
 1                    Other objections regarding hearsay and
 2      proper opinion evidence really, I think, have to
 3      just be made at trial because I just don't have
 4      enough context to know how to rule on those right
 5      now.
 6                    The testimony of Matthew Grose is
 7      overruled.
 8                    Objections to the testimony of Nathan
 9      Pieske is overruled.
10                    Joseph Kidd, overruled.
11                    Derek Dewitt, overruled.
12                    Sergeant McAlpin, overruled.
13                    Scott Vinje, overruled.
14                    There's objections to the testimony of
15      Judson Warden specifically with that witness
16      referencing Exhibit 216.  If relevance is
17      established at trial, I'll rule then.  There may be
18      an objection.  But -- so I'm overruling at this time
19      with the understanding that if there's not a
20      relevant reference to Exhibit 216, I'll sustain at
21      that time.
22                    The testimony of Dr. Daniel Davis, I
23      don't think anybody would be surprised that the
24      medical examiner was available to testify at trial.
25      His report was available.  Plaintiff did attempt to
```

```
1    confer on this issue back in August.  So I'm not

2    going to sustain any objections to his testimony on

3    technical grounds.  So I will allow him to testify.

4              I guess, Mr. Franz, I mean, this isn't

5    exactly a cause of death case and you have

6    Dr. Freedman.  I mean, is Dr. Davis testifying just

7    to establish that they photographed and tried to

8    preserve the trajectory of the bullet and

9    Dr. Freedman is then going to testify from there?  I

10   mean, the entire autopsy report, it seems a little

11   overkill in a case where this isn't a who done it or

12   how did it occur.

13             MR. FRANZ:  We're not going to

14   introduce the autopsy report.

15             THE COURT:  Okay.

16             MR. FRANZ:  Just the lab findings on

17   intoxication.

18             THE COURT:  Correct.

19             MR. FRANZ:  And then the direction of

20   the bullet went here.  The bullet came out of here.

21   And so that if you take it -- you can -- the jury

22   can just decide what they want to do with the head.

23   They can take the head like this, which points like

24   it's down aiming, and they can put the head wherever

25   they want.  These guys aren't going to tell them if
```

```
 1    you put a pin through it, here's where the bullet
 2    went and came out.  Twist the head however you want.
 3                    THE COURT:  Okay.  I'll allow his
 4    testimony.
 5                    There's objections to testimony of
 6    Maggie Peyton, James Antonini, Stephanie Woodcock.
 7    They may testify to any prior acts that are relevant
 8    to life expectancy, habits, health, industry,
 9    sobriety, and thrift.
10                    So they can testify to some of these
11    issues around alcohol use.  Mental illness.  There's
12    issues around the restraining orders and use of
13    firearms.  Plenty of Fish is out, but otherwise I
14    think the probative value of these prior acts
15    outweigh the prejudicial effect because they really
16    do go to the heart of damages in the case.
17                    MR. ODIM:  Clarification, Judge.
18                    THE COURT:  Yes.
19                    MR. ODIM:  Is the defense barred from
20    eliciting testimony about Plenty of Fish?
21                    THE COURT:  Yes.
22                    MR. ODIM:  How did you meet Brian
23    Babb.  Right?
24                    MR. FRANZ:  Well, Maggie would say she
25    met Brian Babb on Plenty of Fish.
```

```
 1                  THE COURT:  How about we just say
 2      social website.  Plenty of Fish just sounds -- I
 3      don't know -- I don't know if it's -- somebody told
 4      me it's a religious website with the whole fish
 5      thing, but it sounds to me like that terrible overly
 6      white male statement of there's plenty of fish in
 7      the sea.  It's sound very anti-women, and I don't
 8      think he should be held to that.  So, right, she can
 9      testify she met him online or on social media.
10                  There's an objection to Linda Realls
11      (phonetic).  It may be that her in-court statement
12      will be inconsistent with her deposition testimony.
13      That doesn't mean she can't testify.  That means you
14      can impeach her with any of her inconsistent
15      statements, so I'll overrule.
16                  MR. ODIM:  Before we move from
17      Ms. Realls, there is a matter that has arisen in the
18      last week.
19                  MR. STROTH:  We've got information
20      from the witness -- I don't know if you want to talk
21      in sidebar or in open court -- that the opposing
22      counsel has potentially intimidated or tried to
23      intimidate this witness to potentially change her
24      statement in the last two weeks.
25                  MR. FRANZ:  That's completely false.
```

1          MR. STROTH:  We have email

2    correspondence from the witness specifically saying

3    those types of things.

4               THE COURT:  Well, those are often just

5    ripe issues for examination.  And my guess is it

6    would be relevant.  You could present it to her if

7    she -- whether she -- the jury will determine

8    whether it was reasonable or not that she felt

9    intimidated by any communication with any attorney

10    about her testimony.

11               So, I mean, that goes towards bias,

12    motivation to lie, all those kinds of issues that

13    are going to be relevant, and it's certainly subject

14    to argument.

15               MR. STROTH:  Okay.  That's fine.

16    Thank you.

17               THE COURT:  There's an objection to

18    Detective Dustin Sprague.  I'm going to overrule

19    those objections.  He may testify about evidence

20    that is relevant to the issue of whether Mr. Babb

21    was planning on committing suicide.

22               There is an objection to the testimony

23    of Eric Hubbard, and this has to do with the

24    incident where Brian Babb allegedly pointed a

25    handgun at Connor Babb.  So I'm denying in part,

1    granting in part.  It may be that Connor Babb will

2    admit to the incident, but otherwise his statements

3    would come in as a party opponent.  But if there are

4    statements of a non party, those would be hearsay

5    unless they testify.

6              So keep that in mind, that if the

7    report is going to come in, and Mr. Hubbard is going

8    to testify, he may have to limit his investigation

9    to what he was told by Connor.  I think that's the

10   salient piece.

11             Okay, that gets us into the motion to

12   bar experts.  Primarily I'm going to focus on the

13   defense exhibits.  I think the plaintiffs' experts

14   are -- a lot of it just depends.  It's just

15   rebuttal, right?  I mean, those would come in to

16   really testify about the accuracy of the data

17   collected by the plaintiff -- defense witnesses.

18             So the first defense witness is Joseph

19   Craig.  He's gathered information from the scene,

20   from witnesses, and from his various measurements,

21   along with data obtained by Mr. Kluse (phonetic).

22   He does a couple of things.  He creates a 3-D

23   software -- or uses a 3-D software program to create

24   a depiction of the scene.  And he's using stand-ins,

25   and based on measurements and witness testimony, he

1    attempts to reenact certain aspects of the incident.

2              A lot of this is to determine who

3    could see what at particular times, of whether the

4    video in the bobcat, which doesn't appear to show

5    anybody in the doorway, is as accurate as what a

6    human being would see if they were looking towards

7    the doorway at a certain measurement.

8              None of this is remarkable.  I mean, I

9    guess it's a little more high tech than what we had

10   when I was an attorney but, I mean, I did bring in

11   nontechnical investigators to create reenactments of

12   the scene based on measurements and data to create a

13   re-creation of the scene.  Of course, then it was

14   drawings and photographs and actual 3-D

15   representations to tables.

16             The only thing unique about this is it

17   uses some software to create a reenactment, and

18   there's really no challenge to the software itself.

19   I mean, Mr. Craig is trained in this area.  He's an

20   expert in creating these things.  I don't think it

21   takes expert -- you can have high school kids

22   recreate a scene.  I mean, this is just -- what's

23   significant is is the data reliable, and in his

24   report he certainly has put forth enough information

25   in this record to show at least by a preponderance

1    that he was using reliable data allowing him to

2    testify.

3                Now, he's certainly subject to

4    cross-examine about the reliability of the

5    information he was using, and certainly rebuttal

6    experts can testify that his measurements are wrong,

7    he placed people in the wrong spot, those kinds of

8    things.

9                So I'll allow him to use the data.

10   I'll allow him to testify about what people could

11   have seen from certain vantage points.  The one

12   thing I will not allow him to testify, though, is

13   that there was -- his opinion that there was not an

14   opportunity for the police to covertly plant the

15   rifle.  That's going to be a factual determination

16   for the jury.

17               He can certainly testify about where

18   people were and what kind of time frame is elapsing

19   for the jury to make that decision, but I think

20   that's a decision for the jury and not really the

21   province of any kind of expert.

22               Furling Cross (phonetic) used standard

23   forensic tools searching Mr. Babb's computer.  He

24   may testify to what was found as long as it's

25   relevant to any issue in this case.

```
 1                  Now, I guess I'm maybe not clear
 2     exactly what he found.  He was searching
 3     specifically for anything having to do with suicide
 4     which would be relevant, but am I right the only
 5     thing that was found was the Plenty of Fish?
 6                  MR. FRANZ:  Yeah.  So we're not going
 7     to use him then if we don't have to establish Plenty
 8     of Fish.
 9                  THE COURT:  Okay.  So he's not going
10     to be testifying.
11                  Doug Carner, he's qualified in the
12     field of audio video forensics, and using accepted
13     software he's created a synchronized overlay of the
14     various audio and video records made at the time of
15     the incident.  His credentials allow him to do this.
16                  Again, certainly the data can be
17     challenged but, I mean, using this kind of
18     information is what a jury needs to help them
19     determine what happened when.  It would be very
20     difficult to present this to the jury, these
21     different recordings, all with their own time
22     stamps, as separate issues.
23                  I mean, at the very least, if you
24     hadn't had an expert, I would be telling you -- each
25     of you to create your own time line based on the
```

1    information you have from these various recordings

2    for the jury to look at.

3                    I think Doug Carner accomplishes that,

4    at least from the perspective of the defense time

5    line.

6                    Now, other experts can testify that

7    it's incorrect in terms of its timing, but I'll

8    allow the testimony.

9                    Dr. Freedman, he's a medical doctor

10   with extensive experience with gun shots in an

11   emergency room setting.  I think he can testify

12   about the trajectory of the gun shot.  I guess I'm a

13   little concerned with him -- and that the head was

14   tilted.

15                   I guess I'm a little concerned with

16   him testifying that it's consistent with somebody

17   holding a rifle to their shoulder.  It seems to me

18   that he's -- he's just saying, Yep, it could have

19   happened that way.  It's really a jury issue to

20   determine, I think, whether Mr. Babb was or was not

21   holding a rifle.  That really goes to the heart of

22   the case.

23                   I think he's going to be able to

24   testify enough in terms of the position of the head

25   and the trajectory of the bullet for the defense to

```
1    argue the consistency with their theory that

2    Mr. Babb was holding a rifle, but I'm not going to

3    allow him to opine what Mr. Babb was doing at the

4    time.

5              MR. ODIM:  Judge, may I make an

6    observation?

7              THE COURT:  Yes.

8              MR. ODIM:  On the question of

9    trajectory, there are two quantums of trajectory if

10   we can quantify.  There's a trajectory by units from

11   the bullet, to the body, to the skin, and there's

12   the trajectory of the bullet from the skin into the

13   anatomy, into the body.

14             Is the trajectory that the Court is

15   talking about just trajectory from the moment the

16   bullet struck the body?

17             THE COURT:  Yes.

18             Now, I haven't seen that he's done

19   some forensic analysis with lasers, for example,

20   which is what we would typically see to show the

21   trajectory of where the bullet was fired from.  I

22   mean, obviously we're going to have testimony where

23   Stutesman was, I assume, at the time that it was

24   fired, but the trajectory is within his limited

25   range of expertise and what he looked at.  But I
```

1    haven't heard anything that he set up lasers and did

2    that kind of analysis.

3                Thank you for clarifying that.

4                Okay.  Anything else with regard to

5    evidence?  I know there was a lot there.  We'll

6    certainly get a minute order with the specifics.

7                MR. ODIM:  There is one general

8    matter.  I don't know that it's controversial.  But

9    having said that, surprises always occur during

10   trials.

11               There are extensive admissions in the

12   answer to the complaint that the plaintiff intends

13   to rely on during trial.  There are over 70

14   specifically itemized admissions that are prefaced

15   with the phrase "Defendants admit that."

16               To the extent that Counsel and I can

17   talk and sort of avoid my having to object to an

18   attempt to change the judicial admissions, I hope

19   Counsel and I will be able to do that, but Plaintiff

20   intends to rely on those judicial admissions.

21               THE COURT:  Okay.  What I would

22   suggest is -- I think sometimes it can get a little

23   burdensome just to throw the pleadings at the jury

24   and say, "Look at all this," is take the specific

25   paragraphs from the complaint and follow them with

1    the specific admission that -- I assume they are

2    admitting to specific factual paragraphs within the

3    complaint?

4                    MR. ODIM:  That's correct.

5                    THE COURT:  Just create an exhibit for

6    me.

7                    MR. ODIM:  Right.  Okay.  So I'll do

8    that.  I have the admissions here.  I'll share that

9    with Counsel so we have our talking points.  I will

10   add, subsequent to this meeting, the complaint

11   paragraphs to that, and there will be a running list

12   then.

13                   THE COURT:  And the jury will have an

14   instruction that evidence includes everything the

15   parties have admitted to or have stipulated to, so

16   let's get it to them in writing.  I think it's

17   easier to do that than throw entire pleadings at

18   them or to just talk about them.

19                   Okay.  With regard to voir dire, let's

20   talk a little bit about that.

21                   As you may now know, I'm coming from

22   state court for many years, I much prefer the

23   attorneys managing voir dire.  You know the case

24   much better than I do.  I think it gives you an

25   opportunity to have more robust discussion with the

1    jury than what we're used to in federal court.

2                    Generally it's been much shorter than

3    my expectations, and that's always been a good

4    thing.  Sometimes in state court it went a little

5    longer than I would have liked.

6                    I'd like to pick a jury in the morning

7    the first day.  I'd like to give each of you

8    basically an hour and 15 minutes to question the

9    jurors.

10                   Looking at your questions, there's

11   only a few of the plaintiffs' questions that I'm

12   going to strike and that's 21, 22, 23, and 24.  I

13   think I'm primarily striking them -- they are very

14   broad questions that could lead to -- the discussion

15   could go on all day, and I don't think they are

16   particularly probative of the qualifications of the

17   jury.

18                   But all of your questions otherwise

19   look great.  Some of them seem a little repetitious,

20   so I'm going to assume that you're going to whittle

21   them down and focus them in in your hour and 15

22   minutes.

23                   But I want you to tell me if I'm being

24   unrealistic about that much time.  I'm kind of

25   basing it on -- I have yet to have -- not like we

1    have tons of trials in federal court, but I've yet

2    to have one where we haven't picked a jury in the

3    morning.  But you have a lot more questions than

4    most people have had, so I want to know if it's

5    realistic or not.

6              MR. ODIM:  From the plaintiffs' side,

7    I think it is realistic.

8              MR. FRANZ:  Can you explain how you're

9    going to seat the jury?  How do you want us -- are

10   you going to do any voir dire at all?

11             THE COURT:  Mr. Spalen (phonetic) will

12   get you this week just the general questions the

13   jury is going to answer, and they are what you

14   probably can expect.  They are going to tell us

15   their name, what they do for a living, if they are

16   retired, what they did.  What part of the state do

17   they live in.

18             And for the plaintiffs -- I mean, the

19   Eugene division is huge, by the way.  I don't know

20   if you've looked at it, but we're going to have

21   people from the coast.  We're going to have people

22   who are coming over the mountains.  It's been a

23   little snowy so the people from Bend and Deschutes

24   County, they are going to be staying here in hotels

25   so they get antsy about -- I can just tell you that

1    they get antsy with both sides about how much time

2    is being used if it doesn't look like it's

3    productive because they really are leaving their

4    homes for a big chunk of time.

5              In some jurisdictions the entire

6    circuit is a quarter of the size of Oregon, but our

7    division is large so it means jurors are traveling

8    from small communities -- a lot of small communities

9    -- and sometimes great distances, as much as -- I

10   don't know, Char, it's got to be over 200 miles away

11   for some of them.

12             How many jurors are showing up on

13   Tuesday morning?

14             THE CLERK:  I just inquired.  I had

15   originally asked for a larger pool because of the

16   length of the trial.

17             THE COURT:  Okay.  So Ms. Pew will

18   have an idea how many jurors are going to be here.

19   If we can fit them all with chairs in front, you

20   will have a big panel here.  It's a long trial.  We

21   try to excuse those with hardships that are just

22   telling us I can't travel from Deschutes County

23   because I don't have a reliable vehicle.  Those kind

24   of folks -- you know, hopefully we've already kind

25   of dealt with them, but -- we may have enough people

1   that we're going to have to have some people in the

2   gallery.  We'll try to put as many as possible in

3   front.

4              We'll pick eight jurors.  All eight

5   will stay throughout the trial and deliberate.  But

6   that gives us a cushion of two jurors if we were to

7   go down to six.

8              Once you're done asking questions --

9   I'm not trying to lecture any of you or tell you

10  what you don't know -- but sometimes this confusion

11  has come up where we go into the back.  I usually

12  take the attorneys then to the jury room, put all

13  the jurors in the back, and we select the eight

14  jurors.  But sometimes we get back there and then

15  all of a sudden I'm hearing motions for cause.

16             So if you're done with your voir dire,

17  and you say, "I'm done.  I pass this jury," that's

18  it.  If you need to raise a for cause challenge, you

19  don't have to scream, "Judge, I want this juror off

20  right now."  You can look at me and say, "Judge, do

21  you want to inquire as to this juror's

22  qualifications," and that's a hint to me that you're

23  raising a for cause challenge.  I'll probably speak

24  to them a little bit and either remove them or not,

25  but we need to do that in the courtroom.

1              And then we'll do our peremptories.

2    You will each have three in the jury room.  And then

3    we'll come out and bring the jury up.

4              Before voir dire, it would be helpful

5    to me to be able to read to the jury a neutral

6    statement of the case, so I do ask that both of you

7    to confer and present to me a very brief neutral

8    statement of the case just so they know that this

9    case is about a police shooting.  This is what the

10   plaintiff alleges.  This is what the defense

11   alleges.  Something that simple in case it jogs any

12   memory.  You know, I believe there was some media

13   coverage of this locally at least.  But it might jog

14   some memory -- so that we can have those

15   discussions.

16             So I will get to you this week the

17   questions that -- the general questions that they

18   will have that they'll answer first before voir dire

19   -- before the attorney's voir dire.  I'll get you

20   the general instructions that I'll give the jury at

21   the beginning of the case.  What is evidence.

22   What's not evidence?  Direct and circumstantial

23   evidence.  Duties of jurors.  Those kind of just

24   general instructions.  How to assess credibility.

25   You will have those.  You will know what

1    instructions I'm giving at the beginning.

2                    If you want to record voir dire, it

3    does slow things down a little bit.  Generally our

4    court reporters want all the jurors to have a

5    microphone in their hand.  We can do it, but it does

6    require my law students to be running around with

7    microphones.  And sometimes it's awkward.

8                    So I prefer not to record voir dire.

9    Now, if there were some kind of challenge that we

10   need to put on the evidence, the court reporter

11   could come down immediately and we could go on the

12   record.  If you tell me we want voir dire on the

13   record, we'll do it.  You have a right to that.  But

14   just remember there's going to be law students

15   handing out microphones before they can answer.

16                    MR. ODIM:  On plaintiffs' side, no

17   recording of voir dire except for issues that relate

18   to cause.

19                    THE COURT:  Okay.

20                    MR. FRANZ:  That's fine with the

21   defendants.

22                    THE COURT:  Next issue is jury

23   questions.  I have mixed feelings about them.  I

24   think they are helpful to the attorneys.  They are

25   not always helpful to the case.  One -- I mean,

1    invariably in my criminal cases in state court

2    somebody would say, you know, why isn't there DNA

3    evidence?  Of course, you know, the prosecutor is

4    thinking, well, because we have a video recording.

5    Right?

6                   So it allows you to kind of address

7    things maybe in your closing or with your witnesses

8    to calm down whatever issue a particular juror might

9    have.  Sometimes the questions are very, very

10   helpful.  But if the parties want -- agree to juror

11   questions, what I do is simply tell the jurors at

12   the beginning of the trial that you're not an

13   inquisitional body.  We rely on the attorneys to ask

14   the questions of the witnesses.  But if you have a

15   question that you feel isn't being asked that should

16   be answered, you can put it in writing.  If you hold

17   it up, Ms. Pew will take it from you and show it to

18   me.  If it can be asked, I'll make a copy of it and

19   you will each get it, and you can ask it if you

20   want.

21                   I'll tell the jury that if the witness

22   is gone we're not going to call the witness back.

23   The only caveat is you don't get to stand up and

24   say, "I am now asking the most insightful question

25   of one of our jurors."  You either ask it or don't

1    ask it without any reference to it being a jury

2    question.

3                    If you're doing done with

4    cross-examination and we're in redirect and you want

5    to ask it, signal to me and you will get the chance

6    to ask it.

7                    But I'll leave it up to you whether

8    you want to ask it or not.  If it's objectionable --

9    you know, in a car accident case somebody might ask

10   is there insurance? -- I just tuck that away and I

11   show it to you later that somebody was concerned

12   about it.

13                   So that's my general approach to jury

14   questions.  I will say that short trials we don't

15   usually get any or many.  This case is going to be

16   longer, and I think jurors start to get comfortable,

17   and start thinking about the evidence more, and they

18   may have questions as time goes on.

19                   I don't know if in your jurisdiction

20   whether you routinely do jury questions?

21                   MR. ODIM:  It depends on the judge,

22   but we've had them done.

23                   THE COURT:  All right.  If anybody has

24   a strong objection, let me know.  Otherwise, that's

25   what I'm going to tell the jury and that will be the

1    process we'll use.

2                    That is all I have.

3                    Now, in terms of the technology in the

4    courthouse --

5                    MR. STROTH:  Your Honor, one quick

6    question.

7                    THE COURT:  Yes.

8                    MR. STROTH:  We like the idea of doing

9    summations, and so how would you want to allocate

10   timing as it relates to summations during the trial?

11                   THE COURT:  Okay, tell me a little

12   bit.  I've always been curious about summations, and

13   I've asked people to do them in the past usually

14   when I'm sensing the jury is confused.  But where

15   are you thinking you would do summations?  Like

16   breaking up parts of the trial?

17                   MR. STROTH:  Well, there's natural

18   breaks during certain key testimony that we think

19   would be a natural opportunity for us to tell the

20   jury what they just heard to make sure there's

21   clarity.

22                   MR. FRANZ:  I object.

23                   THE COURT:  Okay.  So you're talking

24   about summations after the fact, not the following

25   witnesses -- we're now shifting -- you know, often

```
1    it's the plaintiffs, we're now shifting to issues of

2    damage.  Here are the witnesses who we're going to

3    call, and this is their general testimony.

4                    MR. STROTH:  We're talking about after

5    certain evidence is presented to just say very

6    briefly here is a summary.

7                    We've done it with other judges in

8    different districts.

9                    THE COURT:  I'm not familiar with it

10   so I'm going to have to think about that and see

11   if -- I'm not familiar with any judges doing it in

12   the Oregon district.  We're not the most creative

13   group, though.  There's only six of us, and we're

14   pretty conventional.  I'm inclined not to allow you

15   to do it so I would not start preparing them.  I'm

16   going to talk to a couple of our judges who I think

17   try to do different things maybe just to see them if

18   any of them have used it and what their experience

19   is, and they may be able to convince me to change my

20   mind.  But right now I'm a little hesitant to do

21   that.  Okay?

22                    MR. ODIM:  Just one last input on that

23   issue.  When we've experienced it in the 7th Circuit

24   in particular, the judges have allocated a certain

25   amount of time to each side.  So, for instance,
```

1   you've got 30 minutes each side, and each side can

2   use it any way they want wherever they want in the

3   witness line.

4               THE COURT:  All right.  I don't think

5   today you're going to push me into allowing it, but

6   I'll at least give it some thought and talk to some

7   folks.  I just don't have experience with it, and

8   it's starting to sound like it's going to be

9   cumulative.

10              You know, the facts in this case -- I

11  know there's a lot of evidence, but both sides'

12  theories are pretty straightforward factually.  I

13  don't think there's going to be a lot of confusion

14  about what your positions are on the facts and how

15  they should be interpreted.

16              Anything -- oh, technology in the

17  courtroom, please work with Ms. Pew about learning

18  how to use the technology.  She will be able to walk

19  you through all of that.

20              I would suggest, only because I think

21  it's awkward in this courtroom, is we have screens

22  in front of the jurors for them to track your

23  evidence.  It's great during trial when witnesses

24  are testifying, but my experience is when attorneys

25  rely on exhibits during closing argument or maybe

```
 1   even opening, it's kind of like being at the table

 2   with your kids where they are all looking at their

 3   cell phones and they are not looking at you.

 4              So we can turn those off and bring the

 5   screen beside you so it's a little bit more of a Ted

 6   Talk and you're getting their attention as opposed

 7   to having them focus on television screens.  So Char

 8   will explain all that to you.

 9              Your team is going to meet or at least

10   talk to Mr. Osborn.  David will help you set up so

11   that we can get that one witness via video.  I

12   assume we can get him on the big screen in front of

13   everyone.  That worked very well last week for us in

14   Pendleton.

15              Anything else we need to discuss

16   today?

17              MR. ODIM:  Not from the plaintiffs'

18   side.

19              MR. FRANZ:  Your Honor, is Plaintiff

20   intending to ask Sprague anything about whether the

21   weapon was loaded or unloaded?

22              MR. ODIM:  Is that a question directed

23   to Plaintiff or to the Court?

24              MR. FRANZ:  Well, I kind of addressed

25   it this way.
```

1          THE COURT:  What's the answer?  Do we

2    know?

3          MR. FRANZ:  We know.

4          MR. ODIM:  I'm sorry, I was too busy

5    trying to be witty to hear the end of the question.

6    Please ask me the question again.

7          MR. FRANZ:  Are you going to offer

8    evidence that the weapon was unloaded?

9          MR. ODIM:  Which weapon?  The 9

10   millimeter?

11         MR. FRANZ:  The one on the porch.

12         MR. ODIM:  I hadn't particularly

13   focused on that as an issue.  I think it's going to

14   come in as an unloaded rifle.  Isn't that the

15   evidence that's unrebutted?

16         MR. FRANZ:  It's something the

17   officers did not know.

18         THE COURT:  Correct.  But I would

19   think the defense would want it in under the

20   argument that he's pointing an unloaded firearm with

21   the idea he's trying to commit suicide.

22         MR. FRANZ:  Right.  I mean, I think

23   it's very favorable to the defense.  I just want to

24   make sure we're on the same page, that it's coming

25   in without any objection.

```
 1                     THE COURT:  I assume it's part of the

 2      case and it's coming in, so I'll allow the evidence

 3      to come in and it doesn't matter who presents it.

 4                     MR. FRANZ:  When we do opening, first,

 5      time limit, and then how much of the evidence do we

 6      play?  Or do you want some kind of streamlining,

 7      Your Honor, that the entire tape be played?  What's

 8      your feeling on that?

 9                     THE COURT:  How long is the tape

10      itself?

11                     MR. FRANZ:  See, that's the problem.

12      30 minutes.

13                     THE COURT:  Okay.

14                     MR. FRANZ:  35 minutes.

15                     THE COURT:  Why don't you folks confer

16      about that piece.  I mean, it may be that both of

17      you will want simply the tape to be played in

18      advance.  It's coming in anyways, and it's going to

19      be referenced.  Maybe before even opening statements

20      we just play the thing for the jury and then have

21      you give your openings.

22                     MR. FRANZ:  The last shooting case I

23      had that's what we did.

24                     MR. ODIM:  We'll have to think about

25      that.
```

1           THE COURT:  Confer.  My experience is

2    that -- well, I've seen both things happen.  I think

3    it can be a little cumbersome in opening to play all

4    of it, but I certainly won't stop you from doing it

5    if you think it's significant -- either side thinks

6    it's significant to get the whole thing to the jury.

7               Any exhibits, any evidence that I've

8    now admitted either without objection or I've

9    overruled any specific objection is deemed admitted,

10   it can be used in your opening.

11              If you are creating PowerPoint slides,

12   just share them with the other side just out of

13   caution, because every now and then something slips

14   in that shouldn't be there.  And I would prefer that

15   you each review what exhibits you're going to use

16   during your opening so there's no -- there's nothing

17   worse than trying to start a trial and then the

18   wrong exhibit comes in front of the jury and there

19   was some mistake as to what a ruling was, so if you

20   could share those in advance.

21              Anything else we need to discuss?

22              MR. ODIM:  Again, nothing else from

23   the plaintiff.

24              MR. FRANZ:  Nothing, Your Honor.

25   Thank you.

1          THE COURT:  If things do come up, just

2     email Ms. Pew and I can respond -- and the other

3     side -- and I can respond quickly.

4               And again, if you need to stay today

5     and Ms. Pew can show you how to use the technology,

6     that would be great.

7               And if you need any advice for

8     restaurants, I would suggest -- I don't know if

9     Ms. Pew is the right person to ask.  We have some

10    law students, though, that know where to eat in

11    town.

12         MR. ODIM:  I was heartened when Your

13    Honor asked the correct way to pronounce Stutesman.

14    We've been wrestling with that.  And I think we've

15    been cautioned to pronounce Oregon correctly.

16         THE COURT:  So I am a native

17    Washingtonian, so we always pronounce it purposely

18    wrong.  But I'll tell you there are some judges who

19    -- one judge in particular here who really loves to

20    torture pro hac vice when they pronounce Oregon

21    wrong, so you do have to be careful about that.

22               All right.  Thank you, folks.  I

23    appreciate.  It appreciate all your work on this.

24         THE CLERK:  Court is in recess.

25               (The hearing was concluded at 10:20 a.m.)

1    UNITED STATES DISTRICT COURT    )

2    FOR THE DISTRICT OF OREGON      )

3

4        I, Sara Fahey Wilson, CSR No. 06-0400, a
     Certified Shorthand Reporter, certify:

5

6        That the foregoing proceedings were taken before
     me at the time and place therein set forth, at which
     time the witness was put under oath by me;

7

8        That the testimony of the witness, the questions
     propounded, and all objections and statements made
     at the time of the examination were recorded

9    stenographically by me and were thereafter
     transcribed;

10

11       That a review of the transcript was not
     requested;

12       That the foregoing is a true and a full and
     correct transcript of said proceedings reported by

13   me to the best of my ability on said date;

14       I further certify that I am not a relative or
     employee of any attorney of the parties, nor

15   financially interested in the action.

16       IN WITNESS WHEREOF, I have set my hand this 13th
     day of February 2020, in the City of Eugene, County

17   of Lane, State of Oregon.

18

19

20

21

22   Sara Fahey Wilson, CSR

23   CSR No. 06-0400

24   Expiration Date:  March 31st, 2020

25